Exhibit 1

CHARTER

OF THE

CITY OF YAKIMA

WASHINGTON

COY 000001

## AMENDMENT NO. 11

"That Articles I, II, III, IV, VI, VII, VIII, IX, X, XI, XII, XIII, XIV and XVI of the Charter of the City of Yakima be amended to read as follows and that Article XV be repealed:

## ARTICLE I
### Name, Boundaries, Powers, Rights and Liabilities

SECTION 1. The people of the City of Yakima, within the boundaries as now established, or as hereafter established, shall continue to be the body politic and corporate by name of City of Yakima, and under that name shall have perpetual succession; shall use a corporate seal; may sue and be sued; may acquire property within or without its boundaries for municipal purposes by purchase, gift, devise, lease, or condemnation, and may sell, lease, hold, manage and control such property as its interests may require, except that property purchased for park purposes shall be within the city limits; and except as prohibited by the constitution of the State of Washington, or restricted by this charter, the City of Yakima shall have all municipal powers, functions, rights, privileges and immunities of every name and nature whatsoever pertaining to cities of the first class within the State of Washington.

SECTION 2. The enumeration of particular powers by this charter shall not be held or deemed to be exclusive, but in addition to the powers enumerated herein, implied hereby or appropriate to the exercise thereof, the City of Yakima shall have, and may exercise, all powers which under the constitution and laws of the State of Washington it would be lawful for said charter specifically to enumerate. All powers of the City, whether express or implied, shall be exercised in the manner prescribed by this charter, or if not prescribed herein, then in the manner provided by law, ordinance or resolution of the City Council.

## ARTICLE II
### Officers -- Council-Manager Form of Government

SECTION 1. A. The elective officers of the City of Yakima shall consist of seven Council members, who shall be residents of the City, who shall constitute the Council, and one of whom shall be the Mayor chosen as provided by SECTION 3 of this Article II. One Council member shall be elected from each of four separate districts of the City, and three Council members shall be elected from the City at large without regard to residence in any particular area of the City, by the qualified electors of the City, all at the times and in the manner hereinafter provided. The Council members so elected shall constitute the governing body of the City.

B. (1) The City shall be divided by ordinance of the City Council into four districts as nearly equal in population as practicable. On the publication of the results of each decennial federal census, the City shall be redivided by ordinance of the City Council into four districts as nearly equal in population as practicable, which redivision shall be accomplished so as to be effective not less than ninety days prior to the municipal primary election to be held next following the publication of census results for nomination of candidates for "district positions" on the Council, as defined in Subsection C (1) of this SECTION. On the division or redivision of the City into districts as provided by this subsection, any territory thereafter annexed to the City and contiguous to only one then existing district shall be added to and constitute a part of that district; and if annexed territory is contiguous to more than one then existing district, the annexed territory shall be divided into segments, as nearly equal in population as practicable, according to the number of then existing districts contiguous to the annexed territory and each segment shall be added to and constitute a part of its then existing contiguous district.

(2) Whenever the population of any district exceeds the population of any other district by more than ten percent, the City Council shall by ordinance redivide the City into four districts as nearly equal in population as practicable; provided, that any such redivision shall be accomplished so as to be effective not less than ninety days prior to any municipal primary election for Council members to "district positions" as defined in Subsection C (1) of this SECTION.

C. (1) Not less than ten days before the time for filing declarations of candidacy for the City Council for the election to be held in the year 1979, the City Clerk shall designate by consecutive numbers, commencing with the number one and ending with the number four, the positions on the Council to be filled by candidates nominated from districts, and such designations shall be thereafter permanently considered as separate offices for election purposes as "district positions" according to their permanently designated number. At the municipal election to be held in the year 1979, eight candidates shall be nominated from the four districts, as follows: Candidates for "district positions" shall file their candidacy for nomination by the electors of the district wherein each candidate, respectively, resides. At the primary election, each qualified voter of each district may cast only one vote for a candidate. The names of the two candidates from each district for whom the largest number of votes are cast at the primary election shall appear on the citywide general election ballot, and the one candidate from each district who receives the highest number of votes, as cast by the citywide electorate at the general election, shall thereby be declared as duly elected to each respective "district position" as a member of the City Council.

(2) Not less than ten days before the time for filing declarations of candidacy for the City Council for the election to be held in 1981, the City Clerk shall designate, by consecutive numbers commencing with the number five and ending with the number seven, the positions on the Council to be filled by candidates to be elected from the City at large without regard to residence in any particular area of the City, and such designations shall be thereafter permanently considered as separate offices for election purposes as "at large positions" according to their permanently designated numbers.

D. (1) Council members shall be elected for four-year terms. On the expiration of those terms, succeeding elections shall be conducted so that three Council members are elected at large without regard to residence in any particular area of the City and four Council members elected to "district positions" in the manner provided by Subsection C of this SECTION.

(2) In the event any Council member elected or appointed to an "at large position" moves that member's place of residence outside the city boundary, or in the event any Council member elected or appointed to a "district position" moves that member's place of residence outside the district from which that member was nominated or appointed, then that Council member shall forfeit the office of Council member and the position held by that member shall be deemed to be vacant. In the event a vacancy occurs for any reason in the Council, the vacancy shall be filled by the appointment of some qualified person by a majority vote of the remaining members of the Council, but such appointee shall hold office only until the next regular municipal election, at which time a qualified person shall be elected to serve for the remainder of the unexpired term for that position. If the vacancy occurs in a position held by a Council member originally nominated or appointed from a district, then the appointee shall be a resident of that district and the Council member who is elected to serve for the remainder of that term shall be a resident of that district and shall be nominated and elected in the manner provided by Subsection C (1) of this SECTION.

E. Provision for the time and manner of election of Council members, and the conduct of such biennial elections shall be governed by general state laws, by this charter, and by applicable ordinances of the City as they may be enacted from time to time.

CITY 000061

SECTION 2. The Council shall constitute the legislative branch and authority of the City government and shall have power to adopt rules of order and regulations for the conduct of its business.

SECTION 3. The Council shall choose its own chairman at its first meeting and at the first meeting after the subsequent biennial elections. The chairman shall have the title of Mayor during the biennium for which chosen. The Mayor shall preside at all meetings of the Council and shall also have the powers and perform the duties conferred and imposed by this charter and the ordinances of the City. The Mayor shall be recognized as the head of the City for all ceremonial purposes and by the Governor for purposes of military law. The Mayor shall have no regular administrative duties but in time of public danger or emergency shall, if so authorized and directed by a majority vote of the Council, take command of the police, maintain order and enforce the law. The Mayor shall also have the rights, privileges and immunities of a member of the Council with the right to vote as another member thereof. If a vacancy occurs in the office of Mayor, or in case of the Mayor's absence or disability, a Mayor pro tem shall be elected by the Council from its members to act as Mayor for the unexpired term or during the continuance of the absence or disability.

SECTION 4. Except as otherwise provided in this charter, all powers of the City shall be vested in the Council. The Mayor and each member of the Council shall receive compensation as established by Ordinance. Members of the Council shall be qualified electors of the City and any member ceasing to possess any of the qualifications specified in general law or in this charter or convicted of crime involving moral turpitude while in office shall immediately forfeit his office.

SECTION 5. The Council shall meet at the times and places fixed by ordinance, but must hold at least two regular meetings each month. The Clerk shall call special meetings of the Council upon request of the Mayor or any two members. Requests for special meetings shall state the subjects to be considered and no other subject shall be considered at a special meeting except by consent of all members of the Council. All meetings of the Council and of committees thereof shall be open to the public, and the rules of the council shall provide that citizens of the City shall have a reasonable opportunity to be heard at any meetings in regard to any matter being considered thereat.

SECTION 6. The Council shall choose such employees of its own body, as it may deem necessary. Employees of the Council shall not be chosen for a definite term but shall continue to serve during the pleasure of the Council.

SECTION 7. The Council shall appoint an officer whose title shall be City Manager and who shall be the chief executive officer and the head of the administrative branch of the City government. The City Manager shall be chosen upon the basis of character and ability with special reference to actual experience in, or knowledge of, accepted practice in respect to the duties of the office as hereinafter outlined. Choice shall not be limited by any residence or political qualification. No person elected to membership on the Council shall, subsequent to such election, be eligible for appointment as City Manager until one year has elapsed following the expiration of the term for which elected. Before entering upon the duties of the office, such City Manager shall take the official oath for the support of the National and State Governments and the faithful performance of duties, and shall execute a bond in favor of the City in such sum as may be fixed by the Council.

SECTION 8. The City Manager shall be appointed for an indefinite term and may be removed by a majority vote of the Council. At least thirty days before the effective date of removal, the City Manager must be furnished with a formal statement in the form of a resolution passed by a majority vote of the City Council stating the Council's intention to remove the City Manager and the reasons therefor. Upon passage of the resolution stating the Council's intention to remove the City Manager, the Council may by a similar vote suspend the City Manager from duty, but compensation shall continue until the removal becomes effective. The City Manager may, within thirty days from the date of service upon the City Manager of a copy thereof, reply in writing to the resolution of intent for removal. In the event no reply is timely filed, the resolution shall upon the thirty-first day from the date of such service constitute the final resolution removing the City Manager, and the City Manager's services shall terminate upon that day. If a reply shall be timely filed with its Clerk, the Council shall fix a time for a public hearing upon the question of the City Manager's removal and a final resolution removing the City Manager shall not be adopted until a public hearing has been held. The action of the Council in removing the City Manager shall be final. In case of the absence or disability of the City Manager, the Council may designate some qualified person to perform the duties of the office during such absence or disability.

SECTION 9. The powers and duties of the City Manager shall be:
(1) To have general supervision over the administrative affairs of the municipality;
(2) To appoint and remove at any time all department heads, officers and employees of the City, except members of the Council, but the appointment and removal of those department heads, officers and employees who are subject to Civil Service or merit systems of the City of Yakima shall be pursuant to the Civil Service laws, rules and regulations of such City in existence at the effective date hereof: provided, that the Council may cause an audit to be made of any department or office of the City government and may select the persons to make it, without the advice or consent of the City Manager;
(3) To attend all meetings of the Council at which his attendance may be required by that body;
(4) To see that all laws and ordinances are faithfully executed, subject to the authority which the Council may grant the Mayor to maintain law and order in times of emergency;
(5) To recommend for adoption by the Council such measures as he may deem necessary or expedient;
(6) To prepare and submit to the Council such reports as may be required by that body or as he may deem it advisable to submit;
(7) To keep the Council fully advised of the financial condition of the City or town and its future needs;
(8) To prepare and submit to the Council a tentative budget for the fiscal year;
(9) To perform such other duties as the Council may determine by ordinance or resolution.

SECTION 10. Administrative departments shall be created by the City Council as the public business may demand. Pending further action by the City Council, the administrative departments now in existence shall be continued. The rights, powers and duties of the departments shall be prescribed, distributed, assigned, established or discontinued by ordinance.

SECTION 11. The City Manager may authorize the head of the department or office responsible to the City Manager to appoint and remove subordinates in such department or office. Any officer or employee who may be appointed by the City Manager or by the head of a department or office, except one who holds a position subject to Civil Service, may be removed by the City Manager or other such appointing officer at any time. Subject to the provisions of

SECTION 9 herein, the decision of the City Manager or other appointing officer shall be final and there shall be no opportunity for administrative appeal.

SECTION 12. Appointments made by or under the authority of the City Manager shall be on the basis of executive and administrative ability and of the training and experience of the appointees in the work, which they are to perform. Residence within the City shall not be a requirement.

SECTION 13. Neither the Council, nor any of its committees or members shall direct or request the appointment of any person to, or removal from, office by the City Manager or any of the City Manager's subordinates. Except for the purpose of inquiry, the Council and its members shall deal with the administrative service solely through the City Manager and neither the Council nor any committee or member thereof shall give orders to any subordinate of the City Manager, either publicly or privately: Provided, however, that nothing herein shall be construed to prohibit the Council, while in open session, from fully and freely discussing with the City Manager anything pertaining to appointments and removals of City officers and employees and City affairs.

SECTION 14. The City Manager and other officers, assistants and employees, shall receive such salary or compensation as the Council shall fix by ordinance and it shall be payable at such times as the Council shall determine.

SECTION 15. Nothing in this Article shall affect the pension or Civil Service or merit system of the City of Yakima in existence at the effective date hereof.

### ARTICLE III
### Elections

SECTION 1. Elections shall be general, primary or special.  The manner and method of holding and calling municipal elections, both general and special, shall be according to State law.  All municipal elections shall be non-partisan and by the qualified electors of the City.

### ARTICLE IV
### Legislation by the People

SECTION 1. The people of Yakima, in addition to the method of legislation herein before provided, shall have direct legislation by the initiative and referendum.

SECTION 2. The initiative shall be exercised in the following manner: (a) A petition signed by registered and qualified electors of the City, accompanied by the proposed legislation in the form of a proposed ordinance and requesting that such ordinance be submitted to a vote of the people shall be filed with the City Clerk. (b) Within two days from the filing of such petition the City Clerk shall certify the number of votes cast at the last general City election and the number of signers of such petition, and shall present such certificate, petition and proposed ordinance to the City Council. (c) If such petition be signed by qualified electors in number equal to twenty per centum of the total number of votes cast at the last preceding general city election, the City Council, within twenty days after receipt thereof, except as otherwise provided in this Charter, shall either pass such ordinance without alteration, or refer it to a popular vote at a special election which must be held at the first available opportunity in accord with the provisions of State law for special municipal elections: Provided, however, that if any other municipal election is to be held more

CCLERK/CHARTER
5
Revised OY    CITY 000064

than thirty days but within ninety days after the filing of the petition, said proposed ordinance shall be submitted without alteration to be voted upon at such election.

SECTION 3. If, prior to the date when any ordinance shall take effect, a petition signed by qualified electors equal in number to ten per centum of the entire vote cast at the last preceding general city election shall be filed with the City Clerk, protesting against the enactment of such ordinance, it shall be suspended from taking effect. Immediately upon the filing of the petition the City Clerk shall do all things required in SECTION 2 (a) and (b) of this article. Thereupon the City Council shall immediately reconsider such ordinance, and, if it does not entirely repeal the same, shall submit it to popular vote at the next municipal election; or, the City Council may call a special election for that purpose in accord with the provisions of State law for special municipal elections; and such ordinance shall not take effect, unless a majority of the qualified electors voting thereon at such election shall vote in favor thereof.

SECTION 4. The City Council may submit to popular vote for adoption or rejection at any election any proposed ordinance in the same manner and effect as provided in this article for submission on petition.

SECTION 5. There shall not be held under this article more than one special election in any period of six months.

SECTION 6. The City Council, by ordinance, shall make further regulations for carrying out the provisions of this article not inconsistent herewith.

### ARTICLE V
### The Recall

SECTION 1. The holder of any elective office, whether elected or appointed thereto, may be removed from such office by recall proceedings as provided by the laws of the State of Washington for elective officers

SECTION 2. An officer removed from office by recall election or who shall resign from such office pending recall proceedings against him shall not be eligible to hold any city office or employment within two years after such removal or resignation.

### ARTICLE VI
### Additional Powers and Limitations on Officers

SECTION 1. At all meetings of the City Council every resolution and ordinance shall be in writing and read aloud by title before a vote is taken thereon; provided, at the request of a majority of Council members present, a resolution and ordinance shall be read aloud in its entirety before a vote is taken thereon. Upon every vote the yeas and nays shall be called and recorded. All ordinances, except ordinances making appropriations or codifying or rearranging existing ordinances, shall be confined to one subject, which shall be clearly expressed in the title. Ordinances making appropriations shall be confined to the subject of appropriations. The enacting clause of all ordinances shall be, "Be it ordained by the City of Yakima."

SECTION 2. Ordinances making the annual tax levy or relating to local improvements or assessments therefore, or making appropriations, emergency ordinances, or ordinances adopted by vote of the electors shall take effect at the time indicated therein; all other ordinances shall take effect 30 days after the date of the publication thereof as herein provided.

An emergency ordinance is one to provide for the immediate preservation of the public peace, property, health or safety. The unanimous vote of the Council shall be necessary for the passage of an emergency ordinance. No measure making or amending a grant, renewal or extension of a franchise or other special privilege shall ever be passed as an emergency measure.

SECTION 3. Upon its final passage, each ordinance or resolution shall be authenticated by the signature of the Mayor and attested by the City Clerk and recorded in a book kept for that purpose. The number and title of each ordinance passed by the City Council, with certificate as herein provided, attached thereto shall be published once in the official newspaper of the city. Said certificate shall be signed by the City Clerk and shall be in substantially the following form: "Ordinance No._____bearing above title, was duly and regularly passed by the City Council of the City of Yakima, Washington, on the _____ day of _____20___, and is now on file with the undersigned at the office of the City Clerk, where the same is open to the public inspection. Dated . City Clerk."

SECTION 4. Members of the City Council shall be qualified electors of the City, and shall not hold any other public office except that of Notary Public or member of the military branch of the state or federal government. A member of the City Council ceasing to possess any of the qualifications specified in this SECTION, or who may be convicted of a crime involving moral turpitude while in office shall immediately forfeit his office. A certified copy of the judgment of conviction filed in the office of the City Clerk shall be prima facie evidence of forfeiture as above provided.

SECTION 5. No elective official, officer or employee of the City shall solicit or receive any pay, commission, money or thing of value, or derive any benefit, profit or advantage, directly or indirectly from or by reason of any improvement, alteration or repair, or purchase of materials required by the City, or any contract to which the City shall be a party, except his lawful compensation or salary as such officer or employee. A violation of any of the provisions of this SECTION shall disqualify the offender to continue in office or employment and he shall be forthwith removed.

SECTION 6. Any purchase of supplies, material, equipment or services, except for public work or improvement, where the cost thereof exceeds a specific sum to be set by ordinance within the limits established by State law shall be made upon call for bids in the same method and under the same conditions as required herein on a call for bids for public work or improvement. This monetary limit for the purchase of supplies, material, equipment and services may be increased from time to time, but no more often than one time in any twenty-four month period, by ordinance enacted by the vote of no less than a two-thirds majority of the City Council members, up to, but in no case to exceed any amount allowed by State law. In the event of an emergency declared by resolution of the City Council, any purchase of supplies, material, equipment or service may be made without calling for bids.

SECTION 7. In addition to the provisions of the general law the City Council may by ordinance create and establish special funds into which all monies received for a special or specific purpose may be placed: Provided, however, that such fund or funds shall be other than those deriving revenue from taxation.

## ARTICLE VII
## Limitation of Taxation

SECTION 1. The fiscal year of the City shall commence on the first day of January and end on the last day of December each year.

SECTION 2. The City Council shall have power and authority to assess, levy and collect taxes upon all the real and personal property (not exempt from taxation) within the City for the corporate uses and purposes thereof and provide for the payment of the debts and expenses of the City.

SECTION 3. The aggregate of all the property taxes levied or appropriated for City purposes including funds for the parks and playgrounds, police and firemen's relief shall be taken and apportioned by the City Council from the current expense fund which for any one year shall not exceed the statutory limits established by State law on each dollar of assessed valuation of the property within the City except as follows:
(a) The levies for redemption of and interest on the bonded debt of the City heretofore or hereafter authorized in the manner provided by law;
(b) The levy for local improvement district assessment guaranty fund as required by law;
(c) Such other levies as may have been heretofore or which may hereafter is required by general law.

SECTION 4. No special levies shall be made for other purposes than those above specified except those, which may be authorized at an election.

SECTION 5. All City funds shall be administered by the City Council; and boards or committees selected by the City Council to assist in the management of any municipal activities, if any are selected, shall act in an advisory capacity only.

SECTION 6. The City Council shall make no appropriation in aid of any corporation, person or society not expressly authorized by this charter.

## ARTICLE VIII
## Special Boards

SECTION 1. The City Council may appoint advisory boards, committees and commissions as may be deemed helpful and necessary to the City Council to assist in administering the City's operation and programs, including but not limited to parks, playgrounds and city planning. The City Council shall have full charge of the budgets for such purposes and shall by ordinance regulate the organization and duties of such boards, and may provide that any monies acquired by donation, bequest or from leases or concessions, fines, or penalties shall be used in addition to the amount set aside in the annual budget out of the tax levy.

## ARTICLE IX
## Public Utilities

SECTION 1. The City Council shall provide by ordinance rules and regulations and make provisions for the control, management and operation of all public utilities owned and operated by the City, or which may hereafter be acquired by the City in the manner provided by law, or which the City may by law govern, control or regulate.

SECTION 2. The City Council shall have power to arrange by ordinance for the financing and repair, replacement, rehabilitation or extension of any public utility owned and operated by the City, provided, however, that such financing shall be arranged upon the credit of the utility itself and not upon the issuance of general obligation bonds of the City.

## ARTICLE X
### Claims

SECTION 1. Claims for damages and the filing of such claims against the City, its officers, employees or volunteers acting in such capacity, are governed by State law.

## ARTICLE XI
### Franchises

SECTION 1. No exclusive franchise shall ever be granted.

SECTION 2. No franchise or right to occupy or use the streets, highways, bridges, or public places of the City shall be granted, renewed or extended except by ordinance

SECTION 3. No franchise shall be granted unless there be inserted therein a provision that the City may acquire the public utility for the exercise of which the franchise is granted, either by agreement or by condemnation, and that upon such purchase by the City, either by agreement or condemnation, no value of the franchise itself shall be taken into account in fixing the price to be paid by the City for such utility.

SECTION 4. No franchise shall be granted by the City for a longer term than twenty-five years.

SECTION 5. No franchise shall be renewed or extended earlier than three years prior to its expiration.

SECTION 6. No franchise shall be granted without provision for proper compensation to the City. Such compensation shall when feasible be a percentage upon the gross earnings of the person or corporation to whom such franchise is granted arising from the exercise of such franchise. When the determination of the gross earnings by the exercise of the franchise is not feasible the ordinance granting said franchise shall prescribe such other mode of determining the compensation to be paid the City by the grantee as shall be deemed reasonable and just.

SECTION 7. The grantee or assignee of any franchise granted by the City shall submit to the City Council within sixty days after the first day of January of each year, an annual report verified by the oath of such person or the president, treasurer or general manager of such corporation, which shall contain such detailed information as may be prescribed by the City Council to enable it to determine the amount of compensation to be paid to the City for the use of said franchise during the preceding year. Any such person, persons, or corporations which shall refuse or fail to make any such report within the time specified shall be liable to a penalty established in accord with State law, ordinance and specific franchise agreements for each and every day during which he or it shall fail to file such report, such penalty to be sued for and recovered by the City in any court having jurisdiction thereof.

SECTION 8. No franchise granted by the City shall ever be leased, assigned or otherwise alienated without the express consent of the City Council by ordinance passed for that purpose, and no rule of estoppel shall ever be invoked against the City in case it shall assert the invalidity of any attempted transfer in violation of this SECTION.

SECTION 9. The grant of every franchise for a street, suburban, or interurban railroad or bus line shall provide that all United States mail carriers, city officials, policemen and firemen shall at all time while in the actual discharge of their duties be allowed to ride upon such cars or buses under said franchise without paying therefore, and with all rights of other passengers.

SECTION 10. No franchise, right, privilege, or license shall be considered as granted by any ordinance except when expressed therein in plain and unambiguous terms, and if any ambiguity appears therein it shall be construed in favor of the city and against the claimant under said ordinance.

## ARTICLE XII
### Power to Incur Indebtedness

SECTION 1. The City may borrow money and become indebted in any legal way, subject, as to the amount and manner of incurring indebtedness, to the provisions and limitations of the constitution and laws of the state and this charter; and subject to the same provisions and limitations, the City may issue bonds to secure any existing or contemplated indebtedness.

SECTION 2. When a popular vote is not required by law, the City Council by ordinance may authorize any indebtedness and the issuance of bonds.

## ARTICLE XIII
### Amendments

SECTION 1. This charter may be amended in the manner provided by the laws of the State of Washington. Special elections for amending this charter may be called by the City Council or shall be called upon petition of qualified voters of the City of a number not less than fifteen percent of the total number of votes cast at the last preceding general state election, and otherwise as set forth in State law.

## ARTICLE XIV
### Schedule

SECTION 1. Upon the taking effect of this charter all title, right and interest of the former corporation in and to any and all property, real or personal, of whatever kind of character, shall vest in and be owned by the corporation created by this charter.

SECTION 2. All ordinances and resolutions in force at the time this charter shall go into effect and not inconsistent herewith, shall remain in force until amended or repealed or until they expire by limitation. All rights and obligations in favor of or against the City existing at the time this charter shall go into effect shall continue without modification. All street and other improvements, all vacations of public streets, alleys or places, all assessments for improvements, all suits and actions in court, all fines, penalties and forfeitures and all other matters relating to the City that may have been begun and not completed, shall be completed according to the law and ordinances existing prior to the time this charter shall go into effect,

and all taxes and assessments levied and remaining unpaid when this charter shall go into effect shall be collected as provided by the law existing and in effect at the time the same were levied.

SECTION 3. At the election to be held for the purpose of adopting or rejecting this charter amendment, articles numbered I to XIV, inclusive, shall be submitted upon the ballot as a complete charter and shall be included in the vote "For the Charter" and "Against the Charter," and in the event that a majority of all votes cast thereon, shall be "For the Charter" said charter shall be adopted.

## ARTICLE XV
## Civil Service

SECTION 1. The general purpose of this charter amendment is to establish for the City of Yakima a system of personnel administration based on merit principles and governing the appointment, promotion, transfer, layoff, removal, discipline and welfare of its employees, and other incidents of city employment.

SECTION 2. The following terms, whenever used in this Article, shall be construed as follows:
(a) "Commission" means the civil service commission herein created, and "Commissioner" means any one of the three members of any such commission.
(b) "Appointing power" -- Appointing power means the officer or person, board or committee who is empowered to make appointments for employment in the city civil service.
(c) "Appointment" includes all means of selecting, appointing, or employing any person to any office, place, position, or employment in civil service.
(d) "City" means the City of Yakima, Washington.
(e) "Employees" mean all persons regularly employed by the City of Yakima, Washington, either on a part-time or full-time basis with the exception of those persons listed in SECTION 6.

SECTION 3. There is created a city civil service commission, which shall be composed of three persons. The commission members shall be appointed by the City Council in the following manner:
(a) One member shall be appointed by the City Council.
(b) The second member shall be appointed by the City Council from a list of three names submitted to the Council chosen by a referendum of city employees, excluding police and firemen. The City Clerk shall conduct the referendum and shall formulate proper rules and regulations for said referendum.
(c) The third shall be appointed by the City Council from a list of three names submitted to the council by the other two civil service commissioners.
(d) The term of office of the commissioners shall be for six years or until a successor is selected and qualified, except that the first three members of the commission shall be appointed for different times, as follows: The appointee from the employee referendum list shall serve for a period of six years, the appointee at large as designated in subsection (a) above to serve for a period of four years, and the third appointee to serve for two years. All commissioners must be registered voters of Yakima County. Any member of the commission may be removed from office for incompetence, incompatibility, or dereliction of duty, or malfeasance of office, or other good cause; provided, that no member of the commission shall be removed until charges have been preferred, in writing, due notice, and a full hearing held before the City Council. Any vacancy in the commission shall be filled in the same manner as provided for selecting the commissioner previously filling the vacancy. Two members of the commission shall constitute a

CCLERK/CHARTER
DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 17                                        Revised COY 000070

quorum and the votes of any two members concurring shall be sufficient for the decision of all matters and the transaction of all business to be decided by the commission. No member of the civil service commission shall engage in active partisan or non-partisan politics and hold any salaried public office or engage in city employment, other than his commission duties. The members of the commission shall serve without compensation.

SECTION 4. Immediately after appointment the commission shall organize by electing one of its members chairman and shall hold regular meetings at least once a month, and such additional meetings as may be required for the proper discharge of its duties. All meetings of the commission shall be open to the public. It shall appoint a chief examiner who shall also serve as secretary of the commission and such assistants as may be necessary. The chief examiner shall keep the records for the commission, preserve all reports made to it, superintend and keep a record of all examinations held under its direction and perform such other duties as the commission may prescribe. The chief examiner shall be appointed as a result of competitive examination, which examination may be either original and open to all properly qualified persons, or promotional and limited to persons already in the service of the City of Yakima, Washington. The chief examiner shall be subject to suspension, reduction, or discharge in the same manner and subject to the same limitations as are provided in the case of members of the classified service. A pay and classification plan with job descriptions providing equal pay for equal work shall be devised by the chief examiner with the cooperation and approval of the civil service commission which shall be submitted in ordinance form to the City Council for passage.

SECTION 5. It shall be the duty of the civil service commission: (a) To make suitable rules and regulations not inconsistent with the provisions hereof. Such rules and regulations shall provide in detail the manner in which examinations may be held, and appointments, promotions, transfers, reinstatements, demotions, suspensions, and discharges shall be made, and may also provide for any other matters connected with the general subject of personnel administration, and which may be considered desirable to further carry out the general purposes of this Article, or which may be found to be in the interest of good personnel administration. The rules and regulations and any amendments thereof shall be printed, mimeographed, or multigraphed for free public distribution. Such rules and regulations may be changed from time to time. Prior to adoption of new rules or changes in existing rules all interested parties shall be given an opportunity to express opinions concerning the proposed rules at the regular public meetings of the commission.

(b) To give practical tests which shall consist only of subjects which will fairly determine the capacity of persons examined to perform duties of the position to which appointment is to be made. Such tests may include tests of physical fitness or manual skill or both.

(c) To make investigations and report upon all matters concerning the enforcement and effect of the provisions of this Article, and the rules and regulations prescribed hereunder; to inspect all departments, offices, places, positions, and employment affected by this Article, and ascertain whether this Article and all such rules and regulations are being obeyed. Such investigations may be made by the commission or by any commissioner designated by the commission for that purpose. Not only must these investigations be made by the commission as aforesaid, but the commission must make like investigation on petition of any citizen, duly verified, stating that irregularities or abuses exist, and setting forth in concise language, in writing, the necessity for such investigation. In the course of such investigation the commission, or the chairman or chief examiner when authorized by a majority vote of the commission, may issue subpoenas to compel the attendance at such place as may be designated in this City of witnesses and the production of books and papers pertinent to any inquiry or investigation authorized by this Article; or may take depositions of witnesses. Subpoenas shall also be used at the request of the parties to the proceedings other than the commission and the chairman. The commission or

any member thereof, or the chief examiner, when authorized by the commission, may administer oaths and take testimony. The commission or the chief examiner may examine such public records, as they require in relation to any matter, which they have authority to investigate.

(d) To conduct hearings and investigations in accordance with this Article and by the rules of practice and procedure adopted by the commission, and in the conduct thereof neither the commission, nor designated commissioner shall be bound by technical rules of evidence. No informality in any proceedings or hearing, or in the manner of taking testimony before the commission or designated commissioner, shall invalidate any order, decision, rule, or regulation made, or confirmed by the commission; provided, that no order, decision, rule or regulation made by any designated commissioner conducting any hearing or investigation alone shall be any force or effect whatsoever unless and until concurred in by at least one of the other two members.

(e) To hear and determine appeals or complaints respecting the allocation of positions, the rejection of an examinee, and such other matters as may be referred to the commission.

(f) To provide for, formulate, and hold competitive tests to determine the relative qualifications of persons who seek employment in any class or position, and as a result thereof establish eligible lists for the various classes of positions, and provide that persons laid off because of curtailment of expenditures, reduction in force, and for like causes, head the list in the order of their seniority, to the end that they shall be the first to be reemployed.

(g) It shall be the duty of the Civil Service Commission to certify to the appointing authority, when a vacant position is to be filled, on written request, the names of the three persons highest on the eligible list for the class. Any one of the three persons so certified may be appointed. If there is no such list, to authorize a provisional or temporary appointment list for such class. Such temporary provisional appointment(s) shall not continue for longer than five months in any one fiscal year.

(h) To keep such records as may be necessary for the proper administration of this Article.

As amended by vote of the people November 8, 1983.

SECTION 6. The classified civil service and provisions of this Article shall be applicable to and shall include all employees of the city except the following:

(a) Officers elected by the people and persons appointed to fill vacancies in elective offices.

(b) Members of boards and commissions and the City Manager;

(c) Employees under civil service coverage within the police and fire departments;

(d) All department heads; one confidential secretary and one administrative assistant for the City Manager;

(e) Judges, City Attorney and all assistant city attorneys;

(f) Persons employed in a professional or scientific capacity to make or conduct a temporary and special inquiry, investigation, or examination on behalf of the City Council or a committee thereof, or by authority of the City Manager.

SECTION 7. All appointments to and promotions to positions in the classified civil service of the City of Yakima shall be made solely on merit, efficiency, and fitness, which shall be ascertained by open competitive examination and impartial investigation. No person in the classified civil service shall be reinstated in or transferred, suspended, or discharged from any such place, position, or employment, contrary to the provisions of this Article.

SECTION 8. For the benefit of the public service and to prevent delay, injury, or interruption therein by reason of the enactment hereof, all persons holding a position which is deemed classified under SECTION 6 for a continuous period of six months prior to the effective dates of this Article, and still currently employed, are eligible for permanent appointment under



civil service to the offices, places, positions or employment which they then held without examination or other act on their part, and not on probation; and every such person is automatically adopted and inducted permanently into civil service, into the office, place, position or employment which he then held as completely and effectual to all intents and purposes as if such person had been permanently appointed thereto under civil service after examination and investigation.

SECTION 9. The tenure of every person holding an office, place, position or employment under the provisions of this Article shall be only during good behavior, and any such person may be removed or discharged, suspended without pay, demoted or reduced in rank, for any of the following reasons:
(a) Incompetency, inefficiency, or inattention to, or dereliction of duty;
(b) Dishonesty, intemperance, immoral conduct, insubordination, discourteous treatment of the public, or a fellow employee, or any other act of omission or commission tending to injure the public service; or any other willful failure on the part of the employee to properly conduct himself; or any willful violation of the provisions of this Article or of the rules and regulations to be adopted hereunder;
(c) Mental or physical unfitness for the position which the employee holds;
(d) Dishonest, disgraceful, or prejudicial conduct;
(e) Drunkenness or use of intoxicating liquors, narcotics, or any other habit forming drug, liquid, or preparation to such extent that the use thereof interferes with the efficiency or mental or physical fitness of the employee or which precludes the employee from properly performing the function and duties of any position under civil service;
(f) Conviction of a felony, or a misdemeanor involving moral turpitude;
(g) Any other act or failure to act which in the judgment of the civil service commission is sufficient to show the offender to be an unsuitable and unfit person to be employed in the public service.

SECTION 10. No person in the classified civil service who has been permanently appointed or inducted into civil service under provisions of this Article, shall be removed, suspended, or demoted except for cause, and only upon written accusation of the appointing power or any citizen or taxpayer; a written statement of which accusation, in general terms, shall be served upon the accused; and a duplicate filed with the commission. Any person so removed, suspended, or demoted may within ten days from the time of his removal, suspension, or demotion, file with the commission a written demand for an investigation, whereupon the commission shall conduct such investigation. The investigation shall be confined to the determination of the question of whether the removal, suspension, or demotion was made in good faith for cause. After such investigation the commission may affirm the removal, or if it finds that removal, suspension or demotion was not made in good faith or cause, shall order the immediate reinstatement or reemployment of such person in the office, place, position, or employment from which he was removed, suspended, or demoted, which reinstatement shall, if the commission so provides be retroactive, and entitle such person to pay or compensation from the time of the removal, suspension, or demotion. The commission upon such investigation in lieu of affirming a removal, may modify the order by directing a suspension without pay, for a given period, and subsequent restoration to duty, or demotion in classification, grade, or pay. The findings of the commission shall be certified, in writing to the appointing power, and shall be forthwith enforced by such officer. All investigations made by the commission pursuant to this SECTION shall be by public hearing, after reasonable notice to the accused of the time and place thereof, at which hearing the accused shall be afforded an opportunity of appearing in person and by counsel, and presenting his defense. The subpoena provisions of SECTION 5 of this Article shall apply to all such hearings. If the order of removal, suspension, or demotion is

concurred in by the commission or a majority thereof, the accused may appeal therefrom to the superior court of the county wherein he resides. Such appeal shall be taken by serving the commission, within thirty days after the entry of its order, a written notice appeal, stating the grounds thereof, and demanding that a certified transcript of the record and of all papers on file in the office of the commission affecting or relating to its order, be filed by the commission with the court. The commission shall, within ten days after the filing of the notice, make, certify, and file such transcript with the court. The court shall thereupon proceed to hear and determine the appeal in a summary manner. Such hearing shall be confined to the determination of whether the order of removal, suspension, or demotion made by the commission, was or was not made in good faith for cause, and no appeal shall be taken except upon such ground or grounds. The decision of the superior court may be appealed to the Supreme Court.

SECTION 11. Whenever a position in the classified service becomes vacant, the appointing power, if it desires to fill the vacancy, shall requisition the commission for the names and addresses of persons eligible for appointment thereto. The commission shall certify the names of three persons highest on the eligible list for the class to which the vacant position has been allocated, who are willing to accept employment. In case of more than one vacancy in a particular class one additional name shall be certified for each additional vacancy. If there is no appropriate eligible list for the class, the commission shall certify the name of three persons standing highest on the list held appropriate for such class. The appointing power shall forthwith make is appointment to the vacant position from the list of person so certified. To enable the appointing power to exercise a choice in the filling of positions, no appointment, employment, or promotion in any position in the classified service shall be deemed complete until after the expiration of a period of six months' probationary service, as may be provided in the rules of the civil service commission, during which the appointing power may terminate the employment of the person certified to him, if during the performance test thus afforded, upon observation or consideration of the performance of duty, the appointing power deems him unfit or unsatisfactory for employment by the City of Yakima. Thereupon the appointing power shall select from the three persons certified as standing next highest on any such list and such person shall likewise enter upon said duties for the probationary period, until some person is found who is deemed fit for appointment, employment, or promotion whereupon the appointment, employment, or promotion shall be deemed complete.

SECTION 12. All offices, places, positions, and employment coming within the purview of this Article shall be filled by the appointing power; nothing herein contained shall infringe upon the authority that the City Council may have to fix the salaries and compensation of all employees employed hereunder.

SECTION 13. No treasurer, clerk or other officer, or employee of the City subject to this Article shall approve the payment of or be in any manner concerned in paying, auditing, or approving any salary, wage, or other compensation for services, to any person subject to the jurisdiction and scope of this Article, unless a payroll, estimate, or account for such salary, wage, or other compensation, containing the names of the persons to be paid, the amount to be paid, and any other information which, in the judgment of the civil service commission, should be furnished on such payroll, bears the certificate of the civil service commission, or of its chief examiner or other duly authorized agent, that the persons named therein have been appointed or employed in compliance with the terms of this Article and the rules of the commission, and that the payroll, estimate, or account is, insofar as known to the commission, a true and accurate statement. The commission shall refuse to certify the pay of any public officer or employee whom it finds to be illegally or improperly appointed, and may further refuse to certify

the pay of any public officer or employee who willfully or through culpable negligence, violates or fails to comply with this Article or with the rules of the commission.

SECTION 14. The commission shall begin and conduct all civil suits, which may be necessary for the proper enforcement of this Article and rules of the commission. The commission shall be represented in such suits by the city attorney.

SECTION 15. The right of any person to an appointment or promotion or to any position in classified service of the City shall not be withheld because of his race, color, religion, national origin, political affiliation or belief, nor shall any person be dismissed, demoted, transferred or reduced in grade for such reason.

SECTION 16. No public officer, whether elected or appointed, shall discharge, promote, demote, or in any manner change the official rank, employment, or compensation of any person under civil service or promise or threaten so to do for giving or withholding, or neglecting to make any contribution of money, or services, or any other valuable thing, for any political purpose.

SECTION 17. All officers and employees of the City shall aid in all proper ways in carrying out the provisions of this Article, and such rules and regulations as may, from time to time, be prescribed by the commission and afford the commission, its members, and employees, all reasonable facilities and assistance in the inspection of books, papers, documents, and accounts applying or in any way appertaining to any and all offices, places, positions, and employment, subject to civil service, and also shall produce such books, papers, documents, and accounts, and attend and testify, whenever required so to do by the commission or any commissioner.

SECTION 18. The City Council shall provide in the city budget for each fiscal year a sum equal to one half of one per cent of the preceding year's total payroll of those included under the scope of this Article. The funds so provided shall be used for the support of the commission. The City Council may provide additional funds for such purpose; any part of the funds so provided and not expended shall be placed in the current expense fund on the first day of January following the close of such fiscal year.

SECTION 19. This Article shall be full force and effect on and after the first Monday in June, 1959.

SECTION 20. If any SECTION, sentence, clause, or phrase of this Article should be held to be invalid or unconstitutional, the validity or constitutionality thereof shall not affect the validity or constitutionality of any other SECTION, sentence, clause, or phrase of this Article.

As adopted by vote of the people August 16, 2011. Effective date August 31, 2011.

## AUTHENTICATION OF CHARTER AMENDMENT

I, Micah Cawley, Mayor of the City of Yakima, State of Washington, do hereby certify that in accordance with the Constitution and statutes of the State of Washington, the City Council of the City of Yakima duly adopted Resolution No. R-2011-51 at a regular meeting of the Yakima City Council held on April 19, 2011, by which resolution the Yakima City Council proposed to the electors of the City of Yakima, Washington that Articles I, II, III, IV, VI, VII, VIII, IX, X, XI, XII,

CCLERK/CHARTER

COY 000075



XIII, XIV and XVI of the Charter of the City of Yakima be amended and that Article XV be repealed and by which resolution the Yakima City Council called for the election to be held in conjunction with the regular municipal election to be held August 16, 2011, for the submittal to the electors of the City Of Yakima, Washington, for their approval or rejection, of the said proposed amendments to the Yakima City Charter.

That such regular municipal election was duly called by resolution of the Yakima County Auditor, and thereafter the said proposed amendments to the Yakima City Charter were published in the Yakima Herald-Republic, the daily newspaper of largest general circulation published in the requirements of applicable laws, which notice was published at least once each week for four weeks next preceding the date of submitting said proposed charter amendments to the electors for their approval; and that all further notices of said regular municipal election were duly and timely published in accordance with requirements of applicable laws.

That thereafter on August 16, 2011, at such election duly called and held, the said proposed amendments were submitted to the qualified electors of the City of Yakima and the returns canvassed resulted as follows:

> For the proposed amendment to the Charter, 9,532 votes;
> Against the proposed amendments to the charter, 4,371 votes;
> Majority for the proposed amendment to the charter, 5,161 votes;

Whereupon the said proposed amendments of the Yakima City Charter were declared approved and adopted by a majority of the qualified electors voting thereon at the said election.

I further certify that the foregoing is a full, true and complete copy of the said charter amendments so voted upon and adopted as aforesaid.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix the corporate seal of said city at my office this 31st day of August, 2011.

_Neil Cawley_
MAYOR of the City of Yakima, Washington

ATTEST:

_Deborah Kloster_
CITY CLERK of the City of Yakima, Washington



Exhibit 2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

|  |  |
|---|---|
| Rogelio Montes and Mateo Arteaga | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| City of Yakima, et. al. | ) ) |
| Defendants. | ) |

CV- 12-3108-TOR

## <u>REPORT OF RICHARD L. ENGSTROM, Ph.D.</u>

I declare the following:

    1.  My name is Richard L. Engstrom and I am a resident of Chapel Hill, North Carolina.  I am currently a Visiting Research Fellow at the Center for the Study of Race, Ethnicity, and Gender in the Social Sciences at Duke University, a position I have held since 2008.  From August of 2006 through 2007 I was employed as a consultant at the Center for Civil Rights at the School of Law, University of North Carolina at Chapel Hill. I am a former Research Professor of Political Science and Endowed Professor of Africana Studies at the University of New Orleans, where I was employed from August 1971 to May 2006.  I have served two terms as the Chairperson of the Representation and Electoral Systems Section of the American Political Science Association (1993-1995, 1995-1997) and served as a member of the Executive Council for that section from 1993 to 2007.  A copy of my curriculum vitae is attached as Appendix A to this report.

    2.  I have done extensive research into the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect

representatives of their choice. The results of my research on this topic have been published in the *American Political Science Review*, *Journal of Politics, Western Political Quarterly, Legislative Studies Quarterly, Social Science Quarterly, Journal of Law and Politics, Electoral Studies*, *Representation*, and other journals and books. Three articles authored or co-authored by me were cited with approval in <u>Thornburg v. Gingles</u>, 478 U.S. 30, at 46 n.11, 49 n.15, 53 n.20, 55, and 71 (1986), the Supreme Court decision interpreting amended section 2 of the Voting Rights Act. I am the co-author, with Mark A. Rush, of *Fair and Effective Representation? Debating Electoral Reform and Minority Rights* (Lanham, MD: Rowman and Littlefield Publishers, Inc. 2001).

3. I have also testified as an expert witness in numerous cases in federal and state courts across the United States. Since 2008 I have testified at trial and/or been deposed in the following cases: Gonzalez v. State of Arizona (D. Ariz. 2008), United States of America v. Village of Port Chester (S.D.N.Y. 2008), Benavidez v. City of Irving, (N.D. Tex. 2008), Benavidez v. Irving Independent School District (N.D. Tex. 2009), United States of America v. Euclid City School District Board of Education (N.D. Ohio 2009), Texas Latino Redistricting Task Force v. Perry (W.D. Tex. 2011), Committee for a Fair and Balanced Map v. Illinois State Board of Elections (N.D. IL 2011), Egolf v. Duran (1st Judicial District Court, County of Santa Fe, State of New Mexico, 2011), State of Texas v. United States of America (D D.C. 2012), and Fabela v. City of Farmers Branch, TX (ND Tex. 2012). I have also testified by deposition as a fact witness in Backus v. State of South Carolina (D S.C. 2012).

4. Attorneys for plaintiffs in this case have asked me to analyze the extent to which the candidate preferences of Latino and other voters in Yakima, Washington, have

2

differed in the recent elections for members of the city council in which the voters have been presented with a choice between or among Latino and non-Latino candidates. These elections include three primaries and two general elections held in 2009 and 2011, which entail the last three attempts by Latino candidates to win a seat on the council.[1]

5.   They also have asked that I analyze the extent to which the votes cast by Latino and other voters differed in two other recent elections.  One of these is the vote on City of Yakima Proposition 1 in the primary election of 2011.  This proposition, if successful, would have required a change in the city council election system from at-large to district based elections.  The other is the election for Position 8 on the Washington Supreme Court, which was also contested by a Latino and a non-Latino candidate.  This is the latest nonpartisan exogenous election presenting Yakima voters with a choice between or among Latino and non-Latino candidates.

6.   I am being compensated at a rate of $300 an hour for my work on this Report.

THE YAKIMA CITY COUNCIL ELECTION SYSTEM

7.   The Yakima City Council consists of seven members, all of whom are elected to four-year terms in nonpartisan at-large elections.  The system is not, however, a "pure at-large" system in which all candidates would compete together, at one time, for all of the council seats.  Voters in pure at-large elections are allowed to cast as many votes as there are seats, but only one of their votes may be cast for any particular candidate.  The seats are awarded to a number of candidates equal to the number of seats based on a plurality rule, i.e., the top N vote recipients win the N seats.

---

[1]  The Supreme Court in <u>Thornburg v. Gingles</u> relied on a data base that examined the last three elections involving a choice between or among African American and non-African American candidates in the multi-member districts at issue.  See 478 U.S. 30, 80 (1986) (Appendix A to opinion

8.   Council members in Yakima are elected under a different type of at-large system.  It is known as a place or post system with, in effect, a majority vote rule.  Every seat or place on the council is elected separately.  Candidates for the council file for one of the particular places and compete only with the other candidates that file for that same place.  If there are more than two candidates for a particular place, all of them compete in a Top-Two primary election in which each voter may cast only one vote.  The top two finishers in this primary then contest the at-large general election, in which each voter again may cast only one vote.  If only two candidates file for one of the places, they compete in an at-large general election.  While write-in votes are recorded in the general elections, only the top-two candidates, or the only two candidates, have their names on the general election ballot, resulting in this arrangement in effect requiring a candidate to receive a majority of the votes citywide to gain election to the council.[2]

9.   Four of the places on the city council, identified as Districts 1, 2, 3, and 4, have a geographical residency district applied to them.  These residency districts are mutually exclusive geographical areas that cover the entire city.  All of the candidates for such a seat must reside in the geographical district for that place, and in a primary election only voters residing in the district may vote.  In the subsequent general election, however, all voters in the city may vote.  The other three seats on the council are identified as Positions 5, 6, and 7.  Any person residing in the city, if otherwise qualified, may be a candidate for one of these seats.  Both primary and general elections for these seats are held at-large, with every voter in the city allowed to cast a vote.

---

of Brennan, J.)  The last election, prior to 2009, in which voters in Yakima were presented with a choice between or among Latino and non-Latino candidates for the city council was in 1999.

[2]  In none of the elections analyzed for this Report did the number of write-in votes result in a candidate winning a council seat by a plurality of the votes rather than a majority of them.

10. As a result of this place system used in Yakima's at-large elections, any candidate, in order to win a seat on the council, whether or not a residency district is assigned to it, must in effect win a majority of the votes cast in a city-wide general election. This system is widely recognized as enhancing the potential dilutive effect on minority voters of an at-large system.[3] In a pure at-large system every voter has a number of votes equal to the number of seats being filled, and can cast one vote apiece for as many candidates as there are seats. Under this arrangement, members of a minority group may employ a "single shot" voting strategy to increase the opportunity for their candidate of choice to finish among the top N candidates and win a seat. Single shot voting entails group members casting one vote, if they wish, for the candidate favored by the group, and not casting any of their remaining votes for any other candidate. By withholding their remaining votes from the candidates competing with their preferred choice, their candidate of choice has a better opportunity to finish among the top N candidates and win one of the N seats. The place system in Yakima reduces the number of candidates that can win to one in every place, thereby precluding this strategy.

11. In addition, the fact that no more than two candidates may have their name on a general election ballot results, as discussed above, in the at-large system having, in effect, a majority vote requirement to win a seat on the council. This also impedes the opportunity for minority voters to elect a candidate of their choice when voting in a jurisdiction is racially polarized, as it is in Yakima city council elections, as documented below.

---

[3] See, e.g., Fabela v. City of Farmers Branch, TX (2012 U.S. Dist. LEXIS 108086, at 59-60, N.D. TX 2012, August 2, 2012), and also Richard L. Engstrom and Michael D. McDonald, "'Enhancing' Factors in At-Large Plurality and Majority Systems: A Reconsideration," *Electoral Studies* 12 (December 1993), 385-401.

## DATA AND METHODS

12.  The data used in the analyses of the candidate preferences of Latino and non-Latino voters are the number of votes cast for each of the candidates, or cast for Yes or No on Proposition 1, in each of the precincts in these elections, and the total number of people, and the total number with Spanish surnames, who cast ballots in the respective elections in each of the precincts.  The data identifying the votes for the candidates are taken from the Yakima County Elections Department website.  The data that identify by name those who cast ballots in these elections have been provided by the Yakima County Elections Department.

13. William Cooper identified, by precinct, the number of persons casting ballots and the number of such people with Spanish surnames, and provided that information to me.  Mr. Cooper will explain how the matching was performed in the report he will provide in this case.  In the analyses below those with Spanish surnames are considered Latino voters, and those without Spanish surnames are considered non-Latino voters.  This method of identifying the relative presence of Latinos among those voting in each of the precincts in the elections, expressed as a percentage of those casting ballots, is much preferred over relying on Spanish surnames among registered voters, on the census counts of Latino self-identifiers among the voting age population, or on the citizen voting age population, because it provides   a more accurate record of the relative group composition of the voters in each precinct.[4]

14. The estimates of the extent to which the candidate preferences of the Latino

---

[4]  The percentages of the returned ballots on which votes were cast in the particular elections analyzed are as follows:  97.6 percent for Position 5 and 97.5 percent for Position 7 in the 2009 primary, 96.8 percent for Position 5 and 95.2 for Position 7 in the 2009 general election, 80.8 percent for residency

voters differed from those of the non-Latino voters in the elections analyzed have been derived through Gary King's Ecological Inference (EI) procedure, accessible through R software. This version not only provides a specific, or point, estimate of a group's support for a particular candidate, but also confidence intervals for that estimate. This interval identifies the range of estimates within which we can be 95 percent confident, statistically, that the true value of a group's support for a candidate falls. The point estimate is the best estimate, in that it is the value most likely to be the true value, and estimates within the range of a confidence interval are less likely to be the true value the further they are from the point estimate.[5]

## RESULTS

15. The analyses of the elections show that the candidate preferences of the Latino and non-Latino voters were divided in all of these candidate elections involving a choice between or among Latino and non-Latino candidates, and in the vote on Proposition 1 as well. The EI estimates reveal that the Latino voters preferred the Latino candidate in each of these elections, and preferred passage of the proposition, and that the non-Latino voters preferred a non-Latino candidate in each instance, and were opposed to the proposition. The lack of non-Latino support for the Latino candidates functioned in

---

District 2 and 99.1 percent for Proposition 1 in the 2011 primary, and 76.8 percent for Supreme Court in the 2012 primary.

[5] EI is now widely recognized as a superior estimation procedure for this purpose than ecological regression or homogeneous precinct analyses, which had been relied upon for this purpose by the United States Supreme Court in 1986 in Thornburg v. Gingles (478 U.S. 30, at 52-53). EI was developed subsequent to that case for the explicit purpose of improving these estimates. According to D. Stephen Voss, EI "is unparalleled when applied to the actual sort of data needed for analyzing important social issues such as racial voting patterns." "Using Ecological Inference for Contextual Research,' in Gary King, Ori Rosen, and Martin Tanner (eds.), *Ecological Inference: New Methodological Strategies* (Cambridge University Press, 2004), at 93. EI is the subject of Gary King's book, A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data (Princeton University Press, 1997).

every instance as a veto over the election of the Latino candidates in Yakima (although Mr. Gonzales was elected in the statewide vote to the Supreme Court seat, he lost the vote in Yakima) and non-Latino voters likewise vetoed the proposition.

16.   The specific results of the analyses of these elections are reported in the Table at the end of this Report.  Reported in this table are the estimates derived through the EI analyses of the levels of support for the Latino candidates among Latino voters and among non-Latino voters in each candidate election, and the estimated level of support by both groups for Proposition 1.  Identified in the left column of the Table are the offices at issue in the candidate elections, the surname of the Latino candidates in those elections, and whether the vote was held during a primary or general election. For the proposition, the Yes vote replaces a candidate name.  The second and third columns contain the point estimates and confidence interval for the Latino and non-Latino votes respectively.  The best estimates of the voting choices of each group, the point estimates, are reported in the text below.

At-Large Position 5, 2009

17.   Three candidates competed for the Position 5 seat on the council in the 2009 election.  These were Sonia Rodriguez, a Latina who was serving in that position on the council by appointment, and Sharon Madson and Dave Ettl, both non-Latinos.  This election began with a Top-Two primary because there were more than two candidates. Mr. Ettl and Ms. Rodriguez finished first and second and advanced to the general election, having received 47.5 percent and 38.2 percent of the votes respectively.

18.   The EI analysis reveals that Ms. Rodriguez was the candidate of choice of the Latino voters in this primary, receiving an estimated 52.9 percent of their votes.  She was not the choice of the non-Latino voters, however, receiving only 37.3 percent of their votes.[6]

19.   The vote in the general election continued to show group differences in support for Ms. Rodriguez.  This was a head-to-head contest with Mr. Ettl, and Ms. Rodriguez's vote among the Latino voters is estimated to have been 92.8 percent, compared to 42.6 percent among non-Latino voters.  Despite her strong Latino support, she did not retain her seat, receiving 47.8 percent of the total vote.

At-Large Position 7, 2009

20.   A second Latino, Benjamin A. Soria, sought one of two other positions on the council up for election in 2009, Position 7.  Three non-Latino candidates also competed for this position, Mitchell Smith, Bill Lover, and T.J. Davis.  This election also involved a Top-Two primary given that there were four candidates in the race.

21.   Mr. Soria, like Ms. Rodriguez, finished second in the primary, with 31.8 percent of the votes.  Mr. Lover led the field with 54.4 percent.  Mr. Soria was the candidate of choice of the Latino voters, receiving an estimated 59.5 percent of their votes, but he was not the choice of the non-Latino voters, receiving an estimated 31.0 percent of their votes.[7]

22.   In the general election Mr. Soria received an estimated 92.7 percent of the Latino vote, only 0.1 percentage points below that estimated for Ms. Rodriguez.  His

---

[6]  The choice of the non-Latino voters in this primary was Mr. Ettl, who received an estimated 49.4 percent of their votes.  The confidence interval for this estimate is 46.3 to 51.5.

[7]  The choice of the non-Latino voters in this primary was Mr. Lover, who received an estimated 56.5 percent of their votes.  The confidence interval for this estimate is 54.7 to 58.3.

9

support from non-Latino voters, however, is estimated to have been only 30.5 percent. This left him with 35.0 percent of the total vote and he therefore also lost.

23.   In summary, Latino candidates contested two of the three at-large positions on the city council in 2009, and despite both receiving a Latino vote estimated to exceed 90 percent in the decisive election, the general election, both were defeated.

At-Large District 2, 2011

24.   In the next council election, that in 2011, the four seats on the council for which primaries are conducted in residency districts were subject to election.  Only one of these districts, however, required a primary.  This was District 2, in which three candidates competed.  One was a Latino, Rogelio Montes, and the other two, Rich Marcley and Sara Bristol, were non-Latinos.  This three-candidate field necessitated a Top-Two primary, in which all candidates had to reside in the district and only voters residing in the district could participate.

25.   The EI analysis of this primary reveals that Mr. Montes was the choice of the Latinos voters in it, receiving an estimated 53.5 percent of their votes.  He was not the choice of the non-Latino voters, however, receiving an estimated 13.4 percent of their votes.  Mr. Montes therefore was defeated at this stage in the election, receiving 16.8 percent of the total vote.

Proposition 1, 2011

26.   Proposition 1, a proposal to amend the city charter of Yakima to change the council election system to seven single-member districts, was also on the 2011 primary ballot.[8]  Latino voters strongly supported this proposition, with an estimated 98.2 percent

---

[8] The description of Proposition 1 on the ballot stated:

of them voting for it.  Non-Latino voters, however, did not support it, as only an estimated 38.4 percent of them voted for it.  The proposition was therefore defeated by a vote of 58.5 to 41.5 percent.

Supreme Court Position 8, 2012

27.   In the 2012 statewide primary election in Washington a seat on the state Supreme Court, Position 8, was up for election.  This was a nonpartisan election that drew two candidates, one a Latino, Steve Gonzalez, who was serving in this seat by appointment, and the other, Bruce O. Danielson, a non-Latino.  This is the most recent nonpartisan exogenous election in which all of the voters in Yakima were presented with a choice between or among Latino and non-Latino candidates on the ballot.[9]  Neither candidate was a resident of Yakima, nor even of an area close to Yakima.

28.   The vote within the entire City of Yakima in this election has been analyzed to assess whether Latinos and non-Latinos in Yakima were again divided in their support for a Latino candidate in a nonpartisan election, as city council elections are conducted. The EI analysis reveals that it was.  The estimated support for Mr. Gonzalez among Latino voters in Yakima is 63.2 percent, while his support among the non-Latino voters is

---

Adoption of amendment to the Charter of Yakima to abandon and abolish the current districting for the election of city council members and to create seven districts for election of council members within the City of Yakima, and to make further ancillary and corrective measures thereto.

The proposition would also establish a temporary redistricting commission, limit council members to ten consecutive years on the council, and specify that in the election of 2011 council members elected from even-numbered districts would be elected to two-year terms and thereafter to four-year terms. See www.yakimacounty.us/vote/PRIMARY%20web.pdf.

[9]  I am not aware of another exogenous election of this nature occurring within at least the past 10 years.

11

36.9 percent. Although Mr. Gonzalez retained the seat in the statewide vote, he was beaten by Mr. Danielson in Yakima. He won only 39.0 percent of the vote in the city.

29. The confidence intervals reported in the Table are narrower for the estimates of the non-Latino voter behavior than that of Latinos. This is to be expected given the differences in the relative presence of Latinos and non-Latinos across the precincts in Yakima. The percentage of all of the ballots returned that were returned by Latino voters in Yakima ranged from 2.9 to 10.4 in these elections, and the highest percentage of Latinos among those returning ballots in any of the precincts has ranged from 18.6 to 41.9 across the elections.

30. In contrast, in all but one of these elections over 65 percent of the precincts in Yakima have been "homogeneous" non-Latino precincts, defined as precincts in which 90 percent or more of the ballots returned were sent in by non-Latino voters. The exception was the primary election in residency District 2 in the 2011 primary, in which three of the seven precincts satisfied this criterion. Homogeneous non-Latino precincts accounted for from 79.6 percent to 81.6 percent of the votes in all of the citywide elections analyzed. (The figure for the District 2 primary was 48.2.) The application of the EI procedure relies on precinct-level data, and given the greater percentages of non-Latinos in the precincts, these data provide a more reliable, or "efficient," estimate for non-Latino voters than the Latino voters, which is reflected in the confidence intervals.

31. The point estimates indicate that non-Latinos did not provide the Latino candidates in any of these elections, or favor Proposition 1, with a majority of their votes. Indeed, the *highest* point on any confidence interval for the non-Latino support for any Latino candidate, or Proposition 1, is below 50 percent. In contrast, the point estimate for

12

the Latino vote exceeds a simple majority for every Latino candidate, and for Proposition 1. And in the general election for city council in 2009 for Positions 5 and 7, Latinos are estimated to have cast 92.8 percent and 92.7 percent of their votes for the Latino candidates, while their vote on Proposition 1 in 2011 is estimated to have been 98.0 percent in favor. In these three decisive elections the *lowest* point on the confidence intervals are well above a majority, 72.2 percent, 74.1 percent, and 94.9 percent respectively.

CONCLUSION

32. The results of the analyses of voting in the city council elections in Yakima indicate that voting in those elections has been polarized between Latinos and non-Latinos. The Latino voters in all of these council elections preferred the Latino candidate. This preference was not shared by the non-Latino voters in any of these elections, who thereby vetoed the electoral choices of Latino voters. The vote on Proposition 1 was also polarized, as was that in the Supreme Court contest. Even when Latino voters cast over 90 percent of their votes for a Latino candidate, as in the decisive elections for Position 5 and Position 7 on the city council in 2009, and in support of Proposition 1 in 2011, their preferences are submerged and cancelled out by the non-Latino vote in the city.

33. Based on the analyses reported above, I conclude that Latinos have constituted a cohesive voting group in Yakima, and that the non-Latino majority has routinely voted sufficiently as a bloc to defeat those choices.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed on February 1, 2013 in Durham, NC.

Richard L. Engstrom

**TABLE**
**Estimated Divisions in Vote**

Point Estimate
(Confidence Interval)

**Election**

| | Percent of Latino Voters | Percent of Non-Latino Voters |
|---|---|---|
| **At-Large Place 5, 2009** | | |
| *Rodriguez* | | |
| Primary (v. 2 candidates) | 52.9 (15.1 – 82.5) | 37.3 (34.0 – 41.3) |
| General | 92.8 (72.2 – 99.2) | 42.6 (38.0 – 46.9) |
| **At-Large Place 7, 2009** | | |
| *Soria* | | |
| Primary (v. 3 candidates) | 59.5 (16.5 – 83.8) | 31.0 (27.8 – 35.1) |
| General | 92.7 (74.1 – 98.4) | 30.5 (27.6 – 32.8) |
| **At-Large Dist. 2, 2011** | | |
| *Montes* | | |
| Primary (v. 2 candidates) | 53.5 (16.8 – 82.8) | 13.4 (10.5 – 16.7) |

Yakima Proposition 1

*Yes*

| | | |
|---|---|---|
| Primary | 98.2 | 38.4 |
| | (95.9 – 99.2) | (36.4 – 40.3) |

Sup Ct. Position 8, 2012

***Gonzalez***

| | | |
|---|---|---|
| Primary | 63.2 | 36.9 |
| | (42.9 – 79.0) | (33.8 – 40.0) |

16

APPENDIX

Curriculum Vitae

17

# VITA
# RICHARD L. ENGSTROM

January, 2013

OFFICE
Center for the Study of Race, Ethnicity,
    and Gender in the Social Sciences
Social Science Research Institute
Duke Box 90420
Duke University
Erwin Mill
Durham, NC 27705
Phone:(504-756-1478)  Fax:(919)-681-4183
E-Mail Address = richard.engstrom@uno.edu
              richard.engstrom@duke.edu

HOME
23 Banbury Lane
Chapel Hill, NC 27517
Phone = (504)-756-1478

## PERSONAL AND EMPLOYMENT INFORMATION

Born May 23, 1946.  Married to former Carol L. Verheek.  Four children: Richard Neal, born 3/10/70; Mark Andrew, born 1/14/73; Brad Alan, born 3/31/77; and Amy Min, born 8/18/84.

Assistant Professor of Political Science, University of New Orleans, 1971-74; Associate Professor, 1974-1979; Professor, 1979-2006; Research Professor, 1987-2006, Endowed Professor of Africana Studies, 2003-2005.

Chairperson, Department of Political Science, University of New Orleans, 1976-1979. Coordinator of Graduate Studies, 1990-1992, 1993-2006.

Consultant, Center for Civil Rights, School of Law, University of North Carolina, Chapel Hill, 2006-2007.

Visiting Research Professor of Political Science and Visiting Research Fellow, Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University, Spring and Summer, 2008.  Visiting Professor of Political Science and Visiting Research Fellow, Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University 2008 - present.

18

Fulbright-Hays Professor, National Taiwan University and National Chengchi University, and Visiting Research Fellow, Institute of American Culture, Academic Sinica, Taipei, Taiwan, R.O.C., 1981-82.

Fulbright-Hays Professor, University College, Galway, Ireland, 1985-86.

Senior Research Fellow, Institute of Irish Studies, the Queen's University of Belfast, 1990.

David Bruce Fellow, Bruce Centre for American Studies, University of Keele, England, 1993.

Visiting Fellow, School of Politics, Australian Defence Force Academy, Canberra, Australia, 1998.

Program Visitor, Political Science Program, Research School of Social Sciences, Australian National University, Canberra, Australia, June-July, 2005.

Recipient, UNO Alumni Association's Career Distinction Award for Excellence in Research, December 1985.

Recipient, George W. Lucas Community Service Award, New Orleans NAACP, 1993.

FORMAL EDUCATION

Ph.D., University of Kentucky, 1971

M.A., University of Kentucky, 1969

A.B., Hope College (Holland, Michigan), 1968.
    (recipient of Class of '65 Political Science Award, 1968.

PRIMARY TEACHING FIELDS

Election Systems, Urban and Minority Politics, Legislative Process, American Politics.

PROFESSIONAL ACTIVITIES

Member, Election Review Committee, American Political Science Association, 2003-2004.

Chair, Section on Representation and Electoral Systems, American Political Science Association, 1993-95, 95-97.  Section Board, 1993-present.

Book review editor, American Review of Politics, 1995-present.

Lecture tour, under sponsorship of United States Information Agency, of Tanzania, Ethiopia, Kenya, Malawi, and Liberia, January, 1994. Topics include, among others, comparative election systems, legislatures within democratic regimes, and race and gender in contemporary politics.

Associate Member, Centre for the Study of Irish Elections, University College Galway.

Member, Board of Editors, Public Administration Quarterly 1977- present.

Member, Editorial Board, Journal of Politics, 1988-1993.

Member, Board of Editors, State and Local Government Review, 1988- 1990.

Member, Committee on the Status of Blacks, Southern Political Science Association, 1991-1996.

Treasurer, Southwestern Political Science Association, 1981 (position resigned during term due to Fulbright Lectureship).

Chair, Harold D. Lasswell Award Committee, American Political Science Association, 1995-1996 (best dissertation in public policy).

Chair, Ted Robinson Award Committee, Southwestern Political Science Association, 1995-1996 (best research project in minority politics by a graduate student).

Member, Nominating Committees, Southern Political Science Association, 1980; Louisiana Political Science Association, 1981, Study Group on Comparative Representation and Electoral Systems, International Political Science Association, 1988, Section on Representation and Electoral Systems, American Political Science Association, 1999.

Member, Chastain Award Committee, Southern Political Science Association, 1978. V.O. Key Award Committee, Southern Political Science Association, 1990. Ted Robinson Memorial Award Committee, Southwestern Political Science Association, 1995, 1996 (chair). Hallett Award Committee, Section on Representation and Electoral Systems, American Political Science Association, 1999, 2000.

Member, Program Committee (Urban Politics Section), 1976 Annual Meeting of the Southern Political Science Association. Program Committee (Urban Politics Section), 1992 Annual Meeting of the Midwest Political Science Association. Program Committee (Representation and Electoral Systems Section), 1994 Annual Meeting of the American Political Science Association. Program Committee (Representation and Electoral Systems Section), 2002 Annual Meeting of the American Political Science Association.

Member, Membership Committee, Southwestern Social Science Association, 1973-74.

Presented papers at meetings of the American Political Science Association, International Political Science Association, Midwest Political Science Association, Southern Political Science Association, Southwestern Political Science Association, Louisiana Political Science Association, Citadel Symposium on Southern Politics, International Society of Political Psychology, Harvard University Computer Graphics Week, Australian-New Zealand Academy for the Advancement of Science. Formal papers also presented at programs at Tulane University, Sagamon State University, University of Keele (England), Rice University, and Chief Justice Earl Warren Institute on Law and Social Policy, University of California School of Law.

Chaired panels at meetings of the American Political Science Association, Southern Political Science Association, Midwest Political Science Association, Southwestern Political Science Association, and International Political Science Association.

Served as discussant for panels at meetings of the American Political Science Association, Midwest Political Science Association, Southern Political Science Association; Southwestern Social Science Association; Louisiana Political Science Association; Institute of American Culture, Academic Sinica (Taiwan), and International Political Science Association.

Reviewed manuscripts for the American Political Science Review, American Journal of Political Science, Journal of Politics, Political Research Quarterly, Polity, Social Science Quarterly, Legislative Studies Quarterly, American Politics Quarterly, Urban Affairs Review, Electoral Studies, Election Law Journal, Political Analysis, National Political Science Review, Women and Politics, Southeastern Political Review, State and Local Government Review, Public Administration Review, Public Administration Quarterly, American Review of Politics, Presidential Studies Quarterly, Law and Policy, Journal of Policy History, Public Administration and Management, Journal of Women, Politics, and Policy, Howard University Press, Stanford University Press, and Northern Illinois University Press.

Recipient of grant from Pacific Cultural Foundation, Taipei, Taiwan to support project entitled "The Legislative Yuan: A Study of Legislative Adaptation" (1982).

Recipient of grant from private sources, New Orleans, to support a study of mayoral tenure in large American cities (1983).

Recipient of grant from Southern Regional Council, Atlanta, Georgia, to conduct exit poll of cumulative voting election in Chilton County, Alabama (1992).

Recipient of grants from Louisiana Education Quality Support Fund, Fellowship Funding for Superior Graduate Students, 1992 (1993-1997) $48,000; 1996 (1997-2001) $64,000; 1997 (1998-2002) $48,000; 1998 (1999-2003) $56,000.

21

Reviewed grant proposals for National Science Foundation programs in Political Science and Law and Social Sciences, and National Science Foundation graduate fellowship applications for the National Research Council.
Served as mentor in Southern Regional Council's Voting Rights Fellowship Program to Jason F. Kirksey, 1992-1993, and Dr. Olethia Davis, 1993-1994.

United Nations Consultant on Election Systems and Constituency Delimitation, National Election Commission of Liberia, UN Mission in Liberia, 2004.


## COMMUNITY AND UNIVERSITY SERVICE

Consultant, Charter Task Force Committee, New Orleans, 2000. Preparation of Term Limits: A Report to the Charter Task Force Committee, February, 2000.

Interviewed on term limits issue on "Crescent City Close Up," public affairs program on three radio stations, WNOE, KKND, and KUMX, March 19, 2000.

Participant, Roundtable on At-Large Elections for the Internet Corporation for Assigned Names and Numbers (ICANN), sponsored by Common Cause, the Center for Democracy and Technology, and the Markle Foundation, at the Kennedy School of Government, Harvard University, February 9, 2000.

Member, Board of Directors, Concern International Charities, 1998-2003.

Chairperson, Taskforce on Civil Service, Mayor-Elect Ernest Morial's Transition Office (New Orleans), 1977-78.

Member, Chachere Subcommittee of UNO Diversity Cabinet, 2003-2004.

Member, Graduate Council, UNO, 1975-76, 1994-95, 2006.

Member, Research Council, UNO, 1995-97, 2005.

Member, International Student Recruitment Committee, UNO, 1993-96.

Chairperson, Search Committee for Vice Chancellor for Research and Graduate Studies and Dean of the Graduate School, UNO, 1987-88.

Chairperson, Search Committee for Graduate Dean, UNO, 1978-79.

Member, University Budget Committee, UNO, 1983-84.

Member, Liberal Arts Advisory Committee, UNO, 1975-76, 1982-84.

Member, Academic Planning Committee, UNO, 1982-1988.

Member, Faculty Council Committee on Faculty Honors, UNO, 1985-1990.

Member, Committee on Research, UNO Self-Study, 1972-73; 1982-83.

Member, Dean's Advisory Committee on Academic Planning, College of Liberal Arts, UNO, 1983-84.
Member, University Senate, UNO, 1975-77; 1980-81; 83-85; 87-91.

Member, Steering Committee, Legal Division, New Orleans Chapter, American Foundation for Negro Affairs, 1977-79.

Service as expert witness in numerous vote dilution cases in federal courts. Employed by the United States Department of Justice, Lawyers' Committee for Civil Rights Under Law, NAACP Legal Defense and Educational Fund, Center for Constitutional Rights, Mexican-American Legal Defense and Educational Fund; Native American Rights Fund, and other organizations. Served as court-appointed expert for the remedial portion of Williams v. City of Dallas, United States District Court for the Northern District of Texas, Dallas Division, 1991. Service as Special Master for the remedial portion of Harper v. City of Chicago Heights, United States District Court for the Northern District of Illinois, Eastern Division, 2002-2004.

INVITED LECTURES / PRESENTATIONS (Since 1986)

1986: McGee College, University of Ulster - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

The Queen's University of Belfast - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

University of Keele - "The Contemporary Voting Rights Issue in American Politics"

University College Dublin - "The Contemporary Voting Rights Issue in American Politics" (4/30/86).

University College Galway - "The Reagan Elections: Realignment or Dealignment?"

1987: Southern University -"The Equal Protection Clause and Electoral Reapportionment" (4/8/87).

APSA Summer Institute for Black Students, Louisiana State University - "The Political Scientist as Expert Witness" (7/26/87).

NAACP Legal Defense Fund, Conference on Voting Rights, San Antonio, Texas - "Cumulative and Limited Voting as Remedies for Minority Vote Dilution."

<u>1988</u>:  College of William and Mary - "The Contemporary Voting Rights Issue" and "The Role of Social Scientists in Voting Rights Litigation"

University of Queensland - "One Vote, One Value:  The U.S. Experience After 25 Years" (5/24/88).

Griffith University (Brisbane) - "One Vote, One Value: The U.S. Experience After 25 Years" (5/25/88).

<u>1989</u>:  Tulane University - "Frontiers of Voting Rights: Vote Dilution in Judicial Elections" (3/9/89).
Lamar University - "Voting Rights:  A Retrospective" (10/30/89).

Oklahoma State University -  "Frontiers of Voting Rights" (November/10/89).

Prairie View A and M University - "Reapportionment and Black Political Power" (11/16/89).

<u>1990</u>:  The Queen's University of Belfast-Institute of Irish Studies, "The Irish Election System: Manipulation and Reform" (3/13/90); Department of Politics, "The Reagan Presidency: An Assessment" (3/8/90).

Brookings Institution - "Social Scientists and the Voting Rights Act" (10/19/90).

Lyndon Baines Johnson Library (Austin, Texas) - "The Evolution of the Voting Rights Act of 1965" (10/29/90).

<u>1991</u>:  University of Texas at Dallas - "Redistricting the Dallas City Council" (3/8/91).
United States Department of Justice, Voting Section - "Alternative Election Systems" (3/15/91).
Stetson University School of Law - "Alternative Election Systems as Remedies for Minority Vote Dilution" (4/27/91).

Norfolk State University - "Election Analyses in Voting Rights Litigation" (6/15/91).

<u>1992</u>:  University of Colorado, Summer Workshop in Urban Politics - "Race and Voting in Judicial Elections: New Orleans as a Case Study Setting" (7/9/91).

Harold Washington College, Chicago - "Political Science Research and Testimony in the Miami-Dade County Core" (9/5/92 - not presented to illness).

Southern Regional Council, Atlanta, Georgia - "Exit Polls and Voting Rights Litigation" (10/2/92).
<u>1994</u>:   Lecture tour of Tanzania, Ethiopia, Malawi, and Liberia for United States Information Agency, January, 1994.

National Conference of State Legislators, Annual Meeting, New Orleans - "Redistricting and the Courts" (7/26/94)

1995:    Department of International Politics, Peking University, "Constitutional Law, Comparative Electoral Systems, and the Politics of Race and Gender" (10/17/95).

1997: John D. Lees Memorial Lecture, Keynote Address, 1997 Annual Meeting of the American Politics Group, (United Kingdom) Political Science Association, Keele, England, "Affirmative Action: The Election and the Election System" (1/3/97).

Alumni College, College of Liberal Arts, University of New Orleans, "Racial Gerrymandering in the 1990s: The Issues and the Alternatives" (2/1/97).

Commission on Governmental Reorganization, City of New Orleans, "Principles for Governmental Organization" (9/23/97).

Civil Rights Training Institute (Airlie Conference), NAACP Legal Defense and Educational Fund, "Alternative Election Systems in the Post-Shaw Era" (11/8/97).

1998

School of Politics, Australian Defence Force Academy, Canberra, "Racial Gerrymandering in the United States" (4/1/98) and "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (5/29/98).

School of Political Science, University of New South Wales, Sydney, "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (4/8/98).

Illinois Secretary of State's Commission on Redistricting, Chicago, IL, "Computer Generated Districting Plans: Necessary Conditions and Tie Breaking Criteria" (12/16/98).

2001

Carinthian Institute of Minority Affairs, Villach, Austria, "Spiders, Earmuffs, and the Mark of Zorro:  Creating Electoral Opportunities for Minorities in America's Single Member District System" (5/5/01).

Bureau of Governmental Research, New Orleans, LA, "The Mayor: How Many Terms?" (10/10/01).

2002

Pomona College, Claremont, CA,  "Spiders, Earmuffs, and the Mark of Zorro: There Must be a Better Way" (3/13/02).

Utah State University, "The Redistricting Thicket: Are There Alternatives?" Bennion Teachers' Workshop (8/9/02).

Utah State University, "Missing the Target: Priorities among Districting Constraints," Redistricting in the New Millennium: A Lecture Series, (11/26/02).

2003

Florida State University, "Missing the Target: Priorities among Districting Constraints," (1/21/03).

2004

Cleveland City Club/Cleveland State University, "Metro Reform and Minority Voting Rights," (2/25/04).

Liberian National Election Commission Consultative Assembly, Monrovia, Liberia, "Constituency Boundary Redemarcation: Concepts and Timeframes," (6/7/04).

2005

Subcommittee on the Constitution, Committee on the Judiciary, United States House of Representatives, written and oral testimony, hearing on Extension of the Preclearance Provision of the Voting Rights Act, (10/25/05).

William C. Velasquez Institute, San Antonio, TX, "Influence Districts," (11/19/05)

2006

University of West Georgia, "The Gerrymandering Problem:  Lessons from Australia?" (4/3/06).

Duke University, "Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" (4/7/06).

International Political Science Association, Fukuoka, Japan. Roundtable on Electronic Voting. "E Voting in the U.S.," (7/13/06).

Brennan Center for Justice, New York University School of Law, "The Gerrymandering Problem: Lessons from Australia?," (8/7/06).

Short Course on The National Popular Vote Plan to Revamp the Electoral College, American Political Science Association Annual Meeting, Philadelphia, "Potential Impact of the National Popular Vote Plan on Presidential Elections and Other Electoral Reforms," (8/30/06).

American Bar Association, Administrative Law Section, "Redistricting Reform: Lessons from Australia," Washington, D.C. (10/26/06).

2008

Morehouse College, "The Gerrymandering Problem in the United States:   Judicial Protection or Redistricting Commissions or Alternative Election Systems," Voting Analysis in Mathematics and Politics: Interdisciplinary Research and Education Seminar (VAMPIRES) (4/18/08).

2009

Duke University, "Response to Thomas Brunell, 'Why Competitive Elections are Bad for America'," Duke University Political Science Students' Association (2/10/09).

Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity, University of California at Berkeley School of Law, presenter, panel on "The Redistricting Experience: Tales from the Field," conference on Redistricting Reform and Voting Rights: Identifying Common Ground and Challenges, UC Washington Center, (11/11/09).

2010

Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University Presentation on "Race and Redistricting" at the conference "Counting Race: Racial Classifications and the 2010 Census," Duke University (3/19/10).

St. Louis University Law School, Presentation on "Cumulative and Limited Voting as Remedies for Dilutive Election Systems," at the symposium on "Voting 45 Years after the Voting Rights Act," (3/26/10).

Demos, Presentation on "Issues in the Post-2010 Round of Redistricting" and Discussion Leader for Session on Redistricting, "An In-Depth Discussion with Demos," Washington, DC (9/4/10).

NAACP Legal Defense and Educational Fund, Presentation on "Prongs II and III: Necessary Preconditions under *Thornburg* v. *Gingles*," at the Voting Rights and Redistricting Training Institute, Airlie Conference, Warrenton, VA (10/9/10).

Center for Democratic Performance, Binghamton University, "Influence Districts and the Courts:  A Concept in Need of Clarity," (10/28/10).

Mexican American Legal Defense and Educational Fund,  Short presentation on "Racially Polarized Voting Analyses," National Redistricting Convening, San Antonio, TX (12/9/10).

2011

Columbia University, "IRCs in Comparative Perspective: Lessons from Australia?", Conference on Do Independent Redistricting Commissions .Affect Minority Representation?, New York City (12/9/11).

2012

Duke University, "Minorities and the New Round of Redistricting: Native Americans, Latinos, and African Americans, Plus (of course) The Great State of Texas," Center for the Study of Race, Ethnicity, and Gender Colloquium, (3/22/12).

Georgia Perimeter College, Clarkston Campus, "Minority-Majority Districts: Their Adoption and Consequences," (10/4/12).

Numerous other presentations before groups such as the Louisiana Municipal Association; New Orleans League of Women Voters; Public Policy Forums at Southern University in Baton Rouge; Louisiana Municipal Clerks Institute; (La.) Black Legislative Caucus Institute; Robert A. Taft Institute of Government Seminars, Southern University; Special Committee on Elective Law and Voter Participation, American Bar Association; Subcommittee on Civil and Constitutional Law, United States House of Representatives Committee on the Judiciary; Institute of American Culture, Academic Sinica (Taiwan), Foundation for Scholarly Exchange (Taiwan), and Tulane University, Department of Political Science and College of Law.

REFERENCES

Dr. Christine L. Day, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148, 504-280-6266, clday@uno.edu.

Dr. Charles D. Hadley, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148, 504-810-3087, cdhadley@gmail.com.

Dr. Kerry L. Haynie, Department of Political Science, Duke University, Durham, NC 27708, 919-660-4366, klhaynie@duke.edu.

Dr. Baodong Liu, Interim Director, Ethnic Studies and Associate Professor of Political Science, University of Utah, Salt Lake City, UT 84112, 801-581-6473, baodong.liu@utah.edu.

Dr. Michael D. McDonald, Department of Political Science, University of Binghamton, Binghamton, NY 13901 607-777-4563, mdmcd@binghamton.edu.

28

CURRENT RESEARCH

"Districting by Independent Commissions: Lessons from Australia?" being prepared for a volume on Independent Redistricting Commissions and Minority Representation, edited by Rudilfo O. de la Garza.

"Native Americans and Redistricting Issues: State Legislative Redistricting in New Mexico," an invited submission to the *Justice Systems Journal*,

Preparation of an invited Review Essay on Jason P. Casellas, *Latino Representation in State Houses and Congress,* and Michael D. Minta, *Oversight: Representing the Interests of Blacks and Latinos in Congress*, for the *Journal of Politics*, with Kerry L. Haynie.

Analysis of Instance Runoff Voting Elections in North Carolina, 2007 and 2009 (with Michael Cobb).

A Review of the Evidentiary Record for the Renewal and Amendment of the Special Provisions of the Voting Rights Act, 2006, with a focus on Louisiana.

LATEST CONFERENCE PAPERS

"Influence District and the Courts: A Concept in Need of Clarity." Initially presented at the Conference on "Lessons from the Past, Prospects for the Future: Honoring the Fortieth Anniversary of the Voting Rights Act of 1965," Center for the Study of American Politics, Yale University, April 21-23, 2005. Expanded version forthcoming in volume edited by Daniel McCool, The Most Fundamental Right: The 2006 Reauthorization of the Voting Rights Act.

"Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" John Hope Franklin Center, Duke University, April 7, 2006.

"Majority Vote Rule and Runoff Elections," presented at a conference on "Plurality and Multi-Round Elections," University of Montreal, June, 2006 (co-authored with Richard N. Engstrom), Montreal, June 17-18, 2006. Expanded version selected for inclusion in mini-symposium in Electoral Studies, edited by Bernard Grofman, 27 (September 2008) 407-416.

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," presented at the symposium on *Voting 45 Years* after the *Voting Rights Act,* St. Louis University School of Law, March 26, 2010; forthcoming in the Fall 2010 edition of the St. Louis University Public Law Review.

"Political Scientists as Expert Witness," Annual Meeting of the State Politics and Policy Association, Springfield, IL, June, 2010), with Michael P. McDonald. (Presented by Michael P. McDonald.)

# **PUBLICATIONS**

## BOOKS

Fair and Effective Representation? Debating Electoral Reform and Minority Rights (Lanham, MD: Rowman and Littlefield, 2001) (with Mark A. Rush).

## MONOGRAPHS

Home Rule for Louisiana Parishes (Baton Rouge: Police Jury Association of Louisiana and Governmental Services Institute, Louisiana State University, 1974).

Municipal Home Rule in Louisiana (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1974).

Municipal Government Within the 1974 Louisiana Constitution: A Reference Guide for Municipal Officials (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1975).

Louisiana Mayor's Handbook (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1977), (with Edward Clynch and Konrad Kressley).

Mayoral Tenure in Large American Cities (New Orleans: School of Urban and Regional Studies, University of New Orleans, 1983).

## ARTICLES, RESEARCH NOTES, AND BOOK CHAPTERS

"Statutory Restraints on Administrative Lobbying -- 'Legal Fiction'", Journal of Public Law, Vol. 19, No. 1 (1970), 90-103 (with Thomas G. Walker). Reprinted in Dennis Ippolito and Thomas Walker (eds.), Reform and Responsiveness: Readings in American Politics (New York: St. Martin's Press, Inc., 1972), pp. 428-438.

"Race and Compliance: Differential Political Socialization," Polity, 3 (Fall 1970), 100-111. Reprinted in Charles S. Bullock, III, and Harrell Rogers, Jr. (eds.), Black Political Attitudes: Implications for Political Support (Chicago: Markham Publishing Co., 1972), pp. 33-44.

"Political Ambitions and the Prosecutorial Office," Journal of Politics, 33 (February 1971), 190-194.

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments," Midwest Journal of Political Science 15 (August 1971), 475-494 (with W.E. Lyons).

"Expectations and Images: A Note on Diffuse Support for Legal Institutions," Law and Society Review, 6 (May 1972), 631-636 (with Michael W. Giles).

"Black Control or Consolidation: The Fringe Response," Social Science Quarterly, 53 (June 1972), 161-167 (with W.E. Lyons).

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments: A Comparison of Survey Findings," American Journal of Political Science, 17 (February 1973), 182-188 (with W. W. E. Lyons).

"Racial Gerrymandering and Southern State Legislative Redistricting: Attorney General Determinations Under the Voting Rights Act," Journal of Public Law, Vol. 22, No. 1 (1973), 37-66 (with Stanley A. Halpin, Jr.).

"Socio-Political Cross Pressures and Attitudes Toward Political Integration of Urban Governments," Journal of Politics, 35 (August 1973), 682-711 (with W.E. Lyons).

"Candidate Attraction to the Politicized Councilmanic Office: A Note on New Orleans," Social Science Quarterly, 55 (March 1975), 975-982 (with James N. Pezant).

"Home Rule in Louisiana -- Could This Be The Promised Land?," Louisiana History, 17 (Fall 1976), 431-455.

"Judicial Activism and the Problem of Gerrymandering," in Randall B. Ripley and Grace A. Franklin (eds.), National Government and Public Policy in the United States (Itasca, IL: Peacock Publishers, Inc., 1977), pp. 239-244.

"The Supreme Court and Equi-Populous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation," Arizona State Law Journal, Vol. 1976, No. 2 (1977), 277-319. Cited in Karcher v. Daggett, 462 U.S. 725 (1983) (by J. Stevens, concurring, at 750 n. 8, 752 n. 10, 753 n. 11, and 758 n. 16, and J. White, dissenting, at 776 n. 12).

"State Centralization Versus Home Rule: A Note on Ambition Theory's Powers Proposition," Western Political Quarterly 30 (June 1977), 288-294 (with Patrick F. O'Connor).

"Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering," Legislative Studies Quarterly, 2 (November 1977) 465-479 (with John K.

Wildgen).  Cited extensively in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan).

"Racial Vote Dilution: Supreme Court Interpretations of Section 5 of the Voting Rights Act," Southern University Law Review, 4 (Spring 1978), 139-164.

"The Political Behavior of Lawyers in the Louisiana House of Representatives," Louisiana Law Review 39 (Fall 1978), 43-79 (with Patrick F. O'Connor, Justin J. Green, and Chong Lim Kim).

"Restructuring the Regime: Support for Change Within the Louisiana Constitutional Convention," Polity 11 (Spring 1979), 440-451 with Patrick F. O'Connor).

"The Hale Boggs Gerrymander: Congressional Redistricting, 1969," Louisiana History, 21 (Winter 1980), 59-66.

"Lawyer-Legislators and Support for State Legislative Reform," Journal of Politics, 42 (February 1980), 267-276 (with Patrick F. O'Connor).

"Racial Discrimination in the Electoral Process: The Voting Rights Act and the Vote Dilution Issue," in Robert P. Steed, Lawrence W. Moreland, and Tod A. Baker, (eds.), Party Politics in the South (New York: Praeger Publishing, 1980), pp. 197-213.

"Spatial Distribution of Partisan Support and the Seats/Votes Relationship," Legislative Studies Quarterly, 5 (August 1980), 423- 435 (with John K. Wildgen).

"Computer Graphics and Political Cartography: ASPEX of Gerrymandering," in Computer Mapping Applications in Urban, State, and Federal Government, Plus Computer Graphics in Education, Vol. 16, Harvard Library of Computer Graphics, 1981 Mapping Collection (Cambridge, Mass.: Laboratory for Computer Graphics and Spatial Analysis, Harvard University, 1981), pp. 51-57 (with John K. Wildgen).

"The Election of Blacks to City Councils: Clarifying the Impact of Electoral Arrangements on the Seats/Population Relationship," American Political Science Review, 75 (June 1981), 344-354 (with Michael D. McDonald).

"Post-Census Representational Districting: The Supreme Court, 'One Person, One Vote,' and the Gerrymandering Issue," Southern University Law Review, 7 (Spring 1981), 173-226.

"Municipal Government," in James Bolner (ed.), Louisiana Politics: Festival in a Labyrinth (Baton Rouge: Louisiana State University Press, 1982), pp. 181-219.

"The 1980 Election and the Realignment Thesis: A Note of Caution," American Studies (Mei-kuo-Yen-chiu), 12 (June 1982), 107-132.

"Racial Vote Dilution and the 'New' Equal Protection Clause: City of Mobile v. Bolden," American Studies (Mei-kuo-Yen-chiu) 12 (September 1982), 25-72.

"The Underrepresentation of Blacks on City Councils: Comparing the Structural and Socioeconomic Explanations for South/Non-South Differences," Journal of Politics, 44 (November 1982), 1088-1099 (with Michael D. McDonald).

"The Impact of the 1980 Supplementary Election on Nationalist China's Legislative Yuan," Asian Survey, 24 (April 1984), 447-458 (with Chu Chi-hung).

"The Marginality Hypothesis and the State Legislative Salary Issue," Southeastern Political Review, 13 (Spring 1985), 169-182 (with Patrick F. O'Connor).

"Racial Vote Dilution: The Concept and the Court," in Lorn Foster (ed.), The Voting Rights Act: Consequences and Implications (New York: Praeger Publishers, 1985), pp. 13-43.

"Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting," The Urban Lawyer, 17 (Summer 1985), 369-377 (with Michael D. McDonald). Cited in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan).

"The Reincarnation of the Intent Standard: Federal Judges and At- Large Election Cases," Howard Law Journal 28 (No 2, 1985), 495-513.  Cited in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan).  Abbreviated version appeared in Focus (June, 1985).  (Focus is a monthly publication of the Joint Center for Political Studies in Washington, D.C.).

"The Effect of At-Large Versus District Elections on Racial Representation in U.S. Municipalities," in Bernard Grofman and Arend Lijphart (eds.), Electoral Laws and Their Political Consequences (New York: Agathon Press, Inc., 1986), pp. 203-225 (with Michael D. McDonald).

"Repairing the Crack in New Orleans' Black Vote: VRA's Results Test Nullifies 'Gerryduck'," Publius 16 (Fall 1986), 109-121.  Reprinted in Charles Vincent (ed.), The African American Experience in Louisiana: From Jim Crow to Civil Rights (Lafayette, LA: Center for Louisiana Studies).

"Quantitative Evidence in Vote Dilution Litigation, Part II: Minority Coalitions and Multivariate Analysis," Urban Lawyer 19 (Winter 1987), 65-75 (with Michael D. McDonald).

"District Magnitudes and the Election of Women to the Irish Dail," Electoral Studies, 6 (August 1987), 123-132.

"The Election of Blacks to Southern City Councils: The Dominant Impact of Electoral Arrangements," in Robert P. Steed, Laurence W. Moreland, and Tod A. Baker (eds.) Blacks

in Southern Politics (New York: Praeger Publishers, 1987), pp. 245-258 (with Michael D. McDonald).

"Race, Referendums, and Rolloff," Journal of Politics 49 (November 1987), 1081-1092 (with Jim M. Vanderleeuw).

"Definitions, Measurements, and Statistics: Weeding Wildgen's Thicket," Urban Lawyer 20 (Winter 1988), 175-191 (with Michael D. McDonald).

"The Desirability Hypotheses and the Election of Women to City Councils: A Research Note," State and Local Government Review 20 (Winter 1988), 38-40 (with Michael D. McDonald and Bih-Er Chou).

"Black Politics and the Voting Rights Act(s):  1965-1982," in James Lea (ed.), Contemporary Southern Politics:  Continuity and Change (Baton Rouge:  Louisiana State University Press, 1988), pp. 83-106.

"Race and Representational Districting: Protections Against Delineational and Institutional Gerrymandering," Comparative State Politics Newsletter 9 (October 1988), 15-24.

"Cumulative Voting as a Remedy for Minority Vote Dilution: The Case of Alamogordo, New Mexico," Journal of Law and Politics 5 (Spring 1989), 469-497 (with Delbert A. Taebel and Richard L. Cole).  Reprinted in Roger L. Kemp, (ed.), Local Government Election Practices: A Handbook for Public Officials and Citizens (Jefferson, N.C.: McFarland & Co., 1999), 372-391.

"When Blacks Run for Judge: Racial Divisions in the Candidate Preferences of Louisiana Voters," Judicature 73 (August-September 1989), 87-89.

"Detecting Gerrymandering," in Bernard Grofman (ed.), Political Gerrymandering and the Courts (New York:  Agathon Press, Inc., 1990), pp. 178-202  (with Michael D. McDonald).

"Cumulative Voting in a Municipal Election: A Note on Voter Reactions and Electoral Consequences," Western Political Quarterly, 43 (March 1990), 191-199 (with Richard L. Cole and Delbert A. Taebel).

"Alternative Electoral Systems as Remedies for Minority Vote Dilution," Hamline Journal of Public Law and Policy 11 (Spring 1990), 19-29  (with Delbert A. Taebel and Richard L. Cole).  Cited in Holder v. Hall, _____ U.S. _____ (1994), (by J. Thomas, concurring).

"Cincinnati's 1988 Proportional Representation Initiative," Electoral Studies 9 (September 1990), 217-225.

"Getting the Numbers Right: A Response to Wildgen," Urban Lawyer 22 (Summer 1990), 495-502.

"Native Americans and Cumulative Voting: The Sisseton-Wahpeton Sioux," Social Science Quarterly 72 (June 1991), 388-393 (with Charles J. Barrilleaux).

"Proportional Representation Considered in Cincinnati," Representation 30 (Spring 1991), 3-5.

"Voting for Judges: Race and Roll-Off in Judicial Elections," in William Crotty (ed.), Political Participation and Democratic Politics (New York: Greenwood Press, 1991), pp. 171-191 (with Victoria M. Caridas).

"Minority Representation and Councilmanic Election Systems: A Black and Hispanic Comparison," in Anthony Messina, Laurie Rhodebeck, Frederick Wright, and Luis R. Fraga, (eds.), Ethnic and Racial Minorities in Advanced Industrial Democracies, (New York: Greenwood Press, 1992), pp. 127-142 (with Michael D. McDonald).

"Alternative Judicial Election Systems: Solving the Minority Vote Dilution Problem," in Wilma Rule and Joseph F. Zimmerman (eds.), United States Electoral Systems: Their Impact on Women and Minorities (New York: Greenwood Press, 1992), pp. 129-139.

"Modified Multi-Seat Election Systems as Remedies for Minority Vote Dilution," Stetson Law Review 21 (Summer 1992), 743-770.

"Councilmanic Redistricting Conflicts: The Dallas Experience," Urban News 6 (Fall 1992), 1, 4-8.

"The Single Transferable Vote: An Alternative Remedy for Minority Vote Dilution," University of San Francisco Law Review 27 (Summer, 1993), 781-813. Excerpt reprinted in Voting and Democracy Report, 1993 (Washington, D.C.: Center for Voting and Democracy, 1993).

"'Enhancing' Factors in At-Large Plurality and Majority Systems:  A Reconsideration," Electoral Studies 12 (December 1993), 385-401 (with Michael D. McDonald).

"Louisiana," in Chandler Davidson and Bernard Grofman (eds.), The Quiet Revolution: Minority Voting Rights and Representation in the South (Princeton: Princeton University Press, 1994), pp. 103-135, 413-417 (with Stanley A. Halpin, Jean A. Hill, and Victoria M. Caridas-Butterworth).

"The Voting Rights Act: Disfranchisement, Dilution, and Alternative Election Systems," PS: Political Science and Politics 27 (December 1994), 685-688.

"The 1994 New Orleans Mayoral Election: Racial Divisions Continue," Urban News 9 (Spring 1995), 6-9 (with Willie D. Kirkland).

"Shaw v. Reno and New Election Systems: The Cumulative Voting Alternative," Voting Rights Review (Spring 1995), 10, 12 (with Jason F. Kirksey and Edward Still) [excerpt

35

reprinted in <u>Voting and Democracy Report, 1995</u> (Washington, D.C.: Center for Voting and Democracy, 1995), 67-68].

"Voting Rights Districts: Debunking the Myths," <u>Campaigns and Elections</u> (April 1995), 24, 46.

"<u>Shaw</u>, <u>Miller</u>, and the Districting Thicket," <u>National Civic Review</u>, 84 (Fall-Winter 1995), 323-336. Reprinted as "The Supreme Court on Redistricting" in Roger L. Kemp, (ed.), <u>Local Government Election Practices: A Handbook for Public Officials and Citizens</u> (Jefferson, N.C.: McFarland & Co., Inc., 1999), 80-92.

"Local Redistricting Under the Voting Rights Act," <u>Communities and the Voting Rights Act: A Guide to Compliance in These Changing Times</u> (Denver: National Civic League, Inc., 1996), 69-82.

"One Person, Seven Votes: The Cumulative Voting Experience in Chilton County, Alabama," in Anthony Peacock, (ed.), <u>Affirmative Action and Representation: Shaw v. Reno and the Future of Voting Rights</u> (Durham, N.C.: Carolina Academic Press, 1997), pp. 285-313 (with Jason Kirksey and Edward Still).

"Limited and Cumulative Voting in Alabama: An Assessment After Two Rounds of Elections," <u>National Political Science Review</u>, Vol. 6 <u>Race and Representation</u> (New Brunswick: Transaction Publishers, 1997), 180-191 (with Jason F. Kirksey and Ed Still).

"Cumulative Voting and Latino Representation: Exit Surveys in Fifteen Texas Communities," <u>Social Science Quarterly</u> 78 (December 1997), 973-991 (with Robert R. Brischetto).

"Is Cumulative Voting Too Complex? Evidence from Exit Polls," <u>Stetson Law Review</u> 27 (Winter 1998), 813-833 (with Robert R. Brischetto).

"Affirmative Action and the Politics of Race," in Gillian Peele, Christopher J. Bailey, Bruce Cain, and B. Guy Peters, (eds.), <u>Developments in American Politics 3</u> (London: MacMillan Press Ltd. and New York: Chatham House Publishers, 1998), pp. 292-306.

"Race and Representational Districting in Louisiana," in Bernard Grofman, (ed.), <u>Race and Redistricting in the 1990s</u> (New York: Agathon Press, 1998), pp. 229-268 (with Jason F. Kirksey).

"Minority Electoral Opportunities and Alternative Election Systems in the United States," in Mark Rush, (ed.), <u>Voting Rights and Redistricting in the United States</u> (New York: Greenwood Publishing, 1998), pp. 227-243.

"Electoral Arrangements and Minority Political Incorporation," in Richard Kaiser and Katherine Underwood, (eds.), <u>Minority Politics at the Millennium</u> (New York: Garland Publishing, Inc., 2000), pp. 19-50.

36

"Louisiana," in Dale Krane, Platon R. Rigos, and Melvin Hill, (eds.), <u>Home Rule in America: A Fifty-State Handbook</u> (Washington, D.C.: Congressional Quarterly Press, 2001), 173-182 (with Robert K. Whelan).

"The Post-2000 Round of Redistricting: An Entangled Thicket within the Federal System," <u>Publius,</u> 32 (Fall 2002): 51-70.

"The United States: the Future – Reconsidering Single-Member Districts and the Electoral College," in Josep M. Colomer, (ed.), <u>Handbook of Electoral System Choice</u> (London: Palgrave Macmillan Ltd, 2004), 164-176.

"Expert Witness Testimony," <u>Encyclopedia of Social Measurement,</u> Vol. 1 (London: Elsevier Inc., 2005), 919-925.

"Revising Constituency Boundaries in the United States and Australia: It Couldn't be More Different," <u>Democratic Audit of Australia</u>  (August 2005), 1-10 (http://democratic.audit.anu.edu.au)

"Missing the Target: The Supreme Court, 'One Person, One Vote,' and Partisan Gerrymandering," in Peter Galderisi, (ed.), <u>Redistricting in the New Millennium,</u> (Lanham, MD: Lexington Books, 2005), 313-340.

"Reapportionment," in Joseph R. Marbach, Ellis Katz, and Troy E. Smith (eds.), <u>Federalism in America: An Encyclopedia</u> (Westport, CT: Greenwood Press, 2006), Vol. 2, 528-532.

"Race and Southern Politics: The Special Case of Congressional Districting," in Robert P. Steed and Laurence W. Moreland, (eds.), <u>Writing Southern Politics: Contemporary Interpretations and Future Directions,</u> (Lexington, KY: University Press of Kentucky, 2006), 91-118.

"Electoral College," in William A. Darity, Jr. (ed.), <u>International Encyclopedia od the Social Sciences</u> (Vol. 2, 2d ed; Detroit: Macmillan Reference USA, 2008), 559-560.

"Majority Vote Rules and Runoff Primaries in the United States," <u>Electoral Studies,</u> 27 (September 2008): 407-416 (with Richard N. Engstrom).

"<i>NAMUDNO</i>: A Curveball on Voting Rights," <u>Justice System Journal,</u> 30 (No. 3 2009): 351-360.

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," <u>St. Louis University Public Law Review</u> 30 (No. 1, 2010): forthcoming.

"The Political Scientist as Expert Witness," <u>PS</u> 44 (April 2011): 285-289 (with Michael P. McDonald).

"Influence Districts: A Note of Caution and a Better Measure," Chief Justice Earl Warren Institute on Law and Social Policy, University of California Law School, Policy Brief, 2011.

"Influence District: The Concept and the Court," in Daniel McCool (ed.), The Most Fundamental Right: A Debate Over the Voting Rights Act, (Bloomington, IN: Indiana University Press), forthcoming 2012.

TITLED BOOK REVIEWS

"Partisan Gerrymandering and State Legislative Districts," review of Jonathan Winburn, THE REALITIES OF REDISTRICTING: FOLLOWING THE RULES AND LIMITING GERRYMANDERING IN STATE LEGISLATIVE REDISTRICTICTING, in Election Law Journal, 8 (No. 3, 2009), 227-232.

"Thernstrom v. Voting Rights Act: Round Two," review of Abigail Thernstrom, VOTING RIGHTS – AND WRONGS:  THE ELUSIVE QUEST FOR RACIALLY FAIR ELECTIONS, Election Law Journal, 9 (No.3, 2010), 203-210

"Race and Southern Politics," review of Charles S. Bullock and Ronald Keith Gaddie, THE TRIUMPH OF VOTING RIGHTS IN THE SOUTH, in Election Law Journal, 10 (No. 1, 2011), 53-61.

"African American State Legislators and Substantive Representation in Louisiana," review of Jas M. Sullivan and Jonathan Winburn, THE LOUISIANA LEGISLATIVE BLACK CAUCUS: RACE AND REPRESENTATION IN THE PELICAN STATE, in Election Law Journal, 12 (No.1, 2013), forthcoming.

"Minority Representatives and Minority Representation," review essay on Jason Casellas, LATINO REPRESENTATION IN STATE HOUSES AND CONGRESS, and Michael D. Minta, OVERSIGHT: REPRESENTING THE INTERESTS OF BLACKS AND LATINOS IN CONGRESS, Journal of Politics, forthcoming.

OTHER BOOK REVIEWS

Review of John Wilson Lewis (ed.), THE CITY IN COMMUNIST CHINA, in Journal of Politics, 34 (February 1972), 310-311.

Review of Arthur I. Blaustein and Geoffrey Faux, THE STAR-SPANGLED HUSTLE: WHITE POWER AND BLACK CAPITALISM in Wall Street Review of Books, 1 (June 1973), 215-229.

Review of Carroll Smith Rosenberg, RELIGION AND THE RISE OF THE AMERICAN CITY: THE NEW YORK CITY MISSION MOVEMENT, 1812-1870, in Christian Scholar's Review, Vol. 4, No. 1 (1974), 73-75.

Review of Robert Higgs, COMPETITION AND COERCION, BLACKS IN THE AMERICAN ECONOMY, 1865-1914, in Wall Street Review of Books, 6 (Spring 1978), 117-119.

Review of Herbert E. Alexander, MONEY IN POLITICS, and Herbert E. Alexander, FINANCING POLITICS: MONEY, ELECTIONS, AND POLITICAL REFORM, in Wall Street Review of Books, 6 (Summer 1978), 209-211.

Review of James M. Buchanan and Richard E. Wagner, DEMOCRACY IN DEFICIT: THE POLITICAL LEGACY OF LORD KEYNES, in Wall Street Review of Books, 6 (Fall 1978), 319-320.

Review of American Enterprise Institute for Public Policy Research, ZERO-BASE BUDGETING AND SUNSET LEGISLATION, in Wall Street Review of Books, 7 (Winter 1979), 53-55.

Review of David Rogers, CAN BUSINESS MANAGEMENT SAVE THE CITIES? THE CASE OF NEW YORK, in Wall Street Review of Books, 7 (Spring 1979), 75-77.

Review of Kevin R. Cox and R. J. Johnston (eds.), CONFLICT, POLITICS AND THE URBAN SCENE, in American Political Science Review, 78 (June 1984), 531-532.

Review of Manuel Carballo and Mary Jo Bane (eds.), THE STATE AND THE POOR IN THE 1980s, in American Political Science Review, 79 (June 1985), 523-524.

Review of Terry Sanford, A DANGER TO DEMOCRACY: THE PRESIDENTIAL NOMINATING PROCESS, in Presidential Studies Quarterly, 16 (Winter 1986), 153-155.

Review of Charles W. Whalen, Jr., THE HOUSE AND FOREIGN POLICY: THE IRONY OF CONGRESSIONAL REFORM, in Presidential Studies Quarterly, 16 (Spring 1986), 369-371.

Review of Arend Lijphart and Bernard Grofman (eds.), CHOOSING AN ELECTORAL SYSTEM: ISSUES AND ALTERNATIVES, in Irish Political Studies, 1 (1986), 125-127.

Review of David McKay, AMERICAN POLITICS AND SOCIETY, in Presidential Studies Quarterly, 17 (Fall 1987), 784-785.

Review of Sheila D. Collins, THE RAINBOW CHALLENGE:  THE JACKSON CAMPAIGN AND THE FUTURE OF AMERICAN POLITICS, in Presidential Studies Quarterly, 19 (Fall 1988), 874-875.

Review of Abigail M. Thernstrom, WHOSE VOTES COUNT? AFFIRMATIVE ACTION AND MINORITY VOTING RIGHTS, in Policy Studies Review 8 (Autumn 1988), 191-194.

Review of Herbert H. Haines, BLACK RADICALS AND THE CIVIL RIGHTS MAINSTREAM, 1954-1970, in Journal of Southern History, 56 (February 1990): 155-157.

Review of Harlan Hahn and Sheldon Kamienieki, PREFERENDUM VOTING: SOCIAL STATUS AND POLICY PREFERENCES, in Presidential Studies Quarterly 20 (Fall 1990): 828-830.

Review of Michael Gallagher and Michael Marsh (eds.), CANDIDATE SELECTION IN COMPARATIVE PERSPECTIVE: THE SECRET GARDEN OF POLITICS, in Presidential Studies Quarterly 21 (Winter 1991): 167- 168.

Review of Thomas Cronin, DIRECT DEMOCRACY: THE POLITICS OF INITIATIVE, REFERENDUM, AND RECALL, in Presidential Studies Quarterly, 22 (Fall 1992): 786-788.

Review of F. Leslie Seidle, (ed.), COMPARATIVE ISSUES IN PARTY AND ELECTION FINANCE, in British Journal of Canadian Studies, (1993).

Review of John Dittmer, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI, in Annals of the American Academy of Political and Social Science, 540 (July 1995): 170-171.

Review of Michael J. Glennon, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION, in National Political Science Review, 6 (1997): 323-325.

Review of Frederick M. Wirt, "WE AIN'T WHAT WE WAS": CIVIL RIGHTS IN THE NEW SOUTH, in American Political Science Review, 92 (June 1998): 474-475.

Review of David T. Canon, RACE, REDISTRICTING, AND REPRESENTATION: THE UNINTENDED CONSEQUENCES OF BLACK MAJORITY DISTRICTS, in The Law and Politics Book Review, 9 (October 1999): 467-471.

Review of Christopher M. Burke, THE APPEARANCE OF EQUALITY: RACIAL GERRYMANDERING, REDISTRICTING, AND THE SUPREME COURT, in The Law and Politics Book Review, 9 (November 1999): 506-508.

Review of J. Morgan Kousser, COLORBLIND INJUSTICE: MINORITY VOTING RIGHTS AND THE UNDOING OF THE SECOND RECONSTRUCTION, in Journal of Politics, 62 (August 2000): 934-937.

Review of Kathleen L. Barber, A RIGHT TO REPRESENTATION: PROPORTIONAL ELECTION SYSTEMS FOR THE TWENTIETH-FIRST CENTURY, in Representation, 38 (Summer/Autumn 2001), 171-173.

Review of Shaun Bowler and Bernard Grofman, (eds.), ELECTIONS IN AUSTRALIA, IRELAND, AND MALTA UNDER THE SINGLE TRANSFERABLE VOTE: REFLECTIONS ON AN EMBEDDED INSTITUTION, in American Political Science Review, 95 (December 2001), 1012 - 1013.

Review of Dianne T. Thompson, CONGRESSIONAL REDISTRICTING IN NORTH CAROLINA: RECONSIDERING TRADITIONAL CRITERIA, in The Law and Politics Book Review, 13 (December 2003).

Review of Douglas J. Amy, REAL CHOICES / NEW VOICES: HOW PROPORTIONAL REPRESENTATION ELECTIONS COULD REVITALIZE AMERICAN DEMOCRACY, in Representation, 40 (No. 2, 2004), 158-160.

Review of David M. Ferrell and Ian McAllister, THE AUSTRALIAN ELECTION SYSTEM: ORIGINS, VARIATIONS AND CONSEQUENCES, in Representation, 42 (November 2006), 368-370.

Review of Thomas E. Mann and Bruce E. Cain, (eds.), PARTY LINES: COMPETITION, PARTISANSHIP, AND CONGRESSIONAL REDISTRICTING, in Party Politics, 14 (May 2008), 373-376.

Review of Lisa Handley and Bernard Grofman, (eds.), REDISTRICTING IN COMPARATIVE PERSPECTIVE, in American Review of Politics, 30 (Winter 2010), 363-368.

Review of James Thomas Tucker, THE BATTLE OVER BILINGUAL BALLOTS: LANGUAGE MINORITIES AND POLITICAL ACCESS UNDER THE VOTING RIGHTS ACT, in International Journal of Law in Context, 8 (December. 2012), 524-526.

Exhibit 3

Deposition of John Alford, 2/19/2014

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

_____

ROGELIO MONTES and MATEO            )
ARTEAGA,                            )
                                    )
            Plaintiffs,             )
                                    )
            vs.                     )      No. 12-CV-3108 TOR
                                    )
CITY OF YAKIMA, MICAH CAWLEY,       )
in his official capacity as         )
Mayor of Yakima, and MAUREEN        )
ADKINSON, SARA BRISTOL, KATHY       )
COFFEY, RICK ENSEY, DAVE ETTL,      )
and BILL LOVER, in their            )
official capacity as members        )
of the Yakima City Council,         )
                                    )
            Defendants.             )

_____

DEPOSITION UPON ORAL EXAMINATION

OF

JOHN RICHARD ALFORD, PH.D.

_____

9:00 a.m.
February 19, 2014

1201 Third Avenue 4800
Seattle, Washington 98101-3099

JACQUELINE L. BELLOWS
CCR 2297

Deposition of John Alford, 2/19/2014

Page 2

1                I N D E X   O F   E X A M I N A T I O N

2                                                           Page
                                                           ----
3

Examination

4
       By Ms. Khanna -------------------------------  4

5

6

7

8
                  I N D E X   O F   E X H I B I T S

9

   No.   Description                        Marked   Identified
10  ---   -----------                        ------   ----------

11  1    Report of Richard L. Engstrom, Ph.D.      4        106

12  2    Report of John Alford, Ph.D.              4          5

13  3    Reply Report of Richard L. Engstrom,      4         79
            Ph.D.
14
    4    Supplemental Report of Richard L.         4        181
15          Engstrom, Ph.D.

16  5    Supplemental Report of John Alford,       4          6
            Ph.D.
17
    6    The 2000 Census and the New              31         31
18          Redistricting, 2-18-14,
            http://www.schoollawsection.org/
19          redistricting.html

20  7    Reyes, et al., v. City of Farmers Branch, 91        92
            Case No. 3:07-CV-0900-0, Volume 2 of 2
21          Transcript of Trial Before the Court.

22  8    Expert Report of Peter Morrison, Ph.D.  156        156

23

24

25

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 66

Page 3

1

2                          APPEARANCES

3

For the Plaintiffs:

4
                         ABHA KHANNA
5                        KEVIN HAMILTON
                         WILLIAM B. STAFFORD
6                        PERKINS COIE
                         1201 Third Avenue 4800
7                        Seattle, Washington 98101-3099

8

9                        LA ROND BAKER
                         AMERICAN CIVIL LIBERTIES UNION
10                       901 Fifth Avenue 630
                         Seattle, Washington 98164
11

12

13
For the Defendant:
14
                         FRANCIS S. FLOYD
15                       FLOYD PFLUEGER & RINGER
                         200 West Thomas Street 500
16                       Seattle, Washington 98119-4296

17

18

19   Also Present:       RICHARD L. ENGSTROM, Ph.D.

20

21

22   Court Reporter:     JACQUELINE L. BELLOWS
                         VAN PELT, CORBETT, BELLOWS
23                       401 Second Avenue South 700
                         Seattle, WA 98104
24

25                   * * * * * * * * * *

Deposition of John Alford, 2/19/2014

Page 4

1

2                                    [Deposition Exhibits No. 1 - 5 marked.]

3

4    JOHN ALFORD, PH.D.,      having been first duly sworn

5                             by the Court Reporter, appeared

6                             and testified as follows:

7

8                       E X A M I N A T I O N

9    BY MS. KHANNA:

10   **Q    Good morning, Dr. Alford.**

11   A    Good morning.

12   **Q    Could you please state your full name and your address for**

13        **the reporter.**

14   A    Yes.  John Richard Alford, 15907 Erin Creek Court, Houston,

15        Texas.

16   **Q    I take it you've been deposed before?**

17   A    I have.

18   **Q    How many times?**

19   A    I don't know.  More than, more than people should be

20        deposed.  More than 30, I would say.

21   **Q    When was the last time you were deposed?**

22   A    Let's see.  Maybe three or four months ago, I'm thinking.

23        Probably in the fall sometime.

24   **Q    So you're familiar with all the ground rules.  I'm just**

25        **going to let you know that of course if there's any time I**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 68

Deposition of John Alford, 2/19/2014

Page 22

1      do, just to be more -- just to try to run down exactly where

2      differences in our sort of supplemental analysis are coming

3      from.

4  Q   **So you expect to do additional analysis?**

5  A   Not -- I'm not thinking -- I'm not saying new -- I'm not --

6      at this stage I wouldn't necessarily do something new

7      unless, you know, elections took place or something.  But I

8      do typically, once it's -- it's never -- it's not -- I don't

9      actually communicate directly with Dr. Engstrom.  It would

10     be great if I could.

11         So truly at the deposition stage, where I can get a

12     sense of what might underlie, I always like to try to

13     resolve those differences before you go into court because I

14     don't think it serves anybody to have confusion about what

15     the empirical differences are.  So that's the kind thing

16     that I would intend to follow up on and see if I can figure

17     out just what piece -- 'cause his deposition eliminates some

18     of the possibilities.  I didn't know for sure if his

19     analysis used -- so you can run EI, kind of a candidate

20     against the field and then do that as three or four separate

21     runs; or you can do that as a run with everybody in at once.

22     And those produce often very different results.  So I have a

23     better idea now of what is not likely to be the cause of the

24     difference.  So I'm going to try to track that down.

25  Q   **And the differences that you're referring to are the**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 69

Deposition of John Alford, 2/19/2014

Page 23

1    differences in the supplemental reports; is that right?

2  A  Yes.  I don't -- there was nothing in the initial reports

3     that -- where there were numbers that I thought were any

4     different than what you would normally see in the variation

5     from one EI to another.  I actually -- I hadn't really

6     focused that much on the size of the differences in the, in

7     the supplemental reports.  And he mentioned that he still

8     was -- you know, thought that those were larger than you'd

9     expect.

10        And so -- but looking back at standard errors, they

11     certainly are further out than -- I mean there are unstable

12     estimates.  But they are further out than we saw in the

13     earlier analysis.  I just would like to have a better feel

14     for where that comes from.  I still don't think they're

15     substantively different.

16        I think in the -- I think we both have a preference for

17     talking about what the whole analysis shows us rather than a

18     particular individual piece.  If I took his results and

19     substituted them for mine, it wouldn't change my substantive

20     conclusion.  But I still, I would be more comfortable if I

21     had a better idea of where those variations are coming from.

22  Q  Did you expect to write another report in this case?

23  A  Unless I'm -- if I was asked to write another report, I

24     certainly would.  But I haven't been asked to.

25  Q  All right.  What did you do to prepare for today's

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 70

Deposition of John Alford, 2/19/2014

Page 27

1     general election.

2  Q  **How many seats are on the city council?**

3  A  I think there are seven.

4  Q  **Would you characterize the system as a numbered post or a**

5     **number place system?**

6  A  Yes.

7  Q  **What does that -- what do those terms mean?  Well, actually,**

8     **let me back up.**

9         Are those terms synonymous, "numbered post" and a

10    "numbered place system"?

11 A  In my mind, they are, yes.

12 Q  **What does it mean?**

13 A  It's -- this is a variation from -- so what you might think

14    of as kind of a wide-open at large in which people are not

15    actually competing for individual posts but are simply

16    competing for a seat --

17        So, for example, if you put all seven seats up in a

18    single election, everyone who was a candidate for the

19    council would just be listed on the ballot.  People would be

20    given some number of votes, possibly seven, possibly less.

21    And then you would just simply total up the votes.  And you

22    would go down the list until you had the top seven

23    candidates.  And that would be the election.

24        This is called a semi-proportional system because it

25    produces something that's not quite proportional

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 71

Deposition of John Alford, 2/19/2014

Page 28

1     representation but is close to it.  If you limit -- what's

2     called the limited-vote system, is that same system without

3     the full seven votes.  So in a limited vote system, you can,

4     by vary what the limit is you can varying how

5     semi-proportional the system is.

6         So that's -- that is in contrast to a numbered post

7     system in which you, whether separated by staggered terms or

8     by simply place on the ballot, you essentially hold

9     elections that are independent, freestanding elections for

10    each of the numbered posts or places on the city council.

11    So there, each is a standard-alone election rather than

12    pulling the vote together.

13  **Q**   **Do city council elections in Yakima entail a residency**

14      **requirement?**

15  A   I know that there are both.  So in that primary phase, there

16      are, there are districts, geographical districts.  Then

17      there are posts that are truly at large.  But I'm not

18      actually aware of whether that -- whether there's a

19      residential -- there's often not.  In some places there are;

20      in some places there aren't -- residential requirements when

21      you have geographical nomination processes.  So I'm not

22      actually -- at the moment I don't recall.  I'm sure I knew

23      at some time.  But I don't recall whether there is in this

24      case or not.

25  **Q**   **But there are districts as far as you know?**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 72

Deposition of Alford, John, 2/19/2014

Page 52

1      have -- right?  It's putatively accurate.  By legal

2      assertion it's accurate.  This number isn't by legal

3      assertion accurate.  So we're left with a number we know has

4      a lot of error in it.  And the test that would let us set

5      that aside as essentially not -- as a given, it would have

6      to be true if we had the vote district we don't have.  So

7      that leaves open the possibility that it is not actually a

8      CVAP majority.

9   Q   You mentioned just now, without a CVAP majority, you

10      couldn't have a registered voter majority; is that right?

11  A   Yes.

12  Q   If there is a district drawn with a registered voter

13      majority, would you think that therefore there's a CVAP

14      majority?

15  A   It's -- again it is possible that you could, in some

16      convoluted district sense, you could get away with that.

17      But I think in general, if you have a registered vote

18      majority, that you should -- I would think -- I'll say this:

19      I think a registered vote majority is probably a better

20      indicator of having a majority district than is the CVAP

21      number.  And I understand that the court has not delineated

22      that as a bright-line test.  And I have certainly -- I can't

23      remember if it's in this case.

24          But you certainly do see cases where, when you move to

25      drawing the district on the registered vote, the CVAP drops.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 73

Deposition of John Alford, 2/19/2014

Page 53

1    So that the districts that have the highest registered vote
2    are not the districts that have the highest CVAP, which
3    tells you that there is not -- it is not as a matter of fact
4    that, if you have that voter majority, you're going to have
5    a CVAP majority.  Otherwise the CVAP numbers would rise as
6    we drew increasing -- it is, I'd say, more often than not
7    the case that, if you first draw a district on CVAP majority
8    and then draw a district on registered vote majority, at
9    least as often as not the CVAP number will move down rather
10   than up.  And that's counter intuitive.

11        So the reason I don't just focus on that registered
12   vote but go through to an actual district that would elect,
13   is, at that point you've run straight through to the end of
14   what totality of circumstances is about.  And at that point
15   it doesn't matter what.  There's -- again, affirming a CVAP
16   majority is a threshold matter.  And that's not what I'm --
17   I'm not talking about the threshold matter.  I'm talking
18   about where does it get us when the judge has to actually
19   decide what to do here.

20  Q  **So I'm talking about just Gingles 1 as a threshold matter**
21     **for right now.**

22  A  All right.

23  Q  **Is it your understanding that a Gingles 1 determination is**
24     **contingent in any way upon voter turnout, just the Gingles 1**
25     **determination?**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 74

Page 100

1    you've reported the same, substantive information.  So yeah,

2    you can leave them out.  They're -- I think they back up

3    other information.  But yeah, you could leave them out for

4    efficiency reasons.  You can leave them out because you

5    think you've already said that in another way.

6        We've certainly done it here.  I'm perfectly happy to

7    drop them completely.  You can't mistake the scatter plots

8    as anything other than they are.  We've got confidence

9    intervals that tell us basically the same thing:  They're

10   very wide.  Every time the R-squared is low, the confidence

11   interval is very big.  Every time the R-squared is tight,

12   the confidence intervals are tighter.  I'm --

13       There could be lots of reason for not reporting the

14   R-squared.

15   **Q   Let's talk a little bit about ecological inference or EI.**

16       **Would you agree that EI is an improvement on standard**

17       **ecological regression?**

18   A   It improves on standard ecological regression in two

19       instances:  It improves in the instance that you have bounds

20       information that is discarded in ER and that is sufficiently

21       determinative that it helps shapes your estimation.  It

22       improves in that -- because it's agnostic about functional

23       form, you don't have the -- without looking at scatter

24       plots, you could, in theory, mistakenly underestimate a

25       relationship or overestimate a relationship so -- because

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 75

Deposition of John Alford, 2/19/2014

Page 101

1     you're using the wrong functional form.

2          So functional form is a standard assumption.  And in

3     the fact it's agnostic, this makes it's a -- it's a newer

4     technology.  It's developed to address shortcomings,

5     potential shortcomings in ER.  So I've got -- I have no

6     problem with it.  I have only -- if someone just showed me

7     two numbers, one from ER and one from EI and I had --

8     couldn't look at the underlying data but just had to pick a

9     number, I would pick the EI.

10  Q  **So you would agree that EI does a better job of estimating**

11     **particular properties that we're interested in in a racially**

12     **polarization voting analysis?**

13  A  It potentially does better a job.  In fact, as we can see

14     here, it doesn't actually -- for the most part, it doesn't

15     actually do a better job in the sense that it would have to

16     produce estimates that were different from ER to do a better

17     job.  So we're -- despite its being used now for a

18     considerable part of time, a certain amount of time in the

19     social sciences, there remain only a few, rather unusual

20     examples in which you can clearly demonstrate that EI is

21     doing a better job.  I don't recall, in a voting rights

22     case, an example where the EI estimates give you a different

23     substantive conclusion than the ER.  But certainly there,

24     the potential is there.

25  Q  **So in your initial report you decided to employ EI and**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 76

Deposition of John Alford, 2/19/2014

Page 102

1    homogeneous precinct analysis and ER.  And you also reported
2    the R-squared and the scatter plots; is that right?

3  A  Yes.

4  Q  **Why did you employ all of these methods?**

5  A  Just so everything is out there and then we can -- I think
6    it's nice to know that they don't tell you anything
7    different.  Then you don't have to -- again we don't have
8    to -- we don't spend an inordinate amount of time trying to
9    make EI, for example, intuitive because, take your pick.
10   You won't be wrong.  It's all there.

11  Q  **Have there been other cases in which you have provided**
12    **analyses using all three methods along with reporting the**
13    **R-squared and scatter plots?**

14  A  I certainly -- some combination of those, I don't really
15    know whether all of them in a single case.  My reports
16    are -- you know, if the other side is providing things and,
17    you know, I run them and they work, I don't necessarily
18    produce everything.  So I don't know whether some
19    combination of those.  I usually try to put in scatter plots
20    if there aren't so many data points that they don't make
21    sense, which happens with scatter plots.

22        I usually report -- when I report ER results, it's
23    usually the full, the full panel.  So I think I would
24    normally have some -- either the R-squared or confidence
25    intervals in there.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 77

Deposition of John Alford, 2/19/2014

Page 103

1    Q    Do you think it was necessary to use all of these methods in

2         your initial report?

3    A    No, I don't think it's necessary.  I think it can be useful.

4         And it would be necessary if they produced very different

5         results and we need to understand why.  It's not

6         necessary -- you know, not just not necessary in the sense

7         that you could black out any single panel in these results

8         and I would have the same substantive conclusion.  But you

9         could black all of this out, and I could testify just from

10        Professor Engstrom's tables and I would still have the same

11        substantive conclusion.  I think it's not -- there certainly

12        are cases where this could be important.  But this is not

13        one of those cases.

14   Q    You've encountered Dr. Engstrom's work before; is that

15        right?

16   A    Many times.

17   Q    You've both been testifying experts on opposite sides; is

18        that right?

19   A    Yes, we have.

20   Q    You've reviewed his expert analysis based on EI prior to

21        this case; is that right?

22   A    Yes, I have.

23   Q    Do you recall testifying in the Davis v. Perry case that

24        "Dr. Engstrom's analysis uses the best combination of modern

25        statistical techniques and quality data"?  Does that sound

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 78

Deposition of John Alford, 2/19/2014

Page 104

1      **familiar?**

2   A   It sounds very familiar because I can tell you I've heard it

3      more than once since I said it under oath in court.  I'm not

4      sure why it keeps coming up.  But I suspect the reason may

5      be in this room.  Yes, I said that.  And with regard to his

6      current estimations, I continue to stand by that.  He

7      does -- he is one the experts I prefer to have on the other

8      side because he does a very good job.  I would prefer to

9      have the dispute be about how we understand what this means

10      in the context of a case and not a kind of false dispute

11      about what the appropriate data set is or whatever.  So he

12      makes my job easier by doing his job well.

13   Q   **When you made that comment in the case, Dr. Engstrom in that**

14      **case had used exclusively EI; is that right?**

15   A   That's correct.  Actually, is that correct?  I'm really not

16      the best person to answer that question.  I just hesitate

17      'cause I know in the past he has used both ER and EI.  And I

18      don't really know where the Texas -- the Texas case may have

19      fallen at the beginning of sort of his exclusive use of EI.

20      And maybe I'm just thinking about one of those earlier cases

21      where he reported both.

22          But in either case, I certainly stand by what I said

23      about both about the quality of the data as he tends to try

24      to find the data that's the best connected to voting

25      behavior as opposed to some experts, I was very surprised

Deposition of John Alford, 2/19/2014

Page 112

1        a distinct difference between these terms?

2    A   We're talking about the same number.  There are no -- there

3        is no bright-line test here.  So I just think it's -- it's

4        certainly notable.  There are certainly lots of cases where

5        we don't see crossover at these levels.  But I don't know

6        exactly how, in terms of just sort of an adjective sense,

7        what's appropriate level other than just noting, I think,

8        that it is what it is.  It is -- at zero, you have complete

9        polarization.  At 50 percent, you have no -- complete lack

10       of polarization, lack of cohesion.  So this is, you know,

11       somewhere in that mix.  It's closer to 50 than zero.

12   Q   But there's no cutoff points between a moderate crossover

13       vote and a substantial crossover vote or any kind of

14       categories like that?

15   A   Not -- I mean I think all those could be applied to votes at

16       that level, depending on whether you're going to think --

17       say, if you're coming from one side, it might look one way.

18       And coming up from zero, it might look the other.  It's in

19       the middle of somewhere between no polarization and

20       polarization.  And I think that's -- again I think usually

21       we look at that in the broader context.  So I don't think

22       the adjectives matter a whole lot.

23   Q   You further note on page 7 that "The measure of Hispanic

24       cohesion in the seven election contests in your initial

25       report are substantively very similar to Dr. Engstrom's

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 80

Deposition of John Alford, 2/19/2014

Page 113

1      estimates for Hispanic cohesion;" is that right?

2   A  That's correct.

3   Q  And you note that the average estimate of Hispanic support

4      for the Hispanic candidates or for Proposition 1 ranges from

5      70.9 percent to 75 percent depending on which method you

6      use; is that right?

7   A  That's correct.

8   Q  And how would you characterize this level of cohesion?

9   A  Moderate.  I don't know how -- again, it's less than

10      100 percent and more than the, you know, 50-50 split.  So

11      there's -- as for Anglos, there's crossover here.  So we're

12      seeing slightly more Anglo crossover than Hispanic

13      crossover.  But we're not in different ranges.  These are

14      two groups, both of which can be characterized as having

15      whatever all those words were -- modest, moderate,

16      substantial -- crossover.  So I think they're in similar

17      ranges and probably could be characterized about the same

18      way.

19   Q  If you turn to page 10 of the same document, I'm looking at

20      your Table 1.

21   A  Yes.

22   Q  Would you agree that in each of the seven elections analyzed

23      here the estimate of the Latino vote for the Latino

24      candidate is above a majority?

25   A  Let's see.  Yes, the point estimate is above majority in

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 81

Deposition of John Alford, 2/19/2014

Page 114

1        every case.

2    Q   **No matter what method is used?**

3    A   Yes.  No matter what method is used.

4    Q   **And three of these elections were decisive elections in the**

5        **City of Yakima; is that right?**

6    A   By "decisive" you mean the generals as opposed to the

7        primaries, yes.

8    Q   **Well, I'm specifically referring to the Place 5 general, the**

9        **Place 7 general, and Proposition 1, which was a primary but**

10       **wasn't that decisive for that proposition; is that right?**

11   A   Yes.

12   Q   **Would you agree that in each of these decisive elections,**

13       **the estimate of the Latino vote for the Latino candidates**

14       **exceeds 80 percent?**

15   A   In each of these three elections, the estimate does exceed

16       80 percent regardless of method, I believe.  Yes.

17   Q   **And among the seven elections analyzed here, not a single**

18       **estimate of the non-Latino crossover vote exceeds 50**

19       **percent; is that right?**

20   A   That's correct.

21   Q   **And using the EI method, none of the confidence intervals**

22       **around the non-Latino crossover vote exceeds 50 percent; is**

23       **that correct?**

24   A   Could you -- I'm sorry.  Could you repeat that one.  Did we

25       switch back to the -- are we still on the -- are we still on

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 82

Deposition of John Alford, 2/19/2014

Page 115

```
 1        the Anglo crossover?  Or are we back to the . . .
 2   Q    I'm still talking about the Anglo -- or the non-Latino
 3        crossover vote.  Using the EI method, none of the confidence
 4        intervals around the non-Latino crossover vote exceeds
 5        50 percent; is that right?
 6   A    Where do we have the confidence intervals?
 7   Q    I think the -- yeah.  I don't believe the confidence
 8        intervals are reported in Table 1 but rather in the back of
 9        the documents for your analysis.  But actually, if I could
10        turn you to Dr. Engstrom's table in his initial report . . .
11   A    That's on page?
12   Q    It's on page 15.
13   A    That looks to be correct, yes.
14   Q    Would you agree that Ms. Rodriguez was the Latino candidate
15        of choice?
16   A    That's more clearly in the general than in the primary.  In
17        terms of these estimates, yes, you're looking there for
18        majority support.  And that's what we see here.  So I would
19        say this analysis suggests that Ms. Rodriguez is the Latino
20        candidate of choice.
21   Q    And a majority of non-Latino voters voted against her; is
22        that right?
23   A    That's correct.
24   Q    And she was defeated?
25   A    Yes.
```

Deposition of John Alford, 2/19/2014

Page 116

1    Q    Would you agree that Mr. Soria was the Latino candidate of
2         choice?

3    A    Again more clearly in the general but yes.  The Latino
4         candidate of choice would be where I would -- what I would
5         say based on that analysis.

6    Q    And the majority of non-Latino voters voted against him?

7    A    Yes.

8    Q    And he was defeated; right?

9    A    Yes.

10   Q    You said in both those instances, you said "more clearly in
11        the general."  Are both of these candidates, were they the
12        Latino candidate of choice in the primary as well?

13   A    Based on these estimates, they are.  And again, the
14        estimates don't tell us for sure that they were the
15        candidate of choice.  This -- we don't have anything that
16        tells us that for sure because we don't have any homogeneous
17        precinct analysis.

18            So we can say something for sure about the Anglo
19        candidate of choice but not, particularly in those -- in
20        the -- where that is closer to 50 percent in the primaries.
21        We can say what our best estimate is.  But we can't say with
22        certainty.  But based on these estimates, the estimates show
23        that the candidate of choice is -- in 2009 is Rodriguez and
24        in two thousand -- I'm sorry.  In Place 5, Rodriguez, in
25        Place 7, Soria.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 84

Deposition of John Alford, 2/19/2014

Page 117

| | | |
|---|---|---|
| 1 | Q | In both the primary and general elections? |
| 2 | A | Yes. |
| 3 | Q | In the District 2, 2011, primary, Mr. Montes was the Latino |
| 4 | | candidate of choice, was he not? |
| 5 | A | Yes. |
| 6 | Q | And a majority of non-Hispanic voters voted against him? |
| 7 | A | Yes. |
| 8 | Q | In fact, an overwhelming majority? |
| 9 | A | Yes. |
| 10 | Q | And he was defeated? |
| 11 | A | And he was defeated.  I would just say, again, if you look |
| 12 | | at the confidence intervals, I'd say the confidence interval |
| 13 | | around Montes is between -- we're confident Montes got |
| 14 | | something between 17 and 83 percent of the vote.  So whereas |
| 15 | | before we talked about -- we talked about the confidence |
| 16 | | intervals when they didn't cross the line.  Now we're not |
| 17 | | talking about them because they all cross the line. |
| 18 | | So here there's -- we are in -- those primary contests |
| 19 | | where we are talking about the point estimate, they're |
| 20 | | accompanied by extremely large confidence intervals that |
| 21 | | include not just a few places but large swaths of territory |
| 22 | | in which they are not the candidate of choice.  So that's -- |
| 23 | | I mean that's an appropriate caution.  We really -- |
| 24 | | And again, if you look at the confidence intervals, you |
| 25 | | can see that, for example, Rodriguez, in the primary, the |

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 85

Deposition of John Alford, 2/19/2014

Page 118

```
1          confidence intervals are 18 to 82.  In the general it's 72
2          to 99.  So there are -- we're not 95 percent confident that
3          we're above 50 percent.  That's candidate of choice.  That's
4          not true in the primary.  We're just not that confident.
5          So . . .
6     Q    But would you agree that your best estimates, based on your
7          analysis and Dr. Engstrom's analysis, is that Mr. Montes was
8          the Latino candidate of choice?
9     A    But it's all our best estimate.  Our point estimate would
10         put him as candidate of choice.  I would say that in the
11         case of both Ms. Rodriguez, Soria, and Montes, our best
12         estimate is not a good estimate at all.  This is important.
13         It is the best estimate, but it is not a good estimate.  And
14         it's not something we are confident of.
15    Q    In the vote on Proposition 1, would you agree that Latinos
16         were cohesively in favor of this proposition?
17    A    Yes.
18    Q    And a majority of non-Latinos voted against the proposition?
19    A    Yes.
20    Q    And the proposition was defeated?
21    A    Yes.
22    Q    Are you familiar with what Proposition 1 was about?
23    A    I don't recall the exact text of Proposition 1.  My
24         recollection is it was about moving away from the at-large
25         election system.
```

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 86

Deposition of John Alford, 2/19/2014

Page 119

1    Q    **And you would agree that cohesiveness is measured not only**
2         **with respect to electing certain candidates but also**
3         **supporting certain referenda or issues?**
4    A    Yes.  Political cohesion can apply both to candidates and to
5         issues.
6    Q    **In the Supreme Court election in 2012, would you agree that**
7         **Justice Gonzalez was the Latino candidate of choice within**
8         **the city of Yakima?**
9    A    Again, the point estimate suggests that.  But the confidence
10        interval does cross 50 percent.
11   Q    **But the best estimate that you have, based on your analysis,**
12        **is that Justice Gonzalez was the Latino candidate of choice**
13        **in the city of Yakima?**
14   A    Right.  So it's the best estimate but, again, not as good an
15        estimate as we would like.  If you're going to apply a
16        social science standard, in a social science standard where
17        we reject the null hypothesis that Judge Gonzalez -- or that
18        Mr. Gonzalez was not the candidate of choice, we wouldn't
19        reject that null hypothesis.  But if you wanted to look at
20        that from the other direction, what's our best estimate, our
21        best estimate is that in the mid 60 percent range would be
22        the candidate of choice.
23   Q    **And a majority of non-Latinos in Yakima voted against him;**
24        **is that right?**
25   A    Yes.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 87

Deposition of John Alford, 2/19/2014

Page 120

1    Q    Even though Justice Gonzalez won statewide, he received a

2         minority of the votes cast in the city of Yakima; is that

3         right?

4    A    That's my recollection, yes.

5    Q    If you turn back to page 8 of your initial report . . .

6    A    [Complies.]

7    Q    You mentioned in the first full paragraph that, "In general

8         terms the results in Table 1 suggest a mixed pattern."  Do

9         you see that?

10   A    Yes.

11   Q    Then the paragraph following that sentence proceeds to talk

12        about the R-squared figure; is that right?

13   A    Yes.

14   Q    So you're basing your conclusion that there is a mixed

15        pattern on the R-squared figures?

16   A    I'm illustrating it with R-squared figures.  But I think

17        it's -- the mixed pattern is more than the R-squared.  The

18        mixed pattern is illustrated by the actual -- the

19        coefficients in the table.  It's illustrated by the scatter

20        plots.  It is a mixed pattern.  That's -- we just talked

21        about the pattern.  It was mixed.

22             So I mean R squareds illustrate that.  But you could

23        illustrate it exactly the same way with the discussion we

24        just had about both the level of the point estimates and the

25        confidence intervals.  It's mixed.  It looks different in

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 88

Deposition of John Alford, 2/19/2014

Page 134

```
 1         levels of cohesion among Hispanics and the low level of
 2         participation among registered Hispanic voters."  Do you see
 3         that?
 4    A    Yes.
 5    Q    Now, you and Dr. Engstrom, again, agree on the actual
 6         estimates of Latinos voting for a Latino candidate or
 7         Proposition 1; is that right?
 8    A    That's correct.
 9    Q    So there's no substantial difference between your two
10         estimates?
11    A    That's correct.
12    Q    So where you disagree is on the legal significance of those
13         estimates; is that right?
14    A    It may be broader.  I'm not sure.  I think we may disagree
15         about sort of what the underlying behavior indicates.  I may
16         be -- I think Dr. Engstrom is more persuaded by the general
17         fact that these estimates for Hispanic voting are all about
18         50 percent.  So they all indicate the same candidate of
19         choice.  He's less, I think, less disturbed by very large
20         confidence intervals than I am.  So I think we may both
21         disagree about what it really means on the ground.  And then
22         certainly we disagree about its legal significance.
23    Q    But the differences in your conclusions don't depend on any
24         differences in your analysis; is that right?
25    A    That's correct 'cause we both have similar points and we
```

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 89

Deposition of John Alford, 2/19/2014

Page 135

1    also both had -- it would be different if I felt this way

2    because I had big confidence intervals and he didn't feel

3    this way because he had really narrow confidence intervals.

4    That would be an analytical difference.

5         But that's not -- here we are -- again I would write

6    this conclusion if I had only seen his analysis.  I think he

7    would write his conclusion if he'd only seen my analysis.

8    And that to me is the real test, that we're talking about

9    how to interpret this and not about the mechanics of how to

10   produce it.

11   Q    **So in that sentence that I just read at page 17, what do you**

12        **mean by "not consistently cohesive"?**

13   A    I think -- so there are elections in there where you see a

14        pattern that looks like cohesive voting.  Then you see the

15        estimates you point out for the proposition, that Hispanics

16        seem to be politically united on that proposition, at least

17        with regard to cohesion.  So you see indications that

18        cohesion is there.

19             And I think that's difficult to square with, you know,

20        with a contemporaneous election in which, you know, 47 --

21        our estimate is 47 percent of Hispanics are voting for

22        non-Hispanic candidates.  I think that's -- in one of those

23        cases there, the prompt is explicitly racial.  In the other

24        the prompt is a policy choice that may have implications for

25        the ethnic representation.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 90

Deposition of John Alford, 2/19/2014

Page 145

1    circumstances?

2  A    It incorporates some of the logic of the totality of

3       circumstances in a way that 2 or 3 are applied and then --

4       and in combination with the fact that there is no

5       bright-line test, I think that makes them, as a matter of

6       application, substantially different than the Gingles 1

7       threshold test.

8  Q    Back to page 17 of your initial report, you also state your

9       conclusion about whether Gingles 3 has been satisfied; is

10      that right?

11 A    Yes.

12 Q    And you say:  "Anglo crossover in support of Hispanic

13      candidates in the low 30 to low 40 percent range is

14      substantial, much less variable, and is not consistent with

15      polarized Anglo block voting."

16 A    Yes.

17 Q    And again you and Dr. Engstrom agree on the actual numbers

18      of non-Hispanic crossover vote; is that right?  The actual

19      estimates?

20 A    Yes.

21 Q    There's no substantial difference between your estimates?

22 A    No.

23 Q    Where you disagree is on the significance or the

24      interpretation of those estimates?

25 A    Yes.  And here we also disagree on the numbers less than we

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 91

Deposition of John Alford, 2/19/2014

Page 146

1      disagree on Hispanic cohesion because there isn't anything

2      to disagree -- there isn't anything to alter what weight we

3      might give to confidence intervals because the confidence

4      intervals are narrow.  So it really doesn't -- you know, he

5      could give them no credence at all and I could bet my life

6      on 'em and we'd still end up in the same position.  So

7      there's just less there to be --

8          We also have a method of bounds analysis here that just

9      simply -- right?  We know some things.  We know some factual

10     things about Anglo crossover voting.  We're not guessing

11     that 30 or 40 percent of Anglos cross over.  We know.  We

12     know for a fact that something more than third of Anglos are

13     routinely, in every election, crossing over and supporting

14     Hispanic candidates.  That's the only thing we know with any

15     certainty in this polarization analysis.

16         That's isn't a method -- that isn't about analysis.

17     That is factually has to be true.  And so that's an

18     important fact.  It's not something where we're estimating.

19     It's something we're calculating on the basis of actual vote

20     returns.

21         So I think it's both that that level is high.  And it

22     is that it is pretty much, pretty much unresponsive to these

23     different election conditions that are causing substantial

24     variability in how -- in our estimates of how Hispanics cast

25     votes.  Here there's very little variability.  And that

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 92

Deposition of John Alford, 2/19/2014

Page 147

1          suggests that a substantial proportion of the electorate in

2          Yakima routinely casts votes for Hispanic candidates.

3    Q    **So I believe you just said that, in every election, the**

4         **range is in the low 30 to low 40 percent.  But in fact, in**

5         **one of the elections analyzed, the non-Hispanic crossover**

6         **vote was around 13 percent; isn't that right?**

7    A    So we have 13 percent crossover for an Hispanic candidate?

8         I don't recall that.  So Montes in the primary?

9    Q    **So is that right, that in one of the elections, the**

10        **non-Hispanic crossover vote was at 13 percent?**

11   A    That's correct.

12   Q    **Not in the low 30 to 40 percent range that you mentioned?**

13   A    Correct.

14   Q    **Are you aware of any bright-line rule regarding the level of**

15        **non-Hispanic crossover voting that is sufficient to satisfy**

16        **Gingles 3?**

17   A    Again, if the majority of Anglos always casts their vote for

18        the Hispanic candidate -- I'm sorry.  That's not true.  I

19        would hope that if the result always showed exactly a 50-50

20        distribution, that somebody wold recognize that was a lack

21        of cohesion.  But I'm not -- I don't think anybody's ever

22        enunciated that.  And I'm not aware that there is any other

23        bright-line test.

24   Q    **Are you aware of any cases in which the level of the**

25        **non-Hispanic crossover vote was in the low 30 to low 40**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 93

Deposition of John Alford, 2/19/2014

Page 171

```
 1   A    [Complies.]  All right.
 2   Q    And the first heading in Exhibit 5, your supplemental
 3        report, is "The Yakima School Board 2013 General Election;"
 4        is that right?
 5   A    That's correct.
 6   Q    In fact here you did perform a racially polarized voting
 7        analysis of this particular school board election; is that
 8        right?
 9   A    That's correct.
10   Q    Who was the Latino candidate of choice in that election
11        according to your analysis?
12   A    It looks like the candidate of choice is Villanueva or
13        Villanueva.  I'm not sure how that's pronounced.
14   Q    You report that she received over 70.1 percent of Latino
15        votes; is that right?
16   A    I think it's exactly 70.1 percent.
17   Q    And you characterize this -- on page 1 of your report, you
18        characterize this as "real if modest Hispanic cohesion."  Do
19        you see that?
20   A    Yes.
21   Q    What percentage of Latino voters has to vote for the Latino
22        candidate for you to consider it real Hispanic cohesion?
23   A    I think what we're looking at here is the -- what I'm
24        referencing by "real" is the fact that the confidence
25        interval is relatively narrow.  This is by far the narrowest
```

Deposition of John Alford, 2/19/2014

Page 172

1    confidence interval we've seen for the support for a
2    Hispanic candidate.

3  Q  **How did you make that determination to characterize this as**
4     **a "modest Hispanic cohesion"?**

5  A  It's, it's below 90 percent.  So, you know, we're sort of
6     back in that same category again:  Something more than a
7     quarter, maybe closer to a third, of voters are crossing
8     over.  I think sort of what's -- that's kind of what I would
9     characterize as "moderate," something along those lines in
10    terms of cohesion.

11 Q  **So you just said "moderate."  And your report says "modest."**
12    **Is there a difference between "modest" and "moderate"**
13    **cohesion?**

14 A  I don't think so.

15 Q  **Ms. Villanueva received just over 35 percent of non-Latino**
16    **votes; is that right?**

17 A  That's correct.

18 Q  **And she was defeated?**

19 A  Yes, I believe so.

20 Q  **You note on page 1 that "The pattern of support for**
21    **Villanueva is also scattered with the Hispanic proportion of**
22    **the actual voters being well below 10 percent in three of**
23    **the four precincts that Villanueva carried."**

24 A  Yes.

25 Q  **By this you mean that the Latino turnout was not very high**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 95

Deposition of John Alford, 2/19/2014

Page 177

1    if nominated, I will not run; if elected, I will not serve

2    is actually a call to action.  So I just don't know enough

3    about it.

4        It's -- it doesn't strike me as particularly, if I was

5    running a campaign and I heard this as a rumor, I don't

6    think I'd be a particularly happy person.  But I just, I

7    just don't know enough to say for sure.  And with regard to

8    my impression on totality of circumstances, it's -- in my

9    view, I'm really talking about totality of the circumstances

10   as they apply to, you know, to polarization and cohesion and

11   the viability of a remedy district.

12       I mean there's other -- the senate factor stuff, I'm

13   not doing.  So if it has to do with that, I really don't

14   know how that might apply under those circumstances.

15  Q  **On page 3 of your supplemental report, you state that the**

16     **result from your "EI analysis for the 2013 city council**

17     **primaries are substantively very similar to those reported**

18     **by Dr. Engstrom;" is that right?**

19  A  Yes.

20  Q  **What is the basis for that conclusion?**

21  A  We -- there's certainly more variation here than we saw

22     before.  And I guess, you know, absent a sort of chance to

23     dig through that, there are sort of different ways you could

24     characterize that.  And so I thought really hard about, you

25     know, if I was just looking at this, what would I -- you

Deposition of John Alford, 2/19/2014

Page 178

1    know, what would I really see here?

2         So I see Reynaga is above 50 percent.  So if we accept

3    the point estimate, he's candidate of choice.  The

4    confidence interval is -- includes things outside the

5    choice.  So this is not unlike something that we --

6    something that we saw before in regard to that election.

7         Jevons, I have as a not the candidate of choice.  He's

8    not getting a majority vote.  And professor Engstrom has

9    Jevons not getting the majority vote.  We obviously will

10   differ about the support for Folsom-Hill.  But again, these

11   are all three-way contests; and they're all somewhat

12   unstable.  And I just -- I ask myself whether this was

13   substantively different.  And I'd still think, in those

14   basic parameters, it's not more or less unstable than what

15   we saw in elections before.

16        They -- I think there is more -- I'm fairly confident

17   that our differences here reflect more than just the normal

18   difference in EI estimation.  But three-way EI estimation is

19   much more sensitive to -- this is -- you're operating in

20   additional dimensions.  And the likelihood of finding a

21   local minima is much higher in multiple dimensions.  So it

22   doesn't -- it wouldn't surprise me that the results would be

23   more -- slightly more different across our two analyses.

24        I'm not confident yet that there isn't a sort of

25   functional explanation for this.  That's why I would like to

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 97

Deposition of John Alford, 2/19/2014

Page 179

1    go back and see if we figure it out.  But even if we can't

2    figure that out, I still don't think they're -- that they're

3    substantively different.  And I just don't want to suggest

4    that there's something there that really undermines where we

5    are already with this, which I think is where we want to be.

6         Because these are not -- neither of these patterns is

7    particularly unexpected, I -- I mean the other thing I say I

8    always look at these things.  And I guess I probably should

9    apologize for this.  I probably shouldn't do this.  But, you

10   know, Jevons is much closer to being the candidate of choice

11   in my analysis than in Dr. Engstrom's analysis.

12        So I guess, if it was the other way around, if he had

13   an Hispanic candidate close to being the candidate of choice

14   and I had it way down in third place or something, then

15   that's why it looks like maybe we're kind of going in

16   opposite directions there.  So I think it's -- again, I

17   don't think he would come to a different conclusion based on

18   these had he gotten these numbers and I had gotten his

19   numbers.  I think we'd both still be where we are and

20   rightly so.

21  Q   **So based on your conclusion that the results from your and**

22      **Dr. Engstrom's EI analysis are substantively very similar,**

23      **would you be amenable to testify based on Dr. Engstrom's**

24      **results?**

25  A   Sure.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 98

Page 180

1         But I'm also going to check and find out who's right.

2     I'll say, again, there -- it's very possible that we

3     don't -- that no one's right here.  These are precisely the

4     kinds of areas where -- I mean you're doing maximum

5     likelihood estimates.  It's not unusual for people to run a

6     simulation a million times.  These are -- these can get in a

7     local minima and be very difficult to dislodge without

8     substantially expanding the range of possible starting

9     points.

10        And so it's not at all uncommon in the literature to

11    see these tested very hard by lots of repetition.  And so I

12    think probably one of the first things I would do is

13    basically take this and run it 100,000 times and find out

14    what the -- 'cause just I'm not sure exactly what the real

15    variation.  It's much larger here than it would be for the

16    others; right?  So if we run this -- if we run this 50 times

17    with 100 cases, we're going to get much bigger variation

18    than we would for the other kinds of estimates.

19        But I'm just not confident that this is within -- these

20    differences are within that range.  If they are, then I

21    don't think we have anything -- because there is no right

22    answer.  There is, there is no wrong answer; right?  If

23    we're within that range of variation, then we're just

24    talking about basically being at different points that

25    represent reasonably stable probabilistic estimates of

Deposition of John Alford, 2/19/2014

Page 181

1    what's going on.

2         I think this -- the difference here in this somewhat

3    more difficult estimation area highlights again that we're

4    dealing with behavior that is not sharp, crisply defined.

5    And the data does not give us much leverage over that

6    not-crisply-defined behavior.

7         That's, I think, exactly why we have such different

8    estimates.  I don't think those differences -- if we're

9    doing this right -- and I think we probably are -- we

10   couldn't get differences that big.  If we had a 90-10 split

11   in the voters and you had even a reasonable distribution

12   across the range of precincts, it just wouldn't be possible

13   to come up with, with bounds estimates that could be this

14   far, this far off, even with a probabilistic technique.

15        So I think it's just another example of the fact that

16   we don't know for certain which of those estimates is

17   correct at this point.  And at least I think there's a good

18   chance that it's simply because we don't have enough

19   information to know.

20   Q    **I'm going to ask you to look at Dr. Engstrom's S1 in**

21        **Exhibit 4, which is his supplemental report.**

22   A    [Complies.]

23   Q    **So while Dr. Engstrom reports a point estimate of 67.4 for**

24        **the Latino vote for Reynaga, you report a point estimate of**

25        **53.3 percent; is that right?**

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 100

Deposition of John Alford, 2/19/2014

Page 215

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON   )
                           )  SS
3    COUNTY OF YAKIMA      )

4        I, Jacqueline L. Bellows, Washington Certified Court

5    Reporter, pursuant to RCW 5.28.010 authorized to administer

6    oaths and affirmations in and for the State of Washington, do

7    hereby certify:

8        That the foregoing deposition was taken before me at the

9    time and place therein set forth and thereafter transcribed

10   under my direction, the transcript prepared pursuant to the

11   guidelines set out in Washington Administrative Code 308-14-135.

12       That the witness was by me first duly sworn to testify to

13   the truth, the whole truth, and nothing but the truth.

14       That the deposition as transcribed is a full, true, and

15   correct record to the best of my ability of the testimony of the

16   witness and of all questions, objections, motions, stipulations,

17   and exceptions of counsel made at the time of examination.

18       That I am in no way related to any party to this matter nor

19   to any of counsel nor do I have any interest in the matter.

20            Witness my hand and CCR seal this 28th day of March
              2014.
21

22                        _____
                          Jacqueline L. Bellows, CCR No. 2297
23                        in and for the State of Washington,
                          residing at Arlington. My certification
24                        expires April 26, 2014.

25

Exhibit 4

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON


ROGELIO MONTES and MATEO ARTEAGA,            PLAINTIFFS

  v.                                 CIVIL ACTION NO.  12-cv-3108-TOR

CITY OF YAKIMA, WASHINGTON, *et al.*            DEFENDANTS


**DECLARATION OF WILLIAM S. COOPER**


WILLIAM S. COOPER, acting in accordance with 28 U.S.C. §1746, the
Federal Rules of Civil Procedure 26(a)(2)(B), and Rules 702 and 703 of the
Federal Rules of Evidence, does hereby declare and say:

1.      My name is Williams S. Cooper.  I have a B.A. degree in Economics
from Davidson College.  As a private consultant, I currently serve as a demographic
and redistricting expert for the Plaintiffs.

2.      I have testified at trial as an expert witness on redistricting and
demographics in federal courts in 34 voting rights cases.  Three of these lawsuits
resulted in changes to statewide legislative boundaries:  *Rural West Tennessee
African American Affairs v. McWherter, Old Person v. Cooney, and Bone Shirt v.
Hazeltine*.  Approximately 25 of the cases led to changes in local election district
plans.

3.      Since the release of the 2010 Census in February 2011, I have developed several statewide legislative plans (Alabama, Georgia, Florida, South Carolina, and Virginia) and about 100 local redistricting plans – primarily, for groups working to protect minority voting rights.  Three plans that I developed for local government clients during 2011 – Bolivar County, Mississippi, the City of Grenada, Mississippi, and Sussex County, Virginia – were precleared by the U.S. Department of Justice.

4.      For more information on my testimony as an expert witness and experience preparing and assessing proposed redistricting maps for Section 2 litigation, Section 5 comment letters, and other efforts to promote compliance with the Voting Rights Act of 1965, see a summary of my redistricting work attached as **Exhibit A**.  I am compensated at the rate of $100 per hour for my work on this report.

5.      The attorneys for the Plaintiffs in this case asked me to prepare a report that assesses whether it is possible to create one or more majority-Latino districts in a seven single-member district plan for the Yakima City Council.

6.      As explained in this report, I conclude that it is possible to create two out of seven City Council districts where Latinos of voting age would be a majority and where Latino registered voters would comprise a majority of registered voters. I also have determined that it is possible to create at least one Latino citizen voting age-majority district out of seven.

2

7.    In addition, the Plaintiffs' attorneys asked me to review current and historical demographic data for the City of Yakima available from the decennial U.S. Census.

8.    I show in this report that Yakima's Latino population has grown dramatically since 1980 in both absolute and percentage terms.  I conclude that annexations since 1990 – and, in particular, since 2000 – have diminished the Latino percentage of Yakima's overall population.

## I.    DEMOGRAPHIC PROFILE OF YAKIMA

**Location**

9.    The City of Yakima is located east of the Cascades in the Yakima Valley of Central Washington. Yakima is approximately 140 miles southeast of Seattle and 200 miles southwest of Spokane. The City encompasses about 28 square miles and is bounded to the east by the Yakima River and to the north (in part) by the Naches River. Yakima shares borders with Union Gap and Ahtanum to the south and Selah to the north (see **Figure 1** below).

**Figure 1       Yakima, Washington and Vicinity (2012 Boundary)**



## 2010 Census – Population in Yakima by Race and Ethnicity

10.    According to the 2010 Census, Yakima had a population of 91,067

with a Hispanic population of 37,587 (41.27%) and a non-Hispanic white

population of 47,523 (52.18%).[1] The overall minority population in Yakima was 43,544 (47.82%) in 2010. This minority figure includes all persons who are not single-race non-Hispanic white. American Indians represented the largest non-Hispanic minority population subgroup in 2010, with a population of 2,054 (2.25%).[2]

     11.     Consistent with a younger, growing population base, Latinos constituted a smaller percentage of Yakima's voting age population than the total population in 2010.[3] According to the 2010 Census, Yakima had a total voting age population of 65,287, of whom 21,837 (33.45%) were Hispanic – nearly eight percentage points lower than the 41.27% Latino share for the population as a whole. In 2010, there were 39,290 (60.18%) non-Hispanic whites of voting age in

---

[1] In 2010, Yakima annexed several parcels of land. This newly annexed area splits 2010 Census blocks. The City reports a 2011 population of 91,208, so the post-2010 Census annexation added 141 persons.

[2] This American Indian population count is based on the non-Hispanic Department of Justice (NH DOJ) category, which counts all persons who are either single-race Indian or of two races – Indian and white – as American Indian. See: *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*; Notice 76 Fed. Reg. 7,470–73 (Feb. 9, 2011). The NH DOJ category cannot be used for historical comparisons because multi-race categories were not an option on the census form prior to the 2000 Census.

[3] The demographic category of "Hispanic" is used interchangeably with the term "Latino" in this report.

Yakima – significantly higher than the corresponding 52.18% Anglo share of the overall population.[4]

12.    The U.S. Census Bureau estimates that Yakima had a 2011 population of 92,512. There are no 2011 estimates by race or ethnicity for Yakima available from the Census Bureau.[5]

**Population Change in Yakima – 1980 to 2010**

13.    The table in **Figure 2** below shows demographic change in Yakima by race and ethnicity since 1980. Between 1980 and 2010, Yakima's overall population grew by 83% – from 49,826 to 91,067. Over the three-decade period, the Latino population grew by a factor of ten – from 3,470 in 1980 to 37,587 in 2010. During the same time period, the Anglo population grew at a slow pace – from 43,890 persons in 1980 to 47,523 in 2010 – an increase of just 8.3%. In 1980, Yakima was 7% Latino. By 2010, the City was 41.27% Latino.

---

[4]  The demographic category of "non-Hispanic white" is used interchangeably with the term "Anglo" in this report.

[5]  City population estimates are available on the Census Bureau website at: http://www.census.gov/popest/data/cities/totals/2011/SUB-EST2011-states.html

**Figure 2**          **Yakima – 1980 Census to 2010 Census**
**Population and Ethnicity/Race Distribution**

| Race | 1980 Number | Percent | 1990 Number | Percent | 2000 Number | Percent | 2010 Number | Percent |
|------|-------------|---------|-------------|---------|-------------|---------|-------------|---------|
| **Total** | 49,826 | 100.0% | 54,827 | 100.00% | 71,845 | 100.00% | 91,067 | 100.00% |
| **Total Hispanics** | 3,470 | 7.0% | 8,914 | 16.26% | 24,213 | 33.70% | 37,587 | 41.27% |
| **White Alone\*** | 43,890 | 88.1% | 42,967 | 78.37% | 42,928 | 59.75% | 47,523 | 52.18% |
| **Black Alone\*** | 1,158 | 2.3% | 1,226 | 2.24% | 1308 | 1.82% | 1,311 | 1.44% |
| **American Indian and** | 804 | 1.6% | 935 | 1.71% | 1,116 | 1.55% | 1,311 | 1.44% |
| **Asian Alone\*** | 414 | 0.8% | 643 | 1.17% | 792 | 1.10% | 1,286 | 1.41% |
| **Hawaiian or Pacific Islander Alone\*** | | | - | | 48 | 0.07% | 46 | 0.05% |
| **Other Alone\*** | 90 | 0.2% | 142 | 0.26% | 60 | 0.08% | 125 | 0.14% |
| **Two or More Races\*** | | | - | | 1,380 | 1.92% | 1,878 | 2.06% |

\* Non-Hispanic only; in 1980 and 1990 "Asians" includes Hawaiians and Pacific Islanders.

14.    As illustrated in the 1980 to 2010 chart in **Figure 3** below, the decade of the 1990s saw the most pronounced population change in absolute terms for Latinos in Yakima. The Latino population jumped nearly three-fold from 8,914 at the start of the decade to 24,213 by the time of the 2000 Census. By contrast, the non-Hispanic white population did not grow at all in the 1990s – starting the decade at 42,967 and ending the decade with a 39-person decline to 42,928, according to the 2000 Census.[6]

---

[6] The 1980s saw an even larger decline in the non-Hispanic white population – from 43,890 in 1980 to 42,967 in 1990 for a net loss of 923 persons. Meanwhile, the Latino population grew two and a half times – from a 1980 base of 3,478 to 8,914 by 1990.

**Figure 3        Yakima – 1980 Census to 2010 Census
Hispanic and Non-Hispanic White Population Comparison**



## Demographic Impact of Annexations in Yakima – 1990 to 2010

15.    Annexations have played a significant role in Yakima's rapid growth since 1990. The map in **Figure 4** on the following page shows how the city limits have changed since 1990. The beige area in the **Figure 4** map shows the city boundary at the time of the 1990 Census, red shows the extent of the 2000 Census boundary, blue shows the extended city limits under the 2010 Census, and the green areas indicate annexations since 2010.

8

**Figure 4**                **Yakima – Boundary Changes 1990 to 2012**



16.    If Yakima had maintained the 1990 Census boundary, Latinos would

comprise a larger share of the City's population than under today's boundary. The

1990 core of the City had a 2010 population of 62,996, of whom 28,567 were

Hispanic (45.35%) – four percentage points higher than the 2010 Census

percentage of 41.27% Hispanic under the 2010 boundaries. The 2010 Census non-

Hispanic white population in the 1990 core was 30,369 (48.21%), so Anglos would

9

have been a minority of the overall population had there been no annexations since 1990.

17.    The annexations have had a similar dilutive effect on the Latino voting age population as a proportion of the citywide total. The 1990 core of the City had a 2010 voting age population of 44,921, of whom 16,640 were Hispanic (37.04%), compared to 21,837 Hispanics of voting age (33.45%) based on the 2010 Census municipal boundary.

18.    Put another away, annexations between 1990 and 2010 had the effect of adding 28,071 persons to Yakima's 2010 population, of whom 9,020 were Hispanic (32.13%) and 17,154 (61.11%) were non-Hispanic white.

19.    Had annexations not occurred in the 1990s, the 2000 population of Yakima would have been 60,377, of whom 19,870 (32.91%) would have been Hispanic and 36,467 (60.40%) would have been non-Hispanic white. This compares to the actual 2000 population of 71,845, with 24,213 Hispanics (33.7%). Thus, the 1990s annexations resulted in nearly a one percentage point differential gain for the Hispanic population percentage at the time of the 2000 Census – 32.91% without annexations versus the actual 33.7%.

20.    Therefore, the dilutive effect of annexations in Yakima is entirely a phenomenon of the 2000s. Had annexations between 2000 and 2010 not occurred, Yakima would have had a 2010 population of 75,729, of whom 34,863 (46.04%)

would have been Hispanic and 36,077 (47.64%) would have been non-Hispanic white.

21.    Annexations in the 2000s added 15,338 persons to the City's 2010 population – 2,724 were Hispanic (17.76%) and 11,446 (74.63%) were non-Hispanic white. Without the annexations in the 2000s, the non-Hispanic white population would have declined sharply – from 42,928 under the 2000 Census to 36,077 in 2010 –a potential net loss of 6,851 non-Hispanic whites.

**Latino Citizenship in Yakima**

22.    A significant segment of the Latino population in Yakima is non-citizen. According to the *2009-2011 American Community Survey 3-Year Estimates*, 29.39% of the overall Latino population is non-citizen and 45.95% of the voting age population is non-citizen. The *2007-2011 American Community Survey 5-Year Estimates* shows similar non-citizen rates for Yakima's Latinos – 30.08% of all Hispanics and 46.78% of Hispanics over 18.[7]

23.    The Latino non-citizen rate in Yakima has fallen over the past decade. According to *Summary File 3* of the 2000 Census, 36.48% of Latinos (all ages)

---

[7] The Census Bureau released the *2009-2011 American Community Survey 3-Year Estimates* dataset in October 2012 and the *2007-2011 American Community Survey 5-Year Estimates* dataset in December 2012.

were not citizens – seven percentage points higher than the most recent reported rate of 29.39% from the *American Community Survey 3-Year Estimates*.

24.    The Latino non-citizenship rate is poised to drop further in the coming years. Of the 15,748 Latinos in Yakima under 18 in the *2009-2011 American Community Survey 3-Year Estimates,* just 5.52% are non-citizens. Of the 15,011 Latinos in Yakima under 18 in the 2007-2011 *American Community Survey 5-Year Estimates,* just 5.78% are non-citizens.

25.    According to the *2009-2011 American Community Survey 3-Year Estimates*, Latinos represent 34.13% of the citizen population in Yakima and 22.21% of the citizen voting age population. According to the *2007-2011 American Community Survey 5-Year Estimates,* Latinos comprise 32.96% of the citizen population in Yakima and 21.34% of the citizen voting age population.

## Geographic Compactness of the Latino Population

26.    The Latino population of Yakima primarily resides in the east end of the City and is a demonstrably compact community – living for the most part east of 16th Avenue. **Figure 5** below is a map of 2010 Census block groups (green lines) color-coded by percent Latino – from under 20% (yellow) to 80% to 86% (dark red). Block groups contain multiple census blocks and often follow neighborhood lines. They are components of census tracts.

12

**Figure 5**  **Yakima – Percent Latino by Block Group (2010 Census)**



27.    The area east of 16th Avenue (identified with a street name label in the block group map) encompasses a little more than one-third (9.78 square miles) of the 28-square mile area of Yakima. A Latino population of 26,267 resides in this area, representing nearly three-fourths (72.54%) of the City's 2010 Latino population.

13

28.    As shown in the map in **Figure 6**, the Latino citizen voting age population (expressed as a percentage of all voting age citizens) shows a similar geographic distribution. The bulk of the Latino voting age citizen population resides east of 16th Avenue.

**Figure 6        Yakima – Percent 18+ Latino Citizens by Block Group (2007-2011 American Community Survey 5-Year Estimates)**



## II.    YAKIMA REDISTRICTING

### Methodology and Sources

29.    For this analysis, I used a geographic information system software package called *Maptitude for Redistricting,* developed by the Caliper Corporation. This software is deployed by many local and state governing bodies across the country for redistricting and other types of demographic analysis.

30.    The Census 2010 geographic boundary files that I used with *Maptitude* are created from the U.S. Census 2010 TIGER (Topologically Integrated Geographic Encoding and Referencing) files.  The population data is from the 2010 PL 94-171 data file.  This dataset is published in electronic format and is the complete count population file designed by the U.S. Census Bureau for use in legislative redistricting.  The file contains basic race and ethnicity data on the population and voting age population found in units of census geography such as states, counties, municipalities, townships, reservations, school districts, census tracts, census block groups, and census blocks.

31.    *The Maptitude for Redistricting* software processes the TIGER files to produce a map for display on a computer screen.  The software also merges demographic data from the PL94-171 file to match the 2010 Census geography.

32.    I created the election plans discussed below at the census block level for the 2010 Census using *Maptitude for Redistricting.*  A census block is the

15

smallest geographic tabulation area from the decennial census. A block may be as small as a regular city block bounded by four streets, or as large as several square miles in a rural area. Generally, a census block is bounded on all sides by visible features such as streets, rivers, and railroad tracks.

33.     The Plaintiffs' attorneys provided me with an electronic GIS shapefile depicting the 2012 precinct boundaries for Yakima. I understand that this file was prepared by the Yakima County Public Records office.

34.      The Plaintiffs' attorneys also gave me a Microsoft *Excel* file that lists all registered voters in Yakima as of mid-January 2013. I understand that this file was prepared by the Yakima County Department of Elections.

35.     In addition, the Plaintiffs' attorneys gave me a Microsoft *Excel* file that lists over 12,000 Spanish surnames. I understand that this file was given to the Yakima County Department of Elections by the U.S. Department of Justice (DOJ) in order to identify Latino voters. I used the Spanish surname file to identify Latino voters in the January 2013 registered voter list.

36.     I matched the January 2013 registered voter list to the Spanish surname list using a Microsoft *Access* routine. In short, I parsed the surname for all registered voters and then marked all persons with a matching Spanish surname. This match includes a few persons with surnames that in part match Spanish surnames on the DOJ list (for example, the surname "Vega de la Fuente" is marked

as a Spanish surname because both "Vega" and "Fuente" are Spanish surnames on the DOJ list).

37.     I used *Maptitude* to geocode the January 2013 Yakima City registered voter list. Geocoding is a technical process available in GIS software that locates voters by street number and address and converts those locations to points on a computer map. The points can then be tallied to calculate the number of registered voters and Latino registered voters by district.

38.     I developed block-level estimates of the citizen voting age population (Hispanic and non-Hispanic) from the block group estimates in the *2007-2011 American Community Survey 5-year Estimates* dataset prepared by the U.S. Census Bureau.[8] I allocated the estimated Hispanic and non-Hispanic block group citizen voting age population to census blocks based on the complete count block-level voting age Hispanic and non-Hispanic population, according to the 2010 Census. (Census block estimates of the citizen voting age population are not available from the *American Community Survey* or any other Census Bureau publication.)

39.     I relied on a PDF map posted on the City's website to recreate and analyze the 2011 City Council plan with *Maptitude for Redistricting* software.

---

[8] This special file is released on an annual basis at the block group-level. I relied on the most recent dataset, which was released on January 28, 2013 and is available for download at:
http://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html

17

40.     Also, independent of the analysis conducted for this report, I produced a set of tables which tallied total turnout by precinct and total Latino turnout by precinct for various elections in Yakima County.  I delivered these tables in Microsoft *Excel* format to the attorneys for use in Dr. Richard Engstrom's racially polarized voting analysis. The process I followed to create the turnout by precinct tables is explained in ¶41 and ¶42 below.

41.     The Plaintiffs' attorneys gave me Adobe PDF files with lists of persons who voted in the relevant elections. I understand that these lists were provided by the Yakima County Elections Department. I converted these files to Microsoft *Excel* format and imported the files into Microsoft *Access*. I matched voters by surname to the DOJ Spanish surname list using the method described in ¶36.

42.     In addition, the attorneys gave me a file prepared by the Yakima County Department of Elections that identifies Latino voters who cast a ballot in the November 2011 General Election. This voter turnout list includes a few persons with non-Spanish surnames (for example, "Colby"). I understand that the Yakima County Board of Elections records these voters as Latino because they previously had Spanish surnames  (for example, a female voter whose married surname is not Spanish but whose maiden name is Spanish). I used this file to identify additional Latino voters not matched with the surname method described

18

in ¶36.  I matched the voter ID or affidavit number (from the November 2011

Latino voter list) for the relevant elections to voters not identified as Latino with

the surname method.

**2011 City Council Plan**

43.    The Yakima City Council has seven members. Three council members

are elected at-large. The remaining four members live in the districts they represent,

but are chosen by the citywide electorate in the general election cycle.

44.    According to the 2010 Census, there is no majority-Latino registered

voter or majority-Latino citizen voting age district under the current Yakima City

Council plan (the "*2011 Plan*"). The table in **Figure 7** on the next page provides

Census 2010 summary population statistics by residency district for the *2011 Plan.*

**Figure 8** is a general map of the *2011 Plan*.  A more detailed demographic summary

and map are attached as **Exhibit B**.


**Figure 7**                    **Yakima City Council 2011 Plan – 2010 Census**


| District | Population | Deviation | % Deviation | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | % Latino CVAP | % Latino Registered (of all registered) |
|---|---|---|---|---|---|---|---|---|
| 1 | 21951 | -851 | -3.73% | 16549 | 2168 | 13.10% | 10.71% | 7.77% |
| 2 | 21380 | -1422 | -6.24% | 15151 | 5240 | 34.59% | 25.45% | 21.10% |
| 3 | 23831 | 1029 | 4.51% | 15803 | 9443 | 59.75% | 40.17% | 42.78% |
| 4 | 23905 | 1103 | 4.84% | 17784 | 4986 | 28.04% | 17.79% | 15.12% |

**Figure 8**                          **Yakima City Council 2011 Plan**



45.    The ideal district size under a 4-district plan is 22,804 (91,208 /4),
based on the 2011 citywide population of 91,208 – published by the City in a table
accompanying the *2011 Plan* map.[9]  As noted *supra*, the City adds 141 persons to
the Census 2010 population to account for annexations that occurred after the 2010

---

[9] See map and table available for download at:
http://www.yakimawa.gov/council/city-council-districts/

:

Census. The *2011 Plan* has an overall deviation of 11.08%. Residency District 2 is under-populated by 6.24%.

46.     Except for purposes of calculating the ideal district size, I have used the 2010 Census population count in district population statistics in this report because post- annexation block-level estimates by race/ethnicity and voting age have not been published by the City of Yakima or the Census Bureau.

47.     Over 40% of the citywide Latino population (42.86%) resides in Residency District 3 under the *2011 Plan.* Residency District 3 under the *2011 Plan* is majority-Latino voting age at 59.75%, but Latino registered voters comprise just 42.78% of all registered voters in the district. The estimated Latino citizen voting age population (LCVAP) in District 3 is 40.17%.

**Illustrative Plans**

48.     I have prepared two illustrative 7-district plans in order to demonstrate that Latinos are sufficiently numerous and geographically compact to constitute a voting age majority and registered voter majority in two of seven single-member City Council districts, as well as a citizen voting age majority in at least one of the seven districts.

49.     The table in **Figure 9** below provides Census 2010 summary population statistics by district for *Illustrative Plan 1*, with an accompanying map

21

on the following page in Figure **10**.  A more detailed demographic summary and maps for *Illustrative Plan 1* are attached as **Exhibit C**.

**Figure 9**              **Yakima City Council Illustrative Plan 1– 2010 Census**

| District | Population | Deviation | % Deviation | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | % Latino CVAP | % Latino Registered (of all registered) |
|---------|-----------|-----------|-------------|---------|-----------|-------------|---------------|------------------------------------------|
| 1 | 12533 | -497 | -3.81% | 7604 | 5335 | 70.16% | 50.25% | 51.66% |
| 2 | 13358 | 328 | 2.52% | 8545 | 5639 | 65.99% | 43.15% | 51.03% |
| 3 | 12859 | -171 | -1.31% | 9377 | 2564 | 27.34% | 23.68% | 16.99% |
| 4 | 13175 | 145 | 1.11% | 9716 | 3523 | 36.26% | 26.56% | 22.89% |
| 5 | 12683 | -347 | -2.66% | 9801 | 2152 | 21.96% | 12.27% | 13.42% |
| 6 | 13176 | 146 | 1.12% | 10175 | 1083 | 10.64% | 7.13% | 6.62% |
| 7 | 13283 | 253 | 1.94% | 10069 | 1541 | 15.30% | 14.14% | 10.37% |

50.     Under *Illustrative Plan1*, Districts 1 and 2 are Latino majority voting age – 70.16% and 65.99%, respectively.  District 1 is majority Latino citizen voting age (50.25% LCVAP), based on block-level estimates derived from the *2007-2011 American Community Survey 5-Year Estimates* block group dataset. District 1 has a Latino registered voter majority, based on the geocoded January 2013 Yakima City registered voter list (51.66%). District 2 is also majority-Latino registered voter (51.03%).

51.     Under *Illustrative Plan 1*, District 1 encompasses a land area of 2.39 square miles and District 2 covers 3.58 square miles. District 4 has a land area of

22

2.45 square miles. The remaining districts range in geographic size from 4.19

square miles (District 6) to 5.71 square miles (District 7).

**Figure 10**                    **Yakima City Council Illustrative Plan 1**



52.    The table in **Figure 11** below provides Census 2010 summary

population statistics by district for *Illustrative Plan 2*, with an accompanying map

23

on the following page in **Figure 12**.  A more detailed demographic summary and

maps for *Illustrative Plan 2* are attached as **Exhibit D**.

**Figure 11**                **Yakima City Council Illustrative Plan 2– 2010 Census**

| District | Population | Deviation | % Deviation | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | % Latino CVAP | % Latino Registered (of all registered) |
|---|---|---|---|---|---|---|---|---|
| 1 | 12969 | -61 | -0.47% | 7860 | 5534 | 70.41% | 50.13% | 51.86% |
| 2 | 12822 | -208 | -1.60% | 8242 | 5388 | 65.37% | 42.61% | 50.56% |
| 3 | 13079 | 49 | 0.38% | 9532 | 2629 | 27.58% | 23.65% | 17.13% |
| 4 | 13431 | 401 | 3.08% | 9900 | 3619 | 36.56% | 26.77% | 23.03% |
| 5 | 12761 | -269 | -2.06% | 9876 | 2084 | 21.10% | 11.69% | 13.05% |
| 6 | 12722 | -308 | -2.36% | 9808 | 1042 | 10.62% | 7.32% | 6.54% |
| 7 | 13283 | 253 | 1.94% | 10069 | 1541 | 15.30% | 14.14% | 10.37% |

53.      Under *Illustrative Plan 2*, Districts 1 and 2 are also Latino majority

voting age – 70.41% and 65.37%, respectively.  District 1 is majority Latino

citizen voting age (50.13% LCVAP), with a Latino registered voter majority

(51.86%). District 2 is also majority-Latino registered voter (50.56%).

54.      Under *Illustrative Plan 2*, District 1 encompasses a land area of 2.60

square miles and District 2 covers 3.52 square miles. District 4 has a land area of

2.15 square miles. The remaining districts range in geographic size from 4.06 square

miles (District 6) to 5.71 square miles (District 7).

**Figure 12**                    **Yakima City Council Illustrative Plan 2**



55.    The illustrative plans meet one-person, one-vote requirements. The

ideal district size for a 7-district plan is 13,030 (91,208 /7). Illustrative Plan 1 has an

overall deviation from the ideal district size of 6.33%. Illustrative Plan 2 has an

overall deviation from the ideal district size of 5.44%.

25

56.    In sum, the illustrative plans comply with key traditional redistricting criteria, including one-person one-vote, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength.

### III.    CONCLUSION

57.    Given the spatial distribution of Latinos in Yakima, it is very easy to create two majority-Latino voting age districts under a seven single-member district plan. Furthermore, as demonstrated in both illustrative plans, two districts can be drawn so that Latinos represent a majority of registered voters in each. In addition, under both illustrative plans, at least one of the two Latino-majority districts (District 1) has a Latino citizen voting age majority. It is therefore my opinion that Latinos in Yakima are sufficiently numerous and geographically compact to constitute a majority in two single member districts under a seven-member City Council plan.

* * *

26

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

February ___, 2013

*William S. Cooper*

WILLIAM S. COOPER

27