Exhibit 5

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON


ROGELIO MONTES and MATEO ARTEAGA,        PLAINTIFFS

   v.                                    CIVIL ACTION NO. 12-cv-3108-TOR

CITY OF YAKIMA, WASHINGTON, *et al.*        DEFENDANTS


**SECOND SUPPLEMENTAL DECLARATION OF WILLIAM S. COOPER**

WILLIAM S. COOPER, acting in accordance with 28 U.S.C. §1746, the Federal Rules of Civil Procedure 26(a)(2)(B), and Rules 702 and 703 of the Federal Rules of Evidence, does hereby declare and say:

1.       My name is William S. Cooper. I serve as a demographic and redistricting expert for the Plaintiffs. I filed a Declaration in this case on February 1, 2013 and a Supplemental Declaration on April 19, 2013.

2.       Subsequent to my provision of declarations in this matter, the U.S. Census Bureau published new *American Community Survey (ACS)* data[1] and the Yakima County Elections Division updated its voter registration data after the election in November 2013. At the request of the Plaintiffs' attorneys in this matter,

---

[1] The Census Bureau released the *2010-2012 American Community Survey 3-Year Estimates* dataset in November 2013 and the *2008-2012 American Community Survey 5-Year Estimates* dataset in December 2013. The 2008-2012 special tabulation block group citizenship estimates by race and ethnicity were released in January 2014.

I have updated the citizenship and voter registration statistics reported in my previous declarations to provide the Court with the most current information available from the ACS and the Yakima County Elections Division. I have also prepared and included as **Exhibit C** a 64-page document of charts and tables based on the *2010-2012 ACS*, which updates the *2008-2010 ACS* document I attached as Exhibit H to my April 19, 2013 Supplemental Declaration.

3.    This declaration also provides information regarding compactness and incumbency with respect to the illustrative and hypothetical plans included in my previous declarations.

## I.    Updated Latino Citizenship and Registered Voter Statistics – Yakima

4.    As anticipated in my February 1, 2013 Declaration (¶ 24), the Latino non-citizen rate in Yakima continues to drop.

5.    According to the 3-year *2010-2012 ACS*, 27.67% of the overall Latino population is non-citizen and 43.17% of the voting age population is non-citizen. This represents more than a 2 percentage point decline for both non-citizen categories compared to the 3-year *2009-2011 ACS*, which were 29.39% and 45.95%, respectively.[2]

6.    The 5-year *2008-2012 ACS* shows slightly higher non-citizen rates for Yakima's Latinos – 29.30% of all Latinos and 45.47% of the Latino voting age

---

[2] Cooper Declaration, February 1, 2013, ¶ 22.

population. This represents about a 1 percentage point decline for both categories compared to the 5-year *2007-2011 ACS* – 30.08% and 46.78%, respectively.[3]

7.      The Latino non-citizen rate in Yakima will likely continue to drop. Of the 15,946 Latinos in Yakima under the age of 18 in the *2010-2012 ACS*, just 4.36% are non-citizens. Of the 15,500 Latinos in Yakima under 18 in the *2008-2012 ACS*, just 5.29% are non-citizens.

8.      According to the *2010-2012 ACS*, Latinos represent 35.67% of the citizen population in Yakima and 24.17% of the citizen voting age population. According to the *2008-2012 ACS*, Latinos comprise 34.34% of the citizen population in Yakima and 22.66% of the citizen voting age population. Thus, as shown in **Figure 1**, Latino citizenship as a percentage of all citizens and adult citizens increased year-over-year in the two ACS survey datasets.

**Figure 1 – Percent Latino Citizenship by 3-Year and 5-year ACS Dataset**

|  | 2007-11 ACS | 2008-12 ACS | Point Change | 2009-11 ACS | 2010-12 ACS | Point Change |
|---|---|---|---|---|---|---|
| **% Latino citizens all ages** | 32.96 | 34.34 | +1.38 | 34.13 | 35.67 | +1.54 |
| **% Latino CVAP** | 21.34 | 22.66 | +1.32 | 22.21 | 24.17 | +1.96 |

9.      According to March 2014 data reported by the Yakima County Elections Division, there are 7,454 Latino registered voters in Yakima, or 19.03% of the total number of 39,166 registered voters. After including persons with compound or

---

[3] Ibid.

hyphenated Spanish surnames, the surname matched registered voter count is 7,661 or 19.56%. Thus, Latino registered voters as a percentage of overall registered voters climbed by over a percentage point from 18.42% in January 2013 to 19.56% in March 2014. [4]

## II.    Updated Latino Citizenship and Registered Voter Statistics by Plan

10.    **Exhibit A** contains updated summary demographic tables for *Illustrative Plans 1* and *2*, *Hypothetical Plans A*, *B*, and *C*, and the current *2011 Plan* – taking into account the new *2008-2012 ACS* block group citizenship estimates[5] and the March 2014 voter registration data.[6] The updated statistics in the exhibit are in the three lower rightmost columns – percent Latino CVAP, percent Latino registered voters, and percent Latino citizens (all ages). For ease of reference, summary tables highlighting District 1 are included in **Figures 2** and **3** below.

11.    **Figure 2** reports the LCVAP for District 1 by plan under the *2007-2011 ACS* and the updated estimates based on the *2008-2012 ACS*. The LCVAP is reported for both Method 1 and Method 2. (See ¶¶ 4-28 in my April 19, 2013 Supplemental Declaration for a discussion about the two methods.)

---

[4] See Cooper Declaration, February 1, 2013, ¶ 36.

[5]  The *2008-2012 ACS* block group special tabulation dataset prepared by the Census Bureau was released on January 28, 2014 and is available for download at: http://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html.

[6] I have not compiled additional and updated information for *Hypothetical Plans D* and *E* presented in my April 19, 2013 Supplemental Declaration because those two plans were drawn for rhetorical purposes in response to Dr. Peter Morrison's report.

**Figure 2 – Percent LCVAP by Plan – 2007-11 ACS and 2008-12 ACS**

| District | Method 1 2007-11 ACS % Latino CVAP | Method 1 2008-12 ACS % Latino CVAP | Method 1 Change – 2007-11 to 2008-12 ACS | Method 2 2007-11 ACS % Latino CVAP | Method 2 2008-12 ACS % Latino CVAP | Method 2 Change – 2007-11 to 2008-12 ACS |
|---|---|---|---|---|---|---|
| **Illustrative 1** | | | | | | |
| 1 | 50.25% | 54.51% | + 4.26% | 48.31% | 52.52% | + 4.21% |
| **Illustrative 2** | | | | | | |
| 1 | 50.13% | 54.70% | + 4.57% | 47.95% | 52.67% | + 4.72% |
| **Hypothetical A** | | | | | | |
| 1 | 52.17% | 55.53% | + 3.36% | 50.18% | 53.27% | + 3.09% |
| **Hypothetical B** | | | | | | |
| 1 | 56.12% | 59.30% | + 3.18% | 53.01% | 56.31% | + 3.30% |
| **Hypothetical C** | | | | | | |
| 1 | 57.74% | 60.91% | + 3.17% | 54.16% | 57.48% | + 3.32% |

12.     As shown in **Figure 2**, with the latest 5-year ACS dataset, the LCVAP in District 1 goes up significantly across all illustrative and hypothetical plans – gaining 3.17 to 4.57 percentage points under Method 1. Method 2 also yields across- the-board LCVAP increases – gaining 3.09 to 4.72 percentage points compared to the prior year. As a result, District 1 is now over 50% LCVAP in all five plans under both Method 1 and Method 2.

13.     **Figure 3** displays Latino registered voters for District 1 by plan, comparing statistics for January 2013 with March 2014. Based on the surname match to the March 2014 Yakima County Elections Division data, the Latino registered

5

voter percentage is no less than 52% and as high as almost 61% for each of the

iterations of District 1 contained in *Illustrative Plans 1* and *2* and *Hypothetical Plans*

*A*, *B*, and *C*.

**Figure 3 – Percent Latino Registered Voters by Plan – Jan. 2013 and Mar. 2014**

| District | Jan. 2013 %_Latino Registered (of all registered) | Mar. 2014 %_Latino Registered (of all registered) | Jan. 2013 to Mar. 2014 Change |
|---|---|---|---|
| **Illustrative 1** | | | |
| 1 | 51.66% | 52.78% | + 1.12% |
| **Illustrative 2** | | | |
| 1 | 51.86% | 52.76% | + 0.90% |
| **Hypothetical A** | | | |
| 1 | 54.56% | 55.51% | + 0.95% |
| **Hypothetical B** | | | |
| 1 | 58.92% | 56.33% | -2.59% |
| **Hypothetical C** | | | |
| 1 | 59.74% | 60.77% | + 1.03% |

## III.     Compactness Scores

14.     As I mentioned during my deposition in this case, all of the districts

included in my illustrative and hypothetical plans are reasonably compact and

sufficiently regular in shape to pass muster, and there is no reason to rely upon

quantitative measures of compactness. That said, because the issue of quantitative

compactness scores arose during my deposition, I provide in **Figure 4** the

compactness scores of the districts included in my illustrative and hypothetical

6

plans, as well as the scores for the *2011 Plan* currently in effect. These compactness scores are generated by the Reock test.[7]

### Figure 4 – Reock Compactness Score Comparison by Plan

| District | Illustrative 1 | Illustrative 2 | Hypothetical A | Hypothetical B | Hypothetical C | 2011 Plan |
|---|---|---|---|---|---|---|
| 1 | 0.38 | 0.42 | 0.39 | 0.28 | 0.23 | 0.47 |
| 2 | 0.44 | 0.43 | 0.37 | 0.36 | 0.37 | 0.44 |
| 3 | 0.33 | 0.34 | 0.33 | 0.35 | 0.35 | 0.37 |
| 4 | 0.41 | 0.39 | 0.38 | 0.39 | 0.39 | 0.51 |
| 5 | 0.44 | 0.44 | 0.44 | 0.40 | 0.40 | |
| 6 | 0.40 | 0.40 | 0.40 | 0.53 | 0.53 | |
| 7 | 0.25 | 0.25 | 0.25 | 0.24 | 0.24 | |
| Mean | 0.38 | 0.38 | 0.37 | 0.36 | 0.36 | 0.45 |

15.    Because the Reock measure is based on an ideal geometric form, there is no bright-line rule on what constitutes a "passing grade" with respect to this compactness measure for purposes of evaluating a local election plan. By way of example, because the City of Yakima is not itself shaped like a circle, no districting plan can be "perfect" under the Reock measure. In fact, as a single district, the entire City of Yakima scores .45 under the Reock test.

---

[7] "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." (Source: *Maptitude for Redistricting* documentation).

16.    District 1 under *Illustrative Plans 1* and *2* and *Hypothetical Plan A* exceeds the .37 Reock score for the current *2011 Plan* District 3, which – like illustrative District 1 – is anchored in east Yakima.

17.    For purposes of comparison, I have produced Reock compactness scores for a few other statewide and municipal election district plans in Washington.

18.    Based on my analysis, the Washington State Legislature plan has a mean Reock score of .42. However, over one-fourth (26.5%) of the legislative districts score below .37. Seven of the 49 legislative districts score below .30, with a minimum score of .20. According to the Reock test, the Washington Congressional plan is slightly less compact, with a mean score of .38. Three of the 10 Congressional districts score below .30.[8]

19.    I also examined compactness scores for three Washington cities with district-based election plans – Pasco, Spokane, and Tacoma.[9] The mean Reock score for the 5-district plan in Pasco is .35, with a minimum of .23. The mean Reock score for the 3-district plan in Spokane is .35, with a minimum of .26. The

---

[8] GIS shapefiles for the Washington State Legislature and Congressional plans are available via:
http://www.redistricting.wa.gov/maps.asp.

[9] GIS shapefiles for the election plans in the three cities are available via:
Pasco:  http://gis.co.franklin.wa.us/download.asp.
Spokane: http://www.spokanecity.org/services/gis/data/.
Tacoma: http://wspdsmap.ci.tacoma.wa.us/samples/map2.asp?theOption=2.

mean Reock score for the 5-district plan in Tacoma is .51, with a minimum of .40.

## IV.          Incumbents by District Assignments

20.     I understand that the Councilmembers testified about their places of residence in their depositions, and that there is a new councilmember (Thomas Dittmar) on the Yakima City Council. The table in **Exhibit B** shows incumbent assignments by district for the illustrative and hypothetical plans I have submitted in this matter.


#      #      #


Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information and belief.


Executed on: April 25, 2014


WILLIAM S. COOPER

# Population Summary Report

### Yakima City Council  --Illustrative Plan 1

| District | Population | Deviation | % Deviation | Hisp. | % Hisp. | Minority | % Minority | Group Quarters Incarcerated | Group Quarters College Dorms | Group Quarters Military |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12533 | -497 | -3.81% | 9626 | 76.81% | 10227 | 81.60% | 0 | 0 | 0 |
| 2 | 13358 | 328 | 2.52% | 9713 | 72.71% | 10505 | 78.64% | 273 | 0 | 0 |
| 3 | 12859 | -171 | -1.31% | 4395 | 34.18% | 5297 | 41.19% | 0 | 91 | 0 |
| 4 | 13175 | 145 | 1.11% | 5724 | 43.45% | 6761 | 51.32% | 778 | 0 | 0 |
| 5 | 12683 | -347 | -2.66% | 3668 | 28.92% | 4464 | 35.20% | 0 | 0 | 0 |
| 6 | 13176 | 146 | 1.12% | 1820 | 13.81% | 2648 | 20.10% | 0 | 0 | 0 |
| 7 | 13283 | 253 | 1.94% | 2641 | 19.88% | 3642 | 27.42% | 58 | 0 | 0 |
| **Total** | **91067** | | | **37587** | **41.27%** | **43544** | **47.82%** | **1109** | **91** | **0** |
| **Ideal** | **13030** | | | | | | | | | |
| **Total Deviation** | | | **6.33%** | | | | | | | |

| District | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | 18+ NH DOJ Indian | %18+ NH DOJ Indian | 18+ Minority | % 18+ Minority | % Latino CVAP | % Latino Registered (of all registered) | % Latino Citizens (all ages) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7604 | 5335 | 70.16% | 195 | 2.56% | 5748 | 75.59% | 54.51% | 52.78% | 71.93% |
| 2 | 8545 | 5639 | 65.99% | 182 | 2.13% | 6182 | 72.35% | 46.31% | 53.35% | 63.26% |
| 3 | 9377 | 2564 | 27.34% | 222 | 2.37% | 3200 | 34.13% | 24.80% | 18.18% | 32.22% |
| 4 | 9716 | 3523 | 36.26% | 334 | 3.44% | 4301 | 44.27% | 26.69% | 25.24% | 34.57% |
| 5 | 9801 | 2152 | 21.96% | 247 | 2.52% | 2755 | 28.11% | 12.21% | 14.48% | 20.17% |
| 6 | 10175 | 1083 | 10.64% | 125 | 1.23% | 1612 | 15.84% | 7.11% | 6.91% | 11.39% |
| 7 | 10069 | 1541 | 15.30% | 172 | 1.71% | 2199 | 21.84% | 15.14% | 10.59% | 23.24% |
| **Total** | **65287** | **21837** | **33.45%** | **1477** | **2.26%** | **25997** | **39.82%** | **22.66%** | **19.56%** | **34.34%** |

**Notes:**

(1) Group quarters data are from the 2010 Advance Group Quarters File released by the Census Bureau on April 20, 2011
(2) With post-Census 2010 annexation affecting Districts 6 and 7, current city population is 91,208. Deviation is calculated based on ideal district size of 13,030 (91,208/7).
(3) % LCVAP calculated by disaggregating 2008-2012 ACS block group estimates for 18+ citizen Hispanics and Non-Hispanics to 2010 census blocks.
(4) % Latino registered based on Spanish surname match to registered voter list current through mid-March 2014
(5) % Latino citizen calculated by disaggregating 2008-2012 ACS block group estimates for  citizen Hispanics and Non-Hispanics to 2010 census blocks.

# Population Summary Report

### Yakima City Council  --Illustrative Plan 2

| District | Population | Deviation | % Deviation | Hisp. | % Hisp. | Minority | % Minority | Group Quarters Incarcerated | Group Quarters College Dorms | Group Quarters Military |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12969 | -61 | -0.47% | 10006 | 77.15% | 10613 | 81.83% | 0 | 0 | 0 |
| 2 | 12822 | -208 | -1.60% | 9237 | 72.04% | 10018 | 78.13% | 273 | 0 | 0 |
| 3 | 13079 | 49 | 0.38% | 4505 | 34.44% | 5425 | 41.48% | 0 | 91 | 0 |
| 4 | 13431 | 401 | 3.08% | 5873 | 43.73% | 6925 | 51.56% | 778 | 0 | 0 |
| 5 | 12761 | -269 | -2.06% | 3574 | 28.01% | 4366 | 34.21% | 0 | 0 | 0 |
| 6 | 12722 | -308 | -2.36% | 1751 | 13.76% | 2555 | 20.08% | 0 | 0 | 0 |
| 7 | 13283 | 253 | 1.94% | 2641 | 19.88% | 3642 | 27.42% | 58 | 0 | 0 |
| **Total** | **91067** | | | **37587** | **41.27%** | **43544** | **47.82%** | **1109** | **91** | **0** |
| **Ideal** | **13030** | | | | | | | | | |
| **Total Deviation** | | | **5.44%** | | | | | | | |

| District | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | 18+ NH DOJ Indian | %18+ NH DOJ Indian | 18+ Minority | % 18+ Minority | % Latino CVAP | % Latino Registered (of all registered) | % Latino Citizens (all ages) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7860 | 5534 | 70.41% | 196 | 2.49% | 5948 | 75.67% | 54.70% | 52.76% | 72.06% |
| 2 | 8242 | 5388 | 65.37% | 177 | 2.15% | 5923 | 71.86% | 45.58% | 52.93% | 62.35% |
| 3 | 9532 | 2629 | 27.58% | 230 | 2.41% | 3278 | 34.39% | 24.78% | 18.28% | 32.23% |
| 4 | 9900 | 3619 | 36.56% | 340 | 3.43% | 4414 | 44.59% | 26.81% | 25.44% | 35.01% |
| 5 | 9876 | 2084 | 21.10% | 241 | 2.44% | 2684 | 27.18% | 11.53% | 14.14% | 19.11% |
| 6 | 9808 | 1042 | 10.62% | 121 | 1.23% | 1551 | 15.81% | 7.19% | 6.81% | 11.56% |
| 7 | 10069 | 1541 | 15.30% | 172 | 1.71% | 2199 | 21.84% | 15.14% | 10.59% | 23.24% |
| **Total** | **65287** | **21837** | **33.45%** | **1477** | **2.26%** | **25997** | **39.82%** | **22.66%** | **19.56%** | **34.34%** |

**Notes:**

(1) Group quarters data are from the 2010 Advance Group Quarters File released by the Census Bureau on April 20, 2011

(2) With post-Census 2010 annexation affecting Districts 6 and 7, current city population is 91,208. Deviation is calculated based on ideal district size of 13,030 (91,208/7).

(3) % LCVAP calculated by disaggregating 2008-2012 ACS block group estimates for 18+ citizen Hispanics and Non-Hispanics to 2010 census blocks.

(4) % Latino registered based on Spanish surname match to registered voter list current through mid-March 2014

(5) % Latino citizen calculated by disaggregating 2008-2012 ACS block group estimates for  citizen Hispanics and Non-Hispanics to 2010 census blocks.

Exhibit A-3

# Population Summary Report

**Yakima City Council  - Hypothetical Plan A**

| District | Population | Deviation | % Deviation | Hisp. | % Hisp. | Minority | % Minority | Group Quarters Incarcerated | Group Quarters College Dorms | Group Quarters Military |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12819 | -211 | -1.62% | 10038 | 78.31% | 10612 | 82.78% | 0 | 0 | 0 |
| 2 | 12421 | -609 | -4.67% | 8875 | 71.45% | 9630 | 77.53% | 273 | 0 | 0 |
| 3 | 13026 | -4 | -0.03% | 4511 | 34.63% | 5413 | 41.56% | 0 | 0 | 0 |
| 4 | 12676 | -354 | -2.72% | 5329 | 42.04% | 6370 | 50.25% | 778 | 91 | 0 |
| 5 | 13666 | 636 | 4.88% | 4373 | 32.00% | 5229 | 38.26% | 0 | 0 | 0 |
| 6 | 13176 | 146 | 1.12% | 1820 | 13.81% | 2648 | 20.10% | 0 | 0 | 0 |
| 7 | 13283 | 253 | 1.94% | 2641 | 19.88% | 3642 | 27.42% | 58 | 0 | 0 |
| **Total** | **91067** | | | **37587** | **41.27%** | **43544** | **47.82%** | **1109** | **91** | **0** |
| **Ideal** | **13030** | | | | | | | | | |
| **Total Deviation** | | | **9.55%** | | | | | | | |

| District | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | 18+ NH DOJ Indian | %18+ NH DOJ Indian | 18+ Minority | % 18+ Minority | % Latino CVAP | % Latino Registered (of all registered) | % Latino Citizens (all ages) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7862 | 5680 | 72.25% | 186 | 2.37% | 6067 | 77.17% | 55.53% | 55.51% | 72.39% |
| 2 | 7873 | 5062 | 64.30% | 182 | 2.31% | 5586 | 70.95% | 47.26% | 52.39% | 63.70% |
| 3 | 9487 | 2651 | 27.94% | 221 | 2.33% | 3280 | 34.57% | 24.81% | 18.28% | 32.48% |
| 4 | 9431 | 3301 | 35.00% | 329 | 3.49% | 4085 | 43.31% | 25.08% | 24.36% | 32.43% |
| 5 | 10390 | 2519 | 24.24% | 262 | 2.52% | 3168 | 30.49% | 13.58% | 15.19% | 23.49% |
| 6 | 10175 | 1083 | 10.64% | 125 | 1.23% | 1612 | 15.84% | 7.11% | 6.91% | 11.39% |
| 7 | 10069 | 1541 | 15.30% | 172 | 1.71% | 2199 | 21.84% | 15.14% | 10.59% | 23.24% |
| **Total** | **65287** | **21837** | **33.45%** | **1477** | **2.26%** | **25997** | **39.82%** | **22.66%** | **19.56%** | **34.34%** |

**Notes:**

(1) Group quarters data are from the 2010 Advance Group Quarters File released by the Census Bureau on April 20, 2011

(2) With post-Census 2010 annexation affecting Districts 6 and 7, current city population is 91,208. Deviation is calculated based on ideal district size of 13,030 (91,208/7).

(3) % LCVAP calculated by disaggregating 2008-2012 ACS block group estimates for 18+ citizen Hispanics and Non-Hispanics to 2010 census blocks.

(4) % Latino registered based on Spanish surname match to registered voter list current through mid-March 2014

(5) % Latino citizen calculated by disaggregating 2008-2012 ACS block group estimates for  citizen Hispanics and Non-Hispanics to 2010 census blocks.

# Population Summary Report

### Yakima City Council  - Hypothetical Plan B

| District | Population | Deviation | % Deviation | Hisp. | % Hisp. | Minority | % Minority | Group Quarters Incarcerated | Group Quarters College Dorms | Group Quarters Military |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12995 | -35 | -0.27% | 10420 | 80.18% | 11100 | 85.42% | 0 | 0 | 0 |
| 2 | 12706 | -324 | -2.49% | 7401 | 58.25% | 8181 | 64.39% | 273 | 0 | 0 |
| 3 | 12632 | -398 | -3.05% | 4759 | 37.67% | 5626 | 44.54% | 0 | 91 | 0 |
| 4 | 12866 | -164 | -1.26% | 6437 | 50.03% | 7421 | 57.68% | 778 | 0 | 0 |
| 5 | 13323 | 293 | 2.25% | 3956 | 29.69% | 4751 | 35.66% | 0 | 0 | 0 |
| 6 | 13413 | 383 | 2.94% | 1879 | 14.01% | 2758 | 20.56% | 0 | 0 | 0 |
| 7 | 13132 | 102 | 0.78% | 2735 | 20.83% | 3707 | 28.23% | 58 | 0 | 0 |
| **Total** | **91067** | | | 37587 | 41.27% | 43544 | 47.82% | **1109** | **91** | **0** |
| **Ideal** | **13030** | | | | | | | | | |
| **Total Deviation** | | | **5.99%** | | | | | | | |

| District | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | 18+ NH DOJ Indian | %18+ NH DOJ Indian | 18+ Minority | % 18+ Minority | % Latino CVAP | % Latino Registered (of all registered) | % Latino Citizens (all ages) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7917 | 5913 | 74.69% | 176 | 2.22% | 6383 | 80.62% | 59.30% | 56.33% | 75.4% |
| 2 | 8584 | 4351 | 50.69% | 211 | 2.46% | 4876 | 56.80% | 34.62% | 36.42% | 47.5% |
| 3 | 9096 | 2748 | 30.21% | 223 | 2.45% | 3367 | 37.02% | 26.75% | 20.34% | 35.3% |
| 4 | 9213 | 3818 | 41.44% | 325 | 3.53% | 4560 | 49.50% | 31.11% | 24.70% | 44.4% |
| 5 | 10249 | 2296 | 22.40% | 233 | 2.27% | 2899 | 28.29% | 11.77% | 13.57% | 21.1% |
| 6 | 10294 | 1105 | 10.73% | 136 | 1.32% | 1662 | 16.15% | 7.20% | 7.57% | 12.5% |
| 7 | 9934 | 1606 | 16.17% | 173 | 1.74% | 2250 | 22.65% | 15.62% | 11.31% | 22.7% |
| **Total** | **65287** | **21837** | **33.45%** | **1477** | **2.26%** | **25997** | **39.82%** | **22.66%** | **19.56%** | **34.34%** |

**Notes:**

(1) Group quarters data are from the 2010 Advance Group Quarters File released by the Census Bureau on April 20, 2011

(2) With post-Census 2010 annexation affecting Districts 6 and 7, current city population is 91,208. Deviation is calculated based on ideal district size of 13,030 (91,208/7).

(3) % LCVAP calculated by disaggregating 2008-2012 ACS block group estimates for 18+ citizen Hispanics and Non-Hispanics to 2010 census blocks.

(4) % Latino registered based on Spanish surname match to registered voter list current through mid-March 2014

(5) % Latino citizen calculated by disaggregating 2008-2012 ACS block group estimates for  citizen Hispanics and Non-Hispanics to 2010 census blocks.

Exhibit A-5

# Population Summary Report

## Yakima City Council  - Hypothetical Plan C

| District | Population | Deviation | % Deviation | Hisp. | % Hisp. | Minority | % Minority | Group Quarters Incarcerated | Group Quarters College Dorms | Group Quarters Military |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12384 | -646 | -4.96% | 10077 | 81.37% | 10676 | 86.21% | 0 | 0 | 0 |
| 2 | 13243 | 213 | 1.63% | 7705 | 58.18% | 8558 | 64.62% | 273 | 0 | 0 |
| 3 | 12632 | -398 | -3.05% | 4759 | 37.67% | 5626 | 44.54% | 0 | 91 | 0 |
| 4 | 12940 | -90 | -0.69% | 6476 | 50.05% | 7468 | 57.71% | 778 | 0 | 0 |
| 5 | 13323 | 293 | 2.25% | 3956 | 29.69% | 4751 | 35.66% | 0 | 0 | 0 |
| 6 | 13413 | 383 | 2.94% | 1879 | 14.01% | 2758 | 20.56% | 0 | 0 | 0 |
| 7 | 13132 | 102 | 0.78% | 2735 | 20.83% | 3707 | 28.23% | 58 | 0 | 0 |
| **Total** | **91067** | | | 37587 | 41.27% | 43544 | 47.82% | 1109 | 91 | 0 |
| **Ideal** | **13030** | | | | | | | | | |

**Total Deviation**        7.90%

| District | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | 18+ NH DOJ Indian | %18+ NH DOJ Indian | 18+ Minority | % 18+ Minority | % Latino CVAP | % Latino Registered (of all registered) | % Latino Citizens (all ages) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7570 | 5742 | 75.85% | 152 | 2.01% | 6167 | 81.47% | 60.91% | 60.77% | 76.87% |
| 2 | 8881 | 4498 | 50.65% | 231 | 2.60% | 5062 | 57.00% | 34.50% | 38.76% | 47.72% |
| 3 | 9096 | 2748 | 30.21% | 223 | 2.45% | 3367 | 37.02% | 26.75% | 20.72% | 35.26% |
| 4 | 9263 | 3842 | 41.48% | 329 | 3.55% | 4590 | 49.55% | 31.11% | 25.86% | 44.44% |
| 5 | 10249 | 2296 | 22.40% | 233 | 2.27% | 2899 | 28.29% | 11.77% | 13.61% | 21.14% |
| 6 | 10294 | 1105 | 10.73% | 136 | 1.32% | 1662 | 16.15% | 7.20% | 7.00% | 12.50% |
| 7 | 9934 | 1606 | 16.17% | 173 | 1.74% | 2250 | 22.65% | 15.62% | 11.11% | 22.71% |
| **Total** | **65287** | **21837** | **33.45%** | **1477** | **2.26%** | **25997** | **39.82%** | **22.66%** | **19.56%** | **34.34%** |

**Notes:**

(1) Group quarters data are from the 2010 Advance Group Quarters File released by the Census Bureau on April 20, 2011

(2) With post-Census 2010 annexation affecting Districts 6 and 7, current city population is 91,208. Deviation is calculated based on ideal district size of 13,030 (91,208/7).

(3) % LCVAP calculated by disaggregating 2008-2012 ACS block group estimates for 18+ citizen Hispanics and Non-Hispanics to 2010 census blocks.

(4) % Latino registered based on Spanish surname match to registered voter list current through mid-March 2014

(5) % Latino citizen calculated by disaggregating 2008-2012 ACS block group estimates for  citizen Hispanics and Non-Hispanics to 2010 census blocks.

Exhibit A-6

# Population Summary Report

### Yakima City Council -- 2011 Plan

| District | Population | Deviation | % Deviation | Hisp. | % Hisp. | Minority | % Minority | Group Quarters Incarcerated | Group Quarters College Dorms | Group Quarters Military |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 21951 | -851 | -3.73% | 3733 | 17.01% | 5326 | 24.26% | 58 | 0 | 0 |
| 2 | 21380 | -1422 | -6.24% | 9048 | 42.32% | 10458 | 48.91% | 0 | 91 | 0 |
| 3 | 23831 | 1029 | 4.51% | 16111 | 67.61% | 17739 | 74.44% | 1051 | 0 | 0 |
| 4 | 23905 | 1103 | 4.84% | 8695 | 36.37% | 10021 | 41.92% | 0 | 0 | 0 |
| **Total** | **91067** | | | **37587** | **41.27%** | **43544** | **47.82%** | **1109** | **91** | **0** |
| **Ideal** | **22,802** | | | | | | | | | |
| **Total Deviation** | | | **11.08%** | | | | | | | |

| District | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | 18+ NH DOJ Indian | %18+ NH DOJ Indian | 18+ Minority | % 18+ Minority | % Latino CVAP | % Latino Registered (of all registered) | % Latino Citizens (all ages) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16549 | 2168 | 13.10% | 248 | 1.50% | 3176 | 19.19% | 11.55% | 8.36% | 18.24% |
| 2 | 15151 | 5240 | 34.59% | 355 | 2.34% | 6195 | 40.89% | 25.74% | 23.67% | 34.02% |
| 3 | 15803 | 9443 | 59.75% | 494 | 3.13% | 10671 | 67.53% | 44.13% | 46.46% | 61.82% |
| 4 | 17784 | 4986 | 28.04% | 380 | 2.14% | 5955 | 33.49% | 18.31% | 16.65% | 28.88% |
| **Total** | **65287** | **21837** | **33.45%** | **1477** | **2.26%** | **25997** | **39.82%** | **22.66%** | **19.56%** | **34.34%** |

**Notes:**

(1) Group quarters data are from the 2010 Advance Group Quarters File released by the Census Bureau on April 20, 2011

(2) With post-Census 2010 annexation affecting Districts 6 and 7, current city population is 91,208. Deviation is calculated based on ideal district size of 13,030 (91,208/7).

(3) % LCVAP calculated by disaggregating 2008-2012 ACS block group estimates for 18+ citizen Hispanics and Non-Hispanics to 2010 census blocks.

(4) % Latino registered based on Spanish surname match to registered voter list current through mid-March 2014

(5) % Latino citizen calculated by disaggregating 2008-2012 ACS block group estimates for citizen Hispanics and Non-Hispanics to 2010 census blocks.

## District Assignments by Plan

| Council Member | Illustrative 1 | Illustrative 2 | Hypothetical A | Hypothetical B | Hypothetical C | 2011 Plan |
|---|---|---|---|---|---|---|
| Maureen Adkison (D. 1) | 6 | 6 | 6 | 6 | 6 | 1 |
| Thomas Dittmar (D. 2) | 3 | 3 | 3 | 3 | 3 | 2 |
| Richard (Rick) L. Ensey (D. 3) | 5 | 1 | 5 | 5 | 5 | 3 |
| Kathy J. Coffey (D. 4) | 5 | 5 | 5 | 5 | 5 | 4 |
| William (Bill) G. Lover (At Large) | 4 | 4 | 4 | 4 | 4 | 4 |
| Micah Cawley (At Large) | 3 | 3 | 3 | 3 | 3 | 2 |
| Dave Ettl (At Large) | 7 | 7 | 7 | 7 | 7 | 4 |

# Selected Socio-Economic Data

## Yakima city, Washington

## Latino and White, Not Hispanic

## Data Set: 2010-2012 American Community Survey 3-Year Estimates

www.fairvote2020.org

www.fairdata2000.com

1-Dec-13

**C02003. RACE - Universe: TOTAL POPULATION**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | |
|---|---|---|---|
| | Population | Margin of Error (+/-) | % of Total |
| **Total:** | **92,506** | **38** | **100.0%** |
| Population of one race: | 88,692 | 766 | 95.9% |
| White | 65,557 | 2,614 | 70.9% |
| Black or African American | 961 | 318 | 1.0% |
| American Indian and Alaska Native | 1,408 | 622 | 1.5% |
| Asian alone | 1,433 | 523 | 1.5% |
| Native Hawaiian and Other Pacific Islander | 35 | 69 | 0.0% |
| Some other race | 19,298 | 2,522 | 20.9% |
| Population of two or more races: | 3,814 | 771 | 4.1% |
| Two races including Some other race | 1,183 | 522 | 1.3% |
| Two races excluding Some other race, and three or more races | 2,631 | 630 | 2.8% |
| Population of two races: | 3,602 | 770 | 3.9% |
| White; Black or African American | 943 | 391 | 1.0% |
| White; American Indian and Alaska Native | 1,054 | 486 | 1.1% |
| White; Asian | 313 | 170 | 0.3% |
| Black or African American; American Indian and Alaska Native | 56 | 68 | 0.1% |
| All other two race combinations | 1,236 | 527 | 1.3% |
| Population of three races | 212 | 164 | 0.2% |
| Population of four or more races | 0 | 115 | 0.0% |

Note: Hispanics may be of any race. See Table C03002 and chart.

Source: U.S. Census Bureau, 2010-2012 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Population by Race

### Yakima city, Washington



Source:   C02003. RACE - Universe:  TOTAL POPULATION
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C03002. HISPANIC OR LATINO ORIGIN BY RACE - Universe: TOTAL POPULATION**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | |
| --- | --- | --- | --- |
| | Population | Margin of Error (+/-) | % of Total |
| **Total:** | **92,506** | 38 | **100.0%** |
| Not Hispanic or Latino: | 52,586 | 1617 | 56.8% |
| White alone | 46,849 | 1,560 | 50.6% |
| Black or African American alone | 853 | 306 | 0.9% |
| American Indian and Alaska Native alone | 1,036 | 421 | 1.1% |
| Asian alone | 1,406 | 521 | 1.5% |
| Native Hawaiian and Other Pacific Islander alone | 35 | 69 | 0.0% |
| Some other race alone | 50 | 58 | 0.1% |
| Two or more races: | 2,357 | 613 | 2.5% |
| Two races including Some other race | 52 | 51 | 0.1% |
| Two races excluding Some other race, and three or more races | 2,305 | 609 | 2.5% |
| Hispanic or Latino | 39,920 | 1616 | 43.2% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Non-Hispanic by Race and Hispanic Population

### Yakima city, Washington



Source:   C03002. HISPANIC OR LATINO ORIGIN BY RACE - Universe: TOTAL POPULATION
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B03002. HISPANIC OR LATINO ORIGIN BY RACE**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

|  | Yakima city, Washington | | |
| --- | --- | --- | --- |
|  | Population | Margin of Error (+/-) | % of Total |
| Hispanic or Latino: | 39,920 | 1616 | **100.0%** |
| White alone | 18,708 | 2,616 | 46.9% |
| Black or African American alone | 108 | 113 | 0.3% |
| American Indian and Alaska Native alone | 372 | 343 | 0.9% |
| Asian alone | 27 | 45 | 0.1% |
| Native Hawaiian and Other Pacific Islander alone | 0 | 115 | 0.0% |
| Some other race alone | 19,248 | 2,526 | 48.2% |
| Two or more races: | 1,457 | 613 | 3.6% |
| Two races including Some other race | 1,131 | 518 | 2.8% |
| Two races excluding Some other race, and three or more races | 326 | 247 | 0.8% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Hispanic or Latino Origin by Race

### Yakima city, Washington



Source:   B03002. HISPANIC OR LATINO ORIGIN BY RACE
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C01001. SEX BY AGE**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **39,920** | **1616** | **100.0%** | **46,849** | **1,560** | **100.0%** |
| Under 18 years | 15,946 | NC | 39.9% | 7,487 | NC | 16.0% |
| 18 to 64 years | 22,436 | NC | 56.2% | 28,596 | NC | 61.0% |
| 65 years and over | 1,538 | NC | 3.9% | 10,766 | NC | 23.0% |
| Male: | 20,896 | 1,051 | 52.3% | 22,463 | 992 | 47.9% |
| Under 18 years | 8,235 | 835 | 20.6% | 4,029 | 519 | 8.6% |
| 18 to 64 years | 11,900 | 749 | 29.8% | 14,064 | 807 | 30.0% |
| 65 years and over | 761 | 212 | 1.9% | 4,370 | 389 | 9.3% |
| Female: | 19,024 | 1,041 | 47.7% | 24,386 | 970 | 52.1% |
| Under 18 years | 7,711 | 789 | 19.3% | 3,458 | 498 | 7.4% |
| 18 to 64 years | 10,536 | 655 | 26.4% | 14,532 | 684 | 31.0% |
| 65 years and over | 777 | 212 | 1.9% | 6,396 | 407 | 13.7% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Population by Age

### Yakima city, Washington



Source:   C01001. SEX BY AGE
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B05003. SEX BY AGE BY CITIZENSHIP STATUS**

Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total by Age | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total by Age |
| Total: | **39,920** | **1616** | **100.0%** | **46,849** | **1,560** | **100.0%** |
| **Under 18 years:** | **15,946** | **NC** | **100.0%** | **7,487** | **NC** | **100.0%** |
| Native | 15,234 | NC | 95.5% | 7,463 | NC | 99.7% |
| Foreign born: | 712 | NC | 4.5% | 24 | NC | 0.3% |
| Naturalized U.S. citizen | 16 | NC | 0.1% | 24 | NC | 0.3% |
| Not a U.S. citizen | 696 | NC | 4.4% | 0 | NC | 0.0% |
| **18 years and over:** | **23,974** | **NC** | **100.0%** | **39,362** | **NC** | **100.0%** |
| Native | 10,050 | NC | 41.9% | 38,883 | NC | 98.8% |
| Foreign born: | 13,924 | NC | 58.1% | 479 | NC | 1.2% |
| Naturalized U.S. citizen | 3,574 | NC | 14.9% | 327 | NC | 0.8% |
| Not a U.S. citizen | 10,350 | NC | 43.2% | 152 | NC | 0.4% |
| **Male:** | 20,896 | 1,051 | 52.3% | 22,463 | 992 | 47.9% |
| **Under 18 years:** | 8235 | 835 | **100.0%** | 4029 | 519 | **100.0%** |
| Native | 7,914 | 828 | 96.1% | 4,029 | 519 | 100.0% |
| Foreign born: | 321 | 183 | 3.9% | 0 | 115 | 0.0% |
| Naturalized U.S. citizen | 16 | 26 | 0.2% | 0 | 115 | 0.0% |
| Not a U.S. citizen | 305 | 181 | 3.7% | 0 | 115 | 0.0% |
| **18 years and over:** | **12,661** | **799** | **100.0%** | **18,434** | **823** | **100.0%** |
| Native | 5,659 | 844 | 44.7% | 18,162 | 839 | 98.5% |
| Foreign born: | 7,002 | 833 | 55.3% | 272 | 148 | 1.5% |
| Naturalized U.S. citizen | 1,753 | 448 | 13.8% | 202 | 127 | 1.1% |
| Not a U.S. citizen | 5,249 | 757 | 41.5% | 70 | 78 | 0.4% |

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total by Age | White, Not Hispanic | Margin of Error (+/-) | % of NHW by Age |
| **Female:** | 19,024 | 1,041 | 47.7% | 24,386 | 970 | 52.1% |
| **Under 18 years:** | **7,711** | **789** | **100.0%** | **3,458** | **498** | **100.0%** |
| Native | 7,320 | 771 | 94.9% | 3,434 | 495 | 99.3% |
| Foreign born: | 391 | 188 | 5.1% | 24 | 39 | 0.7% |
| Naturalized U.S. citizen | 0 | 115 | 0.0% | 24 | 39 | 0.7% |
| Not a U.S. citizen | 391 | 188 | 5.1% | 0 | 115 | 0.0% |
| **18 years and over:** | **11,313** | **681** | **100.0%** | **20,928** | **810** | **100.0%** |
| Native | 4,391 | 596 | 38.8% | 20,721 | 809 | 99.0% |
| Foreign born: | 6,922 | 755 | 61.2% | 207 | 111 | 1.0% |
| Naturalized U.S. citizen | 1,821 | 507 | 16.1% | 125 | 85 | 0.6% |
| Not a U.S. citizen | 5,101 | 668 | 45.1% | 82 | 68 | 0.4% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

# Citizenship Status of Voting Age Population (18 and Over)

## Yakima city, Washington



Source:  B05003. SEX BY AGE BY CITIZENSHIP STATUS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY RACE FOR CURRENT RESIDENCE IN THE UNITED STATES - Universe: POPULATION 1 YEAR AND OVER**

Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| Total: | **38,910** | **1,619** | **100.0%** | **46,374** | **1,530** | **100.0%** |
| Same house 1 year ago | 29,734 | 1,958 | 76.4% | 38,511 | 1,699 | 83.0% |
| Moved within same county | 7,725 | 1,826 | 19.9% | 5,554 | 1,016 | 12.0% |
| Moved from different county within same state | 620 | 314 | 1.6% | 1,268 | 544 | 2.7% |
| Moved from different state | 776 | 625 | 2.0% | 878 | 342 | 1.9% |
| Moved from abroad | 55 | 56 | 0.1% | 163 | 124 | 0.4% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Geographical Mobility in the Past Year (Population 1 Year and Over)

### Yakima city, Washington



Source:   B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY RACE FOR CURRENT RESIDENCE IN THE UNITED STATES - Universe: POPULATION 1 YEAR AND OVER

Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C08105. MEANS OF TRANSPORTATION TO WORK - Universe: WORKERS 16 YEARS AND OVER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | 14817 | 1164 | **100.0%** | 20322 | 985 | **100.0%** |
| Car, truck, or van - drove alone | 11181 | 1114 | 75.5% | 16803 | 983 | 82.7% |
| Car, truck, or van - carpooled | 2558 | 549 | 17.3% | 1507 | 369 | 7.4% |
| Public transportation (excluding taxicab) | 171 | 159 | 1.2% | 318 | 192 | 1.6% |
| Taxicab, motorcycle, bicycle, walked, or other means | 517 | 263 | 3.5% | 968 | 384 | 4.8% |
| Worked at home | 390 | 376 | 2.6% | 726 | 224 | 3.6% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Means of Transportation to Work (Workers 16 Years and Over)

### Yakima city, Washington



Source:   C08105. MEANS OF TRANSPORTATION TO WORK - Universe: WORKERS 16 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C11002. HOUSEHOLD TYPE FOR POPULATION IN HOUSEHOLDS**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | 37497 | 1926 | **100.0%** | 47932 | 1966 | **100.0%** |
| In family households | 35530 | 1945 | 94.8% | 37165 | 2004 | 77.5% |
| In nonfamily households | 1967 | 731 | 5.2% | 10767 | 1187 | 22.5% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

**Household Type for Population in Households**

**Yakima city, Washington**



Source:   C11002. HOUSEHOLD TYPE FOR POPULATION IN HOUSEHOLDS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C12002. MARITAL STATUS FOR THE POPULATION 15 YEARS AND OVER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **26,183** | **1,290** | **100.0%** | **40,796** | **1,344** | **100.0%** |
| Never married | 11,273 | 1,177 | 43.1% | 9,738 | 940 | 23.9% |
| Now married (except separated) | 11,897 | 1,275 | 45.4% | 19,746 | 1,256 | 48.4% |
| Separated | 783 | 334 | 3.0% | 662 | 264 | 1.6% |
| Widowed | 678 | 249 | 2.6% | 4,241 | 540 | 10.4% |
| Divorced | 1,552 | 442 | 5.9% | 6,409 | 671 | 15.7% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Marital Status for the Population 15 Years and Over

## Yakima city, Washington



Source:   C12002. MARITAL STATUS FOR THE POPULATION 15 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C15002. SEX BY EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **18,732** | **1,162** | **100.0%** | **36,029** | **1,225** | **100.0%** |
| Less than high school diploma | 10,364 | NC | 55.3% | 4,462 | NC | 12.4% |
| High school graduate, GED, or alternative | 4,370 | NC | 23.3% | 9,904 | NC | 27.5% |
| Some college or associate's degree | 3,263 | NC | 17.4% | 12,633 | NC | 35.1% |
| Bachelor's degree or higher | 735 | NC | 3.9% | 9,030 | NC | 25.1% |
| Male: | 9,739 | 715 | 52.0% | 16,673 | 726 | 46.3% |
| Less than high school diploma | 5,895 | 725 | 31.5% | 2,239 | 414 | 6.2% |
| High school graduate, GED, or alternative | 1,986 | 494 | 10.6% | 4,669 | 635 | 13.0% |
| Some college or associate's degree | 1,435 | 452 | 7.7% | 5,457 | 633 | 15.1% |
| Bachelor's degree or higher | 423 | 269 | 2.3% | 4,308 | 508 | 12.0% |
| Female: | 8,993 | 675 | 48.0% | 19,356 | 765 | 53.7% |
| Less than high school diploma | 4,469 | 605 | 23.9% | 2,223 | 438 | 6.2% |
| High school graduate, GED, or alternative | 2,384 | 518 | 12.7% | 5,235 | 613 | 14.5% |
| Some college or associate's degree | 1,828 | 372 | 9.8% | 7,176 | 692 | 19.9% |
| Bachelor's degree or higher | 312 | 161 | 1.7% | 4,722 | 591 | 13.1% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Educational Attainment for the Population 25 Years and Older

### Yakima city, Washington



Source:   C15002. SEX BY EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B16005. NATIVITY BY LANGUAGE SPOKEN AT HOME BY ABILITY TO SPEAK ENGLISH FOR THE POPULATION 5 YEARS AND OVER**

Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **34,191** | **1,616** | **100.0%** | **44,716** | **1,486** | **100.0%** |
| Speak only English | 5,114 | NC | 15.0% | 43,385 | NC | 97.0% |
| Speak another language | 29,077 | NC | 85.0% | 1,331 | NC | 3.0% |
| Speak English "very well" | 12,217 | NC | 35.7% | 1,184 | NC | 2.6% |
| Speak English "less than very well" | 16,860 | NC | 49.3% | 147 | NC | 0.3% |
| Native: | 19,640 | 1,465 | 57.4% | 44,213 | 1,503 | 98.9% |
| Speak only English | 5,027 | 1,022 | 14.7% | 43,018 | 1,503 | 96.2% |
| Speak another language | 14,613 | 1,309 | 42.7% | 1,195 | 395 | 2.7% |
| Speak English "very well" | 9,194 | 1,277 | 26.9% | 1,098 | 381 | 2.5% |
| Speak English "less than very well" | 5,419 | 891 | 15.8% | 97 | 89 | 0.2% |
| Foreign born: | 14,551 | 1,448 | 42.6% | 503 | 205 | 1.1% |
| Speak only English | 87 | 76 | 0.3% | 367 | 173 | 0.8% |
| Speak another language | 14,464 | 1,437 | 42.3% | 136 | 102 | 0.3% |
| Speak English "very well" | 3,023 | 735 | 8.8% | 86 | 66 | 0.2% |
| Speak English "less than very well" | 11,441 | 1,238 | 33.5% | 50 | 57 | 0.1% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Speak English "Less than Very Well" (Population 5 Years and Over)

### Yakima city, Washington



Source:  B16005. NATIVITY BY LANGUAGE SPOKEN AT HOME BY ABILITY TO SPEAK ENGLISH FOR THE POPULATION 5 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE OF RELATED CHILDREN UNDER 18 YEARS**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **8,476** | **575** | **100.0%** | **12,283** | **679** | **100.0%** |
| Income in the past 12 months below poverty level: | 2,559 | 482 | 30.2% | 1,215 | 361 | 9.9% |
| Married-couple family: | 885 | 343 | 10.4% | 286 | 138 | 2.3% |
| With related children under 18 years | 745 | 303 | 8.8% | 160 | 105 | 1.3% |
| Other family: | 1,674 | 396 | 19.7% | 929 | 324 | 7.6% |
| Male householder, no wife present | 376 | 209 | 4.4% | 149 | 106 | 1.2% |
| With related children under 18 years | 330 | 205 | 3.9% | 122 | 95 | 1.0% |
| Female householder, no husband present | 1,298 | 322 | 15.3% | 780 | 308 | 6.4% |
| With related children under 18 years | 1,248 | 319 | 14.7% | 483 | 222 | 3.9% |
| Income in the past 12 months at or above poverty level: | 5,917 | 620 | 69.8% | 11,068 | 691 | 90.1% |
| Married-couple family: | 4,144 | 620 | 48.9% | 8,967 | 659 | 73.0% |
| With related children under 18 years | 2,795 | 534 | 33.0% | 2,834 | 414 | 23.1% |
| Other family: | 1,773 | 445 | 20.9% | 2,101 | 375 | 17.1% |
| Male householder, no wife present | 818 | 284 | 9.7% | 754 | 262 | 6.1% |
| With related children under 18 years | 567 | 259 | 6.7% | 407 | 181 | 3.3% |
| Female householder, no husband present | 955 | 331 | 11.3% | 1,347 | 286 | 11.0% |
| With related children under 18 years | 542 | 267 | 6.4% | 800 | 229 | 6.5% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

**Family Households Below Poverty in the Past 12 Months**

**Yakima city, Washington**



Source:   C17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**Female-headed Households with Related Children Below Poverty in the Past 12 Months**

**Yakima city, Washington**



Source:   C17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C17020 POVERTY STATUS IN THE PAST 12 MONTHS BY AGE - Universe: POPULATION FOR WHOM POVERTY STATUS IS DETERMINED**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino By Age | White, Not Hispanic | Margin of Error (+/-) | % of NHW By Age |
| **Total:** | **39,064** | **1,649** | **100.0%** | **45,344** | **1,513** | **100.0%** |
| Income in the past 12 months below poverty level: | 14,060 | 2,399 | 36.0% | 6,260 | 1,070 | 13.8% |
|   Under 18 years | 7,352 | 1,590 | 46.8% | 1,011 | 468 | 14.2% |
|   18 to 64 years | 6,358 | 1,142 | 29.1% | 4,237 | 728 | 15.1% |
|   65 years and over | 350 | 193 | 23.3% | 1,012 | 287 | 9.9% |
| Income in the past 12 months at or above poverty level: | 25,004 | 2,462 | 64.0% | 39,084 | 1,655 | 86.2% |
|   Under 18 years | 8,349 | 1,312 | 53.2% | 6,103 | 813 | 85.8% |
|   18 to 64 years | 15,500 | 1,461 | 70.9% | 23,752 | 1,157 | 84.9% |
|   65 years and over | 1,155 | 317 | 76.7% | 9,229 | 660 | 90.1% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Population Below Poverty in the Past 12 Months

## Yakima city, Washington



Source:   C17020 POVERTY STATUS IN THE PAST 12 MONTHS BY AGE - Universe: POPULATION FOR WHOM POVERTY STATUS IS DETERMINED
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C19001. HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **9,701** | **628** | **100.0%** | **21,487** | **919** | **100.0%** |
| Less than $ 10,000 | 853 | 276 | 8.8% | 1,631 | 336 | 7.6% |
| $ 10,000 to $ 14,999 | 620 | 252 | 6.4% | 1,269 | 345 | 5.9% |
| $ 15,000 to $ 24,999 | 2,225 | 402 | 22.9% | 3,127 | 468 | 14.6% |
| $ 25,000 to $ 34,999 | 1,257 | 399 | 13.0% | 2,599 | 476 | 12.1% |
| $ 35,000 to $ 49,999 | 1,909 | 453 | 19.7% | 2,879 | 397 | 13.4% |
| $ 50,000 to $ 74,999 | 1,752 | 387 | 18.1% | 3,394 | 505 | 15.8% |
| $ 75,000 to $ 99,999 | 571 | 223 | 5.9% | 2,871 | 447 | 13.4% |
| $ 100,000 to $ 149,999 | 359 | 224 | 3.7% | 2,305 | 448 | 10.7% |
| $ 150,000 to $ 199,999 | 133 | 180 | 1.4% | 823 | 255 | 3.8% |
| $ 200,000 or more | 22 | 35 | 0.2% | 589 | 255 | 2.7% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Household Income in the Past 12 Months

### Yakima city, Washington



Source:   C19001. HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B19013. MEDIAN HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

|  | Yakima city, Washington | | | |
|---|---|---|---|---|
|  | Latino | Margin of Error (+/-) | White, Not Hispanic | Margin of Error (+/-) |
| Median household income in the past 12 months (in 2012 inflation-adjusted dollars) | $    33,507 | $    6,289 | $    45,468 | $    3,782 |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

# Median Household Income in the Past 12 Months

## Yakima city, Washington



Source:   B19013. MEDIAN HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C19101. FAMILY INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **8,476** | **575** | **100.0%** | **12,283** | **679** | **100.0%** |
| Less than $ 10,000 | 855 | 273 | 10.1% | 552 | 251 | 4.5% |
| $ 10,000 to $ 14,999 | 638 | 249 | 7.5% | 297 | 157 | 2.4% |
| $ 15,000 to $ 24,999 | 2,067 | 483 | 24.4% | 990 | 321 | 8.1% |
| $ 25,000 to $ 34,999 | 1,088 | 367 | 12.8% | 1,100 | 340 | 9.0% |
| $ 35,000 to $ 49,999 | 1,557 | 427 | 18.4% | 1,704 | 308 | 13.9% |
| $ 50,000 to $ 74,999 | 1,394 | 390 | 16.4% | 2,415 | 383 | 19.7% |
| $ 75,000 to $ 99,999 | 448 | 195 | 5.3% | 2,050 | 361 | 16.7% |
| $ 100,000 to $ 149,999 | 274 | 193 | 3.2% | 2,032 | 387 | 16.5% |
| $ 150,000 to $ 199,999 | 133 | 180 | 1.6% | 654 | 242 | 5.3% |
| $ 200,000 or more | 22 | 35 | 0.3% | 489 | 188 | 4.0% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Family Income in the Past 12 Months

### Yakima city, Washington



Source:   C19101. FAMILY INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B19113. MEDIAN FAMILY INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

|  | Yakima city, Washington | | | |
|---|---|---|---|---|
|  | Latino | Margin of Error (+/-) | White, Not Hispanic | Margin of Error (+/-) |
| Median family income in the past 12 months (in 2012 inflation-adjusted dollars) | $ 29,846 | $ 4,137 | $ 65,636 | $ 3,123 |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Median Family Income in the Past 12 Months

## Yakima city, Washington



Source:   B19113. MEDIAN FAMILY INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B19202. MEDIAN NONFAMILY HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

|  | Yakima city, Washington | | | |
|---|---|---|---|---|
|  | Latino | Margin of Error (+/-) | White, Not Hispanic | Margin of Error (+/-) |
| Median nonfamily household income in the past 12 months (in 2012 inflation-adjusted dollars) | $ 26,992 | $ 12,716 | $ 26,543 | $ 2,460 |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Median Non-Family Income in the Past 12 Months

## Yakima city, Washington



Source:  B19202. MEDIAN NONFAMILY HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B19301. PER CAPITA INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | |
|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | White, Not Hispanic | Margin of Error (+/-) |
| Per capita income in the past 12 months (in 2012 inflation-adjusted dollars) | $ 10,593 | $ 993 | $ 29,586 | $ 1,777 |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Per capita Income in the Past 12 Months

## Yakima city, Washington



Source:   B19301. PER CAPITA INCOME IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS)
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B20017. MEDIAN EARNINGS IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS) BY SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS FOR THE POPULATION 16 YEARS AND OVER WITH EARNINGS IN THE PAST 12 MONTHS**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | |
|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | White, Not Hispanic | Margin of Error (+/-) |
| Median earnings in the past 12 months (in 2012 inflation-adjusted dollars) -- | | | | |
| Total: | $ 16,857 | $ 1,255 | $ 30,549 | $ 2,079 |
| Male -- | | | | |
| Total | $ 19,808 | $ 2,797 | $ 35,366 | $ 3,886 |
| Worked full-time, year-round in the past 12 months | $ 28,853 | $ 3,456 | $ 46,877 | $ 3,421 |
| Other | $ 10,334 | $ 1,465 | $ 11,846 | $ 2,081 |
| Female -- | | | | |
| Total | $ 14,593 | $ 1,345 | $ 27,005 | $ 4,283 |
| Worked full-time, year-round in the past 12 months | $ 20,965 | $ 1,121 | $ 37,479 | $ 4,803 |
| Other | $ 7,029 | $ 2,214 | $ 11,269 | $ 1,249 |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

**Median earnings in the Past 12 Months (16 Years and Over with Earnings)**

**Yakima city, Washington**



Source:   B20017. MEDIAN EARNINGS IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS) BY SEX BY WORK EXPERIENCE
IN THE PAST 12 MONTHS FOR THE POPULATION 16 YEARS AND OVER WITH EARNINGS IN THE PAST 12 MONTHS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C20005. SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS BY EARNINGS IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS) FOR THE POPULATION 16 YEARS AND OVER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **25,282** | **1,246** | **100.0%** | **40,390** | **1,349** | **100.0%** |
| Worked full-time, year-round in the past 12 months: | 9,207 | NC | 36.4% | 14,594 | NC | 36.1% |
| No earnings | 0 | NC | 0.0% | 0 | NC | 0.0% |
| With earnings: | 9,207 | NC | 36.4% | 14,594 | NC | 36.1% |
| $ 1 to $ 9,999 or loss | 233 | NC | 0.9% | 197 | NC | 0.5% |
| $ 10,000 to $ 19,999 | 2,751 | NC | 10.9% | 1,702 | NC | 4.2% |
| $ 20,000 to $ 29,999 | 2,720 | NC | 10.8% | 2,230 | NC | 5.5% |
| $ 30,000 to $ 49,999 | 2,440 | NC | 9.7% | 4,793 | NC | 11.9% |
| $ 50,000 to $ 74,999 | 808 | NC | 3.2% | 2,939 | NC | 7.3% |
| $ 75,000 or more | 255 | NC | 1.0% | 2,733 | NC | 6.8% |
| Other: | 16,075 | NC | 63.6% | 25,796 | NC | 63.9% |
| No earnings | 6,769 | NC | 26.8% | 16,371 | NC | 40.5% |
| With earnings: less than full time, year-round | 9,306 | NC | 36.8% | 9,425 | NC | 23.3% |
| $ 1 to $ 9,999 or loss | 4,879 | NC | 19.3% | 4,063 | NC | 10.1% |
| $ 10,000 to $ 19,999 | 3,020 | NC | 11.9% | 2,761 | NC | 6.8% |
| $ 20,000 to $ 29,999 | 793 | NC | 3.1% | 831 | NC | 2.1% |
| $ 30,000 to $ 49,999 | 406 | NC | 1.6% | 798 | NC | 2.0% |
| $ 50,000 to $ 74,999 | 208 | NC | 0.8% | 774 | NC | 1.9% |
| $ 75,000 or more | 0 | NC | 0.0% | 198 | NC | 0.5% |
| Male: | 13,334 | 799 | 52.7% | 18,906 | 867 | 46.8% |
| Worked full-time, year-round in the past 12 months: | 5,511 | 695 | 21.8% | 7,556 | 614 | 18.7% |
| No earnings | 0 | 115 | 0.0% | 0 | 115 | 0.0% |
| With earnings: | 5,511 | 695 | 21.8% | 7,556 | 614 | 18.7% |
| $ 1 to $ 9,999 or loss | 96 | 115 | 0.4% | 71 | 67 | 0.2% |
| $ 10,000 to $ 19,999 | 1,314 | 431 | 5.2% | 678 | 254 | 1.7% |
| $ 20,000 to $ 29,999 | 1,496 | 382 | 5.9% | 1,132 | 299 | 2.8% |
| $ 30,000 to $ 49,999 | 1,837 | 494 | 7.3% | 2,129 | 466 | 5.3% |
| $ 50,000 to $ 74,999 | 582 | 297 | 2.3% | 1,661 | 316 | 4.1% |
| | 186 | 219 | 0.7% | 1,885 | 381 | 4.7% |

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/−) | % of Latino Total | White, Not Hispanic | Margin of Error (+/−) | % of NHW Total |
| Other: | 7,823 | 734 | 30.9% | 11,350 | 830 | 28.1% |
| No earnings | 2,925 | 559 | 11.6% | 6,902 | 646 | 17.1% |
| With earnings: | 4,898 | 700 | 19.4% | 4,448 | 610 | 11.0% |
| $ 1 to $ 9,999 or loss | 2,350 | 540 | 9.3% | 1,933 | 409 | 4.8% |
| $ 10,000 to $ 19,999 | 1,485 | 391 | 5.9% | 1,004 | 265 | 2.5% |
| $ 20,000 to $ 29,999 | 633 | 287 | 2.5% | 499 | 220 | 1.2% |
| $ 30,000 to $ 49,999 | 325 | 173 | 1.3% | 433 | 176 | 1.1% |
| $ 50,000 to $ 74,999 | 105 | 123 | 0.4% | 421 | 215 | 1.0% |
| $ 75,000 or more | 0 | 115 | 0.0% | 158 | 167 | 0.4% |
| Female: | 11,948 | 706 | 47.3% | 21,484 | 851 | 53.2% |
| Worked full-time, year-round in the past 12 months: | 3,696 | 593 | 14.6% | 7,038 | 748 | 17.4% |
| No earnings | 0 | 115 | 0.0% | 0 | 115 | 0.0% |
| With earnings: | 3,696 | 593 | 14.6% | 7,038 | 748 | 17.4% |
| $ 1 to $ 9,999 or loss | 137 | 141 | 0.5% | 126 | 115 | 0.3% |
| $ 10,000 to $ 19,999 | 1,437 | 422 | 5.7% | 1,024 | 395 | 2.5% |
| $ 20,000 to $ 29,999 | 1,224 | 347 | 4.8% | 1,098 | 311 | 2.7% |
| $ 30,000 to $ 49,999 | 603 | 267 | 2.4% | 2,664 | 488 | 6.6% |
| $ 50,000 to $ 74,999 | 226 | 144 | 0.9% | 1,278 | 329 | 3.2% |
| $ 75,000 or more | 69 | 67 | 0.3% | 848 | 283 | 2.1% |
| Other: | 8,252 | 757 | 32.6% | 14,446 | 984 | 35.8% |
| No earnings | 3,844 | 585 | 15.2% | 9,469 | 762 | 23.4% |
| With earnings: | 4,408 | 624 | 17.4% | 4,977 | 675 | 12.3% |
| $ 1 to $ 9,999 or loss | 2,529 | 524 | 10.0% | 2,130 | 480 | 5.3% |
| $ 10,000 to $ 19,999 | 1,535 | 397 | 6.1% | 1,757 | 412 | 4.4% |
| $ 20,000 to $ 29,999 | 160 | 123 | 0.6% | 332 | 150 | 0.8% |
| $ 30,000 to $ 49,999 | 81 | 89 | 0.3% | 365 | 187 | 0.9% |
| $ 50,000 to $ 74,999 | 103 | 97 | 0.4% | 353 | 171 | 0.9% |
| $ 75,000 or more | 0 | 115 | 0.0% | 40 | 48 | 0.1% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.

## Employment and Earnings in in the Past 12 Months (16 Years and Over)

### Yakima city, Washington



Source:   C20005. SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS BY EARNINGS IN THE PAST 12 MONTHS (IN 2012 INFLATION-ADJUSTED DOLLARS) FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C21001. SEX BY AGE BY VETERAN STATUS FOR THE CIVILIAN POPULATION 18 YEARS AND OVER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **23,974** | **1,229** | **100.0%** | **39,332** | **1,294** | **100.0%** |
| Veteran | 459 | NC | 1.9% | 5,174 | NC | 13.2% |
| Nonveteran | 23,515 | NC | 98.1% | 34,158 | NC | 86.8% |
| Male: | 12,661 | 799 | 52.8% | 18,404 | 820 | 46.8% |
| 18 to 64 years: | 11,900 | 749 | 49.6% | 14,034 | 802 | 35.7% |
| Veteran | 387 | 246 | 1.6% | 2,108 | 357 | 5.4% |
| Nonveteran | 11,513 | 672 | 48.0% | 11,926 | 866 | 30.3% |
| 65 years and over: | 761 | 212 | 3.2% | 4,370 | 389 | 11.1% |
| Veteran | 72 | 64 | 0.3% | 2,722 | 401 | 6.9% |
| Nonveteran | 689 | 203 | 2.9% | 1,648 | 328 | 4.2% |
| Female: | 11,313 | 681 | 47.2% | 20,928 | 810 | 53.2% |
| 18 to 64 years: | 10,536 | 655 | 43.9% | 14,532 | 684 | 36.9% |
| Veteran | 0 | 115 | 0.0% | 234 | 134 | 0.6% |
| Nonveteran | 10,536 | 655 | 43.9% | 14,298 | 669 | 36.4% |
| 65 years and over: | 777 | 212 | 3.2% | 6,396 | 407 | 16.3% |
| Veteran | 0 | 115 | 0.0% | 110 | 75 | 0.3% |
| Nonveteran | 777 | 212 | 3.2% | 6,286 | 418 | 16.0% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Veterans in the Civilian Population 18 Years and Over

## Yakima city, Washington



Source:   C21001. SEX BY AGE BY VETERAN STATUS FOR THE CIVILIAN POPULATION 18 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B22005. RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY RACE OF HOUSEHOLDER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **9,701** | **628** | **100.0%** | **21,487** | **919** | **100.0%** |
| HH received Food Stamps/SNAP in the past 12 months | 3,867 | 575 | 39.9% | 3,871 | 523 | 18.0% |
| HH did not receive Food Stamps/SNAP in the past 12 months | 5,834 | 699 | 60.1% | 17,616 | 856 | 82.0% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Receipt of Food Stamps/SNAP in the Past 12 Months by Household

## Yakima city, Washington



Source:   B22005. RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY RACE OF HOUSEHOLDER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **25,282** | **1,246** | **100.0%** | **40,390** | **1,349** | **100.0%** |
| In labor force: | 17,505 | NC | 69.2% | 23,307 | NC | 57.7% |
| In Armed Forces | 0 | NC | 0.0% | 30 | NC | 0.1% |
| Civilian: | 17,076 | NC | 67.5% | 22,018 | NC | 54.5% |
| Employed | 15,192 | NC | 60.1% | 20,972 | NC | 51.9% |
| Unemployed | 2,313 | NC | 9.1% | 2,305 | NC | 5.7% |
| Not in labor force | 7,777 | NC | 30.8% | 17,083 | NC | 42.3% |
| Male: | 13,334 | 799 | 52.7% | 18,906 | 867 | 46.8% |
| 16 to 64 years: | 12,573 | 768 | 49.7% | 14,536 | 853 | 36.0% |
| In labor force: | 9,550 | 772 | 37.8% | 10,829 | 845 | 26.8% |
| In Armed Forces | 0 | 115 | 0.0% | 30 | 51 | 0.1% |
| Civilian: | 9,550 | 772 | 37.8% | 10,799 | 837 | 26.7% |
| Employed | 8467 | 755 | 33.5% | 9508 | 728 | 23.5% |
| Unemployed | 1,083 | 366 | 4.3% | 1,291 | 381 | 3.2% |
| Not in labor force | 3,023 | 670 | 12.0% | 3,707 | 570 | 9.2% |
| 65 years and over: | 761 | 212 | 3.0% | 4,370 | 389 | 10.8% |
| In labor force: | 313 | 157 | 1.2% | 700 | 221 | 1.7% |
| Employed | 244 | 161 | 1.0% | 651 | 213 | 1.6% |
| Unemployed | 69 | 60 | 0.3% | 49 | 56 | 0.1% |
| Not in labor force | 448 | 156 | 1.8% | 3,670 | 412 | 9.1% |

| | Yakima city, Washington | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| Female: | 11,948 | 706 | 47.3% | 21,484 | 851 | 53.2% |
| 16 to 64 years: | 11,171 | 669 | 44.2% | 15,088 | 720 | 37.4% |
| In labor force: | 7,526 | 728 | 29.8% | 11,219 | 623 | 27.8% |
| In Armed Forces | 0 | 115 | 0.0% | 0 | 115 | 0.0% |
| Civilian: | 7,526 | 728 | 29.8% | 11,219 | 623 | 27.8% |
| Employed | 6,409 | 736 | 25.4% | 10,278 | 652 | 25.4% |
| Unemployed | 1,117 | 393 | 4.4% | 941 | 303 | 2.3% |
| Not in labor force | 3,645 | 621 | 14.4% | 3,869 | 522 | 9.6% |
| 65 years and over: | 777 | 212 | 3.1% | 6,396 | 407 | 15.8% |
| In labor force: | 116 | 81 | 0.5% | 559 | 213 | 1.4% |
| Employed | 72 | 71 | 0.3% | 535 | 209 | 1.3% |
| Unemployed | 44 | 44 | 0.2% | 24 | 38 | 0.1% |
| Not in labor force | 661 | 201 | 2.6% | 5,837 | 456 | 14.5% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

**Employment Status for the Population 16 years and over**

**Yakima city, Washington**



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

## Unemployment of Working Age Population  (Ages 16 to 64)
## (As a Percent of 16-64 Civilian Labor Force)

### Yakima city, Washington



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C24010. SEX BY OCCUPATION FOR THE CIVILIAN EMPLOYED POPULATION 16 YEARS AND OVER**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **15,192** | **1,177** | **100.0%** | **20,972** | **1,025** | **100.0%** |
| Management, professional, and related occupations | 1,393 | NC | 9.2% | 8,119 | NC | 38.7% |
| Service occupations | 2,489 | NC | 16.4% | 4,184 | NC | 20.0% |
| Sales and office occupations | 2,881 | NC | 19.0% | 4,635 | NC | 22.1% |
| Natural resources, construction, and maintenance occupations: | 4,411 | NC | 29.0% | 2,123 | NC | 10.1% |
| Production, transportation, and material moving occupations | 4,018 | NC | 26.4% | 1,911 | NC | 9.1% |
| Male: | 8,711 | 793 | 57.3% | 10,159 | 732 | 48.4% |
| Management, business, science, and arts occupations: | 873 | 333 | 5.7% | 3,452 | 524 | 16.5% |
| Service occupations | 1,040 | 356 | 6.8% | 1,622 | 371 | 7.7% |
| Sales and office occupations | 928 | 401 | 6.1% | 1,628 | 424 | 7.8% |
| Natural resources, construction, and maintenance occupations: | 3,216 | 733 | 21.2% | 1,936 | 463 | 9.2% |
| Production, transportation, and material moving occupations | 2,654 | 593 | 17.5% | 1,521 | 313 | 7.3% |
| Female: | 6,481 | 735 | 42.7% | 10,813 | 703 | 51.6% |
| Management, professional, and related occupations | 520 | 205 | 3.4% | 4,667 | 536 | 22.3% |
| Service occupations | 1,449 | 379 | 9.5% | 2,562 | 506 | 12.2% |
| Sales and office occupations | 1,953 | 490 | 12.9% | 3,007 | 468 | 14.3% |
| Natural resources, construction, and maintenance occupations: | 1,195 | 371 | 7.9% | 187 | 169 | 0.9% |
| Production, transportation, and material moving occupations | 1,364 | 399 | 9.0% | 390 | 155 | 1.9% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Occupation for the Civilian Employed 16 Years and Over Population

### Yakima city, Washington



Source:   C24010. SEX BY OCCUPATION FOR THE CIVILIAN EMPLOYED POPULATION 16 YEARS AND OVER
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B25003. TENURE - Universe: OCCUPIED HOUSING UNITS**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **9,701** | **628** | **100.0%** | **21,487** | **919** | **100.0%** |
| Owner occupied | 3,653 | 530 | 37.7% | 13,683 | 838 | 63.7% |
| Renter occupied | 6,048 | 594 | 62.3% | 7,804 | 673 | 36.3% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.h

## Home Owners and Renters by Household

## Yakima city, Washington



Source:   B25003. TENURE - Universe: OCCUPIED HOUSING UNITS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B25014. OCCUPANTS PER ROOM  -  Universe: OCCUPIED HOUSING UNITS**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **9,701** | **628** | **100.0%** | **21,487** | **919** | **100.0%** |
| 1.00 or less occupants per room | 8,357 | 676 | 86.1% | 21,313 | 961 | 99.2% |
| 1.01 or more occupants per room | 1,344 | 344 | 13.9% | 174 | 148 | 0.8% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.ht

## More than One Person per Room (Crowding) by Household

## Yakima city, Washington



Source:  B25014. OCCUPANTS PER ROOM  -  Universe: OCCUPIED HOUSING UNITS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**B18101: AGE BY DISABILITY STATUS**
Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| **Total:** | **39,300** | **1,613** | **100.0%** | **45,734** | **1,534** | **100.0%** |
| Under 18 years: | 15,937 | 1,116 | 40.6% | 7,484 | 830 | 16.4% |
| With a disability | 584 | 245 | 1.5% | 282 | 162 | 0.6% |
| No disability | 15,353 | 1,140 | 39.1% | 7,202 | 854 | 15.7% |
| 18 to 64 years: | 21,858 | 1,171 | 55.6% | 28,009 | 1,139 | 61.2% |
| With a disability | 1,336 | 285 | 3.4% | 4,452 | 607 | 9.7% |
| No disability | 20,522 | 1,153 | 52.2% | 23,557 | 1,114 | 51.5% |
| 65 years and over: | 1,505 | 359 | 3.8% | 10,241 | 617 | 22.4% |
| With a disability | 584 | 233 | 1.5% | 4,617 | 518 | 10.1% |
| No disability | 921 | 282 | 2.3% | 5,624 | 587 | 12.3% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Disability by Age

### Yakima city, Washington



Source:   B18101: AGE BY DISABILITY STATUS
Data Set: 2010-2012 American Community Survey 3-Year Estimates

**C27001: HEALTH INSURANCE COVERAGE STATUS BY AGE**

Data Set: 2010-2012 American Community Survey 3-Year Estimates

| | Yakima city, Washington | | | | | |
|---|---|---|---|---|---|---|
| | Latino | Margin of Error (+/-) | % of Latino Total | White, Not Hispanic | Margin of Error (+/-) | % of NHW Total |
| Total: | **39,300** | **1,613** | **100.0%** | **45,734** | **1,534** | **100.0%** |
| Under 18 years: | 15,937 | 1,116 | 40.6% | 7,484 | 830 | 16.4% |
|   With health insurance coverage | 14,854 | 1,155 | 37.8% | 7,222 | 810 | 15.8% |
|   No health insurance coverage | 1,083 | 411 | 2.8% | 262 | 253 | 0.6% |
| 18 to 64 years: | 21,858 | 1,171 | 55.6% | 28,009 | 1,139 | 61.2% |
|   With health insurance coverage | 9,364 | 980 | 23.8% | 22,984 | 1,163 | 50.3% |
|   No health insurance coverage | 12,494 | 1,084 | 31.8% | 5,025 | 777 | 11.0% |
| 65 years and over: | 1,505 | 359 | 3.8% | 10,241 | 617 | 22.4% |
|   With health insurance coverage | 1,318 | 347 | 3.4% | 10,241 | 617 | 22.4% |
|   No health insurance coverage | 187 | 160 | 0.5% | 0 | 115 | 0.0% |

Source: U.S. Census Bureau, 2010-2012 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Lack of Health Insurance Coverage by Age

## Yakima city, Washington



Source:   C27001: HEALTH INSURANCE COVERAGE STATUS BY AGE
Data Set: 2010-2012 American Community Survey 3-Year Estimates

Exhibit 6

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON

ROGELIO MONTES and MATEO ARTEAGA,          PLAINTIFFS

   v.                                                  CIVIL ACTION NO.  12-cv-3108-TOR

CITY OF YAKIMA, WASHINGTON, *et al.*          DEFENDANTS

## SUPPLEMENTAL DECLARATION OF WILLIAM S. COOPER

WILLIAM S. COOPER, acting in accordance with 28 U.S.C. §1746, the
Federal Rules of Civil Procedure 26(a)(2)(B), and Rules 702 and 703 of the
Federal Rules of Evidence, does hereby declare and say:

1.      My name is Williams S. Cooper. I serve as a demographic and
redistricting expert for the Plaintiffs. I filed a declaration in this case on February 1,
2013. I submit this supplemental declaration in response to the March 22, 2013
report of Dr. Peter Morrison (the "Morrison Report") and to his supplemental April
6, 2013 report (the "Morrison Supplemental Report").

2.      In this supplemental declaration, I address Dr. Morrison's claim that
the Latino citizen voting age (LCVAP) majority districts in *Illustrative Plans 1* and
*2* do not satisfy the *Gingles 1* precondition that the minority population must be
"sufficiently large and geographically compact to constitute a majority in a single-
member district." I also address Dr. Morrison's opinion that the creation of a

district with an LCVAP majority would result in an "unavoidable electoral imbalance [that is] decidedly non-neutral along racial and ethnic lines".[1] Finally, I examine several methodological issues discussed in Dr. Morrison's report.

3.        I conclude and reiterate that both *Illustrative Plans 1* and *2* as presented in my February 1, 2013 declaration satisfy *Gingles 1*. If for some reason those two illustrative plans are deemed unsatisfactory, then *Hypothetical Plans A, B,* and *C* submitted with this supplemental declaration would in my opinion meet the *Gingles 1* test. I also conclude that contrary to Dr. Morrison's claim, there is no electoral imbalance or dilution of minority voting strength in *Illustrative Plans 1* and *2*.

**A.    Dr. Morrison's CVAP Disaggregation and Allocation Method is Conceptually Flawed**

4.        At the outset, I must challenge Dr. Morrison's assertion that the methodology I use to allocate citizen voting age population (CVAP) is "fatally flawed". In this section, I demonstrate that my method (Method 1) is analytically sound and that Dr. Morrison's CVAP methodology (Method 2) is conceptually flawed. By way of example, I will explain how Dr. Morrison's methodology can lead to nonsensical CVAP calculations in election districts where a significant percentage of block groups are split between two or more districts – as is the case in District 1 under *Illustrative Plans 1* and *2*.

---

[1] Morrison Report, p. 25.

5.      There are several reasons why CVAP must be disaggregated from the block group level to census blocks for redistricting in a relatively small city such as Yakima, which encompasses just 67 block groups.[2] This includes such objectives as – following precinct boundaries, taking into account municipal boundaries, complying with one-person, one-vote and, of course, avoiding the dilution of minority voting strength. In fact, without block group splits, many small cities and rural counties in the nation with significant Latino populations would be barred from creating Latino districts even though there is adequate LCVAP to do so.

6.      The table in **Figure 1** below lists the 11 block groups that are wholly or partially contained in District 1 of *Illustrative Plan* 1.[3] (The shading identifies the eight block groups that are split between districts.) The first three numerical columns show the official CVAP by block group according to the 2007-2011 American Community Survey (ACS). The fourth column shows the Method 1 calculated CVAP, which adds the non-Hispanic CVAP (official ACS estimate) plus the Latino CVAP (official ACS estimate). The last two columns show the difference and percent difference between the ACS total (official ACS estimate) in numerical column 1 and the calculated Method 1 CVAP (column 4).

---

[2] The hybrid at-large, 4-residency district *2011 Plan* adopted by City Council splits populated areas of six block groups – excluding several jurisdictional splits (see ¶ 69 *infra*). Three of these splits involve District 3 on the east side of Yakima.

[3] Morrison Supplemental Report, ¶ 6.

**Figure 1**          **Block Groups in District 1 of Illustrative Plan 1**

**(Shading Indicates a Split)**

| Block Group | Total CVAP (ACS Total) | Latino CVAP (ACS Total) | Non-Hispanic CVAP (ACS Total) | Method 1 CVAP (Calculated Total) | Difference (ACS Total-Method 1 CVAP | % Difference |
|---|---|---|---|---|---|---|
| 530770001001 | 560 | 125 | 435 | 560 | 0 | 0.0% |
| 530770001002 | 990 | 330 | 660 | 990 | 0 | 0.0% |
| 530770002001 | 1160 | 430 | 730 | 1160 | 0 | 0.0% |
| 530770002002 | 395 | 165 | 230 | 395 | 0 | 0.0% |
| 530770002003 | 630 | 310 | 325 | 635 | 5 | 0.8% |
| 530770003001 | 1715 | 280 | 1435 | 1715 | 0 | 0.0% |
| 530770006001 | 320 | 170 | 150 | 320 | 0 | 0.0% |
| 530770006002 | 1005 | 450 | 550 | 1000 | -5 | -0.5% |
| 530770006003 | 1150 | 610 | 545 | 1155 | 5 | 0.4% |
| 530770007001 | 725 | 100 | 630 | 730 | 5 | 0.7% |
| 530770015014 | 550 | 265 | 285 | 550 | 0 | 0.0% |
| **Total** | **9200** | **3235** | **5975** | **9210** | 10 | 0.1% |

7.      **Figure 1** shows that there is virtually no difference between the official ACS total and the Method 1 calculated total. Three block groups have a calculated Method 1 CVAP that  exceeds the ACS total by 5 persons and one block group has a Method 1 calculated CVAP that is 5 persons less than the ACS total. The net total difference is 10 persons, which represents about one-tenth of a percentage point of the combined ACS total CVAP for all 11 block groups – 9,200. As explained in the Census Bureau's documentation, a minor discrepancy of this magnitude is expected.[4]

---

[4] See p.6 of *CVAP Documentation* prepared by the Census Bureau. Available for download at: http://www.census.gov/rdo/pdf/CVAP_07to11_Documentation.pdf.

8.      Thus, for all intents and purposes, Dr. Morrison and I agree on (and are consistent with) the official ACS CVAP totals by block group. Where we differ is in the method used to allocate the two component parts of CVAP – Latino CVAP and non-Hispanic CVAP. When disaggregating from the block group to the census block level, I allocate both components, while Dr. Morrison leaves non-Hispanic CVAP unaccounted for at the block level. Instead, he opts to impute the non-Hispanic CVAP estimate at the block level – i.e., CVAP minus LCVAP = non-Hispanic CVAP (imputed). Dr. Morrison completely ignores the fact that the ACS data already provides non-Hispanic CVAP as a single direct estimate. There is no reason to impute this value at the block level.

9.      To reiterate, Dr. Morrison's disaggregation method (Method 2) allocates just one of the two component parts of CVAP to the block level – Latino CVAP.  The all-important non-Hispanic CVAP is an unreliable imputed value in the Method 2 equation at the block level. My disaggregation method (Method 1) correctly allocates both CVAP components to the block level – Latino CVAP and non-Hispanic CVAP.

10.     Method 1 and Method 2 generate virtually identical results where an election district is composed of entire census block groups or where (as in most state legislative and congressional districts) split block groups comprise a tiny percentage of the overall number of block groups in a given district.

5

11.     However, where a high percentage of block groups are split to create an election district, as is the case with District 1 under *Illustrative Plan 1*, there is the potential for significant distortion if Method 2 is employed to disaggregate the block group data to the census block level. As shown in **Figure 1**, District 1 splits 8 of 11 block groups. All told, 58.4% of the VAP (4,446 of 7,604 persons over 18) in *Illustrative Plan 1* District 1 resides in a block group that is divided between two or more districts. Therefore, Dr. Morrison's Method 2 should not be used for election plan analysis in Yakima.

## The Conceptual Flaw in Method 2 – A Hypothetical Example

12.     Consider the following extreme example. A block group has 1,000 persons of voting age, of whom 800 are Latino and 200 are non-Hispanic. All 200 non-Hispanics are citizens, but just 400 of the 800 voting age Latinos are citizens. So 60% of the VAP in the block group are citizens (400 plus 200, or 600 of 1,000).

13.     Assume this block group is split between two election districts with the entire Latino VAP in Ward A (800) and the entire non-Hispanic VAP in Ward B (200). **Figure 2** on page 8 below summarizes the calculations that follow.

14.     Method 2 correctly allocates the entire 400 LCVAP to Ward A. But Method 2 incorrectly allocates a total of 480 CVAP to Ward A (80% of 600 citizens) – corresponding to the 80% of VAP residing in the Ward A portion of the block group (800 of 1,000 VAP). So the LCVAP under Method 2 in the split area of

6

Ward A is 83.3% (400 divided by 480). Of course, this is a logical impossibility because the entire population in the split area of Ward A is Latino (both voting age and CVAP).

15.      Logically, the LCVAP should equal 100% in the Ward A split (400 of 400), but Method 2 in effect creates 80 phantom non-Hispanic citizens in Ward A (480-400). And, as a consequence, Method 2 incorrectly allocates a CVAP of 120 to the Ward B split (20% of 600 citizens) – in effect creating 80 phantom Latino non-citizens in the Ward B split.

16.      Method 1 also correctly allocates the entire 400 LCVAP to Ward A. Just as important, Method 1 correctly allocates the 200 non-Hispanic CVAP to Ward B – consistent with the 100% non-Hispanic VAP in the Ward B split. Put differently, the entire 200 non-Hispanic CVAP is assigned to Ward B because there are zero voting age non-Hispanics in the Ward A split and 200 non-Hispanics of voting age in the Ward B split.

17.      **Figure 2** summarizes the calculated results under Method 1 and Method 2. The illogical Method 2 calculations are displayed in red – creating phantom non-Hispanic citizens in Ward A and phantom Latino non-citizens in Ward B.

**Figure 2**               **Hypothetical  Block Group Split – Method 1 vs. Method 2**

|  | Block Group Ward A Split | | Block Group Ward B Split | |
|---|---|---|---|---|
|  | ( Method 1) | ( Method 2) | ( Method 1) | ( Method 2) |
| VAP | 800 | 800 | 200 | 200 |
| Latino VAP | 800 | 800 | 0 | 0 |
| Non-Hispanic VAP | 0 | 0 | 200 | 200 |
| Allocated Total CVAP | 400 | **480** | 200 | **120** |
| Allocated Latino CVAP | 400 | 400 | 0 | NA |
| % Latino CVAP | 100.00% | **83.33%** | 0.00% | NA |
| Allocated Non-Hispanic CVAP | 0 | NA | 0 | **120** |
| % Non-Hispanic CVAP | 0.00% | NA | 100.00% | **60.00%** |

18.     To recap, under Method 1, the Ward A split calculates to 100% LCVAP – 400 divided by 400. There are no phantom non-Hispanic citizens in Ward A. By contrast, under Method 2, the LCVAP in the Ward A split is understated by nearly 17 percentage points – 83.3% versus the logically correct 100% LCVAP (Method 1).

**The Conceptual Flaw in Method 2 – Illustrative Plans 1 and 2**

19.     As the preceding example reveals, Method 2 is systematically biased toward understating the LCVAP in areas with split block groups where the population is segregated along ethnic lines. This built-in bias explains why Method 2 yields an LCVAP for District 1 under *Illustrative Plan 1* that is nearly 2 percentage points lower than the Method 1 calculation. And there is no way to correct this split block group issue except to adopt Method 1 as the disaggregation tool.

20.     In fact, Method 2 is so analytically flawed that it yields two opposite conclusions with regard to whether or not voting age citizen Latinos constitute a majority in District 1 under *Illustrative Plans 1* and *2*.

21.     **Figure 3** shows the Method 2 calculations for the non-Hispanic CVAP in District 1 under *Illustrative Plans 1* and *2*. Non-Hispanic citizens of voting age are a minority under both illustrative plans, according to Method 2.

**Figure 3     Percent non-Hispanic CVAP by Method 2 – Illustrative Plans 1 & 2**

|  | Illustrative Plan 1 | Illustrative Plan 2 |
|---|---|---|
|  | District 1 ( Method 2) | District 1 (Method 2) |
| Total CVAP | 4590.69 | 4753.88 |
| Non-Hispanic CVAP | 2196.17 | 2267.27 |
| % Non-Hispanic CVAP | 47.84% | 47.7% |

22.     **Figure 4** shows the Method 2 calculations for the Latino CVAP in District 1 under *Illustrative Plans 1* and *2*.[5] Latino citizens of voting age are also a minority under both illustrative plans, according to Method 2.

**Figure 4     Percent Latino CVAP by Method 2 – Illustrative Plans 1 & 2**

|  | Illustrative Plan 1 | Illustrative Plan 2 |
|---|---|---|
|  | District 1 ( Method 2) | District 1 (Method 2) |
| Total CVAP | 4590.69 | 4753.88 |
| Latino CVAP | 2217.91 | 2279.36 |
| % Latino CVAP | 48.31% | 47.95% |

---

[5] See Morrison Supplemental Report ¶ 3. These calculations match Dr. Morrison's figures.

9

23.     Thus, according to Method 2, both voting age non-Hispanic citizens and voting age Latino citizens are a minority in District 1 under *Illustrative Plans 1 and 2* – a logical and real-world impossibility.

24.     Clearly, Method 2 is unreliable and conceptually flawed when applied to small population districts with split block groups. In contrast, Method 1 is logical and consistent. Method 1 does not misallocate citizens and non-citizens. Latino CVAP plus non-Hispanic CVAP for each district always adds to a rounded 100%. Logical inconsistencies do not occur.

## A Block Group (with one split) LCVAP-Majority District Example

25.     As expected, when split block groups are minimized in Yakima, Method 1 and Method 2 yield similar results. For instance, as shown in the table in **Figure 5** and map in **Figure 6**, a majority LCVAP and majority registered Latino voter district can be drawn in Yakima with just one block group split – removing a single 719-person census block in Block Group 0001002. Method 2 comes within a tenth of a percentage point of generating the correct answer – 50.58%, calculated under Method 1.

**Figure 5   Majority-LCVAP District with One Split Block Group Summary**

| District | Population | % Deviation | % Latino CVAP (Method 1) | % Latino CVAP (Method 2) | % Latino Registered (of all registered) |
|---|---|---|---|---|---|
| 1 | 12819 | -1.62% | 50.58% | **50.48%** | 52.85% |

10

26.      The map in **Figure 6** below zooms in to display east Yakima. The example District 1 is delineated with thick orange lines. Thin black lines show block group boundaries. Split Block Group 0001002 is the elongated block group in the center of the example district.

**Figure 6**      **Majority-LCVAP District with One Split Block Group**



**Hypothetical Plan A**

27.      I have no confidence in the analytic validity of Method 2 for redistricting

Yakima – assuming districts are drawn with split block groups. However, for the

record, I have developed a third illustrative plan – *Hypothetical Plan A* – that creates

one LCVAP-majority district and two registered Latino voter-majority districts

according to **both** Method 1and Method 2. The table in **Figure 7** provides summary

population statistics by district for *Hypothetical Plan A*, with a map depicting the

plan in **Figure 8.**

28.      The Method 2 LCVAP calculations in **Figure 7** are in red because, in

my opinion, they understate the LCVAP in Districts 1 and 2. A detailed demographic

summary and map for *Hypothetical Plan A* are attached as **Exhibit A.**

**Figure 7      Yakima City Council Hypothetical Plan A  Summary**

| District | Population | Deviation | % Deviation | 18+_Pop | 18+Hisp. | % 18+ Hisp. | % Latino CVAP (Method 1) | % Latino Registered (of all registered) | % Latino CVAP (Method 2) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12819 | -211 | -1.62% | 7862 | 5680 | 72.25% | 52.17% | 54.56% | 50.18% |
| 2 | 12421 | -609 | -4.67% | 7873 | 5062 | 64.30% | 43.07% | 50.10% | 41.81% |
| 3 | 13026 | -4 | -0.03% | 9487 | 2651 | 27.94% | 23.68% | 16.99% | 24.16% |
| 4 | 12676 | -354 | -2.72% | 9431 | 3301 | 35.00% | 25.42% | 22.07% | 25.78% |
| 5 | 13666 | 636 | 4.88% | 10390 | 2519 | 24.24% | 13.48% | 14.10% | 13.54% |
| 6 | 13176 | 146 | 1.12% | 10175 | 1083 | 10.64% | 7.13% | 6.62% | 7.14% |
| 7 | 13283 | 253 | 1.94% | 10069 | 1541 | 15.30% | 14.14% | 10.37% | 14.16% |

12

**Figure 8**            **Yakima City Council Hypothetical Plan A**



29.        Under *Hypothetical Plan A*, Districts 1 and 2 are majority-Latino voting age – 72.25% and 64.30%, respectively. District 1 is majority-Latino citizen voting age (52.17 % LCVAP under Method 1 and 50.18% LCVAP under Method 2). District 1 has a Latino registered voter majority, based on the geocoded January 2013 Yakima City registered voter list (54.56%). District 2 is also majority-Latino registered voter (50.10%).

13

30.        Under *Hypothetical Plan A*, District 1 encompasses a land area of 1.93 square miles and District 2 covers 3.87 square miles. District 4 has a land area of 2.29 square miles. The remaining districts range in geographic size from 4.19 square miles (District 6) to 5.71 square miles (District 7).

31.        *Hypothetical Plan A* meets one-person, one-vote requirements. The ideal district size for a 7-district plan is 13,030 (91,208 /7). *Hypothetical Plan A* has an overall deviation from the ideal district size of 9.55%.

32.        *Hypothetical Plan A* complies with key traditional redistricting criteria, including one-person one-vote, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength.

## B.    Dr. Morrison Has Not Demonstrated That an LCVAP District Cannot Be Drawn in Yakima

33.        Dr. Morrison never states in his declarations that an LCVAP district cannot be created in a 7-single member district plan for the city council. Rather he points to two alleged flaws in my illustrative plans. His quixotic efforts to discount the potential for an LCVAP district rely on speculative imputations of census data or arguably illegal apportionment schemes.  He fails to consider trending demographics and current voter registration data – all of which provide ample justification for a threshold 50% LCVAP district and two majority-Latino registered voter districts. He fails to examine whether an LCVAP district could be created using citizens or voting age citizens as the apportionment base.

14

34.      In Sections III and IV below, I present four additional hypothetical 7-district plans that I believe demonstrate conclusively that the first prong of *Gingles* can be met with ease. Dr. Morrison's purported concern about the dilution of minority voting strength is all for naught. First, I present two out of many possible plans that can be created with much higher LCVAP districts than under *Illustrative Plans 1* and *2* and *Hypothetical Plan A*. Second, I present two hypothetical plans that show LCVAP-majority districts can be drawn using either citizens or voting age citizens as the apportionment base.

35.      For the remainder of the text in this declaration, all LCVAP calculations are based on Method 1.  The flaws inherent to Method 2 would only add unnecessary confusion if reported.

## C.      Voting Age Latino Citizen Majority Districts Can Be Drawn in a Variety of Ways in Yakima

36.      It is my understanding that in order to meet the *Gingles 1* test in a Section 2 Voting Rights Act lawsuit there must be at least one district where the minority community at issue has a citizen voting age majority. However, demonstrative plans developed for a Section 2 lawsuit should take into account more than just the first prong of *Gingles*. A viable demonstrative plan must avoid packing the minority community into a single district in a manner that would dilute overall minority voting strength in the jurisdiction.

37.      According to the 2010 Census, Latinos in Yakima comprise 41.27% of the overall population. According to the *2009-2011 American Community Survey 3-Year Estimates*, Latinos represent 34.13% of the citizen population in Yakima. In my opinion and consistent with the interests of the plaintiffs, election plans for Yakima should balance the Latino population so that Latino registered voters would constitute a majority in two out of seven districts (28.57%).

## *Illustrative Plans 1 and 2 and LCVAP*

38.      In each illustrative plan, I drew a single LCVAP-majority district just above 50% LCVAP with a corresponding Latino registered voter majority. Consistent with demographic trends and current voter registration data, I then created a second Latino registered voter majority district in each plan. I drew the threshold 50% LCVAP district in order to avoid packing Latino registered voters into one district at the expense of creating a second district where Latino registered voters would constitute a majority and have a reasonable opportunity to elect their candidate of choice.

39.      In drafting *Illustrative Plans 1* and *2*, I relied upon the block group-level *Citizen Voting Age Population (CVAP) Special Tabulation From the 2007-2011 5-Year American Community Survey* prepared by the U.S. Census Bureau for

16

the U.S. Department of Justice.[6] The citizen population estimates reported in the special tabulation are the only historical block group citizenship estimates available for the City of Yakima.

40.    The 5-year ACS citizenship special tabulation is used by courts and states throughout the nation to classify districts as Latino-majority. The ACS is the gold standard for reporting historical citizenship rates by legislative district and is routinely employed by government entities, the U.S. Department of Justice, and federal courts for redistricting.

41.    In drafting *Illustrative Plans 1* and *2*, I also relied on the January 2013 registered voter list for the City of Yakima prepared by the Yakima County Elections Division. I geocoded the registered voter list to the census block level using *Maptitude 2012* software.[7]

42.    The block-level geocoded registered voter list is more geographically precise than the ACS LCVAP estimates. This is because the ACS citizenship data is available only at the block group level and must be mathematically allocated to

---

[6] The five additional hypothetical plans submitted with this declaration also use this dataset. Available for download at:
http://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html

[7] See February 1, 2013, Declaration of William S. Cooper, ¶ 36. The resultant Spanish surname registered voter list does not include a number of voters with non-Spanish surnames that the Yakima County Elections Division has classified as Latino (See ¶ 42).

17

the census block level based on voting age population (VAP) reported in the 2010 Census.

43.      The geocoded City of Yakima registered voter list is a more accurate measure than the ACS LCVAP estimates to evaluate present-day Latino voting strength by election district. This is because the registered voter list is based on current data and is not an historical sample survey. By contrast, the ACS LCVAP estimates are derived from a 5-year survey for the 2007 to 2011 period. The midpoint of the 2007-2011ACS period is July 1, 2009 (pre-dating the 2010 Census). Thus, the 5-year ACS is, on average, about three and one-half years behind the real-time registered voter list.[8]

44.      The geocoded registered voter database suggests that the LCVAP is on the increase in Districts 1 and 2 of the illustrative plans. The January 2013 Latino registered voter percentage exceeds the 2007-2011 historical LCVAP in both districts under both plans.

---

[8] The 5-year LCVAP estimates reflecting July 2013 as a midpoint will not be available until late January 2017 when the 2011-2015 ACS special tabulation is released.

45.    A gradual uptick from year to year in Yakima's LCVAP seems likely given that approximately 95% of all Latinos under the age of 18 are citizens according to the 2007-2011 ACS.[9]

46.    In my February 1, 2013 Declaration, I did not report the Latino citizen population percentages for all ages by district in the illustrative plans. For the record, the table in **Figure 9** below compares the Latino citizen percentages for all ages and voting age for Districts 1 and 2 under the two illustrative plans.

**Figure 9    Comparison of Latino Citizen Population Percentages**

| District | Illustrative Plan 1 | | | Illustrative Plan 2 | | |
|---|---|---|---|---|---|---|
| | % Latino Citizens (All Ages) | % Latino CVAP | Differential (All Ages minus CVAP) | % Latino Citizens (All Ages) | % Latino CVAP | Differential (All Ages minus CVAP) |
| 1 | 69.69% | 50.25% | 19.44% | 70.03% | 50.13% | 19.90% |
| 2 | 61.79% | 43.15% | 18.64% | 60.78% | 42.61% | 18.17% |

47.    As can be seen from **Figure 9**, there is a huge differential between the Latino citizen population percentage and the LCVAP in both districts under both plans. The Latino citizen population percentage is more than 19 points higher in District 1 and more than 18 percentage points higher in District 2. This suggests that the current (April 2013) LCVAP is higher than the 2007-2011 historical (July 2009 midpoint) estimate for both districts under both plans.

---

[9] February 1, 2013, Declaration of William S. Cooper, ¶ 25.

48.      An analysis of voters who registered after the April 1, 2010 Census

provides corroborating evidence that the LCVAP is increasing in the area

encompassed by Districts 1 and 2 under *Illustrative Plans* 1 and *2*. **Figure 10**

below shows that a total of 1,728 persons in the area have registered to vote since

April 2, 2010. Of those, 1,033 (59.78%) are Latino. Three-fourths of the 472 new

registrants who turned 18 after the 2010 Census are Latino. About one-third of all

new registrants (34.5%) in the District 1 and 2 areas of *Illustrative Plans 1* and *2*

were under 18 at the time of the 2010 Census.[10]

**Figure 10      District 1 and 2 Voter Registration After April 1, 2010**

| | District 1 and 2 of Illustrative Plans 1 and 2 | | | District 1 of Illustrative Plan 1 | | |
|---|---|---|---|---|---|---|
| | **Total** | **Latino** | **% Latino** | **Total** | **Latino** | **% Latino** |
| New Registrants – Registered After April 1, 2010 | 1728 | 1033 | 59.78% | 784 | 465 | 59.31% |
| New Registrants – Under 18 on April 1, 2010 | 472 | 356 | 75.42% | 209 | 155 | 74.16% |
| Total Registered (Jan. 2013) | 5740 | 2914 | 50.77% | 2433 | 1257 | 51.66% |
| % Under 18 on April 1, 2010 of New Registrants | 27.3% | 34.5% | | 26.7% | 33.3% | |
| % Registered After April 1, 2010 | 30.1% | 35.4% | | 32.2% | 37.0% | |

[10] Data source:  Geocoded using *Maptitude 2012* from the Yakima City registered voter list for January 2013 prepared by the Yakima County Division of Elections. (See February 1, 2013, Declaration of William S. Cooper, ¶36 and ¶42.) Three voters with reported dates of birth after April 1, 1992, but who registered prior to April 1, 2010, are not included in the **Figure 10** new registrant tabulation.

49.     A separate breakout in **Figure 10** for LCVAP-majority District 1 in

*Illustrative Plan 1* shows a nearly identical trend. Latinos comprise 59.31% of all

new registrants since the 2010 Census and 74.16% of all new registrants who have

turned 18 since the 2010 Census are Latino. About one-third of all new registrants

(33.3%) in *Illustrative Plan 1* District 1 were under 18 at the time of the 2010

Census.

### Use of LCVAP in State Redistricting Plans

50.     The block group ACS citizenship calculations are estimates from a

rolling sample survey over a five-year period. There is a margin of error. However,

districts that are considered Latino-majority with LCVAP majorities near 50% as

drawn in the illustrative plans are not uncommon. For example, there are two

districts in the court-drawn 2013-2014 Texas House Plan with LCVAP percentages

close to 50% – District 90 (50.9 %) and District 104 (51.3%).[11] The calculated

margin of error (MOE) in both districts is + or - 1.9% (meaning the negative MOE

range falls below 50%). There are six districts in the adopted 2011 California

Assembly Plan with LCVAP percentages ranging between 50.002% (District 59)

---

[11] Source: Texas Legislative Council. Available for download at:
ftp://ftpgis1.tlc.state.tx.us/PlanH309/Reports/PDF/PlanH309_RED116_ACS_Special_Tabulation_2007-2011.pdf.

and 50.81% (District 31).[12] The California Assembly Plan was precleared by the U.S. Department of Justice in 2011 and has withstood legal challenges in federal courts.

**Hypothetical Plan B**

51.        For demonstration purposes, districts with significantly higher LCVAP-majorities than District 1 in *Illustrative Plans 1* and *2* can be drawn. The table in **Figure 11** below provides summary population statistics by district for *Hypothetical Plan B* with an accompanying map in **Figure 12.** A detailed demographic summary and map for *Hypothetical Plan B* are attached as **Exhibit B**.

**Figure 11    Yakima City Council Hypothetical Plan B Summary**

| District | Population | Deviation | % Deviation | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | % Latino CVAP | % Latino Registered (of all registered) |
|---|---|---|---|---|---|---|---|---|
| 1 | 12995 | -35 | -0.27% | 7917 | 5913 | 74.69% | 56.12% | 58.92% |
| 2 | 12706 | -324 | -2.49% | 8584 | 4351 | 50.69% | 31.91% | 35.65% |
| 3 | 12632 | -398 | -3.05% | 9096 | 2748 | 30.21% | 25.51% | 19.12% |
| 4 | 12866 | -164 | -1.26% | 9213 | 3818 | 41.44% | 30.08% | 24.06% |
| 5 | 13323 | 293 | 2.25% | 10249 | 2296 | 22.40% | 11.48% | 12.69% |
| 6 | 13413 | 383 | 2.94% | 10294 | 1105 | 10.73% | 7.37% | 6.59% |
| 7 | 13132 | 102 | 0.78% | 9934 | 1606 | 16.17% | 14.81% | 11.16% |

---

[12] Source: *California Citizens Redistricting Commission Final Report, Appendix B*, pp.7-8. Available for download at:
http://wedrawthelines.ca.gov/downloads/meeting_handouts_082011/crc_20110815_5appendix_3.pdf.

**Figure 12**          **Yakima City Council Hypothetical Plan B**



52.      *Under Hypothetical Plan B*, District 1 has an LCVAP of 56.12% and a Latino registered voter percentage of 58.92%. The plan has an overall deviation of 5.99%. After allocating the block group-level CVAP to the corresponding 2010 census blocks under *Hypothetical Plan B*, there are 2,312 Latino citizens of voting age and 1,808 non-Hispanic citizens of voting age in District 1. This represents a voting age Latino citizen advantage of more than 500 persons – a margin that I

23

believe would undoubtedly satisfy *Gingles1*, even under the inappropriately strict standards articulated by Dr. Morrison.

53.       The Latino registered voter advantage in District 1 under *Hypothetical Plan B* is also overwhelming. Of the 2,631 registered voters geocoded to District 1, 1,553 are Latino, resulting in a 475-person margin over the 1,078 non-Hispanic registered voters in the district.

54.       The 56.12% LCVAP District 1 in *Hypothetical Plan B* has a higher LCVAP percentage than three of the four LCVAP districts presented by the plaintiffs to the court in *Fabela v. City of Farmers Branch*.[13] In the opinion in that case, the court ruled that the plaintiffs had met *Gingles 1*.

55.       According to the expert for the defendants in the *Farmers Branch* case, the four demonstrative districts had LCVAP percentages of 53.1%, 52.9%, 54.9%, and 53.7% – all lower than District 1 in *Hypothetical Plan B*. According to the plaintiffs' expert in the *Farmers Branch* case, only one of the four demonstration districts had a higher LCVAP at 57.29%.[14]

56.       Not a single demonstration district in the *Farmers Branch* litigation had a Latino registered voter percentage higher than District 1 in *Hypothetical*

_____

[13] *Fabela, et al. v. City of Farmers Branch, et al*., Civil Action No. 3:10-CV-1425-D (N.D. Tex.), August 12, 2012.

[14] *Ibid.,* p.10.  The two experts in the case calculated different LCVAPs by district. The text of the opinion includes a summary table.

*Plan B* (or, for that matter, under the two illustrative plans presented in my February 1, 2013 declaration). According to the expert for the plaintiffs, only one of the demonstrative districts in the *Farmers Branch* case exceeded 50% registered Latino voters.[15]

**Hypothetical Plan C**

57.    The 56.12% LCVAP District 1 depicted in *Hypothetical Plan B* is not the maximum possible LCVAP district that can be drawn in Yakima. For example, as shown in the statistical summary in **Figure 13** and map in **Figure 14** below, I have developed *Hypothetical Plan C* with a District 1 that is 57.74% LCVAP and 59.74% Latino registered voters. A detailed demographic summary and map for *Hypothetical Plan C* are attached as **Exhibit C**.

**Figure 13    Yakima City Council Hypothetical Plan C Summary**

| District | Population | Deviation | % Deviation | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | % Latino CVAP | % Latino Registered (of all registered) |
|---|---|---|---|---|---|---|---|---|
| 1 | 12384 | -646 | -4.96% | 7570 | 5742 | 75.85% | 57.74% | 59.74% |
| 2 | 13243 | 213 | 1.63% | 8881 | 4498 | 50.65% | 31.84% | 35.78% |
| 3 | 12632 | -398 | -3.05% | 9096 | 2748 | 30.21% | 25.51% | 19.12% |
| 4 | 12940 | -90 | -0.69% | 9263 | 3842 | 41.48% | 30.11% | 24.09% |
| 5 | 13323 | 293 | 2.25% | 10249 | 2296 | 22.40% | 11.48% | 12.69% |
| 6 | 13413 | 383 | 2.94% | 10294 | 1105 | 10.73% | 7.37% | 6.59% |
| 7 | 13132 | 102 | 0.78% | 9934 | 1606 | 16.17% | 14.81% | 11.16% |

---

[15] *Ibid.*

**Figure 14 Yakima City Council Hypothetical Plan C**



58.     A hypothetical district with a higher LCVAP than that achieved in *Hypothetical Plan C* is possible. But within the context of this particular Section 2 lawsuit, I believe that such a district, as well as the LCVAP-majority districts under *Hypothetical Plans B* and *C,* would unnecessarily pack Latinos into a single district.

Both hypothetical plans would dramatically cut the Latino registered voter percentage in District 2 from about 51% under the illustrative plans to 36%.

**D.    Voting Age Latino Citizen Majority Districts in Yakima Can Be Drawn Using Citizens or 18+ Citizens as the Apportionment Base**

59.    Dr. Morrison suggests that total population is not the appropriate apportionment base to use in Yakima. He apparently advocates the use of CVAP to correct an "electoral imbalance".[16] I have drafted thousands of redistricting plans covering hundreds of jurisdictions across the country over the past 25 years. I am unaware of any jurisdiction (including the City of Yakima) that uses citizen population or CVAP as the apportionment base.[17]

**Hypothetical Plan D**

60.    Nevertheless, in response to Dr. Morrison's concerns, I demonstrate in **Figures 15** and **16** below that an LCVAP-majority district can be drawn with citizen population (all ages) as the apportionment base. A detailed demographic summary and map for *Hypothetical Plan D* are attached as **Exhibit D.**

---

[16] Morrison Report, ¶¶ 37-43.

[17] Some jurisdictions exclude non-resident prison inmates from the apportionment base, but use total population after the exclusion.

**Figure 15    Yakima City Council Hypothetical Plan D Summary**

| District | Population | Citizens | Deviation | % Deviation | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | % Latino CVAP | % Latino Registered (of all registered) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 16622 | 10866 | -303 | -2.71% | 10262 | 7435 | 72.45% | 55.25% | 55.65% |
| 2 | 14403 | 11155 | -14 | -0.13% | 9837 | 4778 | 48.57% | 30.13% | 32.54% |
| 3 | 11601 | 11142 | -27 | -0.24% | 8947 | 1652 | 18.46% | 14.45% | 12.49% |
| 4 | 11783 | 10779 | -390 | -3.49% | 8676 | 2866 | 33.03% | 28.38% | 21.38% |
| 5 | 12372 | 11087 | -82 | -0.73% | 8811 | 3005 | 34.11% | 20.35% | 20.31% |
| 6 | 11821 | 11412 | 243 | 2.17% | 9568 | 937 | 9.79% | 5.89% | 6.91% |
| 7 | 12465 | 11580 | 411 | 3.68% | 9186 | 1164 | 12.67% | 12.13% | 7.94% |

**Figure 16                Yakima City Council Hypothetical Plan D**



28

61.     *Hypothetical Plan D* creates a Latino-majority district with a 55.25%

LCVAP using the 2007-2011 ACS 5-year estimate of 78,181 citizens in Yakima as

the apportionment base. *Hypothetical Plan D* has an overall deviation of 7.17%,

based on an ideal district size of 11,169 (78,181/7). Latino-majority District 1 has a

deviation of -2.17%. District 1 is overpopulated by about 3,500 persons using total

population as the apportionment base. Over one-third (34.8%) of the City's Latino

population would reside in District 1.

**Hypothetical Plan E**

62.     *Hypothetical Plan E* creates a Latino-majority district with a 51.16%

LCVAP using the 2007-2011 ACS 5-year estimate of voting age citizens in

Yakima as the apportionment base.[18] Summary statistics and a map are shown in

**Figures 17** and **Figure 18** below. A detailed demographic summary and map for

*Hypothetical Plan E* are attached as **Exhibit E**.

---

[18] Dr. Morrison chooses to use the CVAP in Yakima according to the 2009-2011 ACS for the apportionment base. (See Morrison Report, Table 2, p.16). For consistency with the block group dataset, I believe it is preferable to use the citywide citizen voting age estimate from the 2007-2011 ACS.

**Figure 17    Yakima City Council Hypothetical Plan E Summary**

| District | Population | CVAP | Deviation | % Deviation | 18+_Pop | 18+ Hisp. | % 18+ Hisp. | % Latino CVAP | % Latino Registered (of all registered) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 21265 | 7577 | -204 | -2.62% | 13082 | 9193 | 70.27% | 51.16% | 53.91% |
| 2 | 14972 | 7574 | -207 | -2.66% | 10304 | 4902 | 47.57% | 30.81% | 32.01% |
| 3 | 10671 | 7897 | 116 | 1.49% | 8218 | 1481 | 18.02% | 15.97% | 12.34% |
| 4 | 11812 | 7951 | 170 | 2.19% | 8792 | 2687 | 30.56% | 24.53% | 20.01% |
| 5 | 10718 | 7665 | -116 | -1.50% | 8236 | 1685 | 20.46% | 14.54% | 13.00% |
| 6 | 10751 | 7935 | 154 | 1.98% | 8659 | 865 | 9.99% | 2.59% | 6.34% |
| 7 | 10878 | 7635 | -146 | -1.88% | 7996 | 1024 | 12.81% | 13.26% | 7.80% |

**Figure 18    Yakima City Council Hypothetical Plan E**



30

63.      *Hypothetical Plan E* has an overall deviation of 4.85%, based on an ideal district size of 7,781 (54,464/7). District 1 is overpopulated by about 8,000 persons using total population as the apportionment base – 43.5% of the Latino population in Yakima would reside in District 1.

**Deviation Analysis of Adopted 2011 Plan – Alternative Apportionment Bases**

64.      The hybrid at-large, 4-residency district plan adopted by the City in 2011 is grossly malapportioned using either citizens or CVAP as the apportionment base. The overall deviation for the *2011 Plan* with a citizen apportionment base is 24.37%. Using CVAP as the apportionment base, the overall deviation for the *2011 Plan* is 43.33%. With total population as the apportionment base, the *2011 Plan* has an overall deviation of 11.06%.[19] It appears that total population is the apportionment base for the *2011 Plan*, because that is the only population statistic reported on the map posted on the City's website. [20]

65.      To reiterate, while it is certainly possible to draw an LCVAP-majority district using citizens or voting age citizens as the apportionment base, I believe that a valid and constitutional redistricting plan must use total population for the

---

[19] February 1, 2013, Declaration of William S. Cooper, ¶ 45.

[20] See map and table available for download at:
http://www.yakimawa.gov/council/city-council-districts/.

apportionment base. For this reason, I do not believe that *Hypothetical Plans D or E* should be relied upon for the first prong of *Gingles* or as appropriate remedies in this case.[21]

### E.    Additional Methodological Issues Raised by Dr. Morrison

**ACS CVAP versus 2010 Census VAP**

66.    Dr. Morrison identifies 15 block groups in Yakima where the estimated CVAP according to the 2007-2011 ACS exceeds the corresponding 2010 Census VAP. He found 9 block groups where the estimated CVAP exceeds the 2010 Census VAP and an additional 6 block groups where the estimated LCVAP exceeds the 2010 Census Latino VAP.[22]

67.    As shown in the map in **Figure 19** below, all 15 of the block groups flagged by Dr. Morrison (shaded pink) lie outside the boundaries of majority-Latino registered voter Districts 1 and 2 under both illustrative plans (delineated with blue and green lines). Therefore, this inconsistency between the 2010 Census

---

[21] *See Garza v. County of Los Angeles,* 918 F.2d 763, 775–76 (9th Cir.1990).

[22] Morrison Report, ¶¶ 7-8. In the text and accompanying table, Dr. Morrison implies that the block group level citizen counts are estimates that I have calculated. This is not the case. I rely on the official 2007-2011 ACS Special Tabulation block group point estimates published by the Census Bureau. (See my discussion in ¶¶ 6-8 *supra*.)

32

VAP counts and the 2007-2011 ACS CVAP estimates has no effect on the Latino-majority districts in the two illustrative plans.

**Figure 19        Block Groups with 2007-2011 ACS CVAP
               Greater than the 2010 Census VAP**



68.        There is nothing unusual about block groups with 2007-2011 ACS CVAP estimates that exceed the 2010 Census VAP. Of the 217,217 block groups nationwide, 70,523 (32.47%) have 2007-2011 ACS voting age citizen estimates

that exceed the VAP in the 2010 Census count.[23] By comparison, in Yakima, just 13.4% of all block groups (9 of 67) have 2007-2011 ACS citizen voting age populations that exceed the 2010 Census VAP count. Yakima is below the national average by a wide margin.[24]

69.     One anomaly that Dr. Morrison did not mention is his report is that there are 9 block groups in Yakima that extend into areas beyond the city limits. This explains why there is a minor discrepancy between the citywide citizen (*Hypothetical Plan D*) and CVAP (*Hypothetical Plan E*) totals I used to calculate the ideal district size and the sum of the corresponding citizen and CVAP totals by district. Most of the jurisdictional splits are located in the western part of Yakima in areas that have been annexed since 1990. There are no jurisdictional block group splits involving District 1 as drawn in *Hypothetical Plans A* through *E* or in *Illustrative Plans 1* and *2,* so this discrepancy has no impact on *Gingles 1* in this case.

_____

[23] I conducted this analysis with *Maptitude 2012* using a nationwide block group dataset purchased from Caliper Corporation.

[24] Because the nationwide 32.4% total for block groups with CVAP minus VAP excesses is much greater than the 13.4% total for Yakima block groups with excess CVAP **or** LCVAP, there is no point in proceeding to the next step. This step would involve identifying additional block groups nationwide where LCVAP exceeds 2010 Latino VAP.

**Geographical Mobility of  the Latino Population is not a Significant Factor**

70.        Dr. Morrison implies that because some of Yakima's Latinos work in agriculture or food processing, many are not year-round residents.[25] He offers no supporting data regarding Latino household mobility or the occupational structure of the Latino workforce in Yakima – or, for that matter, of the corresponding non-Hispanic population. He presents no block group or neighborhood analysis to support this assertion.

71.        There is, however, evidence from the American Community Survey that shows Latino households in Yakima are stable comparatively speaking – and that the District 1 and 2 areas under the illustrative plans are within the norm in terms of geographical mobility for the city as a whole.

72.        As shown in **Figure 20** below, the *2008-2010 3-Year ACS* indicates that Latinos in Yakima are not a transient population compared to non-Hispanic Whites.[26]

---

[25] See Morrison Report, ¶¶ 28-30.

[26] The ACS numerical estimates underlying **Figure 20** are shown on p. 13 of **Exhibit H**. **Figure 20** is replicated in the chart on p.14 of **Exhibit H**. For ACS estimates and a summary chart showing the occupational structure of the Latino and non-Hispanic White workforces in Yakima see pp. 55-56 of **Exhibit H**.

35

**Figure 20 Geographical Mobility in the Past Year (Population 1 and Over)**

**Latino and Non-Hispanic White Comparison**



73.     Nearly four out of five Latinos (78.4%) live in the same house as one

year ago – comparable to the 80.4% rate of non-Hispanic Whites.[27] Another 14.7%

---

[27] Source: B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY
RACE FOR CURRENT RESIDENCE IN THE UNITED STATES - Universe:
POPULATION 1 YEAR AND OVER Data Set: 2008-2010 American Community
Survey 3-Year Estimates.

of Latinos moved during the year from somewhere else in Yakima County, compared to a 12.0% intra-county rate experienced by non-Hispanic Whites.[28]

74.     During the survey year, 6.8% of Latinos moved from out-of-county, compared to 7.6% of non-Hispanic Whites. This means that over the course of the year, slightly more non-Hispanic Whites compared to their Latino counterparts moved to Yakima from out-of-county or out-of-state areas.

75.     An alternative way to consider the geographical mobility issue is to examine block group-level data for households that moved into their current residence at some point between 2005 and 2010. The map in **Figure 20** below shows that block groups with the highest rate of change of residence over the period are located, for the most part, just west of the Latino-majority districts under the illustrative plans.

76.     Between 60% and 70.6% of the households in the deep pink block groups moved into their current residence at some point between 2005 and 2010.[29] Of the 11,239 Latinos of voting age (according to the 2010 Census) who reside within the majority-Latino districts under *Illustrative Plans 1* and *2*, 17.5% live in block

---

[28] The ACS does not provide a more detailed breakout for intra-city residence changes. Some of the intra-county moves would have been intra-city or intra-neighborhood.

[29] Source: 2012 US Census Planning Database (2006-2010 ACS). Available for download from: http://www.census.gov/research/2012_planning_database/.

groups where 60% to 70.6% of the households moved in the five-year-period. Of the

5,457 non-Hispanics of voting age who reside inside the boundaries of illustrative

Latino-majority districts, 18.5% live in block groups where 60% to 70.6% of the

households moved in the five year-period.

**Figure 21    Percent Change in Household Residence 2005-2010**



77.    Citywide, at the block group level, the median percentage of

households that moved to their current residence between 2005 and 2010 is 41.5%.

This is within the 40% to 60% range of the orange-colored block groups in the map in **Figure 21**. Most of the population in Districts 1 and 2 lives in these orange-colored block groups. (The percentage labels that overlay each block group in the **Figure 2**1 map show the percentage of households that moved between 2005 and 2010.)

## Latino-Majority Districts Will Not Dilute the Votes of Other Minorities

78.      Dr. Morrison poses this question toward the close of his report, but does not provide data or legal analysis in response:

> *Would this electoral imbalance causes* (sic) *unlawful dilution of votes cast by one or more protected groups (e.g., American Indians or Asians) whose numbers are disproportionately concentrated outside demonstration District 1?*[30]

In short, no – for the reasons I discuss below.

79.      First, *Illustrative Plans 1* and *2* create two effective Latino-majority districts – not one. Under both illustrative plans, nearly half of Yakima's minority population would reside in Districts 1 and 2 – 47.6% under *Illustrative Plan 1* and 47.4% under *Illustrative Plan 2*.

80.      Second, under *Illustrative Plans 1* and *2*, District 4 is majority-minority – 51.32% and 51.56% of total population, respectively. Under *Illustrative Plan 1*, District 4 is 26.46% LCVAP with 22.89% Latino registered voters. Under

---

[30] Morrison Report, p. 26.

*Illustrative Plan 2*, District 4 is 26.77% LCVAP with 23.03% Latino registered voters. Minorities comprise 44.27% of the voting age population in District 4 under *Illustrative Plan 1* and 44.59% under *Illustrative Plan 2*. In both plans, on all of these metrics – minority percentage, LCVAP, Latino registered voters, and minority voting age percentage – District 4 scores higher than the corresponding citywide figures.[31]

81.    Under both illustrative plans, nearly two-thirds of Yakima's minority population would reside in Districts 1, 2, and 4 – 63.14% under *Illustrative Plan 1* and 63.3% under *Illustrative Plan 2*.

82.    In sum, under *Illustrative Plans 1* and *2*, more than 60% of the minority population would reside in three single-member districts where a minority candidate for city council could be expected to fare better than under an at-large citywide election system. Minority voters would reside in two out of seven districts with a majority of registered voters who are minority (predominantly Latino) versus zero out of seven under the existing at-large system. This would not represent a dilution of votes for minority voters vis-à-vis the current electoral scheme.

83.    According to the 2010 Census, the national origin of the Latino population in Yakima is overwhelmingly Mexican – 92.3% of all Latinos in Yakima are Mexican-American. (See **Figure 22** below).

_____

[31] See Exhibits C-1 and D-1 in my February 1, 2013 declaration.

**Figure 22          Yakima – Latinos by National Origin (2010 Census)**

| National Origin | 2010 Population | % of Total |
|---|---:|---:|
| Mexican | 34,697 | 92.3% |
| Puerto Rican | 232 | 0.6% |
| Cuban | 48 | 0.1% |
| Dominican | 23 | 0.1% |
| Central American (excluding Mexican) | 338 | 0.9% |
| South American | 149 | 0.4% |
| Other Hispanic or Latino | 2,100 | 5.6% |
| **Total Hispanic or Latino** | **37,587** | **100.0%** |

84.      About 90% of persons of Mexican origin have some North American Indian heritage.[32] In 2010, approximately 14.9% of Mexican nationals (ages 3 and over) were Indian compared to 0.9% of Americans who identified as single-race Indian.[33]

85.      Of the 1,968 persons in Yakima who specified a tribal affiliation in the complete count 2010 Census, 657 (33.38%) were members of the Yakima tribe. The Mexican American Indian category was checked for 118 persons (6.0%). Other

_____

[32] *CIA World Factbook.* Available for download at: www.cia.gov/library/publications/the-world-factbook/geos/mx.html.

[33] Sources: U.S. Census Bureau, 2010 Census. INEGI. *Censo de Población y Vivienda 2010: Tabulados del Cuestionario Ampliado.* Available for download at: *http://www3.inegi.org.mx/sistemas/TabuladosBasicos/LeerArchivo.aspx?ct=27495 &c=27303&s=est&f=1.*

categories which represent Latin American Indian categories amounted to just over

one percent (e.g., Spanish American Indians, South American Indians, and Yaquis).[34]

(See **Exhibit F**). A tribal breakout by voting age and Latino/non-Hispanic is not

available in the 2010 Census.

86.      Latinos may be of any race. **Figure 23** below shows the distribution of

Yakima's Latino population by race, according to the 2010 Census. In the 2010

Census, over half of the Latino population checked "Other race" – 21,091 persons

(56.11%) and 12,655 persons of voting age (57.95%).

**Figure 23      Yakima – Latinos by Race (2010 Census)**

| Race | 2010 Population | % of Total | 2010 18 + Pop. | % of 18 + Pop |
|---|---|---|---|---|
| **White Alone** | 13,542 | 36.03% | 7,791 | 35.68% |
| **Black Alone** | 245 | 0.65% | 128 | 0.59% |
| **American Indian and Eskimo Alone** | 527 | 1.40% | 263 | 1.20% |
| **Asian Alone** | 61 | 0.16% | 40 | 0.18% |
| **Hawaiian or Pacific Islander Alone** | 37 | 0.10% | 25 | 0.11% |
| **Other Alone** | 21,091 | 56.11% | 12,655 | 57.95% |
| **Two or More Races** | 2,084 | 5.54% | 935 | 4.28% |
| **Total Hispanics** | 37,587 | 100.0% | 21,837 | 100.00% |

87.      The socio-economic status of Yakima's American Indian community is

more closely aligned with Latinos than non-Hispanic Whites. The tables and charts in

**Exhibit G** compare Indians and non-Hispanic Whites as reported in the *2006 to 2010*

---

[34] Source: 2010 Census Summary File 1: *QT-P7-Geography-Yakima city, Washington: Race Reporting for the American Indian and Alaska Native Population by Selected Tribes: 2010.*

*American Community Survey 5-Year Estimates* file. This document shows that

Indians, like Latinos, lag behind non-Hispanic Whites across key socio-economic

measures such as poverty and median income. For general comparison, I have

attached as **Exhibit H** a similar set of charts contrasting Latinos and non-Hispanic

Whites from the *2008-2010 American Community Survey 3 year Estimates* dataset.

## F.    Conclusion

88.    This declaration  makes the following key points:

- *Gingles 1* can be met in a variety of ways in Yakima, including a single-member district with an LCVAP at least as high as 57.74% in a 7-member plan. (See *Hypothetical Plan C*).

- *Gingles 1* can be met in Yakima even assuming an apportionment base comprised of citizens or just citizens of voting age. (See *Hypothetical Plans D and E*).

- LCVAP estimates derived from the American Community Survey are routinely used by government entities, the U.S. Department of Justice, and federal courts for redistricting.

- The LCVAP calculations I employ are in no way "tainted" or "suspect."

- For Yakima, the proper method to disaggregate ACS CVAP estimates to the census block level is to allocate both Latino and non-Hispanic CVAP in proportion to the underlying block-level Latino and non-Hispanic VAP from the decennial census.

- Even if the CVAP allocation method advocated by Dr. Morrison is employed, it is possible to create an LCVAP-majority district under a 7-disrict plan and, at the same time, create a second majority-Latino registered voter district. (See *Hypothetical Plan A*).

43

- ▪  Geocoding current registered voter lists is more geographically precise and temporally accurate for gauging current and potential Latino voting strength than the historical ACS block group special tabulation.

- ▪  LCVAP estimates derived from the 5-year ACS are historical indicators of Latino citizenship by district – on average, three and one-half years old the moment they are released. The January 2013 geocoded Spanish surname registered voter list is a current indicator of Latino voting age citizenship by district. ACS Latino citizenship estimates for the under 18 population are forward-looking indicators of current and future LCVAP by district – particularly in Yakima where 95% of under 18 Latinos are citizens.

- ▪  There is a nearly 20-percentage point positive differential between Latino citizens of all ages and LCVAP in Districts 1 and 2 under the illustrative plans.

- ▪  Minorities other than Latinos will not see their votes diluted under a 7-single district plan in Yakima – assuming two majority-Latino registered voter districts and a third majority-minority district with a minority VAP percentage that is higher than the citywide percentage.

- ▪  The Latino population in Yakima is over 90% Mexican-American and shares cultural and socio-economic characteristics with the non-Hispanic American Indian community – the second largest minority population in Yakima.

89.    In summary and upon review of Dr. Morrison's report and supplemental report, I see no reason to alter the conclusions I made in my February 1, 2013 declaration:

- ▪  It is possible to create two out of seven City Council districts where Latinos of voting age would be a majority and where Latino registered voters would comprise a majority of registered voters.

- ▪  It is possible to create at least one Latino citizen voting age-majority district out of seven.

44

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

April ____19____, 2013

WILLIAM S. COOPER

Exhibit 7

MORRISON, PETER 1                                        May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

_____

ROGELIO MONTES and MATEO ARTEAGA,            )
                                             )
                                             )
            Plaintiffs,                      ) Case No.
                                             )
      vs.                                    ) 12-cv-3108
                                             ) TOR
CITY OF YAKIMA, MICAH CAWLEY, in his         )
official capacity as Mayor of Yakima, and    )
MAUREEN ADKINSON, SARA BRISTOL, KATHY        )
COFFEY, RICK ENSEY, DAVE ETTL, and BILL      )
LOVER, in their official capacity as         )
members of the Yakima City Council,          )
                                             )
                                             )
            Defendants.                      )

_____

DEPOSITION OF PETER MORRISON
May 9, 2013
Seattle, Washington

Reported by:
Mary W. Miller, RPR, CRR, CCP
CCR No. 2653
Job No. 431811

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 254

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

```
                                                        Page 2

  1                      APPEARANCES

  2

  3    For the Plaintiffs:

  4           ABHA KHANNA
              SUSAN FAHRINGER
  5           BEN STAFFORD
              Perkins Coie
  6           1201 Third
              Suite 4800
  7           Seattle, Washington 98101
              206-359-8000
  8           akhanna@perkinscoie.com

  9

 10    For the Defendants:

              FRANCIS FLOYD
 11           JOHN SAFARLI
              Floyd Pflueger & Ringer
 12           200 W. Thomas Street
              Suite 500
 13           Seattle, Washington 98119
              206-441-4455
 14           ffloyd@floyd-ringer.com

 15

       Also Present:
 16
              WILLIAM COOPER
 17

 18

 19

 20

 21

 22

 23

 24

 25
```

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 255

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

```
                                                        Page 3

  1
                        EXAMINATION INDEX
  2

  3
     EXAMINATION BY:                               PAGE NO.
  4

  5     MS. KHANNA                                     4

  6                        EXHIBIT INDEX

  7
     EXHIBIT NO.          DESCRIPTION               PAGE NO.
  8
     Exhibit 1      Declaration of William Cooper     46
  9
     Exhibit 2      Expert report of Peter Morrison    5
 10
     Exhibit 3      Supplemental report of Peter Morrison  83
 11
     Exhibit 4      Supplemental declaration of        85
 12                 William Cooper

 13  Exhibit 5      Washington 2000 census microdata areas  134

 14
                  WITNESS INSTRUCTED NOT TO ANSWER
 15
                            (None)
 16
                    INFORMATION REQUESTED
 17
                            (None)
 18

 19

 20

 21

 22

 23

 24

 25
```

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 256

MORRISON, PETER 1                                              May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 4

1           BE IT REMEMBERED that on Thursday, May 9, 2013,

2    at 1201 Third Avenue, Seattle, Washington, at 9:00 a.m.,

3    before Mary W. Miller, Court Reporter in and for the State

4    of Washington, appeared PETER MORRISON, the witness herein;

5           WHEREUPON, the following proceedings were had,

6    to wit:

7

8                           <<<<<<  >>>>>>

9

10   PETER MORRISON,              having been first duly sworn

11                               deposed and testified as follows:

12

13                           EXAMINATION

14   BY MS. KHANNA:

15      Q.  Good morning, Dr. Morrison.  We've already met but

16   just for the record my name is Abha Khanna and I'm

17   representing the plaintiffs in this action.

18           Could you please state your full name and business

19   address for the court.

20      A.  My full name is Peter, middle initial A, Morrison

21   and my business address is No. 3 Eat Fire Springs Road,

22   Nantucket, Massachusetts.

23      Q.  And have you ever been deposed before?

24      A.  Yes, I have.

25      Q.  About how many times?

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 47

1      Q.   And that's on page 13.

2      A.   Yes.

3      Q.   And you see here in this paragraph Mr. Cooper notes

4    that nearly three quarters of the city's 2010 Latino

5    population resides in that nine mile square area east of

6    16th Avenue.

7      A.   Yes.  That answered the question then.  Those

8    numbers, if they're correct, yes, the majority live east of

9    north 16th.

10     Q.   And the figure on page 13 as well shows that the

11   largest concentrations of Latinos are east of 16th Avenue?

12     A.   Yes.  Those areas with the highest share, the

13   largest percentage of total Latino population are east of

14   north 16th, yes.

15     Q.   Are you aware of any other large concentrations of

16   Latinos in the city of Yakima?

17     A.   There are areas that have greater and lesser

18   concentrations west of North 16th and you can see them in

19   this map.  They're not as, they're not as extreme as the

20   ones east of North 16th but there is a pattern of -- you

21   know, it's an interesting pattern to me.  Not all the

22   concentration areas are east of North 16th.  There are some

23   other areas where Latinos are more concentrated relative to

24   the neighboring bloc groups.

25     Q.   But not relative to east of 16th Street?

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 258

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                        Page 48

1        A.  No, not in terms of total population here.  This is

2   a very coarse measure, it's a total population.  When I look

3   at it, I look at this map and I see exactly what you're

4   saying and I have no dispute with what you're asking me

5   about.  But one would want to look at this in terms of, at

6   least my view of this is I see here what would be regarded

7   as a traditional long-standing Latino enclave with some

8   other emerging areas of Latino residents elsewhere in the

9   city, quite possibly areas where the Latinos are more likely

10  to be citizens than in the more heavily concentrated areas.

11  So there's kind of an underlying historical development

12  process here that one has to be aware of based on what I've

13  seen in other places.

14       Q.  But you have no dispute with the information as

15  presented on page 13?

16       A.  I have no reason to doubt that the numbers were

17  accurately mapped.

18       Q.  So given this information would you say that the

19  Latino population in Yakima is geographically concentrated?

20       A.  The total population certainly is geographically

21  concentrated, no question about it.

22       Q.  And you reviewed illustrative plan 1 in Mr. Cooper's

23  declaration; is that right?

24       A.  Yes.

25       Q.  There's seven districts in that plan; is that right?

MORRISON, PETER 1                                              May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                              Page 49

 1      A.   That's my understanding.

 2      Q.   Are the districts in illustrative plan 1 compact?

 3      A.   Compactness is a relative term.  You can only say

 4   it's more compact or less compact than some other

 5   comparison.  I would say they are not bizarrely configured

 6   which is a term that I would carefully apply to some plans

 7   I've seen.

 8      Q.   So relative to other plans that you've seen, would

 9   you say the districts in illustrative plan are compact?

10      A.   No, I would say they're not bizarrely figured.

11   Compactness is a relative term.  You'd have to ask me are

12   they more compact or less compact than some other

13   comparison.

14      Q.   Would you agree that they're not oddly shaped?

15      A.   Again, it's a relative standard.  I would say the

16   standard that I could apply without any question is that

17   they are not bizarrely shaped.

18      Q.   Are you aware of various ways of measuring

19   compactness?

20      A.   Yes, I am.

21      Q.   What are some of those ways?

22      A.   I think there's as many as a dozen different

23   measures that have been developed by political scientists

24   and geographers.  I can't tell you the names of all of them

25   offhand.  One of them is something, Colby something measure,

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

 1   but basically they get a different conceptualizations.  Like
 2   if a perfect district were a circle, how different is it
 3   from a circle in terms of geometry.  There are a lot of
 4   different measures and they all, you know, quantify what we
 5   have in mind, which is does this thing look reasonably
 6   square or reasonably circular or are there, you know, is the
 7   perimeter around the plan much more than what it would be if
 8   it were a circle.  If you have a district like the ones that
 9   have been configured, I can think of some in the state of
10   Illinois, in North Carolina where you look at it and kind of
11   the test one uses if you look at it and you say it looks
12   like an insect that got driven over by a car, that's not
13   going to be compact.  But all of these measures pick up
14   different, analytically different aspects or analytically
15   distinct aspects of a district, and basically when you look
16   at it, you can tell when it's bordering on being bizarre.
17       Q.  So one way to tell compactness is really an
18   eyeballing?
19       A.  An eyeballing can tell you if you got something that
20   really looks strange.  You look at it and say why would
21   anyone draw something that should be more or less, you know,
22   normal or nonbizarre, and an eyeball test would be one test.
23   But the compactness measures are very useful because they
24   give you a metric that allows you to compare different plans
25   and say one -- if all other things are equal, this one is

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 51

1    more compact than that one, and I'm not aware that

2    Mr. Cooper has calculated any of those measures.  I didn't

3    go to the trouble of calculating them because I didn't want

4    to expend any resources on something unless it became a big

5    issue.

6        Q.  But Mr. Cooper did specifically opine that the

7    districts in illustrative plan 1 are compact; is that right?

8        A.  That's his opinion, yes.

9        Q.  But you read that in his report?

10       A.  Yes.

11       Q.  And you did not dispute that in either of your

12   reports; is that right?

13       A.  My, you know, my criterion would be to say when he

14   says they're compact, that's his opinion and that falls -- I

15   would agree insofar as I would say they're definitely not

16   bizarre.

17       Q.  Do you think the compactness of the districts is

18   relevant to Gingles 1 analysis?

19       A.  It's one of the traditional redistricting criteria

20   that should be taken into account when configuring a

21   district.

22       Q.  Are the districts in illustrative plan 1 contiguous?

23       A.  Are the districts contiguous?

24       Q.  Is the plan itself contiguous?

25       A.  Well, if you mean does it exhaustively include all

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 60

 1   There's nothing in the report and I assumed that there would

 2   be something in the deposition.  But I didn't say anything

 3   about it because it was not the predominant concern that I

 4   had.

 5       Q.  So on paragraph 56 in Exhibit 1 when Mr. Cooper

 6   says, "In sum, the illustrative plans comply with key

 7   traditional redistricting criteria," and then he includes a

 8   list, you do not dispute that it complies with compactness?

 9       A.  No, I don't have any -- I certainly have no, no -- I

10   don't directly dispute compactness.  That's not one of the

11   factors that I would dispute.

12       Q.  Or contiguity?

13       A.  Nor contiguity.  Contiguity is off the table.

14   That's not an issue.

15       Q.  And you do discuss the one person, one vote issue in

16   the context of electoral imbalance?

17       A.  That's correct.

18       Q.  But you do not specifically address the respect for

19   communities of interest using that term?

20       A.  I need to know more about what communities of

21   interest there are other than the total Hispanic population

22   that is concentrated in one area.

23       Q.  Do you have any information on whether there are

24   communities of interest?

25       A.  I would say it would have been helpful if the term

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                    Page 64

 1    intruding fingers or nipples of territory.  Sometimes one
 2    has to do that in order to deal with the incumbency issue.
 3        Q.  Do you understand Mr. Cooper's report as opining
 4    that the districts in illustrative plan 2 are compact?
 5        A.  That's what he said, yes.
 6        Q.  Did you dispute that in either of your reports?
 7        A.  No, I did not.
 8        Q.  Are the districts in illustrative plan 2 contiguous
 9    the way you defined it?
10        A.  Yes.
11        Q.  And does illustrative plan 2 have an overall
12    deviation that falls under the ten percent threshold that we
13    discussed?
14        A.  Yes, it does.
15        Q.  In fact it's 5.44; is that right?
16        A.  Correct.
17        Q.  As far as you know does illustrative plan 2 respect
18    any communities of interest?
19        A.  I would have to give the same answer that I gave
20    with plan 1, which is clearly it respects the total Latino
21    population viewed as a community of interest but I don't
22    know what other communities of interest are out there.
23    There is at least one other unnamed community of interest
24    because Mr. Cooper used the plural communities of interest,
25    and there may be more than one other but I don't know what

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 264

MORRISON, PETER 1                                        May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 74

1   means that its application in redistricting has to be

2   governed by judgment as to what it can and cannot assure us

3   of.  So it's like we all acknowledge it's the only, it's the

4   only source of data on citizenship that we have and it is

5   the officially designated one.  We are talking about

6   applying it not to a situation where we're distinguishing

7   concentrations of African Americans, all of whom are

8   citizens where citizenship is not an issue.  We're dealing

9   with a situation where citizenship is more of an issue here

10  than it is probably in 95 percent of jurisdictions where

11  redistricting is done.  And the fact that there are many

12  citizens and many seasonal residents and many people who

13  didn't answer questions and lots of other things

14  cumulatively create a situation where one has to exercise

15  caution in interpreting the data and understanding where one

16  can draw a conclusion of confidence and where one can draw a

17  conclusion but with little or only marginal confidence.

18      Q.  Have you ever relied on ACS data in determining the

19  minority Citizen Voting Age Population in a given district

20  in any previous cases?

21      A.  I do it all the time.

22      Q.  Can you name any of those cases?

23      A.  I'm working on a few right now.  I'm working on one

24  in Gainesville, Georgia, another one in Orange County,

25  Florida.  I certainly have used ACS data, that would be in

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 265

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                    Page 83

 1                    (Exhibit No. 3 marked

 2                     for identification.)

 3        A.   Yes.

 4        Q.   When did you first realize that your initial report

 5   needed supplementation?

 6        A.   I think it was a few days after I completed it and I

 7   was struck by something that stood out that didn't make

 8   sense, and it was at that point that I looked into it more

 9   thoroughly.

10             What I had done is I had compared what Mr. Cooper

11   had done and how he had allocated bloc group level data to

12   individual blocs for Hispanics.  I replicated what he did

13   and I remember saying he did it exactly right, even to the

14   fraction of a person.  He had 37.3 Hispanics, and I did it

15   the way I thought it should be done for Hispanics and I said

16   that's exactly what I get.  That's why I said I think he

17   knows what he's doing with numbers.  But I never went on to

18   look at what had been done with nonHispanics.  I never went

19   on to see what he had done with nonHispanics.

20             I then had proceeded to do Hispanics in total

21   population subtracting the former from the latter.  I made

22   the assumption that he had done it the same way.  I didn't

23   follow through the tedious verification to see if he did it

24   the same way, and what I stumbled into was he was coming out

25   with numbers that was different than I was coming out with

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 266

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 84

1   at the bottom line.  I'm like how did this happen.  And I
2   discovered that what he had done was adopted I guess, you
3   know, his -- he crafted his own method of doing this.  I'm
4   not aware of any, anyone who's done it this way anywhere
5   else.  And he did the two parts and then said well, I'll add
6   the two parts together to get the whole, which is the total
7   CVAP.  And that's where I -- that's the point at which I
8   discovered this problem.  And I realized that it was a
9   problem of fundamental significance because the correct
10  method, my method, came out with a significantly lower
11  Hispanic share of CVAP in District 1.
12      Q.  And you believe that your method is in keeping with
13  the standard demographic practice; is that right?
14      A.  Correct.
15      Q.  And what's the basis for that opinion?
16      A.  I could refer you to the bible that I mentioned
17  before, the Methods and Materials of Demography edited by
18  Jay Segal and David Swanson.  That's Dr. Swanson who I
19  mentioned before who's the professor at UC Riverside.
20          When I talk about standard demographic practice, it
21  derives from various parts of that manual.  It also derives
22  from my consultation with Dr. Swanson and with Tom Bryan, I
23  mentioned before, to assure myself that this is the way they
24  would do it but also understanding why it was the way they
25  would do it.  And as I stated before, there is a fundamental

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 267

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 107

1   phenomenon, and you take the two readings and you form an
2   opinion based on them.  So I would say sometimes yes, but
3   not invariably.
4       Q.  How would you take the two readings and form an
5   opinion based on them?
6       A.  It's very situation specific.  I can't give you a
7   general set of rules.  You have to look at it, you have to
8   look at the history.  You have to look at each measure in
9   the context of what it was the last time it was measured,
10  what direction it was trending, what kinds of errors there
11  might be in each source of data.  How it is you're defining
12  Latino voters, whether this is by surname or whether it is a
13  variable that the election's office has inserted based on
14  some kind of a self report that they got.  It all, it all
15  depends on the quality of the data and you have to just kind
16  of look at everything before you make a judgment.
17      Q.  And you've reviewed Mr. Cooper's report of
18  registered voter data for illustrative plans 1 and 2; is
19  that right?
20      A.  Yes.
21      Q.  Do you dispute the methodology used in determining
22  registered voter determination?
23      A.  The only question I have that still troubles me is
24  the matter of identifying as Latino some registered voters
25  who presently, whose present surname is not on the Spanish

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 268

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 108

1   surname list.  I don't know whether any of those, I'll

2   called them transformed names, have found their way into the

3   count.  From what I heard him saying yesterday, I think the

4   answer is that they did not get included, but I'm not 100

5   percent confident because I didn't get a clear answer.

6       Q.  So you're referring to individuals with Anglo

7   surnames who may be counted as Latino?

8       A.  Not Anglo surnames.  Persons with surnames that are

9   not on the Spanish surname list whose maiden names were on

10  the Spanish surname list and who have been carried forward

11  since a marriage and counted as Latinos without -- first of

12  all in violation of the use of the Spanish surname list and

13  secondly on the assumption that someone who had a Spanish

14  surname let's say 20 years ago and now has an Anglo, no

15  longer has a Spanish surname would still self identify in

16  the same way on a census.  That's another layer of

17  assumptions that are built in.

18          But the most important point I would make is that

19  when you use the list of Spanish surnames, you don't get to

20  change some people because they got married in one direction

21  because getting married can go in the other direction.  That

22  is to say a person whose name was not on the Spanish surname

23  list could marry a person who's, and take the last name of a

24  Spanish surname person and you would not, you know, you

25  would not go in and start tinkering with that and say well,

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 109

1    you used to not be on the Spanish surname list, so you're

2    not really Hispanic even though you married one.  If you do

3    that you are undermining the logic of the Spanish surname

4    list and it invalidates the application.

5        Q.  And you said it was your understanding that

6    Mr. Cooper did not include those individuals in his

7    registered, in his matching of the registered voter rate?

8        A.  From what he said I think that's what I heard but

9    I'm not 100 percent sure.  I'm not entirely sure.  I think I

10   heard the question asked once in a way that was, did any of

11   these changed individuals, are any of these changed

12   individuals reflected in any of the data in some place and I

13   think his answer was no.

14       Q.  Can you turn to page 17 of Exhibit 4 to Mr. Cooper's

15   supplemental declaration.  I'm looking at footnote 7.  Here

16   Mr. Cooper says, "The result in Spanish surname registered

17   voter list does not include a number of voters with

18   nonSpanish surnames that the Yakima County Election Division

19   has classified as Latino."

20       A.  Okay, let me see where that comes in.  Okay, I think

21   I answered the question.

22           MR. FLOYD:  This only relates to claims 1 and 2

23   and not A through E.

24       Q.  I believe my question was did you have any concerns

25   about the methodology used for determining registered voters

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 270

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 110

1   in plans 1 and 2.

2        A.  So that footnote answers that question.

3        Q.  So does that alleviate any concerns you had about

4   Mr. Cooper's methodology for determining the Latino

5   registered voter majority populations in illustrative plans

6   1 and 2?

7        A.  Yes.

8        Q.  So do you dispute Mr. Cooper's determinations of the

9   registered voter population in illustrative plans 1 and 2?

10       A.  Do I dispute -- could you read back the question.

11           MR. FLOYD:  Excuse me, one second.  I'm going to

12   object because if you look at page 16 of his original

13   report, which is Exhibit 1, there's an inconsistent

14   statement than footnote 7 on page 17 of Exhibit 4.  So I

15   think you're mischaracterizing, if you look at both of them

16   in total.

17       A.  I see what you mean there.  I would like to

18   interject.  I do see an inconsistency here and I'm not sure

19   exactly how it's resolved.

20       Q.  Can you explain what the inconsistency that you see.

21       A.  Yeah, I mean he says in footnote 7 on page 17 of

22   Exhibit 4 that the Spanish surname registered voter list

23   does not include a number of voters with nonSpanish surnames

24   that the Yakima County Election Division has classified as

25   Latinos.  And then he says in Exhibit 1, page 16.

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 111

1       Q.   What paragraph?

2       A.   Paragraph 36.  "I matched the January 2013

3   registered voter list to the Spanish surname list using

4   Microsoft Access Routine," and then the sentence after that

5   says, "This match includes a few persons with surnames that

6   in part match Spanish surnames" -- wait a minute, hold on.

7   There's a later place where he says this.  It's not

8   paragraph 36.  It's paragraph 42, that's the one that's

9   inconsistent.

10       Actually you have paragraph 42 in Exhibit 1 versus

11  footnote 7, page 17 in Exhibit 4, and I'm now going to read

12  what he says in paragraph 42 which is adding the apparent

13  inconsistency.  "In addition the attorneys gave me a file

14  prepared by the Yakima County Department of Elections that

15  identifies Latino voters who cast a ballot in the November

16  2011 general election.  This voter turnout list includes a

17  few persons with nonSpanish surnames, for example, quote,

18  Colby, close quote.  I understand that the Yakima County

19  Board of Elections," and then he goes on to explain why

20  there would be names like Colby coded that way.  And then he

21  says in the following sentence, "I used this file to

22  identify additional Latino voters not matched with the

23  surname method described in paragraph 36."

24       So to summarize the inconsistency, in paragraph 32

25  of Exhibit 1, Mr. Cooper's first report, he says that he

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 272

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                      Page 112

 1   used the file to identify additional Latino voters not

 2   matched with the surname method described in paragraph 36.

 3   And then in Exhibit 4, his supplemental declaration, in

 4   footnote 7 on page 17 he says, "The result in Spanish

 5   surname registered voter list does not include a number of

 6   voters with nonSpanish surnames that the Yakima County

 7   Elections Division has classified as Latino."

 8       Q.  Is footnote 7 talking about the registered voter

 9   list or the voter turnout list?

10       A.  The registered voter list.

11       Q.  And is paragraph 42 in Exhibit 1 talking about the

12   registered voter list or the voter turnout list?

13       A.  Paragraph 42 is talking about the voter turnout

14   list.  But if one has looked at the voter turnout list,

15   presumably that is a subset of the registered voters at that

16   time.  So I will, I will have to say I don't consider myself

17   to be well enough informed to say either there is no

18   inconsistency or to claim with certainty that there is one.

19   This is an area that needs to be resolved.

20           And at a minimum, it casts in my mind some doubt on

21   the procedure because it suggests that Mr. Cooper was on the

22   one hand using the list -- he was using a file that was

23   properly coded, but then in another instance he apparently

24   threw in some more people with names like Colby that didn't

25   belong there.  So if -- at a minimum he is not adhering to a

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                      Page 113

1    consistent practice of using Spanish surname list.

2            Once again, this raises in my mind a concern about

3    his approach to analyzing data and his meticulousness in

4    adhering to the proper standards in dealing with

5    administrative record data which are notoriously complicated

6    and have, you know, have all sorts of problems.  Remember

7    registered voter data and voter turnout data from election

8    departments are not designed for the needs of researchers.

9    They're designed to record an official event that occurred

10   and one has to always approach them with a degree of caution

11   and understand what one has.  And at a minimum I would say

12   that this is an indication of Mr. Cooper's failure to

13   recognize that he should not have used any file in which

14   people with the name Colby were called Latino.

15   Q.  Is it your understanding that he used, when he's

16   determining the registered voter population he included

17   people with the last name Colby?  I believe you mentioned

18   earlier that he was using the file that was properly coded,

19   was that right?

20   A.  From what he says in footnote 7, if I were to

21   believe what he said in footnote 7, the answer to your

22   question would be yes, he used it in a proper fashion.  If I

23   read paragraph 42, I would conclude that he used the

24   voter -- he had a voter turnout file that was improperly

25   coded.  And I know that when you work with these files, what

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 274

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                    Page 114

 1    you have is a single file of registered voters and then you

 2    have a variable that is telling you whether or not that

 3    registered voter turned out and was a, a turnout voter in a

 4    particular election.  So the record would be a single

 5    record.

 6            And what he seems to be saying is if it was a

 7    registrant, I didn't have any Colbys, but when I went

 8    through the registrants and I picked out the subset of

 9    registrants who turned out in an election, I included the

10    Colby.  And I'm trying to figure out how you would do

11    it -- not do it in one case but do it in the other when

12    you've only got one record.  Colby is there and in the file

13    you've either said I'm going to count Colby as a Spanish

14    surname person, even though it's not Spanish surname or not.

15    And then if I say it's Colby, did he turn out in an

16    election, either he did or he did not but it's the same

17    record.

18        Q.  So I believe you would testify then that the voter

19    registration file was properly coded, and I believe that was

20    the word that you used.

21        A.  That's what he says in footnote 7.  What he says, he

22    doesn't say it was properly coded.  He says I did not use

23    the improperly coded voter.

24        Q.  So it seems to be that you take issue with his use

25    what you call improperly coded voters in the voter turnout

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                        Page 115

 1   file.

 2       A.  Well, from what he says, he says in his report

 3   here, "I understand" --

 4             MR. FLOYD:  Where are you referencing?

 5       A.  I'm sorry, in paragraph 42 of his first report he

 6   says, "I understand that the Yakima County Board of

 7   Elections records these voters, et cetera and then he says,

 8   "I used this file."

 9       Q.  For what?

10       A.  "To identify additional Latino voters not matched

11   with the surname method."

12       Q.  Do you know for what purpose it was --

13       A.  I don't know.  He said he used the file.

14       Q.  Assuming for the moment that Mr. Cooper did not

15   include what you call improperly coded individuals in the

16   voter registration files that he examined, would you say

17   looking solely at his determination of voter registration,

18   that his calculation of Latino registered voters is correct?

19             MR. FLOYD:  Object to the form of the question.

20       A.  I would say under the hypothetical you posed, yes.

21       Q.  Did you raise any objections or any, sorry -- strike

22   that -- any dispute with Mr. Cooper's methodology for

23   determining the number of Latino registered voters in your

24   first report?

25       A.  No, I did not.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 276

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 116

1      Q.  Did you raise any dispute in your second report?

2      A.  Not to my recollection.  I know that this has been a

3   concern.  The only thing I can't be sure of is whether I

4   mentioned it in my report.  I know I wanted -- what I do

5   recall is wanting to have clarification on the issue because

6   I really didn't know what he'd done.  And so it wasn't that

7   I had said I'm troubled but because I don't know what he

8   did, I simply said I don't know what he did and I'm kind of

9   waiting to hear the answer in his deposition.

10     Q.  Did you discuss the voter registration numbers at

11  all in either of your reports?

12     A.  No.

13     Q.  Did you say that I'm concerned that I don't know

14  what Mr. Cooper did when it came to calculating voter

15  registration in his reports?

16         MR. FLOYD:  Object to the form of the question

17  and argumentative.

18     Q.  You can answer the question.

19     A.  No, I did not.

20     Q.  Did you understand that Mr. Cooper's calculations of

21  the number of Latino registered voters in District 1 in his

22  illustrative plans was relevant to his conclusion regarding

23  Gingles 1?

24     A.  Well, it added an additional element of information

25  and it could be interpreted in any of several ways.  I would

MORRISON, PETER 1                                        May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                        Page 117

 1   say I'd rather have the number than not have the number in

 2   this context simply because it gives us more information

 3   about what might be going on.

 4       Q.  Did you understand Mr. Cooper to believe that his

 5   determinations of voter registration data was relevant to

 6   his conclusions regarding Gingles 1?

 7       A.  I think he sees it as relevant, yes.

 8       Q.  And you understood that when you first read his

 9   initial report?

10       A.  Yes.

11       Q.  Turning to page 22 of Mr. Cooper's original report,

12   Exhibit 1.  Do you dispute that the number of Latino

13   registered voters or the percent of Latino registered voters

14   in District 1, in illustrative plan 1, is 51.66 percent?

15           MR. FLOYD:  Object to the form of the question.

16   Compound.  Go ahead and answer.

17       A.  Do I object to --

18       Q.  Do you dispute that number?

19       A.  No, I don't dispute that.  With the caveat that I'll

20   assume for the moment that there are none of the -- that the

21   column to the right in figure 9, the 51.6 does not include

22   any registrants without Spanish surnames.

23       Q.  So assuming that no Colbys are included in the

24   Latino registered voter count?

25       A.  Right.

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                             Page 118

 1      Q.  And so do you dispute that District 2 in
 2   illustrative plan 1 has a percentage of Latino registered
 3   voters of 51.03 percent?
 4      A.  No, under the same set of conditions, no.
 5      Q.  Under the same set of assumptions on page 24,
 6   looking at illustrative plan 2.  Do you dispute that the
 7   percentage of Latino registered voters is 51.86 in District
 8   1?
 9      A.  No.
10      Q.  And do you dispute that the percentage of Latino
11   registered voters is 50.56 in District 2?
12      A.  No.
13      Q.  I'm going to turn to page 12 of Exhibit 4, which is
14   Mr. Cooper's supplemental declaration.
15      A.  All right.
16      Q.  Assuming that Mr. Cooper used the same methodology
17   to determine the number of Latino registered voters in each
18   district, do you have any reason to dispute that the
19   percentage of Latino registered voters in District 1 in
20   hypothetical plan A is 54.56 percent?
21      A.  Under the same, with the same caveat, that assuming
22   there are no -- what was that surname we're working with.
23      Q.  Colby.
24      A.  No Colbys as we're using the term.  No Colbys
25   involved, no, I do not dispute it.

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 119

1      Q.  And do you have any reason to dispute that District

2  2 in hypothetical plan A has percentage of Latino registered

3  voters at 50.1 percent?

4      A.  No, I do not.

5      Q.  Move on to page 11 of your report -- sorry, on

6  Exhibit 2, yeah, your report.

7      A.  First report?

8      Q.  Your first report.  On page 11 you discuss the

9  difference between current residence and usual place of

10  residence.  Can you explain this difference as it's used

11  between the census and the ACS?

12      A.  Sure.  The census, the decennial census asks you on

13  April 1st, as of April 1st what is your usual place of

14  residence, which is interpreted to mean where do you

15  ordinarily reside or sleep.  And the ACS question is where

16  do you live now, where have you lived for at least two

17  months, or as I recall intend to live for two months.  So

18  there's kind of a two month to four month time frame.

19          Now, this may sound like a fine distinction, but

20  these two different residence rules are extremely important

21  under certain circumstances.  One circumstance would be

22  obvious to us as snowbirds in the Midwest who spend some

23  number of months in Arizona every year and it's the same

24  months and if you ask them what their usual place of

25  residence is, they might say Minnesota.  And if you sent the

MORRISON, PETER 1                                        May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                        Page 141

 1   it's not something you'd say well, gee, I don't really

 2   remember did I do that.  It was five years ago.  It's not

 3   something that one who has done it would take lightly.  As

 4   though if you were asked are you married, you say well, let

 5   me think a minute.  I can't remember.

 6         So on that basis I would say people who haven't

 7   answered and people who have given inconsistent answers are

 8   all part of a group where something is wrong with the

 9   measurement, and one has to infer whether it was just a

10   random accident but they really were citizens and you

11   shouldn't worry about it.  They just didn't fill out the

12   form right, which is always a possibility.  But I would say

13   it could be anywhere from, you know, 41 on down but I

14   wouldn't rule out 41 as a possibility.

15      Q.  Can you say for certain that District 1 in

16   illustrative plans 1 and 2 includes 41 people who are

17   wrongly classified as citizens?

18      A.  I can't say that with any certainty, no.

19         MS. KHANNA:  I think we can go ahead and take

20   our break.

21         MR. FLOYD:  Thank you.

22         (Recess taken 2:04 p.m. to 2:18 p.m.)

23   BY MS. KHANNA:

24      Q.  In paragraph 37A of your initial report, Exhibit 2

25   you state that the odds are 56 to 44 that District 1 in

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 281

MORRISON, PETER 1                                        May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 142

1   Mr. Cooper's illustrative plans is actually a majority of

2   Hispanics district.  How did you calculate those odds?

3       A.  It's very, very complicated to explain how you

4   calculate this.  I was referring to another plan with the

5   district that had a margin that was approximately that thin

6   and the odds are in the vicinity of 56, 44, but the

7   calculation itself entails a procedure that actually my

8   statistician colleague and I have been working on and

9   writing a paper about.  And I simply couldn't explain it to

10  you, you wouldn't understand it and I only understood it

11  recently after he showed it to me.  But basically there is a

12  way to do it and it's in the vicinity of 56 to 44, to say

13  plus or minus a few percentage points.  And I wouldn't want

14  to say that's exactly what it is, but the odds are -- from a

15  legal standpoint the odds are sort of in the range of

16  likelier than not but not beyond a reasonable doubt.

17      Q.  So you would determine that likelier than not?

18      A.  Yeah.

19      Q.  But not beyond a reasonable doubt?

20      A.  Yeah.

21      Q.  And so you said that you're in the process of

22  working on a paper.  Is that what you meant by your

23  preliminary calculations?

24      A.  That's part of what I meant.  But I'm just saying

25  the method itself is one that we are actually -- the method

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 282

MORRISON, PETER 1                                    May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 143

 1   for coming up with an estimate is a methodology that we are
 2   refining and trying out in different context to see how it
 3   works and to see that it does work and gives plausible
 4   results that are not inconsistent.  And when I said this
 5   calculation we were not as far along with the paper as we
 6   are now.  We are getting ready to submit it to a journal.
 7   And so what I am saying is I would stay with 56 to 44 for
 8   now as my preliminary estimate of odds and I would say that
 9   all that matters is that the odds are better than 50/50 but
10   not by a lot.
11       Q.  What are the odds that District 1 in Mr. Cooper's
12   hypothetical plan A is actually majority Hispanic?
13       A.  I think that's what these odds are.
14       Q.  I believe these are out of illustrative plans 1 and
15   2.
16       A.  I'm sorry, you're talking hypothetically.
17       Q.  Hypothetically.
18       A.  I'm sorry, I haven't calculated that.
19       Q.  District 1 in illustrative plan 1 has a Latino CVAP
20   population percentage of 50.25 percent using Mr. Cooper's
21   methodology; is that right?
22       A.  Which page are you on?
23       Q.  I'm on page 22 of the original report, Exhibit 1.
24       A.  I'm sorry, you say it's 50.25.
25       Q.  50.25 is District 1 in illustrative plan 1.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 283

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                            Page 144

1        A.   That's what he shows, yes.

2        Q.   You say there's a 56 to 44 odds that that is a

3    majority Hispanic district?

4        A.   Yes.

5        Q.   Page 24, the same report.

6        A.   Yeah.

7        Q.   District 1 in illustrative plan 2 has a Latino CVAP

8    of 50.13 percent.

9        A.   Uh-huh.

10       Q.   That's using Mr. Cooper's calculations?

11       A.   Right.

12       Q.   His methodologies?

13       A.   Yes.

14       Q.   And you say there's a 56 to 44 percent -- the odds

15   are 56 to 44 that's actually a majority Latino district?

16       A.   Oh, I see.  You're saying that I'm applying 56 to 44

17   to both of those, to each of the plans.

18       Q.   I'm asking if that's the case.

19       A.   Yeah, yeah, I would say that's a reasonable

20   preliminary estimate for each of them.  The odds will be

21   closer to 50/50 for the plan 2 than plan 1 but they're in

22   this range.  I'd say -- the way I would characterize the

23   odds -- the meaningful conclusion that would come out of

24   this is not that it's exactly 56, 44 because that could go

25   up or down a percentage point or two or three, but what it

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 284

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 145

1    says is the odds are better than 50/50 but not by much.

2        Q.  So looking now at the supplemental, Mr. Cooper's

3    supplemental declaration, Exhibit 4, page 12 and I'm looking

4    at hypothetical plan A.

5        A.  Right.

6        Q.  District 1 in hypothetical plan A has a Latino CVAP

7    of 52.17 using Mr. Cooper's CVAP methodology.

8        A.  Right.

9        Q.  Could you guess at whether the odds are better or

10   worse than 56 to 44?

11       A.  The odds would be better than 56 to 44 simply

12   because the percentage is higher.  How much higher they

13   would be, I don't know.  I understand that the odds here,

14   we're referring to the odds that reflect exclusively the

15   uncertainty associated with margins of error.  It has

16   nothing to do with the other nonsampling error concerns that

17   I have.

18       Q.  Please turn to page 22 of the supplemental report,

19   Exhibit 4, hypothetical plan B.  And you see District 1 in

20   hypothetical plan B has a Latino CVAP percentage of 52.12

21   percent?

22       A.  Yes.

23       Q.  What would you say are the odds of this being

24   actually minority district?

25       A.  The odds would be much better.  I haven't calculated

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 285

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

Page 146

1  them but there's no question that they would be much better.

2           MR. FLOYD:  You're talking about 37A odds?

3  You're not talking about general odds?

4           MS. KHANNA:  I'm talking about the same criteria

5  used in 37A.

6      A.  Yeah, the odds here would be well above 50/50 for

7  figure 11, District 1.  Again, just exclusively counting

8  for, you know, sampling error.

9      Q.  So previously you said that the odds for

10  illustrative plans 1 and 2 are more likely than not but not

11  beyond a reasonable doubt?

12     A.  Correct.

13     Q.  How would you characterize that same odds for

14  hypothetical B?

15     A.  For hypothetical plan B I don't want to give a firm

16  conclusion.  But one has a much stronger confidence of a

17  majority when you have it as high as 56.12 before you start

18  to account for errors in the data.  Based purely on sampling

19  error, you know, 56.12 would be, you know, would be, would

20  leave not much doubt in my mind that there was a majority.

21     Q.  Can you turn to page 25 of Exhibit 4.  Here we have

22  hypothetical plan C.  District 1 in hypothetical plan C has

23  a percentage of Latino CVAP, or the Latino percentage of the

24  CVAP is 57.74 percent; is that right?

25     A.  Correct.

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                          Page 158

1     A.  No, I do not.

2     Q.  Do you dispute that it is possible to create at

3  least one district in the city of Yakima in which Latinos

4  comprise a majority of registered voters?

5     A.  Again with the caveat that the surname issue that we

6  were -- the Colby problem is absent, I would not dispute it,

7  no.

8     Q.  With that same caveat, do you dispute that it is

9  possible to draw at least two districts in the city of

10  Yakima in which Latinos form a majority of registered

11  voters?

12     A.  I know I saw one here somewhere.  If you could

13  direct me to the plan that shows that.

14     Q.  If you can turn to page 22 of Exhibit 1.

15     A.  Right.

16     Q.  Illustrative plan 1.

17     A.  No.  With that caveat, no, I would not dispute.

18     Q.  Move on to the section of your report entitled

19  Unequally Weighted Votes in Different Districts.  We've

20  already talked about this issue a fair bit, so I'll try to

21  move through this kind of fast.

22     A.  Sure.

23         MR. FLOYD:  Which report?

24         MS. KHANNA:  Sorry, this is his initial report,

25  Exhibit 2.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 287

MORRISON, PETER 1                                          May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                            Page 209

 1    STATE OF WASHINGTON )
                          ) ss
 2    County of KING      )

 3

 4            I, Mary W. Miller, a Washington Certified Court
      Reporter, pursuant to RCW 5.28.010 authorized to administer
 5    oaths and affirmations in and for the State of Washington,
      do hereby certify:

 6

              That the annexed and foregoing deposition of
 7    PETER MORRISON was taken before me and completed on May 9,
      2013, and thereafter was transcribed under my direction;

 8

              I further certify that according to CR 30 (e) the
 9    witness was given the opportunity to examine, read and sign
      the deposition after the same was transcribed, unless
10    indicated in the record that the review was waived;

11            I further certify that I am not a relative or
      employee of any such attorney or counsel, and that I am not
12    financially interested in the said action or the outcome
      thereof;

13

              I further certify that the witness before
14    examination was by me duly sworn to testify the truth, the
      whole truth and nothing but the truth;

15

         I further certify that the deposition, as transcribed,
16    is a full, true and correct transcript of the testimony,
      including questions and answers, and all objections, motions
17    and exceptions of counsel made and taken at the time of the
      foregoing examination and was prepared pursuant to
18    Washington Administrative Code 308-14-135, the transcript
      preparation format guideline.

19

              IN WITNESS WHEREOF, I have hereunto set my hand
20    this 17th day of May, 2013.

21

22

                        Mary W. Miller
23                      Certified Court Reporter in and for the State
                        of Washington, residing at Issaquah.

24

25

PETER MORRISON                                        May 9, 2013
MONTES vs. CITY OF YAKIMA

                                                      Page 210

1                      DEPOSITION ERRATA SHEET
2          Our Assignment No.  431811
           Case Caption:   ROGELIO MONTES v CITY OF YAKIMA
3
              DECLARATION UNDER PENALTY OF PERJURY
4
              I declare under penalty of perjury
5         that I have read the entire transcript of
          my Deposition taken in the captioned matter
6         or the same has been read to me, and
          the same is true and accurate, save and
7         except for changes and/or corrections, if
          any, as indicated by me on the DEPOSITION
8         ERRATA SHEET hereof, with the understanding
          that I offer these changes as if still under oath.
9
          Signed on the   17th day of  June        , 2013.
10

11
                          PETER MORRISON
12
13                     DEPOSITION ERRATA SHEET
14
          PLEASE SEE ATTACHED ERRATA SHEET

ESQUIRE SOLUTIONS                          800.211.DEPO (3376)
                                           EsquireSolutions.com

## Deposition Errata Sheet -Deposition of Peter A. Morrison

| Page | Line | Correction | Reason for Change |
|------|------|------------|-------------------|
| 9 | 13 | Change "implied" to "applied" | Mistranscribed |
| 50 | 1 | Change "a" to "at" | Mistranscribed |
| 54 | 13 | Change "means" to "meanings" | Mistranscribed |
| 83 | 20 | Change "in" to "and" | Mistranscribed |
| 83 | 21 | Add comma after "population" | To clarify meaning |
| 85 | 5 | Change "irregular liability" to "greater reliability" | Mistranscribed |
| 86 | 12 | Change "weaves" to "weeds" | Mistranscribed |
| 87 | 9 | Change "buy" to "bias" | Mistranscribed |
| 88 | 9 | Change "saying. But" to "saying: But…" | To clarify meaning |
| 88 | 14 | add close quote after "table." | Mistranscribed |
| 91 | 20 | Change "context" to "contexts" | Mistranscribed |
| 92 | 9 | Question: Was the percentage actually stated here "50.18" rather than "51.8"? | Possibly mistranscribed? |
| 96 | 5 | Same question: "50.18" rather than "51.8" ? | Possibly mistranscribed? |
| 101 | 25 | Change "in" to "and" | Mistranscribed |
| 138 | 7 | Change "non Hispanics white" to "non-Hispanic whites" | Mistranscribed |
| 194 | 2 | Change "owners" to "voters" | Mistranscribed |

Signature: *[signature]*

Date: June 17, 2013

Corrections to Morrison Deposition.xlsx

Exhibit 8

Cooper, William S.                                    May 8, 2013

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF WASHINGTON

_____

ROGELIO MONTES and MATEO        )
ARTEAGA,                        )
                                )
        Plaintiffs,             )
                                )
    vs.                         )
                                )
CITY OF YAKIMA, MICAH           )    No. CV-12-3108-TOR
CAWLEY, in his official         )
capacity as Mayor of            )
Yakima, and MAUREEN             )
ADKISON, SARA BRISTOL,          )
KATHY COFFEY, RICK ENSEY,       )
DAVE ETTL, and BILL             )
LOVER, in their official        )
capacity as members of          )
the Yakima City Council,        )
                                )
        Defendants.             )
_____

DEPOSITION UPON ORAL EXAMINATION OF

WILLIAM S. COOPER

_____

Taken at Floyd, Pflueger & Ringer

200 W. Thomas Street

Seattle, Washington

DATE TAKEN:   May 8, 2013

REPORTED BY:  Mary A. Whitney, CCR - WCRL #2728

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 291

Cooper, William S.                                      May 8, 2013

```
                                                             Page 2

 1
 2                         APPEARANCES
 3
 4    FOR THE PLAINTIFFS:     ABHA KHANNA, ESQ.
 5                           KEVIN J. HAMILTON, ESQ.
 6                           WILLIAM (BEN) STAFFORD, ESQ.
 7                           Perkins Coie
 8                           1201 Third Avenue | #4800
 9                           Seattle, WA  98101
10                           (206) 359-8312
11                           akhanna@perkinscoie.com
12                           khamilton@perkinscoie.com
13                           wstafford@perkinscoie.com
14
15    FOR THE DEFENDANTS:     FRANCIS S. FLOYD, ESQ.
16                           JOHN A. SAFARLI, ESQ.
17                           Floyd, Pflueger & Ringer
18                           200 W. Thomas Street | #500
19                           Suite 500
20                           Seattle, WA  98119
21                           (206) 441-4455
22                           ffloyd@floyd-ringer.com
23
24    (Cont'd)
25
```

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 292

Cooper, William S.                                          May 8, 2013

Page 3

1

2                      APPEARANCES - (Cont'd)

3

4

5    ALSO PRESENT:              PETER A. MORRISON, Ph.D.

6

7

8                              -o0o-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 293

Cooper, William S.                                          May 8, 2013

                                                                Page 6

 1          SEATTLE, WASHINGTON; WEDNESDAY, MAY 8, 2013

 2                         10:00 A.M.

 3                          -o0o-

 4   WILLIAM S. COOPER,          witness herein, having been

 5                               first duly sworn on oath,

 6                               was examined and testified

 7                               as follows:

 8

 9                         EXAMINATION

10   BY MR. FLOYD:

11       Q.   Mr. Cooper, would you please state your full

12   name for the record and your current professional

13   address.

14       A.   My name is William Sexton Cooper, and

15   my address is 525 Garden Lane, Bristol, Virginia.

16   24201.

17       Q.   And is that your professional and your

18   residence address?

19       A.   Right.

20       Q.   You work out of your home, then?

21       A.   Right.

22       Q.   Are you married?

23       A.   No, I'm not.

24       Q.   And what is your age?

25       A.   I am 58.  Finished.  Over the hill.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 294

Cooper, William S.                                    May 8, 2013

Page 78

1              That's not to say that the Supreme Court

2     couldn't rule otherwise, but as it now stands,

3     that's what you do, that's what the City of Yakima

4     has done, and I see no reason to explore it any

5     further.

6         Q.   All right.

7              We talked about compactness, correct, earlier?

8         A.   Right.

9         Q.   Do you have anything else to add on

10    compactness other than what you have discussed so

11    far?

12        A.   No.  I mean, I -- you can visually look at

13    these districts and see that they are reasonably

14    shaped, and in many instances -- well, in almost all

15    instances, follow primary road and precinct lines.

16    They're not oddly shaped.

17             I've looked at thousands and thousands of

18    districts around America, and these districts are not

19    at all problematic from a standpoint of the shell case

20    and compactness.  In fact, districts 1 and 2, just

21    in terms of land area covered, are much more

22    compact than the other districts in the plans I've

23    developed.

24        Q.   Did you try to avoid splitting precincts when

25    you were drawing your lines?

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 295

Cooper, William S.                                    May 8, 2013

Page 79

 1      A.    To a certain extent, yes.

 2      Q.    Why?

 3      A.    It's just always best -- if you can follow a

 4   precinct line, it's always best to try to follow one.

 5      Q.    You talked about the bias that can occur

 6   when you split up a block group, correct?

 7      A.    Well, only as it relates to calculating the

 8   LCVAP.  Other than that, there's no bias introduced

 9   for -- just for the straight up 2010 population.

10   Block groups are routinely split, but normally I would

11   not focus very much on split block groups if I were

12   drawing a voting plan.

13      Q.    Did you look to see how many block groups you

14   split in each of your plans?

15      A.    No.

16      Q.    Was that a concern of yours?

17      A.    I mean, the only time I really looked at

18   block group data from that perspective, in terms of

19   splits, really was in response to Dr. Morrison's

20   report.

21      Q.    What is the lowest level of data for

22   citizenship that is available?

23      A.    The American Community Survey block group

24   level, the citizenship special tabulation.

25      Q.    So that would be the ACS block group,

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 296

William S. Cooper                                            May 8, 2013

\_1

2                        SIGNATURE

3

4

5          I declare under penalty of perjury under

6     the laws of the State of Washington that I have read

7     my within deposition, and the same is true and

8     accurate, save and except for changes and/or

9     corrections, if any, as indicated by me on the

10    CHANGE SHEET flyleaf page hereof.

11

12

                    Signed in Bristol, Virginia,
                    .........

14    on the ...5th ..... day of ...June........, 2013.

15

16

17

18

19          *William S. Cooper*
            .......................

20                 WILLIAM S. COOPER

21                 TAKEN:  May 8, 2013

22

23

24    Mary A. Whitney, CCR - WCRL #2728

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com        206.622.6661 * 800.657.1110    FAX: 206.622.6236

Cooper, William S.                                    May 8, 2013

                                                        Page 153

 1                        CERTIFICATE

 2

 3   STATE OF WASHINGTON    )

 4                          )    ss.

 5   COUNTY OF KING         )

 6          I, the undersigned Washington Certified Court

 7   Reporter, hereby certify that the foregoing deposition

 8   upon oral examination of WILLIAM S. COOPER was taken

 9   stenographically before me on May 8, 2013, and

10   thereafter transcribed under my direction;

11          That the witness, before examination, was

12   first duly sworn by me pursuant to RCW 5.28.010 to

13   testify truthfully; that the transcript of the

14   deposition is a full, true, and correct transcript to

15   the best of my ability; and that I am neither attorney

16   for, nor relative or employee of any of the parties to

17   the action, or any attorney or counsel employed by the

18   parties hereto, nor financially interested in its

19   outcome.

20          IN WITNESS WHEREOF, I have hereunto set my

21   hand this 15th day of May, 2013.

22

23                          /s/ Mary A. Whitney
                            ---------------------------
24

25   Mary A. Whitney, CCR - WCRL #2728

          SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110    FAX: 206.622.6236

William S. Cooper                                          May 8, 2013

| 1 | C H A N G E   S H E E T |
|---|---|

2

3    PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS
     SHEET, INDICATING PAGE, LINE, AND CORRECTION/REASON

4

5

| | PAGE / LINE | CORRECTION/REASON |
|---|---|---|
| 6 | 13/10 | reads "difference" should read "district" / TYPO |
| 7 | 13/10 | reads "color" should read "coloring"/TYPO |
| 8 | 23/12 | reads "pretty clear" should read "pre-cleared" /TYPO |
| 9 | 43/17 | reads "a portion of the base" should read "an "apportionment base" /TYPO |
| 10 | 55/1 | reads "notice" should read "website"/TYPO |
| 11 | 62/16 | reads "licensing" should read "elections"/TYPO |
| 12 | 68/14 | reads "present" should read "component" /TYPO |
| 13 | 71/17 | reads "column" should read "prong" /TYPO |
| 14 | 72/15 | reads "50.02" should read "50.25"/TYPO or MISSPOKE |
| 15 | 76/19 | reads "A" should read "E"/TYPO or MISSPOKE |
| 16 | 78/19 | reads "shell" should read "Shaw"/TYPO |
| 17 | 91/10 | reads "legislators" should read "legislatures" /TYPO |
| 18 | 96/6 | reads "Plan 1" should read "Plan A" /TYPO or MISSPOKE |
| 19 | 108/18 | reads "C and D" should read "B and C" /TYPO or MISSPOKE |
| 20 | 122/7 | reads "57.74%" should read "56.12%"/MISSPOKE |
| 21 | 136/9 | reads "districts 4, 5, 6, and 7" should read "districts 3, 5, 6, and 7"/ MISSPOKE |
| 22 | 139/23 | reads "population" should read "large populations"/TYPO or MISSPOKE |

William S. Cooper                                              May 8, 2013

Page156-2

```
 .1                 C H A N G E    S H E E T

  2

  3        PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS
        SHEET, INDICATING PAGE, LINE, AND CORRECTION/REASON
  4
     -------------------------------------------------------------
  5
           PAGE / LINE              CORRECTION/REASON
  6

  7    141/10-11    reads "diverse and geographic it can" should read "numerous and geographically compact
                    one can"/TYPO

  8    141/11-12    reads "single-majority Latino district" should read "single majority-Latino district"/TYPO

  9    147/24       reads "non-Hispanic, white" should read "Hispanic"/TYPO or MISSPOKE

 10

 11

 12

 13

 14

 15                      William S. Cooper
 16
                         WILLIAM S. COOPER
 17
                         TAKEN:  May 8, 2013
 18

 19

 20

 21

 22

 23
        Re:  Montes vs. Yakima
 24          USDC/EasternWA - No. CV-12-3108-TOR

 25    Mary A. Whitney, CCR - WCRL #2728
```

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 300

Exhibit 9

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| **ROGELIO MONTES and MATEO ARTEAGA,** | § § § | |
| **Plaintiffs,** | § § | |
| **vs.** | § § | **NO: 12-CV-3108-TOR** |
| **CITY OF YAKIMA,** *et al*, | § § | |
| **Defendants** | § | |

## <u>REPORT OF JOHN ALFORD, Ph.D.</u>

I have been retained as an expert by the city of Yakima, Washington. My rate of compensation is $400 per hour. I am a tenured associate professor of political science at Rice University. At Rice, I have taught courses on redistricting, elections, political representation, voting behavior, and statistical methods at both the undergraduate and graduate level. Over the last twenty-five years, I have worked with numerous local governments on districting plans and on Voting Rights Act issues. I have previously provided expert reports and/or testified as an expert witness in voting rights and statistical issues in a variety of court cases, working for the U.S. Attorney in Houston, the Texas Attorney General, members of the U.S. Congress, and various cities and school districts. In the 2001 round of redistricting, I was retained as an expert to provide advice to the Texas Attorney General in his role as Chair of the Legislative Redistricting Board. I subsequently served as the expert for the State of Texas in the state and federal litigation involving the 2001 redistricting for U.S. Congress, the Texas Senate, the Texas House of

Representatives, and the Texas Board of Education, and my testimony was cited by the Court as helpful in their drawing of the US House district map for the 2002 elections. When that court-drawn map was replaced in 2003 with a legislative map (the so called Delay plan), I testified for a group of US House members that were successful in overturning parts of the new map.  I am currently an expert for the State of Texas in the consolidated cases challenging the 2011 statewide redistricting.  I have worked as an expert in redistricting and voting rights cases in New Mexico, Mississippi, Wisconsin, Florida, and Alabama.  The details of my academic background, including all publications in the last ten years and work as an expert, including all cases in which I have testified by deposition or at trial in the last four years, are covered in the attached vita (Appendix B).

I have been retained as an expert to provide an analysis of the *Gingles* test (focusing primarily on prongs two and three) and the totality of circumstances as they apply to elections in the city of Yakima.  In preparing this report I have relied on the expert reports and various data files relevant to the preparation of their reports provided in this case by Dr. Richard Engstrom and Mr. William Cooper, data and materials available on the website of the Yakima County Elections Department, and precinct level computations of the proportion of voters with Spanish surnames calculated by Dr. Peter Morrison and by William Cooper.

### *Gingles* Two and Three

Ecological Inference (EI) results for seven elections from 2009 to 2012 are presented in the table included with Professor Engstrom's report.  The Ecological

2

Inference estimates from his report are reprinted here in Table 1 below.  In addition, Dr. Engstrom's EI results are supplemented with an independent replication of the same EI estimations using the same data provided by the plaintiffs.  Two other techniques commonly used in VRA lawsuits to assess voter cohesion and polarization – homogeneous precinct analysis and ecological regression (ER) – are also provided for comparison.

### A.  Homogeneous Precinct Analysis

Homogeneous precinct analysis, also referred to as extreme precinct analysis, is the simplest technique used to assess voting patterns.  Precincts are selected that all share very high levels of minority voters (typically 90% or above) and the voting results for the minority candidate in the election are compared to precincts selected on the basis of very low minority percentages (typically 10% or less).  This allows a comparison the patterns of support for a minority candidate between a set of homogeneously minority voting precincts and a set of homogeneously non-minority voting precincts.

In this case we can use this technique to assess non-Hispanic voting behavior, as in more than half of all the voting precincts less than 10% of the voters casting ballots have Spanish surnames.  Unfortunately, we cannot do the same for Hispanic voters.  In no precinct in any of the elections covered here do 90% or more of the voters have Spanish surnames.  In fact not a single precinct even reaches 50% Spanish surname voters (and only one precinct exceeds 30%).  This is unusual and problematic.  It is problematic because it reduces our ability to accurately assess the cohesion of Hispanic voters.  It is also unusual given that the plaintiffs' claim to be able to draw two districts that will be Hispanic majority districts.  In both versions of District 1 in Mr. Cooper's

3

report precincts 101 and 104 are mostly contained within District 1, and together account for the majority of the geography of the district.  In these precincts the percentage of Spanish surname voters in the 2009 Rodriquez general election contest was 20.1% and 15.3% respectively.   Similarly, in both versions of District 2 in Mr. Cooper's report precincts 120 and 126 are mostly contained within District 2, and together account for the majority of the geography of district.  In these precincts the percentage of Spanish surname voters in the 2009 Rodriquez general election contest was 26.4% and 30.3% respectively.

Mr. Cooper reports that the 2010 Census for Yakima indicates that Hispanics comprise 41.3% of the population of Yakima, and that this Hispanic population is concentrated primarily in eastern Yakima, where Mr. Cooper locates his two demonstration districts.  The fact that not a single precinct in Yakima turns out a Hispanic majority of voters in an actual election seems very unlikely, given the numerousness and concentration that the overall population levels and geographic concentration would suggest.  The explanation for this disconnect can be found in two sources.  The Hispanic population is younger and much less likely to be citizens in comparison to the non-Hispanic population.  This alone reduces the Hispanic concentration from over 40 percent of the total population to only 21.6% of the adult citizen population.  The Hispanic proportion of registered voters, at 18.5%, is close to what we would expect given the eligible population percent.  It is principally the low levels of Hispanic turnout that reduce the share of actual voters to levels typically below 7%.

4

### B.  Ecological Regression Analysis

Ecological regression analysis is the other technique commonly used in VRA lawsuits to assess voter cohesion and polarization.  In a nutshell, regression is a mathematical technique for estimating the single best fitting straight line that could be drawn to describe the relationship between two variables in a scatter plot.  Ecological regression is distinct from simple regression in the fact that it relies on a data set made up of precinct level aggregations of voters and election results, rather than a data set of individual voter characteristics and vote choices.

Applied to voting rights cases, the logic of regression analysis is to determine to what degree, if any, the vote for a candidate increases in a linear fashion as the concentration of voters of a given ethnicity in the precincts increases.  The estimated coefficients for the intercept and for the slope form the estimated equation of the actual regression line, with the intercept defining the point at which the line crosses the vertical axis, and the slope indicating rise over run.  More intuitively, the intercept tells us the predicted value of the dependent variable when the independent variable is equal to zero, or in this case the predicted share of the vote for the Hispanic candidate when the percent of actual voters that with Spanish surnames in a precinct is zero.  Similarly, the slope tells us the predicted change in the dependent variable for a one unit change in the independent variable, or in this case the predicted change in the vote for the Hispanic candidate for a one percentage point change in the percent of the actual voters that have Spanish surnames in the precinct.  By using the slope and the intercept we can compute an estimate for the vote for the Hispanic candidate when the percent of the voters in a precinct with Spanish surnames equals 100.  This estimate is then an estimate of Hispanic

5

(or at least Spanish surname) voting cohesion for the candidate. Similar procedures can be used to access non-Spanish surname (our proxy for non-Hispanic) voting cohesion.

In addition to the estimates of Hispanic and non-Hispanic voting generated from the regression estimates for the slope and intercept, there is also a measure of the overall 'goodness of fit' for the regression line called the '$R^2$' that is typically reported. The $R^2$ ranges from 0 to 1.0, and is generally used as a "goodness-of -fit" measure to describe how tightly the actual data points are clustered around the regression line. The can be interpreted as the proportion of variation in the dependent variable that is explained or accounted for by the independent variable. In this case, the proportion of the variation in the percentage of the votes cast for the Hispanic candidate that can be explained by variation in the percentage of voters in a precinct that have Spanish surnames. For example, an $R^2$ close to zero would indicate that the ethnicity of voters was not linearly related to variation support for the Hispanic candidate. Similarly, an $R^2$ closer to 1.0 would indicate that the ethnicity of voters was very closely related (linearly) to variation support for the Hispanic candidate. An $R^2$ of .50 would indicate that about half of the variation support for the Hispanic candidate could be accounted for by variations in the ethnicity of voters, and the remaining half could be attributed to other factors impacting vote choice.

### C.  Ecological Inference Analysis

Dr. Engstrom relies on the most recent methodology for the analysis of ecological data - Gary King's Ecological Inference (EI) procedure. This approach utilizes a combination of a method of bounds analysis, combined with a more traditional statistical method, to improve on standard ecological regression. While the details are

6

mathematically complex, the differences mostly center on utilizing bounds information contained in individual precinct results that would not be exploited in ecological regression, and by not imposing a linear constraint on the pattern across precincts.

**D.  Election Analysis Results**

As is clear from Table 1 below, the results from each of the three analytical methods are substantively very similar.  For the seven election contests the average estimate of non-Hispanic support for the Hispanic candidate (or 'yes' vote on Proposition 1 in 2011) is 34.8% based on the homogeneous precinct method, 33.3% based on the EI method (32.9 Engstrom EI), and 32.5% based on the ER method.  Turning to Hispanic cohesion we have only the estimates from the EI and ER analysis (due to the lack of homogenously Hispanic precincts).  Again, the results from each of these analytical methods are substantively very similar. For the seven election contests the average estimate of Hispanic support for the Hispanic candidate (or 'yes' vote on Proposition 1 in 2011) is 70.9% based on the EI method (73.3 Engstrom EI), and 75.0% based on the ER method.

The fact that the replication of the EI analysis reported here does not exactly match the estimates reported by Dr. Engstrom may seem unusual, but this is actually what we would expect.  EI utilizes a repeated series of simulations to converge on a resulting estimate, and as such will produce modestly different results each time it is run, even on exactly the same data set.  In this case, running EI repeatedly for the 2009 Rodriguez primary contest, and using a limit of 100 simulations (as does Dr. Engstrom), produced estimates of Hispanic vote for Rodriguez that vary from 49.1 percent to 54.5 percent (these results, along with the EI output that is summarized in Table 1 below, are

7

included in the attached Appendix A). To reduce this inherent instability of the estimates, the replications reported here for EI are based on 1000 simulations, an increase that should produce an approximate doubling in the stability of the estimates.

In general terms the results in Table 1 suggest a mixed pattern. The range of values for the $R^2$ indicate that the influence of the ethnicity of voters on their vote choice is both highly variable (ranging from only 4% to 54%) and typically not very strong (the average for the seven elections is 27% and only in the two 2011 primary contests (one in a district that includes only 7 of the 33 precincts in Yakima and the other involving a proposition and not an actual minority candidate) does the $R^2$ inch above 50%. In the five city wide contests that included a Hispanic candidate the average $R^2$ is only 16.4%. Substantively, this means only 16.4% of variance in support for the Hispanic candidate across precincts can be accounted for by corresponding variation in the percentage of votes with Spanish surnames in those precincts.

The same mixed pattern is evident for Hispanic cohesion. Two of the Hispanic candidates (Rodrigues and Soria in the 2009 general election) have the cohesive support of Hispanic voters, but in the other contests, including the primary contests for both Rodriguez and Soria in 2009, Hispanic voter cohesion is very weak (a 50%/50% split is the lowest possible value for cohesion in this analysis – indicating that a Spanish surnamed voters is equally likely to support the Hispanic candidate or not). This lack of consistent cohesive political support is also evident in the low levels of turnout among Hispanic registered voters even in contests that feature Hispanic candidates. While Hispanics make up more 41 percent of the population of Yakima, they make up only 22 percent of the adult citizens, a proportion very close to the 18 percent of the registered

8

votes in Yakima that have Spanish surnames, and yet they are typically less than 7 percent of the actual voters in the elections analyzed here.  In an election like the 2009 in which Rodriguez is a candidate for place 5, this low level of Hispanic turnout was critical.  Based on the EI estimates of cohesion, Rodriguez would have won the election if Hispanic voters made up 16 percent of the actual voters, a level comparable to their share of the registered voters.

The estimates for non-Hispanic voting behavior are much more consistent across elections.  In all five of the citywide elections with Hispanic candidates, non-Hispanic crossover voting for Hispanic candidates is substantial – ranging from the low thirty percent to the low 40 percent range.  The average estimated Anglo crossover for these five elections is 38.1 percent based on the homogeneous precinct method and 36.1 percent based on the EI method (35.7 percent Engstrom EI).

**Table 1: Estimates for Elections Included in Prof. Engstrom's Report**

| | Percent Voting for the Hispanic Candidate | | $R^2$ |
|---|---|---|---|
| | Spanish Surname Voters | Non-Spanish Surname Voters | |
| **Place 5 2009 Primary (Rodriguez)** | | | |
| Homogeneous Precinct Analysis | NA | 38.1 | |
| EI | 52.4 | 37.7 | |
| Weighted ER | 57.0 | 37.0 | .04 |
| Engstrom's EI | 52.9 | 37.3 | |
| **Place 5 2009 General (Rodriguez)** | | | |
| Homogeneous Precinct Analysis | NA | 47.3 | |
| EI | 86.7 | 43.4 | |
| Weighted ER | 82.0 | 45.5 | .16 |
| Engstrom's EI | 92.8 | 42.6 | |
| **Place 7 2009 Primary (Soria)** | | | |
| Homogeneous Precinct Analysis | NA | 31.7 | |
| EI | 59.0 | 31.1 | |
| Weighted ER | 64.3 | 29.7 | .20 |
| Engstrom's EI | 59.5 | 31.0 | |
| **Place 7 2009 General (Soria)** | | | |
| Homogeneous Precinct Analysis | NA | 34.3 | |
| EI | 85.4 | 31.2 | |
| Weighted ER | 84.5 | 31.6 | .37 |
| Engstrom's EI | 92.7 | 30.5 | |
| **District 2 2011 Primary (Montes)** | | | |
| Homogeneous Precinct Analysis | NA | 13.6 | |
| EI | 52.8 | 13.5 | |
| Weighted ER | 72.1 | 10.7 | .54 |
| Engstrom's EI | 53.5 | 13.4 | |
| **Proposition 1 2011 Primary** | | | |
| Homogeneous Precinct Analysis | NA | 39.3 | |
| EI | 92.7 | 39.1 | |
| Weighted ER | 100.0 | 36.2 | .53 |
| Engstrom's EI | 98.2 | 38.4 | |
| **Sup. Ct. Pos. 8 2012 Primary (Gonzalez)** | | | |
| Homogeneous Precinct Analysis | NA | 39.1 | |
| EI | 67.4 | 37.2 | |
| Weighted ER | 65.4 | 36.9 | .05 |
| Engstrom's EI | 63.2 | 36.9 | |

10

While the analysis reported above provides useful detail, a similar overall picture can be derived by simply looking at the scatterplots provided below in Figures 1 through 7 for each of the elections.  A visual inspection of the scatterplots tells the same story as the statistical analysis reported above in Table 1.  The plot for Rodriguez in the 2009 primary (Figure 1), for example, clearly shows that support at the polls for Rodriguez is not simply a function of strongly polarized voting patterns.  Instead of clustering tightly around a 45 degree line sloping up from the origin at (0,0) (0% Spanish surname voters, and 0% vote for Rodriguez) to the upper right corner at (100,100) (100% Spanish surname voters, and 100% vote for Rodriguez), which would indicate a strong relationship between the two variables, the actual precinct data points are shifted up (indicating substantial support for Rodriguez in precincts with few Hispanics) and scattered almost randomly (indicating that this level of support is only weakly connected to the percent of Spanish surname voters in the precinct).

The only scatterplot that comes anywhere close to a classic pattern of polarization is Figure 6 for the 2011 District 2 primary.  The results are limited, as there are only 7 precincts in the primary, but the points are all closer to a 45 degree line and more tightly clustered than they are for any of the other candidates.  This tighter clustering is reflected in the relatively high $R^2$ of .54, and the position of the points nearer a 45 degree line is reflected in the relatively low 10.7 intercept.  These low levels of non-Hispanic voter support for the Hispanic candidate in precincts with few Hispanic voters is hardly typical.  In fact, it is not evident in any other contest.  Montes gets less than 20 percent of the vote in five of the seven precincts in the 2011 election.  In all of the other contests combined

11

there is only one precinct (with only eleven voters in the 2009 general election) where

less than 20 percent of the vote goes to the Hispanic candidate.

Figure 1:  2009 Place 5 - Primary Election



Figure 2: 2009 Place 5 - General Election



Figure 3:  2009 Place 7 - Primary Election



Figure 4:  2009 Place 7 - General Election



Figure 5:  2011 District 2 - Primary Election



Figure 6:  2011 Proposition 1 - Primary Election



Figure 7:  2012 Supreme Ct. Position 8 - Primary Election



The elections for the Yakima school board are also instructive, as they are also non-partisan

elections and cover a very similar geography.  During most of the last decade there has been at least one

Hispanic board member.  Several of these Hispanic board members have run unopposed (a situation that

would not be expected if the Anglo electorate was a politically cohesive force working to block Hispanic

representation), but there are three contested elections with Hispanic candidates. In one of those

contested elections the Hispanic candidate, Ybarra, wins the election.  In another the Hispanic candidate,

Saenz, loses without much apparent support from either Hispanics or non-Hispanic.  In the third contest

the results appear to be more similar to the Soria 2009 general election reported above.  Like the City

Council contests, the school board contests do not demonstrate consistent polarized voting in Yakima.

16

Taken as a whole, the election analysis does not show evidence of a consistent pattern of polarized voting. Hispanic voters are not consistently cohesive, as evident in both the highly variable levels of cohesion among Hispanics and the low level of participation among registered Hispanic voters (typically less than seven percent of those casting a ballot). Anglo crossover in support of Hispanic candidates, in the low 30 to low 40 percent range, is substantial, much less variable, and is not consistent with polarized Anglo bloc voting.

JOHN ALFORD, Ph.D.

March 22, 2013

# APPENDIX A

# EI Results

# **2009 Primary Place 5**

```
  Model: ei.RxC
  Number of simulations: 1000
```

Expected Values: E(Y|X)

```
  Observation PctRodrig_09_pri_place5
          hpct     NOThpct
mean  0.5240036 0.37707919
sd    0.1663248 0.02219829
2.5%  0.1470338 0.33803792
97.5% 0.7805618 0.42565859


  Observation PctNOTRodrig_09_pri_place5
          hpct     NOThpct
mean  0.4759964 0.62292081
sd    0.1663248 0.02219829
2.5%  0.2194382 0.57434141
97.5% 0.8529662 0.66196208
```

# **2009 General Place 5**

```
  Model: ei.RxC
  Number of simulations: 1000
```

Expected Values: E(Y|X)

```
  Observation PctRodrig_09_gen_place5
          hpct     NOThpct
mean  0.86679195 0.43436120
sd    0.07513016 0.02135715
2.5%  0.69109033 0.39115946
97.5% 0.95896689 0.47289524


  Observation PctNOTRodrig_09_gen_place5
          hpct     NOThpct
mean  0.13320805 0.56563880
sd    0.07513016 0.02135715
2.5%  0.04103311 0.52710476
97.5% 0.30890967 0.60884054
```

18

# 2009 Primary Place 7

```
   Model: ei.RxC
   Number of simulations: 1000
```

Expected Values: E(Y|X)

```
   Observation PctSoria_09_pri_place7
           hpct      NOThpct
mean   0.5902589  0.31116486
sd     0.1406681  0.01827066
2.5%   0.2545193  0.27931310
97.5%  0.7943070  0.34982717


   Observation PctNOTSoria_09_pri_place7
           hpct      NOThpct
mean   0.4097411  0.68883514
sd     0.1406681  0.01827066
2.5%   0.2056930  0.65017283
97.5%  0.7454807  0.72068690
```

# 2009 General Place 5

```
   Model: ei.RxC
   Number of simulations: 1000
```

Expected Values: E(Y|X)

```
   Observation PctSoria_09_gen_place7
           hpct      NOThpct
mean   0.8539305  0.31203000
sd     0.0681423  0.01127536
2.5%   0.6538474  0.29052525
97.5%  0.9334410  0.33355244


   Observation PctNOTSoria_09_gen_place7
           hpct       NOThpct
mean   0.14606950  0.68797000
sd     0.06814230  0.01127536
2.5%   0.06655903  0.66644756
97.5%  0.34615259  0.70947475
```

19

# 2011 Primary Dist 2

```
Model: ei.RxC
Number of simulations: 1000
```

Expected Values: E(Y|X)

```
   Observation PctMotes_11_pri_dist2
          hpct     NOThpct
mean  0.5278522 0.13495207
sd    0.1098932 0.01332221
2.5%  0.3344753 0.11299975
97.5% 0.7068483 0.16376025


   Observation PctNOTMotes_11_pri_dist2
          hpct     NOThpct
mean  0.4721478 0.86504793
sd    0.1098932 0.01332221
2.5%  0.2931517 0.83623975
97.5% 0.6655247 0.88700025
```

# 2011 Prop 1

```
Model: ei.RxC
Number of simulations: 1000
```

Expected Values: E(Y|X)

```
   Observation PctYes_11_pri_prop1
           hpct     NOThpct
mean  0.92714479 0.39103728
sd    0.02646523 0.01312309
2.5%  0.85979957 0.36779511
97.5% 0.95835264 0.41797268


   Observation PctNOTYes_11_pri_prop1
           hpct     NOThpct
mean  0.07285521 0.60896272
sd    0.02646523 0.01312309
2.5%  0.04164736 0.58202732
97.5% 0.14020043 0.63220489
```

20

# 2012 Supreme Court, Pos 8

    Model: ei.RxC
    Number of simulations: 1000

Expected Values: E(Y|X)

    Observation PctGonzales_12_supct
             phsign     posign
mean   0.6737825 0.37176505
sd     0.0945540 0.01501406
2.5%   0.4558982 0.34359729
97.5%  0.8235203 0.40183722


    Observation PctNOTGonzales_12_supct
             phsign     posign
mean   0.3262175 0.62823495
sd     0.0945540 0.01501406
2.5%   0.1764797 0.59816278
97.5%  0.5441018 0.65640271

---

# 2009 Primary Place 5

**Several Runs with only 100 Simulations**

    Model: ei.RxC
    Number of simulations: 100

Expected Values: E(Y|X)

    Observation PctRodrig_09_pri_place5
             hpct       NOThpct
mean   0.5088137 0.37670573
sd     0.1706963 0.02359066
2.5%   0.1472984 0.33223036
97.5%  0.7797170 0.42332895


    Observation PctNOTRodrig_09_pri_place5
             hpct       NOThpct
mean   0.4911863 0.62329427
sd     0.1706963 0.02359066
2.5%   0.2202830 0.57667105
97.5%  0.8527016 0.66776964


    Model: ei.RxC
    Number of simulations: 100

Expected Values: E(Y|X)

    Observation PctRodrig_09_pri_place5
             hpct       NOThpct

21

```
mean  0.4912955 0.38031222
sd    0.1656753 0.02500265
2.5%  0.1566484 0.33876726
97.5% 0.7690554 0.43334294


  Observation PctNOTRodrig_09_pri_place5
         hpct    NOThpct
mean  0.5087045 0.61968778
sd    0.1656753 0.02500265
2.5%  0.2309446 0.56665706
97.5% 0.8433516 0.66123274
```

```
   Model: ei.RxC
   Number of simulations: 100

Expected Values: E(Y|X)

   Observation PctRodrig_09_pri_place5
            hpct    NOThpct
mean  0.5439055 0.3758689
sd    0.1634286 0.0222147
2.5%  0.1863998 0.3385723
97.5% 0.7916758 0.4149811

   Observation PctNOTRodrig_09_pri_place5
            hpct    NOThpct
mean  0.4560945 0.6241311
sd    0.1634286 0.0222147
2.5%  0.2083242 0.5850189
97.5% 0.8136002 0.6614277
> s.out <- sim(z.out, num = 100)




   Model: ei.RxC
   Number of simulations: 100

Expected Values: E(Y|X)

   Observation PctRodrig_09_pri_place5
            hpct    NOThpct
mean  0.5024080 0.38119015
sd    0.1842371 0.02494356
2.5%  0.1076505 0.33896961
97.5% 0.7904215 0.43379787

   Observation PctNOTRodrig_09_pri_place5
            hpct    NOThpct
mean  0.4975920 0.61880985
sd    0.1842371 0.02494356
2.5%  0.2095785 0.56620213
97.5% 0.8923495 0.66103039
```

23

```
   Model: ei.RxC
   Number of simulations: 100

Expected Values: E(Y|X)

   Observation PctRodrig_09_pri_place5
            hpct     NOThpct
mean   0.5094792 0.37806379
sd     0.1664341 0.02331578
2.5%   0.1697166 0.33739649
97.5% 0.7633860 0.41624003

   Observation PctNOTRodrig_09_pri_place5
            hpct     NOThpct
mean   0.4905208 0.62193621
sd     0.1664341 0.02331578
2.5%   0.2366140 0.58375997
97.5% 0.8302834 0.66260351
> s.out <- sim(z.out, num = 100)




   Model: ei.RxC
   Number of simulations: 100

Expected Values: E(Y|X)

   Observation PctRodrig_09_pri_place5
            hpct     NOThpct
mean   0.5151990 0.3765646
sd     0.1775123 0.0233914
2.5%   0.1548885 0.3356893
97.5% 0.7698420 0.4189269

   Observation PctNOTRodrig_09_pri_place5
            hpct     NOThpct
mean   0.4848010 0.6234354
sd     0.1775123 0.0233914
2.5%   0.2301580 0.5810731
97.5% 0.8451115 0.6643107
```

24

```
   Model: ei.RxC
   Number of simulations: 100

Expected Values: E(Y|X)

   Observation PctRodrig_09_pri_place5
           hpct    NOThpct
mean   0.5454507 0.37413241
sd     0.1822671 0.02534705
2.5%   0.1476312 0.33123929
97.5%  0.8053883 0.43084593

   Observation PctNOTRodrig_09_pri_place5
           hpct    NOThpct
mean   0.4545493 0.62586759
sd     0.1822671 0.02534705
2.5%   0.1946117 0.56915407
97.5%  0.8523688 0.66876071



   Model: ei.RxC
   Number of simulations: 100

Expected Values: E(Y|X)

   Observation PctRodrig_09_pri_place5
           hpct    NOThpct
mean   0.5204967 0.37919596
sd     0.1695293 0.02088545
2.5%   0.1604392 0.34176427
97.5%  0.7804931 0.42828045

   Observation PctNOTRodrig_09_pri_place5
           hpct    NOThpct
mean   0.4795033 0.62080404
sd     0.1695293 0.02088545
2.5%   0.2195069 0.57171955
97.5%  0.8395608 0.65823573
```

25

```
   Model: ei.RxC
   Number of simulations: 100

Expected Values: E(Y|X)

   Observation PctRodrig_09_pri_place5
            hpct      NOThpct
mean   0.5205903 0.3765396
sd     0.1684277 0.0237497
2.5%   0.1498936 0.3361919
97.5% 0.7834246 0.4289930

   Observation PctNOTRodrig_09_pri_place5
            hpct      NOThpct
mean   0.4794097 0.6234604
sd     0.1684277 0.0237497
2.5%   0.2165754 0.5710070
97.5% 0.8501064 0.6638081
>
```

26

APPENDIX B

ALFORD CV

# John R. Alford

Curriculum Vitae

December, 2012

Dept. of Political Science

Rice University - MS-24

P.O. Box 1892

Houston, Texas   77251-1892

713-348-3364

JRA@RICE.EDU

## Employment:

Associate Professor, Rice University, 1985 to present.

Assistant Professor, University of Georgia, 1981-1985.

Instructor, Oakland University, 1980-1981.

Teaching-Research Fellow, University of Iowa, 1977-1980.

Research Associate, Institute for Urban Studies, Houston, Texas, 1976-1977.

## Education:

Ph.D., University of Iowa, Political Science, 1981.

M.A., University of Iowa, Political Science, 1980.

M.P.A., University of Houston, Public Administration, 1977.

B.S., University of Houston, Political Science, 1975.

## Publications:

"Genetic and Environmental Transmission of Political Orientations."  with Carolyn L. Funk, Matthew Hibbing, Kevin B. Smith, Nicholas R. Eaton, Robert F. Krueger, Lindon J. Eaves, John R. Hibbing. **Political Psychology**.  Forthcoming.

"Biology, Ideology, and Epistemology: How Do We Know Political Attitudes Are Inherited and Why Should We Care?" with Kevin Smith, Peter K. Hatemi, Lindon J. Eaves, Carolyn Funk, and John R. Hibbing.  **American Journal of Political Science**. (January, 2012)

"Disgust Sensitivity and the Neurophysiology of Left-Right Political Orientations" with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **PlosONE**, (2011), 6(10):e25552. doi:10.1371/journal.pone.0025552.

"The Politics of Mate Choice" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Journal of Politics**, (2011) 73, doi:10.1017/S0022381611000016.

"Linking Genetics and Political Attitudes: Re-Conceptualizing Political Ideology" with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **Political Psychology**, (June, 2011).

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" with Peter Hatemi, John Hibbing, Sarah Medland, Matthew Keller, Kevin Smith, Nicholas Martin, and Lindon Eaves, **American Journal of Political Science**, (July, 2010).

"The Ultimate Source of Political Opinions: Genes and the Environment" with John R. Hibbing in **Understanding Public Opinion**, 3rd Edition eds. Barbara Norrander and Clyde Wilcox, Washington D.C.: CQ Press, (2010).

"Is There a 'Party' in your Genes" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Political Research Quarterly**, (September, 2009).

"Twin Studies, Molecular Genetics, Politics, and Tolerance: A Response to Beckwith and Morris" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (December, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Political Attitudes Vary with Physiological Traits" with Douglas R. Oxley, Kevin B. Smith, Matthew V. Hibbing, Jennifer L. Miller, Mario Scalora, Peter K. Hatemi, and John R. Hibbing, **Science**, (September 19, 2008).

"The New Empirical Biopolitics" with John R. Hibbing, **Annual Review of Political Science**, (June, 2008).

"Beyond Liberals and Conservatives to Political Genotypes and Phenotypes" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (June, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

29

"Personal, Interpersonal, and Political Temperaments" with John R. Hibbing, **Annals of the American Academy of Political and Social Science**, (November, 2007).

"Is Politics in our Genes?" with John R. Hibbing, **Tidsskriftet Politik**, (February, 2007).

"Biology and Rational Choice" with John R. Hibbing, **Political Economy Newsletter**, (Fall, 2005)

"Are Political Orientations Genetically Transmitted?" with John R. Hibbing and Carolyn Funk, **American Political Science Review**, (May, 2005). (The main findings table from this article has been reprinted in two college level text books - Psychology, 9th ed. and Invitation to Psychology 4th ed. both by Wade and Tavris, Prentice Hall, 2007).

"The Origin of Politics: An Evolutionary Theory of Political Behavior" with John R. Hibbing, **Perspectives on Politics**, (December, 2004).

"Accepting Authoritative Decisions: Humans as Wary Cooperators" with John R. Hibbing, **American Journal of Political Science**, (January, 2004).

"Electoral Convergence of the Two Houses of Congress" with John R. Hibbing, in **The Exceptional Senate**, ed. Bruce Oppenheimer, Columbus: Ohio State University Press, (2002).

"We're All in this Together: The Decline of Trust in Government, 1958-1996." in **What is it About Government that Americans Dislike?**, eds. John Hibbing and Beth Theiss-Morse, Cambridge: Cambridge University Press, (2001).

"The 2000 Census and the New Redistricting," **Texas State Bar Association School Law Section Newsletter**, (July, 2000).

"Overdraft: The Political Cost of Congressional Malfeasance" with Holly Teeters, Dan Ward, and Rick Wilson, **Journal of Politics** (August, 1994).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 5th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1993).

"The 1990 Congressional Election Results and the Fallacy that They Embodied an Anti-Incumbent Mood" with John R. Hibbing, **PS** 25 (June, 1992).

"Constituency Population and Representation in the United States Senate" with John R. Hibbing. **Legislative Studies Quarterly**, (November, 1990).

"Editors' Introduction:   Electing the U.S. Senate" with Bruce I. Oppenheimer. **Legislative Studies Quarterly**, (November, 1990).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 4th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1988).   Reprinted in The Congress of the United States, 1789-1989, ed. Joel Silby, Carlson Publishing Inc., (1991), and in The Quest for Office, eds. Wayne and Wilcox, St. Martins Press, (1991).

"Can Government Regulate Fertility?   An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge.   **The Western Political Quarterly** (December, 1986).

"Partisanship and Voting" with James Campbell, Mary Munro, and Bruce Campbell, in **Research in Micropolitics.   Volume 1 - Voting Behavior**.   Samuel Long, ed.   JAI Press, (1986).

"Economic Conditions and Individual Vote in the Federal Republic of Germany" with Jerome S. Legge.   **Journal of Politics** (November, 1984).

"Television Markets and Congressional Elections" with James Campbell and Keith Henry.   **Legislative Studies Quarterly** (November, 1984).

"Economic Conditions and the Forgotten Side of Congress:   A Foray into U.S. Senate Elections" with John R. Hibbing, **British Journal of Political Science** (October, 1982).

"Increased Incumbency Advantage in the House" with John R.   Hibbing, **Journal of Politics** (November, 1981).   Reprinted in The Congress of the United States, 1789-1989, Carlson Publishing Inc., (1991).

"The Electoral Impact of Economic Conditions:   Who is Held Responsible?" with John R. Hibbing, **American Journal of Political Science** (August, 1981).

31

"COMMENT ON INCREASED INCUMBENCY ADVANTAGE" WITH JOHN R. HIBBING, REFEREED COMMUNICATION: **AMERICAN POLITICAL SCIENCE REVIEW** (MARCH, 1981).

"CAN GOVERNMENT REGULATE SAFETY?  THE COAL MINE EXAMPLE" WITH MICHAEL LEWIS-BECK, **AMERICAN POLITICAL SCIENCE REVIEW** (SEPTEMBER, 1980).

## Awards and Honors:

CQ PRESS AWARD - 1988, HONORING THE OUTSTANDING PAPER IN LEGISLATIVE POLITICS PRESENTED AT THE 1987 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.  AWARDED FOR "THE DEMISE OF THE UPPER HOUSE AND THE RISE OF THE SENATE: ELECTORAL RESPONSIVENESS IN THE UNITED STATES SENATE" WITH JOHN HIBBING.

## Research Grants:

NATIONAL SCIENCE FOUNDATION, 2009-2011, "IDENTIFYING THE BIOLOGICAL INFLUENCES ON POLITICAL TEMPERAMENTS", WITH JOHN HIBBING, KEVIN SMITH, KIM ESPY, NICOLAS MARTIN AND READ MONTAGUE.  THIS IS A COLLABORATIVE PROJECT INVOLVING RICE, UNIVERSITY OF NEBRASKA, BAYLOR COLLEGE OF MEDICINE, AND QUEENSLAND INSTITUTE FOR MEDICAL RESEARCH.

NATIONAL SCIENCE FOUNDATION, 2007-2010, "GENES AND POLITICS:  PROVIDING THE NECESSARY DATA", WITH JOHN HIBBING, KEVIN SMITH, AND LINDON EAVES.  THIS IS A COLLABORATIVE PROJECT INVOLVING RICE, UNIVERSITY OF NEBRASKA, VIRGINIA COMMONWEALTH UNIVERSITY, AND THE UNIVERSITY OF MINNESOTA.

NATIONAL SCIENCE FOUNDATION, 2007-2010, "INVESTIGATING THE GENETIC BASIS OF ECONOMIC BEHAVIOR", WITH JOHN HIBBING AND KEVIN SMITH.  THIS IS A COLLABORATIVE PROJECT INVOLVING RICE, UNIVERSITY OF NEBRASKA, VIRGINIA COMMONWEALTH UNIVERSITY, AND THE QUEENSLAND INSTITUTE OF MEDICAL RESEARCH.

RICE UNIVERSITY FACULTY INITIATIVES FUND, 2007-2009, "THE BIOLOGICAL SUBSTRATES OF POLITICAL BEHAVIOR".  THIS IS IN ASSISTANCE OF A COLLABORATIVE PROJECT INVOLVING RICE, BAYLOR COLLEGE OF MEDICINE, QUEENSLAND INSTITUTE OF MEDICAL RESEARCH, UNIVERSITY OF NEBRASKA, VIRGINIA COMMONWEALTH UNIVERSITY, AND THE UNIVERSITY OF MINNESOTA.

32

NATIONAL SCIENCE FOUNDATION, 2004-2006, "DECISION-MAKING ON BEHALF OF OTHERS", WITH JOHN HIBBING.    THIS IS A COLLABORATIVE PROJECT INVOLVING RICE AND THE UNIVERSITY OF NEBRASKA.

NATIONAL SCIENCE FOUNDATION, 2001-2002, DISSERTATION GRANT FOR KEVIN ARCENEAUX, "DOCTORAL DISSERTATION RESEARCH IN POLITICAL SCIENCE: VOTING BEHAVIOR IN THE CONTEXT OF U.S. FEDERALISM."

NATIONAL SCIENCE FOUNDATION, 2000-2001, DISSERTATION GRANT FOR STACY ULBIG, "DOCTORAL DISSERTATION RESEARCH IN POLITICAL SCIENCE: SUB-NATIONAL CONTEXTUAL INFLUENCES ON POLITICAL TRUST."

NATIONAL SCIENCE FOUNDATION, 1999-2000, DISSERTATION GRANT FOR RICHARD ENGSTROM, "DOCTORAL DISSERTATION RESEARCH IN POLITICAL SCIENCE: ELECTORAL DISTRICT STRUCTURE AND POLITICAL BEHAVIOR."

RICE UNIVERSITY RESEARCH GRANT, 1985, RECENT TRENDS IN BRITISH PARLIAMENTARY ELECTIONS.

FACULTY RESEARCH GRANTS PROGRAM, UNIVERSITY OF GEORGIA, SUMMER, 1982. IMPACT OF MEDIA STRUCTURE ON CONGRESSIONAL ELECTIONS, WITH JAMES CAMPBELL.


## Papers Presented:

"THE PHYSIOLOGICAL BASIS OF POLITICAL TEMPERAMENTS" 6TH EUROPEAN CONSORTIUM FOR POLITICAL RESEARCH GENERAL CONFERENCE, REYKJAVIK, ICELAND (2011), WITH KEVIN SMITH, AND JOHN HIBBING.

"IDENTIFYING THE BIOLOGICAL INFLUENCES ON POLITICAL TEMPERAMENTS" NATIONAL SCIENCE FOUNDATION ANNUAL HUMAN SOCIAL DYNAMICS MEETING (2010), WITH JOHN HIBBING, KIMBERLY ESPY, NICHOLAS MARTIN, READ MONTAGUE, AND KEVIN B. SMITH.

"POLITICAL ORIENTATIONS MAY BE RELATED TO DETECTION OF THE ODOR OF ANDROSTENONE" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2010), WITH KEVIN SMITH, AMANDA BALZER, MICHAEL GRUSZCZYNSKI, CARLY M. JACOBS, AND JOHN HIBBING.

33

"TOWARD A MODERN VIEW OF POLITICAL MAN: GENETIC AND ENVIRONMENTAL TRANSMISSION OF POLITICAL ORIENTATIONS FROM ATTITUDE INTENSITY TO POLITICAL PARTICIPATION" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, WASHINGTON, DC (2010), WITH CAROLYN FUNK, KEVIN SMITH, AND JOHN HIBBING.

"GENETIC AND ENVIRONMENTAL TRANSMISSION OF POLITICAL INVOLVEMENT FROM ATTITUDE INTENSITY TO POLITICAL PARTICIPATION" ANNUAL MEETING OF THE INTERNATIONAL SOCIETY FOR POLITICAL PSYCHOLOGY, SAN FRANCISCO, CA (2010), WITH CAROLYN FUNK, KEVIN SMITH, AND JOHN HIBBING.

"ARE VIOLATIONS OF THE EEA RELEVANT TO POLITICAL ATTITUDES AND BEHAVIORS?" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2010), WITH KEVIN SMITH, AND JOHN HIBBING.

"THE NEURAL BASIS OF REPRESENTATION" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, TORONTO, CANADA (2009), WITH JOHN HIBBING.

"GENETIC AND ENVIRONMENTAL TRANSMISSION OF VALUE ORIENTATIONS" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, TORONTO, CANADA (2009), WITH CAROLYN FUNK, KEVIN SMITH, MATTHEW HIBBING, PETE HATEMI, ROBERT KRUEGER, LINDON EAVES, AND JOHN HIBBING.

"THE GENETIC HERITABILITY OF POLITICAL ORIENTATIONS: A NEW TWIN STUDY OF POLITICAL ATTITUDES" ANNUAL MEETING OF THE INTERNATIONAL SOCIETY FOR POLITICAL PSYCHOLOGY, DUBLIN, IRELAND (2009), WITH JOHN HIBBING, CARY FUNK, KEVIN SMITH, AND PETER K HATEMI.

"THE HERITABILITY OF VALUE ORIENTATIONS" ANNUAL MEETING OF THE BEHAVIOR GENETICS ASSOCIATION, MINNEAPOLIS, MN (2009), WITH KEVIN SMITH, JOHN HIBBING, CAROLYN FUNK, ROBERT KRUEGER, PETER HATEMI, AND LINDON EAVES.

"THE ICK FACTOR: DISGUST SENSITIVITY AS A PREDICTOR OF POLITICAL ATTITUDES" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2009), WITH KEVIN SMITH, DOUGLAS OXLEY MATTHEW HIBBING, AND JOHN HIBBING.

"THE IDEOLOGICAL ANIMAL: THE ORIGINS AND IMPLICATIONS OF IDEOLOGY" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, BOSTON, MA (2008), WITH KEVIN SMITH, MATTHEW HIBBING, DOUGLAS OXLEY, AND JOHN HIBBING.

34

"The Physiological Differences of Liberals and Conservatives" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Kevin Smith, Douglas Oxley, and John Hibbing.

"Looking for Political Genes: The Influence of Serotonin on Political and Social Values" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Peter Hatemi, Sarah Medland, John Hibbing, and Nicholas Martin.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the American Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Matthew Keller, Nicholas Martin, Sarah Medland, and Lindon Eaves.

"Factorial Association: A generalization of the Fulker between-within model to the multivariate case" Annual meeting of the Behavior Genetics Association, Amsterdam, The Netherlands (2007), with Sarah Medland, Peter Hatemi, John Hibbing, William Coventry, Nicholas Martin, and Michael Neale.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the Midwest Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Nicholas Martin, and Lindon Eaves.

"Getting from Genes to Politics: The Connecting Role of Emotion-Reading Capability" Annual Meeting of the International Society for Political Psychology, Portland, OR, (2007.), with John Hibbing.

"The Neurological Basis of Representative Democracy." Hendricks Conference on Political Behavior, Lincoln, NE (2006), with John Hibbing.

"The Neural Basis of Representative Democracy" Annual meeting of the American Political Science Association, Philadelphia, PA (2006), with John Hibbing.

"How are Political Orientations Genetically Transmitted? A Research Agenda" Annual meeting of the Midwest Political Science Association, Chicago Illinois (2006), with John Hibbing.

"The Politics of Mate Choice" Annual meeting of the Southern Political Science Association, Atlanta, GA (2006), with John Hibbing.

"The Challenge Evolutionary Biology Poses for Rational Choice"    Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing and Kevin Smith.

"Decision Making on Behalf of Others"    Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions"    Annual meeting of the Midwest Political Science Association, Chicago Illinois (2005), with John Hibbing and Carolyn Funk.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions"    Annual meeting of the American Political Science Association, Chicago Illinois (2004), with John Hibbing and Carolyn Funk.

"Accepting Authoritative Decisions:  Humans as Wary Cooperators"    Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2002), with John Hibbing

"Can We Trust the NES Trust Measure?"    Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2001), with Stacy Ulbig.

"The Impact of Organizational Structure on the Production of Social Capital Among Group Members"    Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Allison Rinden.

"Isolating the Origins of Incumbency Advantage:  An Analysis of House Primaries, 1956-1998"    Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Kevin Arceneaux.

"The Electorally Indistinct    Senate,"    Norman Thomas Conference on Senate Exceptionalism, Vanderbilt University; Nashville, Tennessee; October (1999), with John R. Hibbing.

"Interest Group Participation and Social Capital"    Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (1999), with Allison Rinden.

"We're All in this Together:  The Decline of Trust in Government, 1958-1996."    The Hendricks Symposium, University of Nebraska, Lincoln. (1998)

36

"CONSTITUENCY POPULATION AND REPRESENTATION IN THE UNITED STATES SENATE," ELECTING THE SENATE; HOUSTON, TEXAS; DECEMBER (1989), WITH JOHN R. HIBBING.

"THE DISPARATE ELECTORAL SECURITY OF HOUSE AND SENATE INCUMBENTS," AMERICAN POLITICAL SCIENCE ASSOCIATION ANNUAL MEETINGS; ATLANTA, GEORGIA; SEPTEMBER (1989), WITH JOHN R. HIBBING.

"PARTISAN AND INCUMBENT ADVANTAGE IN HOUSE ELECTIONS," ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION (1987), WITH DAVID W. BRADY.

"PERSONAL AND PARTY ADVANTAGE IN U.S. HOUSE ELECTIONS, 1846-1986" WITH DAVID W. BRADY, 1987 SOCIAL SCIENCE HISTORY ASSOCIATION MEETINGS.

"THE DEMISE OF THE UPPER HOUSE AND THE RISE OF THE SENATE: ELECTORAL RESPONSIVENESS IN THE UNITED STATES SENATE" WITH JOHN HIBBING, 1987 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"A COMPARATIVE ANALYSIS OF ECONOMIC VOTING" WITH JEROME LEGGE, 1985 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"AN ANALYSIS OF ECONOMIC CONDITIONS AND THE INDIVIDUAL VOTE IN GREAT BRITAIN, 1964-1979" WITH JEROME LEGGE, 1985 ANNUAL MEETING OF THE WESTERN POLITICAL SCIENCE ASSOCIATION.

"CAN GOVERNMENT REGULATE FERTILITY?  AN ASSESSMENT OF PRO-NATALIST POLICY IN EASTERN EUROPE" WITH JEROME LEGGE, 1985 ANNUAL MEETING OF THE SOUTHWESTERN SOCIAL SCIENCE ASSOCIATION.

"ECONOMIC CONDITIONS AND THE INDIVIDUAL VOTE IN THE FEDERAL REPUBLIC OF GERMANY" WITH JEROME S. LEGGE, 1984 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

"THE CONDITIONS REQUIRED FOR ECONOMIC ISSUE VOTING" WITH JOHN R. HIBBING, 1984 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

"INCUMBENCY ADVANTAGE IN SENATE ELECTIONS," 1983 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

"TELEVISION MARKETS AND CONGRESSIONAL ELECTIONS:  THE IMPACT OF MARKET/DISTRICT CONGRUENCE" WITH JAMES CAMPBELL AND KEITH HENRY, 1982 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

"ECONOMIC CONDITIONS AND SENATE ELECTIONS" WITH JOHN R. HIBBING, 1982 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION. "POCKETBOOK VOTING: ECONOMIC CONDITIONS AND INDIVIDUAL LEVEL VOTING," 1982 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"INCREASED INCUMBENCY ADVANTAGE IN THE HOUSE," WITH JOHN R. HIBBING, 1981 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

## Other Conference Participation:

ROUNDTABLE PARTICIPANT "GENES, BRAINS, AND CORE POLITICAL ORIENTATIONS" 2008 ANNUAL MEETING OF THE SOUTHWESTERN POLITICAL SCIENCE ASSOCIATION, LAS VEGAS.

ROUNDTABLE PARTICIPANT "POLITICS IN THE LABORATORY" 2007 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION, NEW ORLEANS.

SHORT COURSE LECTURER, "WHAT NEUROSCIENCE HAS TO OFFER POLITICAL SCIENCE" 2006 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR AND DISCUSSANT, "NEURO-SCIENTIFIC ADVANCES IN THE STUDY OF POLITICAL SCIENCE" 2006 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PRESENTATION, "THE TWIN STUDY APPROACH TO ASSESSING GENETIC INFLUENCES ON POLITICAL BEHAVIOR" RICE CONFERENCE ON NEW METHODS FOR UNDERSTANDING POLITICAL BEHAVIOR, 2005.

PANEL DISCUSSANT, "THE POLITICAL CONSEQUENCES OF REDISTRICTING," 2002 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL DISCUSSANT, "RACE AND REDISTRICTING," 1999 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

INVITED PARTICIPANT, "ROUNDTABLE ON PUBLIC DISSATISFACTION WITH AMERICAN POLITICAL INSTITUTIONS", 1998 ANNUAL MEETING OF THE SOUTHWESTERN SOCIAL SCIENCE ASSOCIATION.

PRESENTATION, "REDISTRICTING IN THE '90S," TEXAS ECONOMIC AND DEMOGRAPHIC ASSOCIATION, 1997.

PANEL CHAIR, "CONGRESSIONAL ELECTIONS," 1992 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

PANEL DISCUSSANT, "INCUMBENCY AND CONGRESSIONAL ELECTIONS," 1992 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR, "ISSUES IN LEGISLATIVE ELECTIONS," 1991 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR, "ECONOMIC ATTITUDES AND PUBLIC POLICY IN EUROPE," 1990 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION

PANEL DISCUSSANT, "RETROSPECTIVE VOTING IN U.S. ELECTIONS," 1990 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

CO-CONVENER, WITH BRUCE OPPENHEIMER, OF ELECTING THE SENATE, A NATIONAL CONFERENCE ON THE NES 1988 SENATE ELECTION STUDY. FUNDED BY THE RICE INSTITUTE FOR POLICY ANALYSIS, THE UNIVERSITY OF HOUSTON CENTER FOR PUBLIC POLICY, AND THE NATIONAL SCIENCE FOUNDATION, HOUSTON, TEXAS, DECEMBER, 1989.

INVITED PARTICIPANT, UNDERSTANDING CONGRESS: A BICENTENNIAL RESEARCH CONFERENCE, WASHINGTON, D.C., FEBRUARY, 1989.

INVITED PARTICIPANT--HENDRICKS SYMPOSIUM ON THE UNITED STATES SENATE, UNIVERSITY OF NEBRASKA, LINCOLN, NEBRASKA, OCTOBER, 1988

INVITED PARTICIPANT--CONFERENCE ON THE HISTORY OF CONGRESS, STANFORD UNIVERSITY, STANFORD, CALIFORNIA, JUNE, 1988.

INVITED PARTICIPANT, "ROUNDTABLE ON PARTISAN REALIGNMENT IN THE 1980'S", 1987 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

39

## Professional Activities:

**Other Universities:**

INVITED LECTURER, BIOLOGY AND POLITICS MASTERS SEMINAR (JOHN GEER AND DAVID BADER), DEPARTMENT OF POLITICAL SCIENCE AND BIOLOGY DEPARTMENT, VANDERBILT UNIVERSITY, 2010.

INVITED LECTURER, BIOLOGY AND POLITICS SENIOR SEMINAR (JOHN GEER AND DAVID BADER), DEPARTMENT OF POLITICAL SCIENCE AND BIOLOGY DEPARTMENT, VANDERBILT UNIVERSITY, 2008.

VISITING FELLOW, THE HOOVER INSTITUTION, STANFORD UNIVERSITY, 2007.

INVITED SPEAKER, JOINT POLITICAL PSYCHOLOGY GRADUATE SEMINAR, UNIVERSITY OF MINNESOTA, 2007.

INVITED SPEAKER, DEPARTMENT OF POLITICAL SCIENCE, VANDERBILT UNIVERSITY, 2006.

**Member:**

EDITORIAL BOARD, JOURNAL OF POLITICS, 2007-2008.

PLANNING COMMITTEE FOR THE NATIONAL ELECTION STUDIES' SENATE ELECTION STUDY, 1990-92.

NOMINATIONS COMMITTEE, SOCIAL SCIENCE HISTORY ASSOCIATION, 1988

**Reviewer for:**

AMERICAN JOURNAL OF POLITICAL SCIENCE
AMERICAN POLITICAL SCIENCE REVIEW
AMERICAN POLITICS RESEARCH
AMERICAN POLITICS QUARTERLY
AMERICAN PSYCHOLOGIST
CANADIAN JOURNAL OF POLITICAL SCIENCE

40

Comparative Politics

Electoral Studies

Evolution and Human Behavior

International Studies Quarterly

Journal of Politics

Legislative Studies Quarterly

National Science Foundation

Policy Studies Review

Political Behavior

Political Psychology

Public Opinion Quarterly

Science

Social Forces

Western Political Quarterly


## University Service:

Member, University Council, 2012-2013.

Invited Speaker, Rice Alumni Association, Atlanta, 2011.

Lecturer, Advanced Topics in AP Psychology, Rice University AP Summer Institute, 2009.

Scientia Lecture Series: "Politics in Our Genes: The Biology of Ideology" 2008

Invited Speaker, Rice Alumni Association, Seattle, San Francisco and Los Angeles, 2008.

Invited Speaker, Rice Alumni Association, Austin, Chicago and Washington, DC, 2006.

Invited Speaker, Rice Alumni Association, Dallas and New York, 2005.

Director: Rice University Behavioral Research Lab and Social Science Computing Lab, 2005-2006.

Internship Director for the Department of Political Science, 2004-2012.

University Official Representative to the Inter-university Consortium for Political and Social Research, 1989-2012.

Director: Rice University Social Science Computing Lab, 1989-2004.

Member, Rice University Information Technology Access and Security Committee, 2001-2002

Rice University Committee on Computers, Member, 1988-1992, 1995-1996; Chair, 1996-1998, Co-chair, 1999.

Acting Chairman, Rice Institute for Policy Analysis, 1991-1992.

Divisional Member of the John W. Gardner Dissertation Award Selection Committee, 1998

Social Science Representative to the Educational Sub-committee of the Computer Planning Committee, 1989-1990.

Director of Graduate Admissions, Department of Political Science, Rice University, 1986-1988.

Co-director, Mellon Workshop: Southern Politics, May, 1988.

Guest Lecturer, Mellon Workshop: The U.S. Congress in Historical Perspective, May, 1987 and 1988.

Faculty Associate, Hanszen College, Rice University, 1987-1990.

Director, Political Data Analysis Center, University of Georgia, 1982-1985.

## External Service:

Expert Witness, Garcia-Sonnier et al v. Pasadena ISD, racially polarized voting analysis, 2012.

Expert witness, Montes v. City of Yakima, challenge to Yakima, Washington At-Large City Council Elections, 2012.

Consultant, Lamar ISD - Demographic analysis and redrawing of election districts, 2012.

42

EXPERT WITNESS, RODRIGUEZ, ET. AL. V HARRIS CO., CHALLENGE TO ADOPTED HARRIS COUNTY COMMISSIONERS' COURT PRECINCTS, 2011.

CONSULTANT, CITY OF BAYTOWN - DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2011.

CONSULTANT, GOOSE CREEK ISD - DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2011.

CONSULTANT, SAN ANTONIO WATER SYSTEM - ANALYSIS OF PRECLEARANCE ISSUES RELATED TO MERGER WITH BEXARMET WATER AUTHORITY, 2011.

EXPERT WITNESS, TEXAS V US, PRECLEARANCE SUIT FOR TEXAS STATEWIDE DISTRICTS, 2011.*

EXPERT WITNESS, DAVIS V PERRY (AND CONSOLIDATED CASES), CHALLENGE TO ADOPTED TEXAS SENATE DISTRICTS, 2011.

EXPERT WITNESS, PEREZ, ET. AL. V STATE OF TEXAS (AND CONSOLIDATED CASES), CHALLENGE TO ADOPTED TEXAS STATEWIDE DISTRICTS, 2011.*

EXPERT WITNESS, FABELA, ET. AL. V CITY OF FARMERS BRANCH, FARMERS BRANCH CITY COUNCIL AT LARGE DISTRICT CHALLENGE, 2011.

EXPERT WITNESS, EL PASO APARTMENT OWNERS ASSOC. V CITY OF EL PASO, ANALYSIS OF RACIAL PATTERNS IN HOUSING OCCUPANCY, 2009.

EXPERT WITNESS, BENEVIDES, V IRVING ISD, RACIALLY POLARIZED VOTING ANALYSIS, 2008-2009.

EXPERT WITNESS, BENEVIDES, V CITY OF IRVING, RACIALLY POLARIZED VOTING ANALYSIS, 2008-2009.

EXPERT WITNESS, REYES, ET. AL. V CITY OF FARMERS BRANCH, RACIALLY POLARIZED VOTING ANALYSIS, 2007-2008.

Exhibit 10

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

|  |  |  |
|---|---|---|
| Rogelio Montes and Mateo Arteaga | ) ) ) | |
| Plaintiffs, | ) ) ) | CV- 12-3108-TOR |
| v. | ) ) | |
| City of Yakima, et. al. | ) ) | |
| Defendants. | ) ) | |

## SUPPLEMENTAL REPORT
## OF RICHARD L. ENGSTROM, Ph.D.

I declare the following:

1.  My name is Richard L. Engstrom and I have submitted an initial Report and a Reply Report previously in this case.[1]

2.  Attorneys for the Plaintiffs in this matter have requested that I perform a racially polarized voting analyses of the August 2013 primary election for seats on the Yakima City Council in this Supplemental Report. This primary presented voters across Yakima with a choice between a Latino candidate and non-Latino candidates for two At-Large City Council positions, Position 5 and Position 7. The Latino candidate in both of these elections was defeated in the primary and did not advance to the November general election. The results of these analyses are provided in this Supplemental Report.

3.  The attorneys have also requested that I comment on the election for Position

---

[1] On p. 2 of my initial Report I listed the cases in which I had testified as an expert witness either in deposition or at trial since 2008. Since that Report I have testified by deposition in *Romo v. Dezner* (Cir. Ct. for the 2nd Jud. Dist. in and for Leon County, FL, 2013).

1 on the Board of Directors for the Yakima School District No. 7, held last month.  This election also presented voters with a choice of a Latino candidate and non-Latino candidate.  School board elections have been referenced by the Defendants' experts, Peter Morrison and John Alford, in their Reports in this case.  I replied to their discussions of these elections in my Reply Report (at 10-11), and add to that reply below.

CITY COUNCIL PRIMARIES, 2013

4.    The analyses of the city council primaries have been conducted in the same manner as those for the elections examined in my initial Report (see pp. 6-7 of that Report).[2]  The Latino candidate contesting Position 5 was Isidro (Sid) Reynaga, and the Latino candidate contesting Position 7 was Enrique Jevons.  Both competed with two non-Latino candidates for the respective seats.  The results of the analyses of these elections are reported in Table S1 attached to this report.  Identified in the left column of the Table are the specific At-Large Positions at issue in the election, and the surname of the Latino candidates in these elections.  The second and third columns contain the point estimates and values of the 95-percent confidence intervals for the Latino and non-Latino votes respectively.  The best estimates of the voting choices of each group, the point estimates, are reported in the text below.

Position 5 At-large

5.    Three candidates competed for the Position 5 seat on the council in the 2013 election.  These were Mr. Reynaga, Charles Noel, and Dave Ettl.  Mr. Reynaga was the

---

[2]   The percentages of the returned ballots on which votes were cast in the particular elections analyzed are 96.4 percent in the Position 5 contest and 97.2 percent in the Position 7 contest.

2

choice of the Latino voters, receiving an estimated 67.4 percent of their votes.[3]  The

estimate of his non-Latino support however was only 15.3, and he finished last among the

Position 5 candidates listed on the ballot, receiving only 19.4 percent of the total votes

cast for that position.  The candidate preferred by Latino voters therefore was eliminated

from the competition for Position 5 at the primary stage of the election.

Position 7 At-Large

      6.   Three candidates also competed for the Position 7 seat on the council in the

2013 election.  These were Mr. Jevons along with non-Latino candidates Bill Lover and

Carol Folsom-Hill.  Mr. Jevons finished second among Latino voters in this primary,

receiving an estimated 39.2 percent of their votes.  Like Mr. Reynaga, he received only a

small percentage of the non-Latino vote, an estimated 11.4 percent.  He finished last

among the Position 7 candidates listed on the ballot, receiving only 13.3 percent of the

total votes.  The leading vote recipient among the Latino voters was Ms. Folsom-Hill,

who is estimated to have received 49.7 percent of their votes; the confidence interval

around this estimate ranges from 32.0 percent to 65.4 percent.  Her vote among the non-

Latino voters is estimated to be 34.2 percent; the confidence interval around this estimate

ranges from 32.0 percent to 36.5 percent.[4]

      7.   In my initial Report I concluded, based on the racially polarized voting found

in the elections I analyzed, and the results of those elections, that the Latino voters'

preferences for Latino candidates were being submerged and cancelled out in Yakima by

---

[3]  The analysis does not include the 75 write-in votes cast in this election, none of which were cast for any of the candidates listed on the ballot.  The largest number of write-in votes, 24, were cast for "No Name"; the most received by any individual identified by a name were two.

[4]  As with the Position 5 contest, this analysis does not include the write-in votes.  There were 55 such votes cast for the Position 7 seat, none of which were cast for any of the candidates listed on the

the more numerous non-Latino vote. The results of the election analyses reported in this supplement reinforce that conclusion.

## SCHOOL BOARD ELECTIONS

8.    In my Reply Report I noted that the last contested election between a Latino candidate and a non-Latino candidate for the Board of Directors of the Yakima School District No. 7 in which the Latino candidate won occurred in 2003. That candidate was Vickie Ybarra, who had been appointed to the seat she won prior to the election. I also noted that in both of the subsequent School Board elections in which a Latino candidate ran against a non-Latino candidate, the Latino candidates were defeated. Specifically, these elections occurred in 2005, when Jorge Torres Saenz was defeated, and in 2009, when Raymond Navarro was defeated. Both lost by wide margins; Mr. Saenz received 26.6 percent of the votes and Mr. Navarro, who like Ms. Ybarra had been appointed to the seat prior to the election, received 27.9 percent (Reply Report, at 11).

9.    The next, and most recent, election presenting voters in the school district with a choice between a Latino and non-Latino candidate occurred in November of this year. The Latina was Graciela Villanueva, who also had been appointed to the seat, Position 1, prior to the election. Her opponent was Jeni Rice, who announced in September that she dropped out of the race, ceased campaigning for the position, and stopped submitting disclosure forms required of candidates by the state, but whose name remained on the ballot.[5] Ms. Rice won 61.2 percent of the total votes while Ms.

---

ballot. Again, the largest number of write-in votes, 23, were cast for "No Name"; the most received by any individual identified by a name were again two.

[5] Rafael Guerrero, "Candidate Who Says She Dropped Out of Race Wins School Board Seat,' *Yakima Herald Republic*, November 6, 2013; Rafael Guerrero, "School Board Candidate Who Won Withdrew from Race Says She Plans to Serve," *Yakima Herald Republic*, November 7, 2013;

Villanueva garnered 38.0 percent.  This became the third straight election, beginning in 2005, in which the Latino candidate was defeated by the non-Latino candidate for the Board.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed on December 17, 2013 in Durham, NC.

Richard L. Engstrom

---

Editorial, "Through Actions, Jeni Rice Shows She's Unfit to Hold School Board Post," *Yakima Herald Republic*, November 26, 2013.

5

**TABLE S1**
**Estimated Divisions in Vote**
**City Council Primary 2013**

Point Estimate
(Confidence Interval)

| <u>Election</u> | Percent of <u>Latino Voters</u> | Percent of <u>Non-Latino Voters</u> |
|---|---|---|
| <u>Position 5 At-Large</u> | | |
| *Reynaga* | | |
| Primary (v. 2 candidates) | 67.4 (45.9 – 81.4) | 15.3 (13.5 – 17.5) |
| <u>Position 7 At-Large</u> | | |
| *Jevons* | | |
| Primary (v. 2 candidates) | 39.2 (25.9 – 49.9) | 11.4 (9.8 – 13.1) |

6

Exhibit 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| ROGELIO MONTES and MATEO ARTEAGA, | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | NO:  12-CV-3108-TOR |
| CITY OF YAKIMA, *et al*, | § § | |
| Defendants | § § | |

## SUPPLEMENTAL REPORT OF JOHN ALFORD, Ph.D.

I have been retained as an expert by the City of Yakima, Washington.  The details of my background and compensation are included in my original report in this case.  An updated version of my CV is attached as Appendix A at the end of this report.

### *Yakima School Board 2013 General Election*

Professor Engstrom's supplemental report discusses the 2013 Yakima School Board election. Table 1 below includes the Ecological Inference estimates for the 2013 Position 1 election for the Yakima School Board.  Villanueva is estimated to have received about 70 percent support among Hispanic voters and about 35 percent support among non-Hispanic voters.  The results are most similar to those included in my original report for the 2012 Supreme Court Position 8 contest, i.e., real, if modest, Hispanic cohesion accompanied by very substantial non-Hispanic crossover.  The pattern of voter support for Villanueva is also scattered, with the Hispanic proportion of the actual voters being well below 10 percent in three of the four precincts that Villanueva carried.

**TABLE 1**

| Position 1 School Board General | Percent of Voters* with Spanish Surnames Supporting Candidate | Percent of Voters* with Non-Spanish Surnames Supporting Candidate |
|---|---|---|
| Villanueva | 70.1 (60.8 – 78.8) | 35.2 (33.7 – 36.7) |
| Rice | 30.0 (21.2 – 39.2) | 64.8 (63.3 – 66.3) |

Numbers in parentheses are 95% confidence intervals. *Voters are all voters casting a vote for one of the two candidates.


***Yakima City Council August 2013 Primary***

Ecological Inference (EI) results for the 2013 primary contests for Position 5 and Position 7 are presented in the table included in Professor Engstrom's supplemental report. These Ecological Inference estimates from his report are supplemented here with independent EI estimations for the same election contests and reported below in Table 2.

2

**TABLE 2**

| Position 5 At-Large Primary | Percent of Voters* with Spanish Surnames Supporting Candidate | Percent of Voters* with Non-Spanish Surnames Supporting Candidate |
|---|---|---|
| Reynaga | 53.3 (38.6 – 62.3) | 16.9 (15.7 – 18.5) |
| Noel | 34.0 (22.4 – 43.9) | 20.7 (19.5 – 22.1) |
| Ettl | 12.7 (5.4 – 20.5) | 62.4 (61.1 – 63.6) |

Numbers in parentheses are 95% confidence intervals. *Voters are all voters casting a vote for one of the three candidates.

| Position 7 At-Large Primary | Percent of Voters* with Spanish Surnames Supporting Candidate | Percent of Voters* with Non-Spanish Surnames Supporting Candidate |
|---|---|---|
| Jevons | 45.4 (33.3 – 58.7) | 10.9 (9.7 – 12.0) |
| Lover | 28.3 (22.2 – 37.4) | 52.9 (51.7 – 54.0) |
| Folsom-Hill | 26.4 (16.7 – 37.1) | 36.2 (35.0 – 37.6) |

Numbers in parentheses are 95% confidence intervals. *Voters are all voters casting a vote for one of the three candidates.

As is clear from Table 2 above, the results from this EI analysis are substantively very similar to those reported by Dr. Engstrom. Moreover, in both Position 5 and Position 7 the results clearly indicate a lack of cohesion among voters with Hispanic surnames. In both contests the estimates indicate that the Hispanic vote is essentially split 50/50 between the Hispanic candidate and the non-Hispanic candidates. This continues the pattern of weak to non-existent minority cohesion that was evident in the initial reports in the case that covered earlier elections. Specifically, in the previous analysis the estimated Hispanic vote for the Hispanic candidate in the primaries was 52% for Rodriguez in the 2009 Place 5 Primary, 59% for Soria in the 2009 Place 7 Primary, and 53% for Montes in the 2011 District 2 Primary.

3

In addition to the absence of cohesion, the Hispanic vote also continues to exhibit the same lack of numerosity and geographic concentration that was apparent in the earlier elections. Only 7 percent of the voters in the 2013 primary were Hispanic. Again as in the previous elections, there is not a single precinct in the City where a majority of the voters are Hispanic. One precinct in 2013 approaches 40% Hispanic, but in every other precinct three-quarters or more of the voters were non-Hispanic. Reynaga and Jevons both fail to reach a majority of the vote in even a single precinct. In the three-way contest for Position 5, Reynaga's share of the vote exceeds 33 percent in only two precincts (46 percent in one and 36 percent in the other). Jevons' share of the vote in the three-way contest for Position 7 doesn't reach 33 percent in even one precinct, and in fact reaches only 25 percent in one precinct. The Gingles three-prong test is meant to establish that a group of voters is sufficiently numerous, geographically compact, and united in preference such that absent being submerged in an at-large electorate they would prevail in electing their candidates of choice. Here the election evidence indicates that, in my opinion, Hispanic voters in Yakima are so politically divided, so few in number, and so geographically dispersed their lack of election success cannot be simply attributed to the at large system of elections.

JOHN ALFORD, Ph.D.

January 17, 2014

4

# APPENDIX A

# ALFORD CV

5

# JOHN R. ALFORD

CURRICULUM VITAE

JANUARY, 2014

DEPT. OF POLITICAL SCIENCE

RICE UNIVERSITY - MS-24

P.O. BOX 1892

HOUSTON, TEXAS   77251-1892

713-348-3364

JRA@RICE.EDU

## Employment:

ASSOCIATE PROFESSOR, RICE UNIVERSITY, 1985 TO PRESENT.

ASSISTANT PROFESSOR, UNIVERSITY OF GEORGIA, 1981-1985.

INSTRUCTOR, OAKLAND UNIVERSITY, 1980-1981.

TEACHING-RESEARCH FELLOW, UNIVERSITY OF IOWA, 1977-1980.

RESEARCH ASSOCIATE, INSTITUTE FOR URBAN STUDIES, HOUSTON, TEXAS, 1976-1977.

## Education:

PH.D., UNIVERSITY OF IOWA, POLITICAL SCIENCE, 1981.

M.A., UNIVERSITY OF IOWA, POLITICAL SCIENCE, 1980.

M.P.A., UNIVERSITY OF HOUSTON, PUBLIC ADMINISTRATION, 1977.

B.S., UNIVERSITY OF HOUSTON, POLITICAL SCIENCE, 1975.

## Books:

*PREDISPOSED: LIBERALS, CONSERVATIVES, AND THE BIOLOGY OF POLITICAL DIFFERENCES*. NEW YORK: ROUTLEDGE, 2013. CO-AUTHORS, JOHN R. HIBBING AND KEVIN B. SMITH.

## Articles:

"DIFFERENCES IN NEGATIVITY BIAS UNDERLIE VARIATIONS IN POLITICAL IDEOLOGY."   WITH KEVIN B. SMITH AND JOHN R. HIBBING. **BEHAVIORAL AND BRAIN SCIENCES**.   FORTHCOMING.

"Genetic and Environmental Transmission of Political Orientations." with Carolyn L. Funk, Matthew Hibbing, Kevin B. Smith, Nicholas R. Eaton, Robert F. Krueger, Lindon J. Eaves, John R. Hibbing. **Political Psychology**, (December, 2013).

"Biology, Ideology, and Epistemology: How Do We Know Political Attitudes Are Inherited and Why Should We Care?" with Kevin Smith, Peter K. Hatemi, Lindon J. Eaves, Carolyn Funk, and John R. Hibbing. **American Journal of Political Science**. (January, 2012)

"Disgust Sensitivity and the Neurophysiology of Left-Right Political Orientations" with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **PlosONE**, (2011), 6(10):e25552. doi:10.1371/journal.pone.0025552.

"The Politics of Mate Choice" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Journal of Politics**, (2011) 73, doi:10.1017/S0022381611000016.

"Linking Genetics and Political Attitudes: Re-Conceptualizing Political Ideology" with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **Political Psychology**, (June, 2011).

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" with Peter Hatemi, John Hibbing, Sarah Medland, Matthew Keller, Kevin Smith, Nicholas Martin, and Lindon Eaves, **American Journal of Political Science**, (July, 2010).

"The Ultimate Source of Political Opinions: Genes and the Environment" with John R. Hibbing in **Understanding Public Opinion**, 3rd Edition eds. Barbara Norrander and Clyde Wilcox, Washington D.C.: CQ Press, (2010).

"Is There a 'Party' in your Genes" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Political Research Quarterly**, (September, 2009).

"Twin Studies, Molecular Genetics, Politics, and Tolerance: A Response to Beckwith and Morris" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (December, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

7

"Political Attitudes Vary with Physiological Traits" with Douglas R. Oxley, Kevin B. Smith, Matthew V. Hibbing, Jennifer L. Miller, Mario Scalora, Peter K. Hatemi, and John R. Hibbing, **Science**, (September 19, 2008).

"The New Empirical Biopolitics" with John R. Hibbing, **Annual Review of Political Science**, (June, 2008).

"Beyond Liberals and Conservatives to Political Genotypes and Phenotypes" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (June, 2008). This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Personal, Interpersonal, and Political Temperaments" with John R. Hibbing, **Annals of the American Academy of Political and Social Science**, (November, 2007).

"Is Politics in our Genes?" with John R. Hibbing, **Tidsskriftet Politik**, (February, 2007).

"Biology and Rational Choice" with John R. Hibbing, **Political Economy Newsletter**, (Fall, 2005)

"Are Political Orientations Genetically Transmitted?" with John R. Hibbing and Carolyn Funk, **American Political Science Review**, (May, 2005). (The main findings table from this article has been reprinted in two college level text books - Psychology, 9th ed. and Invitation to Psychology 4th ed. both by Wade and Tavris, Prentice Hall, 2007).

"The Origin of Politics: An Evolutionary Theory of Political Behavior" with John R. Hibbing, **Perspectives on Politics**, (December, 2004).

"Accepting Authoritative Decisions: Humans as Wary Cooperators" with John R. Hibbing, **American Journal of Political Science**, (January, 2004).

"Electoral Convergence of the Two Houses of Congress" with John R. Hibbing, in **The Exceptional Senate**, ed. Bruce Oppenheimer, Columbus: Ohio State University Press, (2002).

8

"WE'RE ALL IN THIS TOGETHER: THE DECLINE OF TRUST IN GOVERNMENT, 1958-1996." IN **WHAT IS IT ABOUT GOVERNMENT THAT AMERICANS DISLIKE?**, EDS. JOHN HIBBING AND BETH THEISS-MORSE, CAMBRIDGE: CAMBRIDGE UNIVERSITY PRESS, (2001).

"THE 2000 CENSUS AND THE NEW REDISTRICTING," **TEXAS STATE BAR ASSOCIATION SCHOOL LAW SECTION NEWSLETTER**, (JULY, 2000).

"OVERDRAFT: THE POLITICAL COST OF CONGRESSIONAL MALFEASANCE" WITH HOLLY TEETERS, DAN WARD, AND RICK WILSON, **JOURNAL OF POLITICS** (AUGUST, 1994).

"PERSONAL AND PARTISAN ADVANTAGE IN U.S. CONGRESSIONAL ELECTIONS, 1846-1990" WITH DAVID W. BRADY, IN **CONGRESS RECONSIDERED** 5TH EDITION, EDS. LARRY DODD AND BRUCE OPPENHEIMER, CQ PRESS, (1993).

"THE 1990 CONGRESSIONAL ELECTION RESULTS AND THE FALLACY THAT THEY EMBODIED AN ANTI-INCUMBENT MOOD" WITH JOHN R. HIBBING, **PS** 25 (JUNE, 1992).

"CONSTITUENCY POPULATION AND REPRESENTATION IN THE UNITED STATES SENATE" WITH JOHN R. HIBBING. **LEGISLATIVE STUDIES QUARTERLY**, (NOVEMBER, 1990).

"EDITORS' INTRODUCTION: ELECTING THE U.S. SENATE" WITH BRUCE I. OPPENHEIMER. **LEGISLATIVE STUDIES QUARTERLY**, (NOVEMBER, 1990).

"PERSONAL AND PARTISAN ADVANTAGE IN U.S. CONGRESSIONAL ELECTIONS, 1846-1990" WITH DAVID W. BRADY, IN **CONGRESS RECONSIDERED** 4TH EDITION, EDS. LARRY DODD AND BRUCE OPPENHEIMER, CQ PRESS, (1988). REPRINTED IN THE CONGRESS OF THE UNITED STATES, 1789-1989, ED. JOEL SILBY, CARLSON PUBLISHING INC., (1991), AND IN THE QUEST FOR OFFICE, EDS. WAYNE AND WILCOX, ST. MARTINS PRESS, (1991).

"CAN GOVERNMENT REGULATE FERTILITY? AN ASSESSMENT OF PRO-NATALIST POLICY IN EASTERN EUROPE" WITH JEROME LEGGE. **THE WESTERN POLITICAL QUARTERLY** (DECEMBER, 1986).

"PARTISANSHIP AND VOTING" WITH JAMES CAMPBELL, MARY MUNRO, AND BRUCE CAMPBELL, IN **RESEARCH IN MICROPOLITICS. VOLUME 1 - VOTING BEHAVIOR**. SAMUEL LONG, ED. JAI PRESS, (1986).

"ECONOMIC CONDITIONS AND INDIVIDUAL VOTE IN THE FEDERAL REPUBLIC OF GERMANY" WITH JEROME S. LEGGE. **JOURNAL OF POLITICS** (NOVEMBER, 1984).

9

"TELEVISION MARKETS AND CONGRESSIONAL ELECTIONS" WITH JAMES CAMPBELL AND KEITH HENRY. **LEGISLATIVE STUDIES QUARTERLY** (NOVEMBER, 1984).

"ECONOMIC CONDITIONS AND THE FORGOTTEN SIDE OF CONGRESS:  A FORAY INTO U.S. SENATE ELECTIONS" WITH JOHN R. HIBBING, **BRITISH JOURNAL OF POLITICAL SCIENCE** (OCTOBER, 1982).

"INCREASED INCUMBENCY ADVANTAGE IN THE HOUSE" WITH JOHN R.  HIBBING, **JOURNAL OF POLITICS** (NOVEMBER, 1981).  REPRINTED IN THE CONGRESS OF THE UNITED STATES, 1789-1989, CARLSON PUBLISHING INC., (1991).

"THE ELECTORAL IMPACT OF ECONOMIC CONDITIONS:  WHO IS HELD RESPONSIBLE?" WITH JOHN R. HIBBING, **AMERICAN JOURNAL OF POLITICAL SCIENCE** (AUGUST, 1981).

"COMMENT ON INCREASED INCUMBENCY ADVANTAGE" WITH JOHN R. HIBBING, REFEREED COMMUNICATION: **AMERICAN POLITICAL SCIENCE REVIEW** (MARCH, 1981).

"CAN GOVERNMENT REGULATE SAFETY?  THE COAL MINE EXAMPLE" WITH MICHAEL LEWIS-BECK, **AMERICAN POLITICAL SCIENCE REVIEW** (SEPTEMBER, 1980).


## Awards and Honors:

CQ PRESS AWARD - 1988, HONORING THE OUTSTANDING PAPER IN LEGISLATIVE POLITICS PRESENTED AT THE 1987 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.  AWARDED FOR "THE DEMISE OF THE UPPER HOUSE AND THE RISE OF THE SENATE: ELECTORAL RESPONSIVENESS IN THE UNITED STATES SENATE" WITH JOHN HIBBING.


## Research Grants:

NATIONAL SCIENCE FOUNDATION, 2009-2011, "IDENTIFYING THE BIOLOGICAL INFLUENCES ON POLITICAL TEMPERAMENTS", WITH JOHN HIBBING, KEVIN SMITH, KIM ESPY, NICOLAS MARTIN AND READ MONTAGUE.  THIS IS A COLLABORATIVE PROJECT INVOLVING RICE, UNIVERSITY OF NEBRASKA, BAYLOR COLLEGE OF MEDICINE, AND QUEENSLAND INSTITUTE FOR MEDICAL RESEARCH.

10

National Science Foundation, 2007-2010, "Genes and Politics: Providing the Necessary Data", with John Hibbing, Kevin Smith, and Lindon Eaves. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2007-2010, "Investigating the Genetic Basis of Economic Behavior", with John Hibbing and Kevin Smith. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the Queensland Institute of Medical Research.

Rice University Faculty Initiatives Fund, 2007-2009, "The Biological Substrates of Political Behavior". This is in assistance of a collaborative project involving Rice, Baylor College of Medicine, Queensland Institute of Medical Research, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2004-2006, "Decision-Making on Behalf of Others", with John Hibbing. This is a collaborative project involving Rice and the University of Nebraska.

National Science Foundation, 2001-2002, dissertation grant for Kevin Arceneaux, "Doctoral Dissertation Research in Political Science: Voting Behavior in the Context of U.S. Federalism."

National Science Foundation, 2000-2001, dissertation grant for Stacy Ulbig, "Doctoral Dissertation Research in Political Science: Sub-national Contextual Influences on Political Trust."

National Science Foundation, 1999-2000, dissertation grant for Richard Engstrom, "Doctoral Dissertation Research in Political Science: Electoral District Structure and Political Behavior."

Rice University Research Grant, 1985, Recent Trends in British Parliamentary Elections.

Faculty Research Grants Program, University of Georgia, Summer, 1982. Impact of Media Structure on Congressional Elections, with James Campbell.

11

## Papers Presented:

"The Physiological Basis of Political Temperaments" 6th European Consortium for Political Research General Conference, Reykjavik, Iceland (2011), with Kevin Smith, and John Hibbing.

"Identifying the Biological Influences on Political Temperaments" National Science Foundation Annual Human Social Dynamics Meeting (2010), with John Hibbing, Kimberly Espy, Nicholas Martin, Read Montague, and Kevin B. Smith.

"Political Orientations May Be Related to Detection of the Odor of Androstenone" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, Amanda Balzer, Michael Gruszczynski, Carly M. Jacobs, and John Hibbing.

"Toward a Modern View of Political Man: Genetic and Environmental Transmission of Political Orientations from Attitude Intensity to Political Participation" Annual meeting of the American Political Science Association, Washington, DC (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Genetic and Environmental Transmission of Political Involvement from Attitude Intensity to Political Participation" Annual meeting of the International Society for Political Psychology, San Francisco, CA (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Are Violations of the EEA Relevant to Political Attitudes and Behaviors?" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, and John Hibbing.

"The Neural Basis of Representation" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with John Hibbing.

"Genetic and Environmental Transmission of Value Orientations" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with Carolyn Funk, Kevin Smith, Matthew Hibbing, Pete Hatemi, Robert Krueger, Lindon Eaves, and John Hibbing.

"The Genetic Heritability of Political Orientations: A New Twin Study of Political Attitudes" Annual Meeting of the International Society for Political Psychology,

Dublin, Ireland (2009), with John Hibbing, Cary Funk, Kevin Smith, and Peter K Hatemi.

"The Heritability of Value Orientations" Annual meeting of the Behavior Genetics Association, Minneapolis, MN (2009), with Kevin Smith, John Hibbing, Carolyn Funk, Robert Krueger, Peter Hatemi, and Lindon Eaves.

"The Ick Factor: Disgust Sensitivity as a Predictor of Political Attitudes" Annual meeting of the Midwest Political Science Association, Chicago, IL (2009), with Kevin Smith, Douglas Oxley Matthew Hibbing, and John Hibbing.

"The Ideological Animal: The Origins and Implications of Ideology" Annual meeting of the American Political Science Association, Boston, MA (2008), with Kevin Smith, Matthew Hibbing, Douglas Oxley, and John Hibbing.

"The Physiological Differences of Liberals and Conservatives" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Kevin Smith, Douglas Oxley, and John Hibbing.

"Looking for Political Genes: The Influence of Serotonin on Political and Social Values" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Peter Hatemi, Sarah Medland, John Hibbing, and Nicholas Martin.

"Not by Twins Alone:  Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the American Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Matthew Keller, Nicholas Martin, Sarah Medland, and Lindon Eaves.

"Factorial Association: A generalization of the Fulker between-within model to the multivariate case" Annual meeting of the Behavior Genetics Association, Amsterdam, The Netherlands (2007), with Sarah Medland, Peter Hatemi, John Hibbing, William Coventry, Nicholas Martin, and Michael Neale.

"Not by Twins Alone:  Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the Midwest Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Nicholas Martin, and Lindon Eaves.

13

"Getting from Genes to Politics:   The Connecting Role of Emotion-Reading Capability" Annual Meeting of the International Society for Political Psychology, Portland, OR, (2007.), with John Hibbing.

"The Neurological Basis of Representative Democracy." Hendricks Conference on Political Behavior, Lincoln, NE (2006), with John Hibbing.

"The Neural Basis of Representative Democracy" Annual meeting of the American Political Science Association, Philadelphia, PA (2006), with John Hibbing.

"How are Political Orientations Genetically Transmitted?  A Research Agenda" Annual meeting of the Midwest Political Science Association, Chicago Illinois (2006), with John Hibbing.

"The Politics of Mate Choice"  Annual meeting of the Southern Political Science Association, Atlanta, GA (2006), with John Hibbing.

"The Challenge Evolutionary Biology Poses for Rational Choice"  Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing and Kevin Smith.

"Decision Making on Behalf of Others"  Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions"  Annual meeting of the Midwest Political Science Association, Chicago Illinois (2005), with John Hibbing and Carolyn Funk.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions" Annual meeting of the American Political Science Association, Chicago Illinois (2004), with John Hibbing and Carolyn Funk.

"Accepting Authoritative Decisions:  Humans as Wary Cooperators" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2002), with John Hibbing

"Can We Trust the NES Trust Measure?" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2001), with Stacy Ulbig.

14

"THE IMPACT OF ORGANIZATIONAL STRUCTURE ON THE PRODUCTION OF SOCIAL CAPITAL AMONG GROUP MEMBERS" ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION, ATLANTA, GEORGIA (2000), WITH ALLISON RINDEN.

"ISOLATING THE ORIGINS OF INCUMBENCY ADVANTAGE: AN ANALYSIS OF HOUSE PRIMARIES, 1956-1998" ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION, ATLANTA, GEORGIA (2000), WITH KEVIN ARCENEAUX.

"THE ELECTORALLY INDISTINCT SENATE," NORMAN THOMAS CONFERENCE ON SENATE EXCEPTIONALISM, VANDERBILT UNIVERSITY; NASHVILLE, TENNESSEE; OCTOBER (1999), WITH JOHN R. HIBBING.

"INTEREST GROUP PARTICIPATION AND SOCIAL CAPITAL" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, ILLINOIS (1999), WITH ALLISON RINDEN.

"WE'RE ALL IN THIS TOGETHER: THE DECLINE OF TRUST IN GOVERNMENT, 1958-1996." THE HENDRICKS SYMPOSIUM, UNIVERSITY OF NEBRASKA, LINCOLN. (1998)

"CONSTITUENCY POPULATION AND REPRESENTATION IN THE UNITED STATES SENATE," ELECTING THE SENATE; HOUSTON, TEXAS; DECEMBER (1989), WITH JOHN R. HIBBING.

"THE DISPARATE ELECTORAL SECURITY OF HOUSE AND SENATE INCUMBENTS," AMERICAN POLITICAL SCIENCE ASSOCIATION ANNUAL MEETINGS; ATLANTA, GEORGIA; SEPTEMBER (1989), WITH JOHN R. HIBBING.

"PARTISAN AND INCUMBENT ADVANTAGE IN HOUSE ELECTIONS," ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION (1987), WITH DAVID W. BRADY.

"PERSONAL AND PARTY ADVANTAGE IN U.S. HOUSE ELECTIONS, 1846-1986" WITH DAVID W. BRADY, 1987 SOCIAL SCIENCE HISTORY ASSOCIATION MEETINGS.

"THE DEMISE OF THE UPPER HOUSE AND THE RISE OF THE SENATE: ELECTORAL RESPONSIVENESS IN THE UNITED STATES SENATE" WITH JOHN HIBBING, 1987 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"A COMPARATIVE ANALYSIS OF ECONOMIC VOTING" WITH JEROME LEGGE, 1985 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"An Analysis of Economic Conditions and the Individual Vote in Great Britain, 1964-1979" with Jerome Legge, 1985 Annual Meeting of the Western Political Science Association.

"Can Government Regulate Fertility?  An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge, 1985 Annual Meeting of the Southwestern Social Science Association.

"Economic Conditions and the Individual Vote in the Federal Republic of Germany" with Jerome S. Legge, 1984 Annual Meeting of the Southern Political Science Association.

"The Conditions Required for Economic Issue Voting" with John R. Hibbing, 1984 Annual Meeting of the Midwest Political Science Association.

"Incumbency Advantage in Senate Elections," 1983 Annual Meeting of the Midwest Political Science Association.

"Television Markets and Congressional Elections:  The Impact of Market/District Congruence" with James Campbell and Keith Henry, 1982 Annual Meeting of the Southern Political Science Association.

"Economic Conditions and Senate Elections" with John R. Hibbing, 1982 Annual Meeting of the Midwest Political Science Association. "Pocketbook Voting: Economic Conditions and Individual Level Voting," 1982 Annual Meeting of the American Political Science Association.

"Increased Incumbency Advantage in the House," with John R. Hibbing, 1981 Annual Meeting of the Midwest Political Science Association.


## Other Conference Participation:

Roundtable Participant "Genes, Brains, and Core Political Orientations" 2008 Annual Meeting of the Southwestern Political Science Association, Las Vegas.

Roundtable Participant "Politics in the Laboratory" 2007 Annual Meeting of the Southern Political Science Association, New Orleans.

16

SHORT COURSE LECTURER, "WHAT NEUROSCIENCE HAS TO OFFER POLITICAL SCIENCE" 2006 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR AND DISCUSSANT, "NEURO-SCIENTIFIC ADVANCES IN THE STUDY OF POLITICAL SCIENCE" 2006 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PRESENTATION, "THE TWIN STUDY APPROACH TO ASSESSING GENETIC INFLUENCES ON POLITICAL BEHAVIOR" RICE CONFERENCE ON NEW METHODS FOR UNDERSTANDING POLITICAL BEHAVIOR, 2005.

PANEL DISCUSSANT, "THE POLITICAL CONSEQUENCES OF REDISTRICTING," 2002 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL DISCUSSANT, "RACE AND REDISTRICTING," 1999 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

INVITED PARTICIPANT, "ROUNDTABLE ON PUBLIC DISSATISFACTION WITH AMERICAN POLITICAL INSTITUTIONS", 1998 ANNUAL MEETING OF THE SOUTHWESTERN SOCIAL SCIENCE ASSOCIATION.

PRESENTATION, "REDISTRICTING IN THE '90S," TEXAS ECONOMIC AND DEMOGRAPHIC ASSOCIATION, 1997.

PANEL CHAIR, "CONGRESSIONAL ELECTIONS," 1992 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

PANEL DISCUSSANT, "INCUMBENCY AND CONGRESSIONAL ELECTIONS," 1992 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR, "ISSUES IN LEGISLATIVE ELECTIONS," 1991 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR, "ECONOMIC ATTITUDES AND PUBLIC POLICY IN EUROPE," 1990 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION

PANEL DISCUSSANT, "RETROSPECTIVE VOTING IN U.S. ELECTIONS," 1990 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

CO-CONVENER, WITH BRUCE OPPENHEIMER, OF ELECTING THE SENATE, A NATIONAL CONFERENCE ON THE NES 1988 SENATE ELECTION STUDY.  FUNDED BY THE RICE INSTITUTE

17

FOR POLICY ANALYSIS, THE UNIVERSITY OF HOUSTON CENTER FOR PUBLIC POLICY, AND THE NATIONAL SCIENCE FOUNDATION, HOUSTON, TEXAS, DECEMBER, 1989.

INVITED PARTICIPANT, UNDERSTANDING CONGRESS: A BICENTENNIAL RESEARCH CONFERENCE, WASHINGTON, D.C., FEBRUARY, 1989.

INVITED PARTICIPANT--HENDRICKS SYMPOSIUM ON THE UNITED STATES SENATE, UNIVERSITY OF NEBRASKA, LINCOLN, NEBRASKA, OCTOBER, 1988

INVITED PARTICIPANT--CONFERENCE ON THE HISTORY OF CONGRESS, STANFORD UNIVERSITY, STANFORD, CALIFORNIA, JUNE, 1988.

INVITED PARTICIPANT, "ROUNDTABLE ON PARTISAN REALIGNMENT IN THE 1980'S", 1987 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.


## Professional Activities:

### Other Universities:

INVITED SPEAKER, GRADUATE STUDENT COLLOQUIUM, DEPARTMENT OF POLITICAL SCIENCE, UNIVERSITY OF NEW MEXICO, 2013.

INVITED KEYNOTE SPEAKER, POLITICAL SCIENCE ALUMNI EVENING, UNIVERSITY OF HOUSTON, 2013.

INVITED LECTURER, BIOLOGY AND POLITICS MASTERS SEMINAR (JOHN GEER AND DAVID BADER), DEPARTMENT OF POLITICAL SCIENCE AND BIOLOGY DEPARTMENT, VANDERBILT UNIVERSITY, 2010.

INVITED LECTURER, BIOLOGY AND POLITICS SENIOR SEMINAR (JOHN GEER AND DAVID BADER), DEPARTMENT OF POLITICAL SCIENCE AND BIOLOGY DEPARTMENT, VANDERBILT UNIVERSITY, 2008.

VISITING FELLOW, THE HOOVER INSTITUTION, STANFORD UNIVERSITY, 2007.

INVITED SPEAKER, JOINT POLITICAL PSYCHOLOGY GRADUATE SEMINAR, UNIVERSITY OF MINNESOTA, 2007.

INVITED SPEAKER, DEPARTMENT OF POLITICAL SCIENCE, VANDERBILT UNIVERSITY, 2006.

**Member:**

EDITORIAL BOARD, JOURNAL OF POLITICS, 2007-2008.

PLANNING COMMITTEE FOR THE NATIONAL ELECTION STUDIES' SENATE ELECTION STUDY, 1990-92.

NOMINATIONS COMMITTEE, SOCIAL SCIENCE HISTORY ASSOCIATION, 1988

**Reviewer for:**

AMERICAN JOURNAL OF POLITICAL SCIENCE

AMERICAN POLITICAL SCIENCE REVIEW

AMERICAN POLITICS RESEARCH

AMERICAN POLITICS QUARTERLY

AMERICAN PSYCHOLOGIST

AMERICAN SOCIOLOGICAL REVIEW

CANADIAN JOURNAL OF POLITICAL SCIENCE

COMPARATIVE POLITICS

ELECTORAL STUDIES

EVOLUTION AND HUMAN BEHAVIOR

INTERNATIONAL STUDIES QUARTERLY

JOURNAL OF POLITICS

JOURNAL OF URBAN AFFAIRS

LEGISLATIVE STUDIES QUARTERLY

NATIONAL SCIENCE FOUNDATION

PLoS ONE

POLICY STUDIES REVIEW

POLITICAL BEHAVIOR

POLITICAL COMMUNICATION

POLITICAL PSYCHOLOGY

POLITICAL RESEARCH QUARTERLY

PUBLIC OPINION QUARTERLY

SCIENCE

SECURITY STUDIES

SOCIAL FORCES

SOCIAL SCIENCE QUARTERLY

WESTERN POLITICAL QUARTERLY

## University Service:

MEMBER, UNIVERSITY BENEFITS COMMITTEE, 2013-2014.

MEMBER, UNIVERSITY COUNCIL, 2012-2013.

INVITED SPEAKER, RICE TEDxRiceU , 2013.

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, ATLANTA, 2011.

LECTURER, ADVANCED TOPICS IN AP PSYCHOLOGY, RICE UNIVERSITY AP SUMMER INSTITUTE, 2009.

SCIENTIA LECTURE SERIES: "POLITICS IN OUR GENES: THE BIOLOGY OF IDEOLOGY" 2008

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, SEATTLE, SAN FRANCISCO AND LOS ANGELES, 2008.

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, AUSTIN, CHICAGO AND WASHINGTON, DC, 2006.

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, DALLAS AND NEW YORK, 2005.

DIRECTOR: RICE UNIVERSITY BEHAVIORAL RESEARCH LAB AND SOCIAL SCIENCE COMPUTING LAB, 2005-2006.

INTERNSHIP DIRECTOR FOR THE DEPARTMENT OF POLITICAL SCIENCE, 2004-2012.

UNIVERSITY OFFICIAL REPRESENTATIVE TO THE INTER-UNIVERSITY CONSORTIUM FOR POLITICAL AND SOCIAL RESEARCH, 1989-2012.

DIRECTOR: RICE UNIVERSITY SOCIAL SCIENCE COMPUTING LAB, 1989-2004.

MEMBER, RICE UNIVERSITY INFORMATION TECHNOLOGY ACCESS AND SECURITY COMMITTEE, 2001-2002

20

Rice University Committee on Computers, Member, 1988-1992, 1995-1996; Chair, 1996-1998, Co-chair, 1999.

Acting Chairman, Rice Institute for Policy Analysis, 1991-1992.

Divisional Member of the John W. Gardner Dissertation Award Selection Committee, 1998

Social Science Representative to the Educational Sub-committee of the Computer Planning Committee, 1989-1990.

Director of Graduate Admissions, Department of Political Science, Rice University, 1986-1988.

Co-director, Mellon Workshop:  Southern Politics, May, 1988.

Guest Lecturer, Mellon Workshop:  The U.S. Congress in Historical Perspective, May, 1987 and 1988.

Faculty Associate, Hanszen College, Rice University, 1987-1990.

Director, Political Data Analysis Center, University of Georgia, 1982-1985.


## External Service:

The Japanese Consulate of Houston - Texas and U.S. Politics, 1987-2012.

Expert Witness, Rodriguez v. Grand Prairie ISD, racially polarized voting analysis, 2013.

Expert Witness, Garcia-Sonnier et al v. Pasadena ISD, racially polarized voting analysis, 2012.

Expert witness, Montes v. City of Yakima, challenge to Yakima, Washington At-Large City Council Elections, 2012.

Consultant, Lamar ISD - Demographic analysis and redrawing of election districts, 2012.

21

EXPERT WITNESS, RODRIGUEZ, ET. AL. V HARRIS CO., CHALLENGE TO ADOPTED HARRIS COUNTY COMMISSIONERS' COURT PRECINCTS, 2011.

CONSULTANT, CITY OF BAYTOWN - DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2011.

CONSULTANT, GOOSE CREEK ISD - DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2011.

CONSULTANT, SAN ANTONIO WATER SYSTEM - ANALYSIS OF PRECLEARANCE ISSUES RELATED TO MERGER WITH BEXARMET WATER AUTHORITY, 2011.

EXPERT WITNESS, TEXAS V US, PRECLEARANCE SUIT FOR TEXAS STATEWIDE DISTRICTS, 2011.*

EXPERT WITNESS, DAVIS V PERRY (AND CONSOLIDATED CASES), CHALLENGE TO ADOPTED TEXAS SENATE DISTRICTS, 2011.

EXPERT WITNESS, PEREZ, ET. AL. V STATE OF TEXAS (AND CONSOLIDATED CASES), CHALLENGE TO ADOPTED TEXAS STATEWIDE DISTRICTS, 2011.*

EXPERT WITNESS, FABELA, ET. AL. V CITY OF FARMERS BRANCH, FARMERS BRANCH CITY COUNCIL AT LARGE DISTRICT CHALLENGE, 2011.

EXPERT WITNESS, EL PASO APARTMENT OWNERS ASSOC. V CITY OF EL PASO, ANALYSIS OF RACIAL PATTERNS IN HOUSING OCCUPANCY, 2009.

EXPERT WITNESS, BENEVIDES, V IRVING ISD, RACIALLY POLARIZED VOTING ANALYSIS, 2008-2009.

EXPERT WITNESS, BENEVIDES, V CITY OF IRVING, RACIALLY POLARIZED VOTING ANALYSIS, 2008-2009.

EXPERT WITNESS, REYES, ET. AL. V CITY OF FARMERS BRANCH, RACIALLY POLARIZED VOTING ANALYSIS, 2007-2008.

Exhibit 12

1  Francis S. Floyd, WSBA 10642
   Sean E.M. Moore, WSBA 30840
2  John A. Safarli, WSBA 44056
   *Attorneys for Defendants*
3  FLOYD, PFLUEGER & RINGER P.S.
   200 W. Thomas Street, Suite 500
4  Seattle, WA 98119-4296
   ffloyd@floyd-ringer.com
5  smoore@floyd-ringer.com
   jsafarli@floyd-ringer.com
6  Tel (206) 441-4455
   Fax (206) 441-8484

7

8              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WASHINGTON
9

   ROGELIO MONTES and MATEO
10  ARTEAGA,                              NO. CV-12-3108-TOR

11              Plaintiffs,               **PLAINTIFFS' FIRST REQUESTS
                                          FOR ADMISSION TO**
12      vs.                               **DEFENDANTS**

13  CITY OF YAKIMA, MICAH                 **AND DEFENDANTS' ANSWERS
    CAWLEY, in his official capacity as   AND OBJECTIONS**
14  Mayor of Yakima, and MAUREEN
    ADKISON, SARA BRISTOL, KATHY
15  COFFEY, RICK ENSEY, DAVE ETTL,
    and BILL LOVER, in their official
16  capacity as members of the Yakima City
    Council,
17
                Defendants.
18

19

   PLAINTIFFS' FIRST REQUESTS        FLOYD, PFLUEGER & RINGER P.S.
   FOR ADMISSION TO                  200 WEST THOMAS STREET, SUITE 500
   DEFENDANTS AND                    SEATTLE, WA 98119-4296
   DEFENDANTS' ANSWERS AND           TEL 206 441-4455
   OBJECTIONS - 1                    FAX 206 441-8484

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 372

1    COME NOW defendants, through their counsel of record, pursuant to

2    Rules 26, 36, and 37, hereby provide Answers to Plaintiffs' First Requests for

3    Admission.

4    ## I.    <u>GENERAL STATEMENT</u>

5    Defendants and their counsel have not completed their investigation of the

6    facts relating to this case, nor have they completed their discovery or preparation

7    for trial.  The answers herein are made on the basis of information and documents

8    presently available to defendants.    Therefore, defendants reserve the right to

9    supplement discovery and offer and/or to rely at trial on subsequently discovered

10   information or documents, or on information omitted from these answers as the

11   result of any good faith oversight, error or mistake.

12   ## II.    <u>GENERAL OBJECTIONS</u>

13   The following objections apply generally to plaintiffs' initial instructions,

14   definitions, and Requests for Admission:

15   1.    <u>Scope of Requests for Admission.</u>  Defendants object to any Request

16   for Admission that does not request an admission of the truth of any matters

17   within the scope of Rule 26(b)(1) relating to (a) facts, the application of law to

18   fact, or opinions about either; and (b) the genuineness of any described

19

PLAINTIFFS' FIRST REQUESTS
FOR ADMISSION TO
DEFENDANTS AND
DEFENDANTS' ANSWERS AND
OBJECTIONS - 2

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119-4296
TEL 206 441-4455
FAX 206 441-8484

1  documents.

2      2.   <u>Purposes of Admission</u>.  Pursuant to Rule 36(b), an admission under

3  Rule 36(a) is not an admission for any other purpose and cannot be used against

4  the party in any other proceeding.

5      3.   <u>Limitations of Discovery.</u>  Defendants object to any Request for

6  Admission that exceeds the limitations imposed by Rule 26(b)(2)(C), is objected

7  to insofar as (a) the Request for Admission is unreasonably duplicative or

8  duplicative, or can be obtained from other source that is more convenient, less

9  burdensome, or less expensive; (b) the party seeking discovery has had ample

10  opportunity to obtain the information by discovery in the action; or (c) the burden

11  or expense of the proposed Request for Admission outweighs its likely benefit,

12  considering the needs of the case, the amount in controversy, the parties'

13  resources, the importance of the issues at stake in the action, and the importance

14  of the discovery in resolving the issues.

15

16

17

18

19

PLAINTIFFS' FIRST REQUESTS FOR ADMISSION TO DEFENDANTS AND DEFENDANTS' ANSWERS AND OBJECTIONS - 3

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119-4296
TEL 206 441-4455
FAX 206 441-8484

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 374

1

## III.   REQUESTS FOR ADMISSION

2   **REQUEST FOR ADMISSION NO. 1:**  Admit that no Latino candidate has ever

3   been elected to the Yakima City Council.

4   **ANSWER:**  Request for Admission No. 1 is objected to on the basis of plaintiffs'

5   definition of Latino as "a person of Latin American origin or ancestry."  The

6   definition *per se* is not objected to, but the definition is impractical for purposes

7   of admitting or denying this Request for Admission.  Defendants do not have the

8   specific knowledge or information necessary to determine whether each candidate

9   who has been elected to the City Council was a person—or identified as a

10   person—with "Latin American origin or ancestry."   Without waiving said

11   objection and based on the current knowledge available to defendants, defendants

12   are not aware of a Latino candidate, as defined by plaintiffs, who has been elected

13   to the City Council.

14

15

16       *The undersigned attorney of record certifies that the above objection*

    *complies with Rule 26(g)(1).*

17

18

    Francis S. Floyd, WSBA 10642

19

PLAINTIFFS' FIRST REQUESTS
FOR ADMISSION TO
DEFENDANTS AND
DEFENDANTS' ANSWERS AND
OBJECTIONS - 4

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119-4296
TEL 206 441-4455
FAX 206 441-8484

1    **REQUEST FOR ADMISSION NO. 2:** Admit that Sonia Rodriguez-True is the

2    only Latino ever to have been appointed to the Yakima City Council.

3    **ANSWER:** Request for Admission No. 2 is objected to on the basis of plaintiffs'

4    definition of Latino as "a person of Latin American origin or ancestry." The

5    definition *per se* is not objected to, but this definition is impractical for purposes

6    of admitting or denying this Request for Admission. Defendants do not have the

7    specific knowledge or information necessary to determine whether each person

8    appointed to the City Council was a person, or identified as a person, with "Latin

9    American origin or ancestry." Without waiving said objection, based on the

10   current knowledge available to defendants, and with the exception of Sonia

11   Rodriguez-True, defendants are not aware of a Latino, as defined by plaintiffs,

12   who has been appointed to the City Council.

13

14

15       *The undersigned attorney of record certifies that the above objection*

      *complies with Rule 26(g)(1).*

16

17                                    _____

                                        Francis S. Floyd, WSBA 10642

18

19

      PLAINTIFFS' FIRST REQUESTS          FLOYD, PFLUEGER & RINGER P.S.
      FOR ADMISSION TO                    200 WEST THOMAS STREET, SUITE 500
      DEFENDANTS AND                      SEATTLE, WA 98119-4296
      DEFENDANTS' ANSWERS AND             TEL 206 441-4455
      OBJECTIONS - 5                      FAX 206 441-8484

1   **REQUEST FOR ADMISSION NO. 3:**   Admit that, after her appointment,

2   Sonia Rodriguez-True was defeated the first time she was on the ballot, in the

3   2009 general election.

4   **ANSWER:**  Admit.

5

6

7

8

9   **REQUEST FOR ADMISSION NO. 4:**  Admit that records maintained by the

10  Yakima County Elections Department accurately record election results in the

11  City of Yakima.

12  **ANSWER:**  Objection.  This Request for Admission requests defendants to admit

13  to the accuracy of records recorded and maintained by another government

14  agency.  As required by Washington State statutes, including RCW 29A.60.190,

15  the Yakima County Elections Department records election results in Yakima

16  County.  Defendants have no knowledge that any specific records are inaccurate.

17  Subject to this objection and qualification, admit.

18

19

PLAINTIFFS' FIRST REQUESTS
FOR ADMISSION TO
DEFENDANTS AND
DEFENDANTS' ANSWERS AND
OBJECTIONS - 6

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119-4296
TEL 206 441-4455
FAX 206 441-8484

1    *The undersigned attorney of record certifies that the above objection*

2    *complies with Rule 26(g)(1).*

3

4                                        Francis S. Floyd, WSBA 10642

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

PLAINTIFFS' FIRST REQUESTS          FLOYD, PFLUEGER & RINGER P.S.
FOR ADMISSION TO                    200 WEST THOMAS STREET, SUITE 500
DEFENDANTS AND                      SEATTLE, WA 98119-4296
DEFENDANTS' ANSWERS AND             TEL 206 441-4455
OBJECTIONS - 7                      FAX 206 441-8484

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 378

1

## CERTIFICATION

2      After reading the above answers and objections and, after a reasonably

3   inquiry, I hereby certify that, to the best of my knowledge, information and belief,

4   the above answers comply with the requirements of Rule 26(g).

5

6      DATED this 17th day of December, 2012.

7

                        FLOYD, PFLUEGER & RINGER, P.S.

8

9      _____

10                        Francis S. Floyd, WSBA No. 10642
                        Sean E.M. Moore, WSBA No. 30840
                        John Safarli, WSBA No. 44056
11                        200 W. Thomas Street, Suite 500
                        Seattle, WA 98119
12                        ffloyd@floyd-ringer.com
                        smoore@floyd-ringer.com
13                        jsafarli@floyd-ringer.com
                        Tel (206) 441-4455
14                        Fax (206) 441-8484

15

16

17

18

19

PLAINTIFFS' FIRST REQUESTS          FLOYD, PFLUEGER & RINGER P.S.
FOR ADMISSION TO                    200 WEST THOMAS STREET, SUITE 500
DEFENDANTS AND                      SEATTLE, WA 98119-4296
DEFENDANTS' ANSWERS AND             TEL 206 441-4455
OBJECTIONS - 8                      FAX 206 441-8484

**VERIFICATION**

I, Helen A. Harvey, am a Senior Assistant City Attorney for the City of Yakima. I am authorized, on behalf of defendants, to sign the above answers pursuant to Rule 36(a)(3).

DATED this 17th day of December, 2012

*Helen A. Harvey*
Helen A. Harvey

PLAINTIFFS' FIRST REQUESTS
FOR ADMISSION TO
DEFENDANTS AND
DEFENDANTS' ANSWERS AND
OBJECTIONS - 9

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119-4296
TEL 206 441-4455
FAX 206 441-8484

1

## CERTIFICATE OF SERVICE

2

The undersigned hereby certifies under penalty of perjury under the laws of

3

the State of Washington, that on the date noted below, a true and correct copy of

4

the foregoing was delivered and/or transmitted in the manner(s) noted below:

5

6
7
8
9

| Sarah Dunne WSBA 34869<br>La Rond Baker WSBA 43610<br>ACLU of Washington Foundation<br>901 Fifth Avenue, Suite 630<br>Seattle, WA 98164<br>(206) 624-2184<br>dunne@aclu-wa.org<br>lbaker@aclu-wa.org | *Counsel for*<br>*Plaintiffs* | ☒ VIA EMAIL<br>☐ VIA FACSIMILE<br>☒ VIA MESSENGER<br>☐ VIA U.S. MAIL<br>☐ VIA CM/ECF<br>SYSTEM |

10
11
12

| Joaquin Avila<br>The Law Firm of Joaquin Avila<br>P.O. Box 33687<br>Seattle, WA 98133<br>(206) 724-3731<br>*Pro Hac Vice* | *Counsel for*<br>*Plaintiff Rogelio*<br>*Montes* | ☒ VIA EMAIL<br>☐ VIA FACSIMILE<br>☐ VIA MESSENGER<br>☒ VIA U.S. MAIL<br>☐ VIA CM/ECF<br>SYSTEM |

13
14
15
16
17

| Laughlin McDonald<br>ACLU Foundation, Inc.<br>Voting Rights Project<br>230 Peachtree Street, Suite 1440<br>Atlanta, GA 30303-1227<br>(404) 523-2721<br>lmcdonald@aclu.org<br>*Pro Hac Vice* | *Counsel for*<br>*Plaintiff Mateo*<br>*Arteaga* | ☒ VIA EMAIL<br>☐ VIA FACSIMILE<br>☐ VIA MESSENGER<br>☒ VIA U.S. MAIL<br>☐ VIA CM/ECF<br>SYSTEM |

18

19

PLAINTIFFS' FIRST REQUESTS
FOR ADMISSION TO
DEFENDANTS AND
DEFENDANTS' ANSWERS AND
OBJECTIONS - 10

FLOYD, PFLUEGER & RINGER P.S.
200 WEST THOMAS STREET, SUITE 500
SEATTLE, WA 98119-4296
TEL 206 441-4455
FAX 206 441-8484

1

2

3   Kevin J. Hamilton, WSBA 15648        *Counsel for*        ☒ VIA EMAIL
    Noah G. Purcell, WSBA 43492          *Plaintiffs*          ☐ VIA FACSIMILE
4   Perkins Coie LLP                                           ☒ VIA MESSENGER
    1201 Third Avenue, Suite 4900                              ☐ VIA U.S. MAIL
5   Seattle, WA 98101-3099                                     ☐ VIA CM/ECF
    (206) 359-8000                                             SYSTEM
6   khamilton@perkinscoie.com
    npurcell@perkinscoie.com
7
        DATED this 17th day of December, 2012.
8

9

10                              Yalda Biniazan, Legal Assistant

11

12

13

14

15

16

17

18

19

    PLAINTIFFS' FIRST REQUESTS           FLOYD, PFLUEGER & RINGER P.S.
    FOR ADMISSION TO                     200 WEST THOMAS STREET, SUITE 500
    DEFENDANTS AND                       SEATTLE, WA 98119-4296
    DEFENDANTS' ANSWERS AND              TEL 206 441-4455
    OBJECTIONS - 11                      FAX 206 441-8484

Exhibit 13

OPINIONS   John J. O'Connell | 1957-1968 | Attorney General of Washington

ELECTIONS - CIVIL RIGHTS - VOTER REGISTRATION - ADMINISTRATION OF LITERACY TEST TO PERSONS REGISTERING TO VOTE.

Persons registering to vote in Washington cannot currently be tested for literacy in the manner provided for in RCW 29.07.070 (13), in view of the provisions of the 1965 federal voting rights act (42 U.S.C., § 1971 (a)).

- - - - - - - - - - - -

June 15, 1967

Honorable Alfred E. Cowles
Executive Secretary, Washington
State Board Against Discrimination
Senate Arms Building
Olympia, Washington 98501

Cite as:  AGO 1967 No. 21

Dear Sir:

You have asked for the opinion of this office on a question which we paraphrase as follows:

May persons registering to vote in Washington currently be tested for literacy in the manner provided for in RCW 29.07.070 (13), in view of the provisions of recent federal voting rights legislation?

We answer your question in the negative for the reasons set forth in our analysis.

ANALYSIS

The Washington constitution (Article VI, § 1) provides that:

"All persons of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote at all elections: . . . they shall be able to read and speak the English language: . . . The legislative authority shall enact laws defining the manner of ascertaining the qualifications of voters as to their ability to read and speak the English language, and providing for punishment of persons voting or registering in violation of the provision of this section."

[[Orig. Op. Page 2]]

Pursuant to this article, the Washington legislature has provided (RCW 29.07.070):

"Having administered the oath, the registration officer shall interrogate the applicant for registration, concerning his qualifications as a voter . . ., requiring him to

state:

    ". . .

    "(13) Whether the applicant . . . is able to read and speak the English language so as to comprehend the meaning of ordinary English prose, and in case the registration officer is not satisfied in that regard, he may require the applicant to read aloud and explain the meaning of some ordinary English prose;"

    Notably, this is the only Washington statute pertaining to the administration of literacy tests in implementation of the constitutional provision.  It is further to be noted that this office has previously advised that the Washington literacy requirement has been modified by the "Puerto Rico" provision contained in the federal voting rights act of 1965, 42 U.S.C. § 1973b (e).  See our letter to Honorable A. Ludlow Kramer, Secretary of State, dated September 20, 1966, a copy of which is enclosed. This provision says that literacy in English cannot be a qualification to vote for persons educated in American flag schools in which the predominant classroom language was other than English.

    Except for persons who come within the Puerto Rico provision, supra, the Washington literacy requirement remains in effect.  However, the manner of testing for literacy is now controlled by federal law, as will be hereinafter seen.  Preliminarily though, it should be noticed that the state of Washington is not one of the places where literacy tests have been prohibited outright by federal legislation.  The 1965 voting rights act suspends literacy tests and other devices only in those states or political subdivisions where the director of census determines that less than fifty percent of the persons of voting age residing therein were registered on November 1, 1964, or that less than fifty percent of such persons voted in the presidential election of November, 1964.  See 42 U.S.C. [[Orig. Op. Page 3]] § 1973b.  Washington was not included in the director of census' report on the states that failed these fifty-percent requirements.  See 30 Fed. Reg. 9897.

    Unlike this more publicized part of the federal voting rights legislation, the part controlling the manner of administering literacy tests applies uniformly in all the states, including, of course, Washington.  The pertinent language appears in 42 U.S.C., § 1971 (a), as follows:

    ". . .

    "(2) No person acting under color of law shall -

    ". . .

    "(C) employ any literacy test as a qualification for voting in any election unless (i) such test is administered to each individual and is conducted wholly in writing, and (ii) a certified copy of the test and of the answers given by the individual is furnished to him within twenty-five days of the submission of his request made within the period of time during which records and papers are required to be retained and preserved pursuant to sections 1974-1974e of this title: . . .

    "(3) For purposes of this subsection -

    ". . .

"(B) the phrase 'literacy test' includes any test of the ability to read, write, understand, or interpret any matter."  (Emphasis supplied.)

The quoted language originated in the civil rights act of 1964.  At that time it was limited to federal elections, but the 1965 voting rights act (§ 15 (a), 79 Stat. 445) made it applicable to state and local elections as well.

The purpose of this feature of the federal voting rights legislation was explained in the report of the House Judiciary Committee recommending passage of the 1964 Civil Rights Act as  [[Orig. Op. Page 4]] follows:1/

"Title I is designed to meet problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960, by which the Congress took steps to guarantee to all citizens the right to vote without discrimination as to race or color.

       ". . .

"Section 101 (a) is designed to insure nondiscriminatory practices in the registration of voters for Federal elections.  It would amend existing law (42 U.S.C. 1971 (a)) by requiring the application of uniform standards, practices, and procedures to all persons seeking to vote in Federal elections . . . These provisions would provide specific protections to the right to vote and would reduce opportunities for discriminatory application of voting standards without in any way lessening or limiting the broad prohibitions against voting discrimination already contained in existing law."

Seven members of the committee expressed additional views as follows:2/

"Closely related to the delays in justice are the intricate methods employed by some State or county voting officials to defeat Negro registration . . .

       ". . .

       [[Orig. Op. Page 5]]

"(T)he basic troubles come not from discriminatory laws, but (as the Civil Rights Commission so well expressed in its 1959 report, p. 133) 'from the discriminatory application and administration of apparently nondiscriminatory laws.'

"It is for these reasons that the committee has amended the 1957 and 1960 Civil Rights Acts to provide that, in Federal elections State registration officials must: (1) apply standards, practices, and procedures equally among individuals seeking to register to vote; . . . (3) administer literacy tests in writing. . . ."3/

The approach of the earlier 1957 and 1960 Civil Rights Acts had been to enforce voting rights by authorizing the United States attorney general to bring civil lawsuits against offending state officers.  But the state officers were acting under laws designed to give them an arbitrary discretion which was not easily subjected to judicial review.  See, Louisiana v. United States, 380 U.S. 145 at 151-52 (1965), in which the court found that interpretation tests, such as Louisiana's requirement that an applicant give a reasonable interpretation of any section of the state or federal constitution, were adopted for the frank purpose of disfranchising Negroes, it being understood that the registration officers would use their discretion for that purpose.

And, when the United States attorney general succeeded in having a state literacy statute declared unconstitutional, another slightly different one would be enacted to take its place.

Thus, in 1964, Congress decided to get to the heart of the problem; i.e., the practice of vesting unlimited discretion in state registration officers. Accordingly, the 1964 Civil [[Orig. Op. Page 6]] Rights Act prohibited the use of literacy tests unless they met federal standards for uniform application. The basic operative language of the statute (now applicable as to state elections as well) is:

"No person . . . shall . . . employ any literacy test as a qualification for voting in any election unless . . . such test is administered to each individual and is conducted wholly in writing . . ."

In other words, unless a state's system for administering literacy tests meets the standards of the federal law, state officers may not use literacy tests at all.4/

RCW 29.07.070, supra, does not presently require that a literacy test be given to each person who applies to register to vote. Instead, our statute says that a test is to be administered only if the registration officer "is not satisfied" with the applicant's sworn statement that he is able to read and speak the English language so as to comprehend the meaning of ordinary English prose.

In addition, our statute does not require that the test be given in writing; it says that the registration officer -

". . . may require the applicant to read aloud and explain the meaning of some ordinary English prose;"

While Washington is not one of the states with a tradition of discrimination against minorities in voting, our statutory provisions on literacy tests are like those which were in effect where abuse occurred. The federal government has prohibited the discretionary approach, and Washington is bound to obey the law5/ as much as those states whose misconduct caused it to be enacted.

We reiterate that it is literacy testing, not the literacy requirement, at which 42 U.S.C. § 1971 (a) (2) is directed.

[[Orig. Op. Page 7]]

Except in cases where the Puerto Rico provision applies, we see nothing in the federal voting rights legislation which prevents a voter registration officer from requiring an applicant to state (RCW 29.07.070) and swear (RCW 29.07.080) that he is able to read and comprehend ordinary English prose.6/   A person who falsely swears for this purpose is guilty of a felony. RCW 29.85.200.

To summarize, we have concluded that:

(1) The Washington requirement that a person be able to read and speak the English language in order to vote remains in effect, except for persons educated in American flag schools where the predominant classroom language was other than English.

(2) Except as noted in (1), federal law does not prevent a voter registration

officer from requiring an applicant to state and swear that he is able to read and speak the English language.

[[Orig. Op. Page 8]]

(3) Until Washington provides for the administration of literacy tests on a uniform basis in conformity with federal law, no person may be required to take a literacy test.

We trust that the foregoing will be of assistance to you.

Very truly yours,

JOHN J. O'CONNELL
Attorney General

MORTON M. TYTLER
Assistant Attorney General

### ***  FOOTNOTES  ***

1/House Report No. 914, 88th Congress, 2d Session, 1964 U.S. Code Cong. & Ad. News 2391 at 2394.

2/Additional views on H.R. 7152 by Representatives McCulloch, Lindsay, Cahill, Shriver, MacGregor, Mathias and Bromwell, 1964 U.S. Code Cong. & Ad. News, 2487 at 2490.

3/For additional legislative history, see the comments of Representative Rogers of Colorado on the House floor, January 31, 1964, 110 Cong. Record 1548, and of Senator Keating on the Senate floor, April 1, 1964, 110 Cong. Record 6717.

4/See note, Federal Protection of Negro Voting Rights, 51 Va. L.R. 1051 [[51 Va. L. Rev.]]at 1192.

5/The constitution of the United States says:  "This Constitution, and the laws of the United States which shall be made in pursuance thereof; . . . shall be the supreme law of the land . . . anything in the constitution or laws of any state to the contrary notwithstanding."  Article VI, clause 2.

6/For their own guidance, voter registration officers may wish to take note of 42 U.S.C., § 1971(c) which says that in any lawsuit brought by the United States attorney general to enforce voting rights:

". . . there shall be a rebuttable presumption that any person who has not been adjudged an incompetent and who has completed the sixth grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico where instruction is carried on predominantly in the English language, possesses sufficient literacy, comprehension, and intelligence to vote in any election."

Exhibit 14

Reproduced at the National Archives at Seattle

1  Charles E. Ehlert
   Attorney for Plaintiffs
2
   214 North Chestnut
3  Toppenish, Washington
   Phone 865-2145
4
5              IN THE UNITED STATES DISTRICT COURT
               ~~FOR THE~~ EASTERN DISTRICT OF WASHINGTON
6                        SOUTHERN DIVISION

7  MEXICAN-AMERICAN FEDERATION-WASHINGTON       )
   STATE, a non-profit organization; CAESARIO   )
8  JIMENEZ; SIMON RAMOS; JENNIE MARIN; and      )   COMPLAINT FOR DECLARATORY
   MARTA CANTU; on their own behalves and on    )   AND INJUNCTIVE RELIEF
9  behalf of all others similarly situated,     )   filed September 11, 1968
                                                )
10                                Plaintiffs.    )   CIVIL ACTION NO. 2457
                                                )
11     vs.                                      )   THREE JUDGE COURT
                                                )
12 EUGENE NAFF, Yakima County Auditor;          )
   MAURINE SEEFELDT, Toppenish City Clerk       )       FILED IN THE
13 and Yakima County Deputy Registrar; and      )   U. S. DISTRICT COURT
   CHARLES SKINNER, Zillah City Clerk and       )   Eastern District of Washington
14 Yakima County Deputy Registrar; on           )
   their own behalves and on behalf of all      )       SEP 11 1968
15 others similarly situated,                   )
                                                )   DOROTHY E. MOULTON, Clerk
16                                Defendants.    )
                                                )   ...........Deputy
17
18     NOW COME the plaintiffs, for themselves and for all others similarly

19 situated, and allege as follows:

20                              I

21                         JURISDICTION

22     This is an action for declaratory and injunctive relief authorized by 42

23 U.S.C. Section 1983 to secure rights, privileges and immunities protected by

24 the First and Fourteenth Amendment of the Constitution of the United States.

25 Jurisdiction of this Court is also invoked under 42 U.S.C. Section 1971 and

26 under 28 U.S.C. Sections 1343 and 2201-2202, which grants this Court original

27 jurisdiction of suits authorized by 42 U.S.C. Section 1983.

28                             II

29                       THREE JUDGE COURT

30     A three judge court is requested at the earliest date to determine the

31 matters herein, pursuant to 28 U.S.C. Sections 2281, 2283, 2284.  This is a

32 proper case for adjudication by a three judge court in that it seeks an

                       Complaint Page 1                              1

Reproduced at the National Archives at Seattle

1  injunction to restrain the defendant officers of political subdivisions of the
2  State of Washington from applying, enforcing, executing and implementing
3  Amendment V of the Washington State Constitution and Revised Code of Washington
4  29.07.070 (13) (attached hereto as Exhibit A), insofar as those provisions
5  require an ability to read and speak the English language as a condition for
6  eligibility to vote in the State of Washington and insofar as they discriminate
7  against persons able to read and speak Spanish but not able to read and speak
8  the English language and insofar as they empower or authorize voting registrars
9  to test the ability of voting registration applicants to read and speak the
10 English language, on the ground that said constitutional and statutory provisions
11 of Washington law injure the plaintiffs and deny to plaintiffs the right of
12 peaceful assembly and association, the right to petition their government for
13 redress of their grievances, and the privileges and immunities and equal
14 protection of the laws guaranteed by the First and Fourteenth Amendments of the
15 Constitution of the United States.

### III

#### PLAINTIFF MEXICAN AMERICAN FEDERATION

1.  The Mexican-American Federation-Washington State herinafter referred to as "Mexican American Federation", is a non-profit corporation organized in November 1967, under the laws of the State of Washington, having its principle office at 2912 West Chestnut Street, Yakima, Yakima County, Washington.

2.  Plaintiff Mexican American Federation is the only organization in existance whose purpose and goal it is to represent, promote and achieve the economic, social, and cultural interests of all Mexican American and Spanish speaking people in the State of Washington through regular and usual political processes.  Under its charter from the State of Washington, its purposes are, among others:

> "(1)  To create a non-partisan organization for the social, economic, cultural, and civic betterment of Mexican-Americans and all other Spanish-speaking people through political action and to promote, protect and preserve the individual freedom and human dignity of every man.

> "(2)  To promote the election and appointment to public office of Mexican-Americans and other persons sympathetic to our aims.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY

"(3)  To encourage increased activity in both major political parties...

"(4)  To take Stands on political issues, to be present and endorse candidates for public office.

"(5)  To maintain a permanent registration and get-out-the-vote drive throughout the State of Washington.

"(14) Conduct and carry-on, directly or indirectly, research, development and promotional or experimental activities, political, social, or legal action.

"(15) Carry on any activity whatsoever, either as principal, agent or partner, which this corporation may deem proper or convenient in connection with any of the foregoing purpose . . .

3.  The primary immediate goal of the Mexican American Federation is the registration of all Mexican American people eligible to vote in the State of Washington.

4.  The effect of the defendants, acts, practices and conduct, and of their enforcement, application and implementation of Amendment V of the Washington State Constitution and R.C.W. 29.07.070 (13), as hereinbelow described, is to prevent many Mexican American people from voting in the State of Washington, thereby causing irreparable injury to the Mexican American Federation, as follows:

a.  By depriving it, its members, and other Mexican American and Spanish speaking people in the State of Washington of the fullest degree of political power and effectiveness which would be available to them if there were no discrimination in the registration of voters against people who read and speak Spanish only;

b.  By making it impossible for the Federation to achieve its primary immediate goal, the registration of all Mexican American people eligible to vote in the State of Washington; and

c.  By depriving the Mexican American Federation of the popular and political support of an association with qualified voters which are necessary to the achievement of its economic, social, educational and cultural goals through the regular and usual political processes.

IV

PLAINTIFF CAESARIO JIMENEZ

1.  Plaintiff Caesario Jimenez is a citizen of the United States, over 21

Complaint Page 3

3

Reproduced at the National Archives at Seattle

Reproduced at the National Archives at Seattle

1  years of age, has resided in the State of Washington for more than one year,

2  in Yakima County for more than 90 days, and in his precinct for more than 30

3  days.

4      2. Plaintiff Jimenez is a Mexican American and was born in 1909, in D'Hanis,

5  Texas, near Hondo, Texas, where his birth was registered.

6      3. Plaintiff Jimenez lived in Texas until about 1912, when his father

7  returned to Mexico, taking the plaintiff with him.  The plaintiff lived in

8  Mexico for approximately 47 years and attended school there, through the fourth

9  grade.  Plaintiff Jimenez returned to live in the United States in 1959.

10      4. Since about 1960, plaintiff Jimenez has worked and resided on the

11  Goulding Farm, near Toppenish, in Yakima County Rural Princint No. 96, also

12  known as "Toppenish Rural Precinct No. 3," in Yakima County, Washington.

13      5. Plaintiff Jimenez can read and speak the Spanish language fluently but

14  cannot read or speak the English language, except for a few words.

15      6. In all respects other than his inability to read and speak the English

16  language, plaintiff Jimenez is qualified and eligible to vote in the State of

17  Washington.

18

19                     V

20           PLAINTIFF SIMON RAMOS

21      1. Plaintiff Simon Ramos is a citizen of the United States, over 21

22  years of age, and he resided in the State of Washington for more than one year,

23  in Yakima County, for more than 90 days, and in his precinct for more than 30 days.

24      2. Plaintiff Simon Ramos, is a Mexican American, and was born on October

25  19, 1902, in Bay City, Texas.

26      3. Plaintiff Ramos attended school in San Antonio, Texas, through the

27  third grade.

28      4. Plaintiff Ramos has lived in the State of Washington for 22 years and

29  now resides at 206 North F Street, Toppenish, Yakima County, Washington.

30      5. Plaintiff Ramos can read and speak the Spanish language fluently, and

31  can read and speak a few words of English, but can not read and speak the

32  English language well.

Complaint Page 4

4

Reproduced at the National Archives at Seattle

6.  In all respects other than his limited ability to read and speak the English language, plaintiff Ramos is qualified and eligible to vote in the State of Washington.

VI

PLAINTIFF JENNIE MARIN

1.  Plaintiff Jennie Marin is a citizen of the United States, over 21 years of age, and has resided in the State of Washington for more than one year, in Yakima County for more than 90 days and in her precinct for more than 30 days.

2.  Plaintiff Marin is a Mexican American and was born August 10, 1925, in Grand Junction, Colorado.

3.  Plaintiff Marin has lived in the State of Washington since 1957, and now resides at 210 North F. Street in Toppenish, Yakima County, Washington.

4.  Plaintiff Marin can read and speak the Spanish language and can speak and understand English but can not read the English language well.

5.  In all respects other than her inability to read the English language plaintiff Marin is qualified and eligible to vote in the State of Washington.

VII

PLAINTIFF MARTA CANTU

1.  Plaintiff Marta Cantu is a citizen of the United States, over 21 years of age and has resided in the State of Washington for more than one year, in Yakima County for more than 90 days, and in her precinct for more than 30 days.

2.  Plaintiff Cantu is a Mexican American and was born June 12, 1943, in Alamo, Hidalgo County, Texas.

3.  Plaintiff Cantu attended school in Edinburgh, Texas to the fifth grade.

4.  Plaintiff Cnatu has lived in the State of Washington since 1961, and now resides in Crewport Farm Labor Camp, near Granger, In Yakima County Rural Precinct No. 59 in Yakima County, Washington.

5.  Plaintiff Cantu can read and speak the Spanish language and can understand some spoken English, can read and speak a few words of English, but can not read and speak the English language well.

6.  In all respects other than her limited ability to read and speak the

Complaint Page 5

5

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 392

Reproduced at the National Archives at Seattle

English language plaintiff Cantu is qualified and eligible to vote in the State of Washington.

## VIII

### PLAINTIFF CLASS

1. Plaintiff Jimenez, Ramos, Marin and Cantu are representatives of a class composed of persons who are Mexican American citizens of the United Stetes, over 21 years of age, residents of the State of Washington for at least one year, of Yakima County for at least 90 days and of their precinct for at least 30 days, and who are in all other respects elibible to register and vote in the State of Washington, who read and speak the Spanish language, but who do not read and speak the English language.

2. The plaintiff class includes many persons whose applications to register to vote have been refused by voting registrars in the State of Washington and many persons who, upon applying to register to vote, have been given various forms of literacy tests by registrars to determine whether and to what extent they can read and speak the English language or whether they can explain simple English prose to the satisfaction of voting registrars in the State of Washington.

3. Plaintiffs Jimenez, Ramos, Marin and Cantu bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and of all persons constituting the plaintiff class, hereinabove described, who are similarly situated. The persons in this class are so numerous that joinder of all members is impracticable; there are questions of law and/or fact common to the class; and the representative parties will fairly and adequately protect the interests of the class. The defendants have acted and/or refused to act on grounds generally applicable to the plaintiff class as a whole, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 393

Reproduced at the National Archives at Seattle

IX

DEFENDANT EUGENE NAFF

1. Defendant Eugene Naff is the elected Auditor of Yakima County, Washington.

2. Defendant Naff is the registrar for voters residing in all rural precincts within Yakima County.

3. Defendant Naff is authorized by R.C.W. 29.07.010 to appoint deputy registrars and he has appointed certain deputy registrars, including defendants Seefeldt and Skinner, to conduct the registration of voters from rural precincts in Yakima County.

4. Defendant Naff's office, residence and the rural precincts for which he is the voting registrar are all located within the Southern Division of the Eastern District of Washington and are within the jurisdiction of this Court.

X

DEFENDANT MAURINE SEEFELDT

1. Defendant Maurine Seefeldt is the City Clerk of the City of Toppenish, Washington, and is the registrar of voters residing in precincts in Toppenish, Washington, pursuant to R.C.W. 29.07.020.

2. Defendant Seefeldt has also been appointed by defendant Naff to act as deputy registrar for rural precincts located near Toppenish, including Yakima County Rural Precinct No. 96, also known as "Toppenish Rural Precinct No. 3".

3. Defendant Seefeldt's office, residence and the precincts for which she is the voting registrar are all located within the Southern Division of the Eastern District of Washington, and within the jurisdiction of this Court.

XI

DEFENDANT CHARLES SKINNER

1. Defendant Charles Skinner is the Clerk of the Town of Zillah, Washington, and is the registrar of voters residing in precincts in Zillah, Washington, pursuant to R.C.W. 29.07.020.

2. Defendant Skinner has also been appointed by defendant Naff to act as deputy registrar for rural precincts located near Zillah, Washington,

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 394

Reproduced at the National Archives at Seattle

1. including the rural precinct in which Crewport Farm Labor Camp is located,
2. known as Yakima County Rural Precinct No. 59.
3.     3.  Defendant Skinner's office, residence and the precincts for which he
4. is the voting registrar are all located within the Southern Division of the
5. Eastern District of Washington, and within the jurisdiction of this Court.

XII

DEFENDANT CLASS

6.     1.  Defendants, Naff, Seefeldt and Skinner are representative members of a
   class composed of all persons who are authorized by laws of the State of
   Washington, specifically R.C.W. Ch. 29.07, to act as registrars of voters within
   the State of Washington, consisting of all county auditors in the State of
   Washington and all city and town clerks in the State of Washington, and all
   deputy registrars appointed by them.

   2.  Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules
   of Civil Procedure against the defendants, individually and as public officers,
   and as representative members of the defendant class of persons similarly
   situated.  The persons in the defendant class are so numerous that joinder of
   all members is impracticable; there are questions of law and/or fact common to
   the class; the claims and/or defenses of the representative parties are typical
   of the claims and/or defenses of the class; and the representative parties will
   fairly and adequately protect the interests of the class.  The plaintiffs have
   acted and/or refused to act on grounds generally applicable to the class,
   thereby making appropriate final injunctive relief and corresponding  declara-
   tory relief with respect to the class as a whole.

XIII

FIRST CLAIM FOR RELIEF:
ENGLISH LITERACY REQUIREMENTS VIOLATE FOURTEENTH AMENDMENT

   1.  On or about July 26, 1968, plaintiff Caesario Jimenez went to the
   office of defendant Maurine Seefeldt, Toppenish City Clerk and Yakima County
   deputy registrar, to register to vote in the State of Washington.  Said
   defendant refused to register plaintiff Jimenez to vote on the sole ground that
   he does not read and speak the English language.  Defendant Seefeldt acted as

Complaint  Page  8

8

Reproduced at the National Archives at Seattle

1  agent and deputy registrar for defendant Naff on that occasion.

2     2. On or about July 25, 1968, plaintiff Simon Ramos went to the office

3  of defendant Maurine Seefeldt, Toppenish City Clerk, to register to vote.

4  Defendant Seefeldt refused to register plaintiff Ramos to vote on the sole

5  ground that he does not read and speak the English language.

6     3. On or about the middle of March, 1968, and again on or about August 16,

7  1968 plaintiff Jennie Marin went to the office of defendant Seefeldt, Toppenish

8  City Clerk, to register to vote.  Defendant Seefeldt refused to register

9  plaintiff Marin to vote on the sole ground that plaintiff Marin does not read

10  and speak the English language.

11     4. On or about August 14, 1968, plaintiff Marta Cantu went to the office

12  of defendant Charles Skinner, Town Clerk of Zillah, and Yakima County deputy

13  registrar, to register to vote.  Said defendant acting as agent and deputy

14  registrar for defendant Naff, refused to register plaintiff Cantu to vote on the

15  sole ground that she does not read and speak the English language.

16     5. The defendants Naff, Seefeldt, and Skinner and the other members of the

17  defendant class have refused and will continue to refuse to register Mexican

18  American members of the plaintiff class to vote in the State of Washington on

19  the sole ground that such persons do not read and speak the English language.

20     6. In said conduct the defendants and members of the defendant class

21  were, are and will be acting under color of law, specifically Amendment V of the

22  Washington State Constitution and R.C.W. 29.07.070 (13).

23     7. Amendment V of the Washington State Constitution and R.C.W. 29.07.070

24  (13) are unconstitutional and in violation of the First Amendment and the

25  Due Process and Equal Protection Clauses of the Fourteenth Amendment and the

26  Fifteenth Amendment of the United States Constitution insofar as they prohibit

27  plaintiffs and members of the plaintiff class from voting in the State of

28  Washington because of their inability to read and speak the English language,

29  in that they deprive plaintiffs of their right to participate in a government

30  which they are required to support and whose laws they are bound and required

31  to obey, and in that they constitute:

32

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 396

Reproduced at the National Archives at Seattle

1        a.   An unreasonable and invidious discrimination against

2   plaintiff;

3        b.   An abridgement of plaintiffs' privileges and immunities as

4   citizens of the United States;

5        c.   An abridgement of plaintiffs' right to petition their

6   government for redress of their grievances, as incorporated in the Due Process

7   Clause of the Fourteenth Amendment;

8        d.   An abridgement of plaintiffs' right to assemble and associate

9   peacefully.

10        e.   A denial and abridgement of plaintiffs' right to vote, on

11   account of race.

12   8.   Plaintiffs and members of the plaintiff class have been irreparably

13   injured and have no adequate remedy at law.

14

15                                    XIV

16          SECOND CLAIM FOR RELIEF:
       LITERACY TESTING STATUTE VOID ON ITS FACE

17   1.   The Washington statute authorizing defendants and members of the

18   defendant class to administer literacy tests to persons who apply to register

19   to vote, R.C.W. 29.07.070 (13), is unconstitutional and void on its face and

20   in violation of the Due Process and Equal Protection Clauses of the Fourteenth

21   Amendment of the United States Constitution in that it is a delegation of

22   unconstitutionally broad discretion to voting registrars to accept or reject

23   voting registration applicants, without adequate standards, and is in language

24   so vague and indefinite that its meaning can not be ascertained by reasonable

25   men.

26   2.   Defendants and members of the defendant class have administered liter-

27   acy tests to plaintiffs Jimenez, Ramos, Marin, and Cantu, and members of the

28   plaintiff class acting under color of law, specifically pursuant to R.C.W. 29.

29   07.070 (13).

30   3.   Because of the vagueness of R.C.W. 29.07.070 (13) the literacy tests

31   administered by defendants and members of the defendant class have no objective

32   standards, and plaintiffs and members of the plaintiff class who can read and

Complaint Page 10

10.

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 397

Reproduced at the National Archives at Seattle

1   speak one or two or more words of English are arbitrarily and capriciously

2   disenfranchised according to the momentary and subjective whims of the

3   defendants and members of the defendant class.

4      4.  Plaintiffs and members of the plaintiff class have been irreparably

5   injured and have no adequate remedy at law.

6

7                                 XV

8                       THIRD CLAIM FOR RELIEF:
       LITERACY TESTS PROHIBITED BY VOTERS RIGHTS ACT

9      1.  On or about July 26, 1968 defendant Seefeldt, acting as agent and

10  deputy registrar for defendant Naff, administered a literacy test to plaintiff

11  Jimenez when he applied to register to vote, by requiring him to state orally

12  whether he could read and speak the English language, without any instructions

13  as to what part of or how much of the English language he was required to read

14  and speak.  Defendant Seefeldt then refused to register plaintiff Jimenez to

15  vote, on the ground that he could not read and speak the English language to

16  her satisfaction.

17     2.  On or about July 25, 1968, defendant Seefeldt, acting as City Clerk

18  of Toppenish administered a literacy test to plaintiff Ramos when he applied

19  to register to vote, by asking him to state whether he could read the English

20  language and by handing him a large piece of paper containing English printed

21  matter, used for a voter's registration form, telling him to sign in several

22  places, and observing to see whether plaintiff Ramos could read the matter

23  printed in English upon the page sufficiently well to determine where to sign

24  it.  Defendant Seefeldt then refused to register plaintiff Ramos to vote, on

25  the ground that he could not read and speak the English language to the

26  satisfaction of defendant Seefeldt.

27     3.  On or about the middle of March, 1968, defendant Seefeldt, acting as

28  Toppenish Clerk, administered a literacy test to plaintiff Marin, when she

29  applied to register to vote, by asking her to read a paragraph printed in the

30  English language upon a voter's registration form.  Again, on or about August

31  16, 1968, defendant Seefeldt, acting as Toppenish City Clerk, administered a

32  literacy test to plaintiff Marin, when she applied to register to vote, by

Reproduced at the National Archives at Seattle

1 requiring her to state whether she could read the English language without

2 specifying any particular English words, phrases or language. On both

3 occasions defendant Seefeldt refused to register plaintiff Marin to vote on

4 the sole ground that plaintiff Marin could not read and speak the English

5 language to the satisfaction of defendant Seefeldt.

6     4. On or about August 14, 1968, defendant Charles Skinner, acting as agent

7 and deputy registrar for defendant Naff, administered a literacy test to

8 plaintiff Cantu, when she applied to register to vote, by requiring her to read

9 first from a handwritten and then from a printed list of names. Defendant

10 Skinner then refused to register plaintiff Cantu to vote on the sole ground

11 that she could not read and speak the English language to the satisfaction of

12 defendants Skinner and Naff.

13     5. Defendants Naff, Seefeldt and Skinner and the members of the defendant

14 class have administered various literacy tests to Mexican American members of

15 the plaintiff class who have applied to register to vote in the State of

16 Washington.

17     6. The literacy tests given by defendants are not written in every case,

18 are not given to every person applying to register to vote, are given more

19 frequently to persons whose names or appearance indicates that they may be

20 Mexican Americans than to other persons, the same test is not given to all

21 persons tested, and applicants are not able to obtain copies of their tests and

22 answers from defendants.

23     7. Said tests employ oral and written devices used to enable defendants

24 to determine, measure, assess and evaluate the ability of applicants to read

25 and speak the English language, including oral questions, written questions,

26 oaths and other matters printed in English on voter registration forms which

27 differ among the various counties, handwritten material in the English

28 language, and miscellaneous devices such as memoranda pads, water bills and

29 other matters written in the English language.

30     8. In administering said literacy tests the defendants and members of the

31 defendant class were, are and will continue to act under color of law, specific-

32 ally Amendment V of the Washington State Constitution and R.C.W. 29.07.070 (13).

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 399

Reproduced at the National Archives at Seattle

9.  The administration of all such literacy tests and devices to enable defendants to assess, determine and/or evaluate the ability of registration applicants to read and speak the English language is prohibited by the Voters Rights Act of 1965, 42 U.S.C 1971 (a) (2) (c).

10.  The acts of the defendants and members of the defendant class have injured the plaintiffs and members of the plaintiff class by depriving them of the right to vote in the State of Washington.

11.  Plaintiffs and the members of the plaintiff class have been irreparably injured and have no adequate remedy at law.

XVI

FOURTH CLAIM FOR RELIEF:
PATTERN AND PRACTICE OF DISCRIMINATION VIOLATES FOURTEENTH AMENDMENT

1.  In implementing the literacy requirements hereinabove described, the defendants have administered literacy tests as hereinabove described to Mexican American members of the plaintiff class more frequently, more carefully and more stringently than they have admistered them to other persons, including Anglo Americans whose ability to read and speak the English is imperfect or limited.

2.  Although there are approximately 12,000 Spanish speaking Mexican Americans residing in Yakima County comprising approximately one-twelfth of the resident population of the County, and although defendant Naff has appointed approximately 35 English speaking Anglo American persons to act as deputy registrars for rural precincts in Yakima County, he has failed and refused to appoint any Spanish speaking Mexican American to act as deputy registrar in Yakima County and he has refused to appoint any of three Spanish speaking Mexican Americans who volunteered to act as deputy registrars, on the purported ground that he had no legal power to appoint a Spanish speaking Mexican American as deputy registrar, and defendant Naff has wholly failed and refused to take steps to correct the imbalance in the proportion of Mexican Americans registered to vote caused by the enforcement of the English literacy requirement of the Washington Constitution and his discriminatory use of English literacy tests.


Complaint Page 13

13

Reproduced at the National Archives at Seattle

3.   Other defendants have failed to take steps to correct the imbalance in the proportion of Mexican Americans registered to vote, which has resulted from the enforcement of the English literacy requirement of the Washington Constitution and their discriminatory use of English literacy tests.

4.   In all of said acts and failures to act the defendant Eugene Naff and the other defendants and members of the defendant class have engaged in a pattern and practice of discrimination against Mexican American and Spanish speaking people and members of the plaintiff class, which has resulted in a disproportionately low number of otherwise eligible Mexican American persons being registered to vote in Yakima County and in the State of Washington.

5.   The defendants' acts and failures to act have deprived Mexican American and Spanish speaking people and members of the plaintiff class of their rights to assemble and associate peacefully, and to petition their government for redress of their grievances, has abridged their privileges and imuninities as citizens of the United States and has unreasonably discriminated against them and denied them the equal protection of the laws, in violation of the Fourteenth Amendment of the United States Constitution and have denied and abridged the plaintiffs right to vote on account of race, in violation of the Fifteenth Amendment of the United States Constitution.

6.   In all of said acts and failures to act defendants have acted and will continue to act under color of law, specifically Amendment V of the Washington State Constitution and R.C.W. 29.07.070 (13).

7.   Plaintiffs and the members of the plaintiff class have been irreparably injured and have no adequate remedy at law.

<u>PRAYER FOR RELIEF</u>

WHEREFORE the plaintiffs pray for judgment against the defendants, as follows:

(1)   Assuming jurisdiction of this cause and convening a three judge court pursuant to 28 U.S.C Section 2281 and 2284;

(2)   Ordering that this cause be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedures, defining the classes of

DECLARATION OF A. KHANNA IN SUPPORT
PLAINTIFFS' MOTION FOR

Reproduced at the National Archives at Seattle

plaintiffs and defendants and requiring appropriate notices to be given to members of the plaintiffs and defendant classes.

(3)  Declaring that Amendment V of the Washington State Constitution and R.C.W. 29.07.070 (13) are unconstitutional as an abridgement of the right to peacefully assemble and associate and to petition the government for redress of grievances, as an abridgement of privileges and immunities of citizens of the United States and as an unreasonable discrimination and denial of equal protection of the laws under the Fourteenth Amendment of the United States Constitution and as a device and abridgement of plaintiffs right to vote on account of race, in violation of the Fifteenth Amendment of the United States Constitution, insofar as they prohibit persons from voting in the State of Washington who do not read and speak the English language but who do read and speak the Spanish language and who are otherwise eligible to vote in the State of Washington;

(4)  Declaring that R.C.W. 29.07.070 (13) is void on its face as a denial of due process and equal protection of the laws, under the Fourteenth Amendment of the United States Constitution;

(5)  Declaring that the tests, devices and experiments given and administered to the plaintiffs and the plaintiff class by the defendants and the defendant class to determine, measure, assess and evaluate the plaintiffs' ability to read and speak the English language is prohibited by the Voters Rights Act of 1965, 42 U.S.C §1971 (a) (2) (c);

(6)  Declaring that in the registration of voters, a pattern and practice of discrimination by the defendants Naff, Seefeldt, Skinner and others exists in Yakima County directed against plaintiffs Jimenez, Ramos, Marin and Cantu and other Mexican American and Spanish speaking people and members of plaintiff class, in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

(7)  Granting plaintiffs immediate, temporary and permanent injunctive relief requiring defendants Naff, Seefeldt and Skinner to register plaintiffs Jimenez, Ramos, Marin and Cantu to vote in the State of Washington;

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 402

(8)  Granting plaintiffs and the members of the plaintiff class immediate, temporary and permanent injunctive relief against defendants Naff, Seefeldt and Skinner and all members of the defendant class, restraining, enjoining and prohibiting the enforcement of the English literacy requirement of Amendment V of the Washington State Constitution and of R.C.W. 29.07.070 (13), and restraining, enjoining and prohibiting them from failing or refusing to register any person who applies to register to vote who can read and speak the Spanish language and is otherwise eligible to vote, on the sole ground of his inability to read and speak the English language.

(9) Granting plaintiffs and members of the plaintiff class immediate, temorary and permanent injunctive relief against defendants Naff, Seefeldt, Skinner and all members of the defendant class, restraining, enjoining and prohibiting them from giving or administering any test, device or experiment to any person who applies to register to vote and from employing any oral or written question or oath, any written matter on registration forms or any other document or paper to enable defendants to determine :::::::, measure, assess or evaluate the applicant's ability to read and speak the English language, unless and until defendants and members of defendant class comply with the requirements of the Voters Rights Act of 1965, 42 U.S.C. §1971 (a) (2) (c).

(10)  Granting plaintiffs immediate, temporary and permanent injunctive relief against defendant Eugene Naff, requiring him to appoint one or more Spanish speaking Mexican American persons to act as deputy registrar of voters in Yakima County, and to provide such deputy registrar with an adequate supply of voter registration forms and requiring defendant Eugene Naff to do such other things as the court may deem necessary, reasonable, or appropriate to the end of correcting the registration imbalance among Mexican American and Spanish speaking residents of Yakima County;

(11)  Granting appropriate immediate temporary and permanent injunctive relief against voting registrars of any County, City or Town of the State of Washington where it may appear or be shown that there exists or has existed a pattern and practice of discrimination against Mexican American and Spanish speaking people in the registration of voters within such other County, City or

16

DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 403

Reproduced at the National Archives at Seattle

Town;

 (12) Awarding plaintiffs their costs, expenses and a reasonable attorneys fees; and

 (13) Awarding such other and further relief as to the Court may deem necessary, reasonable and appropriate.

Dated this  11  day of September, 1968.

        Charles E. Ehlert
        Attorney for Plaintiffs

Complaint Page 17

17

Reproduced at the National Archives at Seattle

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

AMENDMENT 5

Art. VI §1.   Qualifications of Electors.  All persons of the age of twenty-
one years or over, possessing the following qualifications, shall be entitled
to vote at all elections:  They shall be citizens of the United States; they
shall have lived in the state one year, and in the county ninety days, and in
the city, town, ward or precinct thirty days immediately preceding the election
at which they offer to vote; they shall be able to read and speak the English
language:  Provided, That Indians not taxed shall never be allowed the elective
franchise:  And further provided, That this amendment shall not affect the
rights of franchise of any person who is now a qualified elector of this state.
The legislative authority shall enact laws defining the manner of ascertaining
the qualifications of voters as to their ability to read and speak the English
language, and providing for punishment of persons voting or registering in
violation of the provision of this section.  There shall be no denial of the
elective franchise at any time on account of sex.

R.C.W. 29.07.070

Examination of voter as to qualifications.  Having administered the oath,
the registration officer shall interrogate the applicant for registration,
concerning his qualifications as a voter of the state, and of the county, city,
town, and precinct in which he applies for registration requiring him to state:

* * * * *

(13)  Whether the applicant was a legal voter of the State of Washington
on November 3, 1896, or is able to read and speak the English language so as
to comprehend the meaning of ordinary English prose, and in case the registra-
tion officer is not satisfied in that regard, he may require the applicant to
read aloud and explain the meaning of some ordinary English prose;

* * * * *



✓ EXHIBIT A to complaint

18

Exhibit 15

Reproduced at the National Archives at Seattle

File Endorsement
(omitted in printing)

FILED IN THE
U. S. DISTRICT COURT
Eastern District of Washington

MAY 2 1969

DOROTHY E. MOULTON, Clerk

........................Deputy

In the UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

SOUTHERN DIVISION

| | |
|---|---|
| MEXICAN-AMERICAN FEDERATION-WASHINGTON STATE, a non-profit organization; CAESARIO JIMINEZ; SIMON RAMOS; JENNIE MARIN; and MARTA CANTU; on their own behalves and on behalf of all others similarly situated,<br><br>                          Plaintiffs,<br><br>             vs.<br><br>EUGENE NAFF, Yakima County Auditor; MAURINE SEEFELDT, Toppenish City Clerk and Yakima County Deputy Registrar; and CHARLES SKINNER, Zillah City Clerk and Yakima County Deputy Registrar; on their own behalves and on behalf of all others similarly situated,<br><br>                     Defendants,<br><br>THE STATE OF WASHINGTON, a body politic, and A. LUDLOW KRAMER, Secretary of State,<br><br>              Additional Defendants. | CIVIL ACTION<br><br>NO. 2457 |

OPINION OF THE COURT — filed may 2, 1969

FPI SANDSTONE—
12-1-68—75M—1192

351

Reproduced at the National Archives at Seattle

Article VI of the Washington State Constitution as amended by Amendment 5, Section 1, provides in part as follows:

> "QUALIFICATION OF ELECTORS.  All persons of
> the age of twenty-one years or over, possessing
> the following qualifications, shall be entitled
> to vote at all elections:  They shall be citizens
> of the United States; they shall have lived in
> the state one year, and in the county ninety days,
> and in the city, town, ward or precinct thirty
> days immediately preceding the election at which
> they offer to vote; they shall be able to read and
> speak the English language:"

It is the last sentence that has precipitated this controversy.

## THE PLAINTIFFS

The Mexican-American Federation is a Washington corporation.  Its purposes include to represent, promote and achieve the economic, social and cultural interests of all Mexican-American people in the State of Washington.

The plaintiff, Caesario Jiminez, is a citizen of the United States, over the age of twenty-one (21) years, and was born in the State of Texas.

The plaintiff, Simon Ramos, is a citizen of the United States, over the age of twenty-one (21) years, and was born in the State of Texas.

The plaintiff, Jennie Marin, is a citizen of the United States, over the age of twenty-one (21) years, and was born in the State of Colorado.

The plaintiff, Marta Cantu, is a citizen of the United States, over the age of twenty-one (21) years, and was born in the State of Texas.

They are members of the Mexican-American Federation. They bring this action individually and as a class action.

352

Reproduced at the National Archives at Seattle

## THE DEFENDANTS

The defendant, Eugene Naff, is the Auditor of Yakima County who is empowered by statute to act as Registrar of Voters, R.C.W. 29.07.010, for said county and to appoint deputy registrars to assist him in the performance of his statutory duty.  Naff, among others, appointed defendant, Maurine Seefeldt, the City Clerk of the City of Toppenish, Yakima County, Washington, and the defendant, Charles Skinner, the City Clerk of the City of Zillah, Yakima County, Washington, deputy registrars.

In addition, the plaintiffs have named the State of Washington and A. Ludlow Kramer, Secretary of State, as defendants.

## THE CLAIMS

Plaintiffs contend:

1.  That the provision in Amendment 5 that requires voters to be able to speak and read the English language is offensive to the First, Fourteenth and Fifteenth Amendments of the Constitution of the United States.

2.  That the defendants, Seefeldt and Skinner, have engaged in discriminatory practices by their refusal to register to vote plaintiffs and other members of the class that plaintiffs represent because of plaintiffs' inability to read and speak the English language; and

3.  The defendants administered literacy tests to plaintiffs and other members of the class that plaintiffs represent which are discriminatory and contravene the provisions of 42 U.S.C.A. § 1971(a)(2)(C)(i).



**353** 

Reproduced at the National Archives at Seattle

1    Preliminary to any reference to the facts, it is

2    necessary to resolve the issue of the plaintiff corporation,

3    Mexican-American Federation's right to seek the relief it

4    requests.  The claims of the corporation and the individual

5    plaintiffs are the same.  In addition to the attack on the

6    constitutionality of the English language provision of

7    Amendment 5, plaintiffs seek redress pursuant to the pro-

8    visions of 42 U.S.C.A. § 1983 (the Civil Rights Act) and

9    42 U.S.C.A. § 1971 (the Voting Rights Act).

10    Hague v. Committee for Industrial Organizations, 307

11    U.S. 496, settled this issue.  In Hague, the American Civil

12    Liberties Union, in addition to other plaintiffs, brought an

13    action for redress of civil rights under the First Amendment

14    and for violation of the privileges and immunities clause of

15    the Fourteenth Amendment, although the action was grounded on

16    provisions of 28 U.S.C.A. § 41.  The provisions of that

17    section are now codified as 42 U.S.C.A. § 1983 so that the

18    claims were of the same character as the civil rights claims

19    of the instant plaintiffs.  The Court made reference to the

20    right of the A.C.L.U. corporate plaintiff to maintain the

21    action.  At page 527 of the opinion, it was stated:

22    "Since freedom of speech and freedom of assembly
      are rights secured to persons by the due process
23    clause, all of the individual respondents are
      plainly authorized by § 1 of the Civil Rights Act
24    of 1871 to maintain the present suit in equity to
      restrain infringement of their rights.  As to the
25    American Civil Liberties Union, which is a corpora-
      tion, it cannot be said to be deprived of the civil
26    rights of freedom of speech and of assembly, for
      the liberty guaranteed by the due process clause is
27    the liberty of natural, not artificial, persons."

28

29    It is clear that the Mexican-American Federation has

30    no standing in this cause and must be dismissed as a plaintiff.

31    It is also clear that the plaintiffs, Jiminez, Ramos,

32

FPI SANDSTONE—
12-1-66—75M—1192

354

Reproduced at the National Archives at Seattle

1    Marin and Cantu may maintain this class action if the pre-

2    requisites to a class action required by Rule 23 of the Rules

3    of Civil Procedure are present.  We conclude that the pre-

4    requisites are, in fact, present.  Plaintiffs allege that

5    defendants, Kramer, Seefeldt and Skinner, are representatives

6    of a class.  The Secretary of State of the State of Washington,

7    in his official capacity, cannot be a member of a class.  The

8    same is true of the County Auditor of Yakima County in his

9    official capacity.  The defendants, Seefeldt and Skinner, are

10   appointees of the defendant Naff and could only be called

11   members of a class of appointees.  The answer to plaintiffs'

12   claim is not necessary to the ultimate decision of the Court.

13                            THE FACTS

14       In 1968 the plaintiff organization embarked on a voter

15   registration project in Yakima County, Washington.  This is

16   the county in which the individual plaintiffs and other

17   members of the class reside.  The plaintiffs, Jiminez, Ramos,

18   Marin and Cantu, presented themselves to the deputy registrars

19   in the towns of Toppenish and Zillah, Yakima County.  At the

20   time that each of the plaintiffs appeared at the office of the

21   deputy registrar, he or she was accompanied by one Guadulupe

22   Gamboa, who spoke to the deputy registrar in English, and told

23   the deputy registrar that the plaintiffs wished to register to

24   vote.  Gamboa stated that he would interpret from Spanish to

25   English and English to Spanish for the plaintiff applicants so

26   that the deputy registrars, defendant Seefeldt, defendant

27   Seefeldt's employee, a Mrs. Alexander, and defendant Skinner

28   would be able to obtain essential information for their

29   records in effecting a proper registration of the plaintiff

30   applicants.  This proffered service of Gamboa was refused by

31   defendants Seefeldt, Skinner and defendant Seefeldt's employee,

32   Alexander.  Gamboa was advised that the plaintiffs must present

     their request to register in person to the deputy registrars,



355

Reproduced at the National Archives at Seattle

not by interpreter, and make such request in the English
language so that the deputy registrars could follow the
mandate of the Washington Constitution.

In varying degrees (the amount of variation is not
important to the Court's determination of the issues), plain-
tiffs had some knowledge of English.

Plaintiff Jiminez could speak a few words of English
but he could not read or write it. He speaks and reads
Spanish. He could only testify at the trial by interpreter.
Plaintiff Ramos could not speak or read English. He testified
by interpreter. Plaintiff Marin could speak English so that
an interpreter was not needed when she testified, but she
stated she could not read or write it. Plaintiff Cantu could
read simple words and understand some English phrases but re-
quired an interpreter when she testified. All plaintiffs
testified that they could not read or understand the following
oath when it was read to them in English:

> "You do solemnly swear (or affirm) that you
> will fully and truly answer such questions as
> may be asked touching your qualifications as a
> voter under the laws of this state."

It was apparent at the trial that none of the plaintiffs had
sufficient familiarity with the English language to answer in
English questions propounded to them by the deputy registrars
and necessary to the completion of the registrar's form. This
form contains information essential to the keeping of the
records by the registrar of the County of Yakima and is
prefaced by the applicant's oath:

> "I, the undersigned, do solemnly swear that
> the foregoing facts (numerically designated)
> touching my qualifications as a voter entered in
> my presence by the registration officer are true.
> I further certify that I will be at least twenty-
> one years of age on the day of the next election
> and that I am able to read and speak the English
> language."

The defendant registrars refused to register plaintiffs because
plaintiffs were unable to speak and read the English language.



DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 411

Reproduced at the National Archives at Seattle

THE LAW

The detailed claims by plaintiffs are that Article VI, Amendment 5, Section 1:

(a) discriminates against the plaintiffs;

(b) denies them liberty without due process of law;

(c) abridges plaintiffs' privileges and immunities as citizens of the United States;

(d) denies the plaintiffs the right to petition their government for redress of their grievances under the due process clause of the Fourteenth Amendment of the Constitution of the United States;

(e) abridges plaintiffs' right to assemble and associate peacefully; and

(f) denies the plaintiffs the right to vote on account of race.

The Constitution of the State of North Carolina contains a literacy test. It is found in Section 4, Article VI. The pertinent part of Section 4 reads as follows:

> "Every person presenting himself for registra-
> tion shall be able to read and write any section
> of the Constitution in the English language. . . ."

The provision in the North Carolina Constitution is more stringent than that found in Amendment 5, Article VI, of the Washington State Constitution. The constitutionality of the provision of the North Carolina Constitution was upheld by the Supreme Court of the United States in Lassiter v. Northampton County Board of Elections, 360 U.S. 45. At page 51 of the Court's opinion, Justice Douglas, speaking for the Court, had this to say:

> "We do not suggest that any standards which a
> State desires to adopt may be required of voters.
> But there is wide scope for exercise of its juris-
> diction. Residence requirements, age, previous
> criminal record are obvious examples indicating



FPI SANDSTONE—
12-1-66—75M—1192

Reproduced at the National Archives at Seattle

"factors which a State may take into consideration in determining the qualifications of voters. The ability to read and write likewise has some relation to standards designed to promote intelligent use of the ballot. Literacy and illiteracy are neutral on race, creed, color, and sex, as reports around the world show. Literacy and intelligence are obviously not synonymous. Illiterate people may be intelligent voters. Yet in our society where newspapers, periodicals, books, and other printed matter canvass and debate campaign issues, a State might conclude that only those who are literate should exercise the franchise."

and at page 53:

"The present requirement, applicable to members of all races, is that the prospective voter 'be able to read and write any section of the Constitution of North Carolina in the English language.' That seems to us to be one fair way of determining whether a person is literate, not a calculated scheme to lay springes for the citizen. Certainly we cannot condemn it on its face as a device unrelated to the desire of North Carolina to raise the standards for people of all races who cast the ballot."

The constitutional provision that a person otherwise eligible must speak and read the English language is a valid exercise of the State of Washington's power to determine the conditions under which the right of suffrage may be exercised. Guinn v. U. S., 238 U. S. 347; Pope v. Williams, 193 U. S. 621, 633; Lassiter v. Northampton County Board of Elections, 360 U. S. 45.

To implement the provisions of Article VI, Amendment 5, of the Constitution, the Legislature of the State of Washington enacted R.C.W. 29.07.070. It provides:

"Having administered the oath, the registration officer shall interrogate the applicant for registration, concerning his qualifications as a voter . . . requiring him to state:
* * *
"(13) Whether the applicant . . . is able to read and speak the English language so as to comprehend the meaning of ordinary English prose, and in case the registration officer is not satisfied in that regard, he may require the applicant to read aloud and explain the meaning of some ordinary English prose, . . . ."

The defendants State and Kramer concede that the

FPI SANDSTONE—
12-1-66—75M—1192

358

the provision of R.C.W. 29.07.070 authorizing the registrar

"to require applicant to read aloud and explain the meaning of

some ordinary English prose conflicts with 42 U.S.C.A. § 1971

(a)(2)(C)(i). It provides:

> "(2)  No person acting under color of law shall--
>
> (C)  employ any literacy test as a quali-
> fication for voting in any election unless
> (i) such test is administered to each
> individual and is conducted wholly in
> writing, and (ii) a certified copy of the
> test and of the answers given by the
> individual is furnished to him within
> twenty-five days of the submission of his
> request made within the period of time
> during which records and papers are re-
> quired to be retained and preserved
> pursuant to sections 1974-1974e of this
> title:"

This section has been amended and made applicable to the state

elections.  Pub.L. 89-110, § 15(a) (1965)

However, the defendants refer to two opinions of the

Attorney General of the State of Washington in which the

Secretary of State is advised of the conflict and of the

invalidity of the provision of the state statute, and further

advised that no literacy test should be administered by any

registrar or deputy registrar in the state until such time as

a universal test has been promulgated, and which test complies

with the requirement of 42 U.S.C.A. § 1971.

It was further stated by defendants and not contra-

dicted that the Attorney General's opinion has been circulated

throughout the State of Washington, and all registrars and

deputy registrars are presently following the directive con-

tained in the opinion that no literacy tests should be

administered to applicants who seek to register to vote.

The enforcement provision of the Voting Rights Act,

42 U.S.C.A. §1971, empowers the Attorney General of the United

States to institute the appropriate action to enforce the

provisions of the Act.  We do not decide the question of the

FPI SANDSTONE—
12-1-66—75M—1193

359

Reproduced at the National Archives at Seattle

1  propriety of plaintiffs seeking relief pursuant to its terms.

2  42 U.S.C.A. § 1971(c):

3      "(c)  Whenever any person has engaged or there
       are reasonable grounds to believe that any person
4      is about to engage in any act or practice which
       would deprive any other person of any right or
5      privilege secured by subsection (a) or (b) of this
       section, the Attorney General may institute for
6      the United States, or in the name of the United
       States, a civil action or other proper proceeding
7      for preventive relief, including an application
       for a permanent or temporary injunction, restrain-
8      ing order, or other order.  If in any such proceed-
       ing literacy is a relevant fact there shall be a
9      rebuttable presumption that any person who has not
       been adjudged an incompetent and who has completed
10     the sixth grade in a public school in, or a private
       school accredited by, any State or territory, the
11     District of Columbia, or the Commonwealth of Puerto
       Rico where instruction is carried on predominantly
12     in the English language, possesses sufficient
       literacy, comprehension, and intelligence to vote
13     in any election.  In any proceeding hereunder the
       United States shall be liable for costs the same
14     as a private person.  Whenever, in a proceeding
       instituted under this subsection any official of a
15     State or subdivision thereof is alleged to have
       committed any act or practice constituting a de-
16     privation of any right or privilege secured by
       subsection (a) of this section, the act or practice
17     shall also be deemed that of the State and the State
       may be joined as a party defendant and, if, prior to
18     the institution of such proceeding, such official has
       resigned or has been relieved of his office and no
19     successor has assumed such office, the proceeding
       may be instituted against the State."
20

21      There is no evidence that the registrars and deputy

22  registrars are not following the directive, and it would serve

23  no useful purpose to enter an order of a like character in

24  this cause.

25      Plaintiffs urge that any inquiry with respect to

26  plaintiffs' knowledge of English is, in fact, a literacy

27  test.  Webster defines test as follows:  "a series of questions

28  or exercises or other means of measuring the schooling, know-

29  ledge, intelligence, capacities, or aptitudes of an individual

30  or group."

31      The history of the Voting Rights Act and cases constru-

32  ing its provisions indicate that the congressional intent

FPI SANDSTONE—
12-1-66—75M—1192

360  

Reproduced at the National Archives at Seattle

providing for written tests was to prohibit variations in the type of literacy tests given to applicants who sought to register to vote so that discriminatory practices disqualifying negroes could not be maintained. U. S. v. Manning, 215 F. Supp. 272, 294 (W.D.La., 1963); U. S. v. Mayton, 335 F. 2d 153, 159 (5 Cir., 1964). A simple inquiry by the registrar of the applicant in this form, "Can you speak and read English?" is not a test and could not conceivably result in discriminatory practices. Nor is the oath required of the applicant offensive to the provisions of 42 U.S.C.A. § 1971.

Plaintiffs have alleged that the defendants administered literacy tests to Mexican-American members of the plaintiffs' class more frequently, more carefully, and more stringently than they have administered them to other persons, including Anglo-Americans whose ability to read and speak English is imperfect or limited.

This contention was fully explored and plaintiffs were able to establish one isolated incident where what might be called a literacy test was, in fact, administered when plaintiff, Marta Cantu, appeared at the office of the defendant Skinner in Zillah accompanied by Gamboa. The plaintiff Cantu was unable to read the preliminary oath. Thereupon, Skinner asked her if she could read the names on the list of candidates which he presented to her. She was unable to read the list and did testify that her ability to read was limited to a few simple words in her children's school books. Skinner had already been told by Gamboa that plaintiff Cantu could not read and speak the English language. It would appear that Skinner's conduct was designed to assist Cantu rather than to hinder her in her application to register. Although this incident might be termed a test, it is an isolated incident and does not sustain plaintiff's contentions that the


DECLARATION OF A. KHANNA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT – 416

Reproduced at the National Archives at Seattle

registrars and deputy registrars in Yakima County were engaged in any practices that had discriminatory overtones.

We therefore conclude that plaintiffs have failed to establish any factual or legal basis for injunctive relief against the defendants, and their requests for such relief must be DENIED.

This opinion will serve as findings of fact and conclusions of law in this cause, and counsel for defendants may prepare a judgment to conform to the conclusions we reach herein.

DATED this ___1___ day of ___May___, 1969.

/s/ FREDERICK G. HAMLEY
United States Court of Appeals Judge

/s/ CHARLES L. POWELL
United States District Court Judge

/s/ WILLIAM N. GOODWIN
United States District Court Judge

Copies mailed 5/2/69 to:

Mr. Charles E. Ehlert
2101 Smith Tower, Seattle, Wa. 98104

Mr. Lincoln E. Shropshire, Pros.Atty
County Courthouse, Yakima, Wa. 98901

Mr. Joseph C. Murphy
217B So. Topp. Ave., Toppenish, Wa. 98948

Hovis, Cockrill & Roy
P. O. BOX 437, Yakima, Wa. 98901

Atty. Gen. of Wash., Donald Brazier, Asst.
Temple of Justice, Olympia, Wa. 98501

362

Exhibit 16

Reproduced at the National Archives at Seattle

FILED IN THE
U. S. DISTRICT COURT
Eastern District of Washington

SEP 27 1971

J. R. FALLQUIST, Clerk

_____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
SOUTHERN DIVISION

| | | |
|---|---|---|
| MEXICAN-AMERICAN FEDERATION – WASHINGTON STATE, a non profit corporation; CAESARIO JIMENEZ, SIMON RAMOS, JENNIE MARIN and MARTA CANTU, on their own behalves and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs | ) ) | NO.  2457 |
| vs. | ) ) | |
| EUGENE NAFF, Yakima County Auditor; MAURINE SEEFELDT, Toppenish City Clerk; and CHARLES SKINNER, Zillah City Clerk; on their own behalves and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) | ORDER VACATING JUDGMENT |
| Defendants | ) ) | |
| and | ) ) | |
| the STATE OF WASHINGTON, a body politic, and A. LUDLOW KRAMER, Secretary of State, | ) ) ) ) | |
| Defendants | ) ) | |

The above-entitled cause having come on regularly

for trial and determination of April 1, 1969, before the

Honorable Frederick G. Hamley, the Honorable Charles L.

Powell, and the Honorable William N. Goodwin, in the District

Court of the United States, for the Eastern District of

Reproduced at the National Archives at Seattle

Washington, Southern Division, Yakima, Washington, the plain-
tiffs appearing by Mr. Charles E. Ehlert; the defendant,

Eugene Naff, appearing by Mr. Jon R. Harlan and Mr. Cameron

Hopkins; the defendant, Maurine Seefeldt, appearing by Mr.

Joseph C. Murphy; the defendant, Charles Skinner, appearing

by Mr. Ted A. Roy; and the defendants, State of Washington

and A. Ludlow Kramer, appearing by Mr. Donald H. Brazier;

the Opinion of the Court having been filed on May 2, 1969,

and having been reported as Jimenez v. Naff, 299 F.Supp. 587

(1969); a final judgment dismissing the complaint herein, hav-

ing been unanimously signed July 29, 1969 and filed July 30,

1969; a Notice of Appeal to the United States Supreme Court

having been filed on September 25, 1969; the cause having

come on to be heard by the Supreme Court on the transcript of

the record, and the judgment of the above-mentioned District

Court having been vacated with costs, and the cause having

been remanded on January 11, 1971, for further consideration

in light of Oregon et al. v. Mitchell et al., Nos. 43, 44, 46

and 47 Originals, decided December 21, 1970, 400 U.S. 112,

91 S. Ct. 260, 27 L.Ed. 2d 272 (1970); and this Court having

examined the record and being fully advised in the premises,

now makes and enters the following

ORDER VACATING JUDGMENT:

IT IS ORDERED that the Judgment of this Court dis-

missing the complaint herein, signed July 29, 1969, filed July

30, 1969, and based on the opinion reported as Jimenez v. Naff,

-2-

Reproduced at the National Archives at Seattle

299 F.Supp. 587 (1969) be, and the same hereby is, vacated;

IT IS FURTHER ORDERED that the defendants above-
named and their appointees shall hereafter comply with the
requirememts of Oregon et al. v. Mitchell et al., Nos. 43,
44, 46 and 47 Originals, decided December 21, 1970, 400 U.S.
112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), as that opinion is
pertinent to prohibiting the conditioning of the franchise
upon a showing of literacy;

IT IS FURTHER ORDERED and DECLARED that the provis-
ions of Amendment V of the Washington State Constitution and
of RCW 29.07.070(13) requiring that voters be able to read
and speak the English language are in conflict with the Vot-
ing Rights Act of 1965, Public Law 89-110, as amended by the
Voting Rights Act Amendments of 1970, Public Law 91-285, and
that during the existence of said Voting Rights Act, and to
August 6, 1975, the said Act shall take priority over and
supersede the Washington State Constitution and the statute
above cited, and

IT IS FURTHER ORDERED that the defendants Eugene
Naff, Maurine Seefeldt and Charles Skinner and their appoint-
ees, agents and successors in office shall register the plain-
tiffs to vote upon presentation of the plaintiffs' applications
indicating compliance with all requirements for voting other
than the ability to read and speak the English language;

IT IS FURTHER ORDERED that the defendants Eugene
Naff, Maurine Seefeldt and Charles Skinner and their appointees,

-3-

Reproduced at the National Archives at Seattle

agents, and successors in office, shall hereafter register

otherwise qualified applicants to vote without requiring that

they demonstrate the ability to read, write, or speak the

English language, or understand or interpret any matter, or

that they demonstrate any educational achievement or knowledge

of any particular subject, as used in Section 6 of the Voting

Rights Act Amendments of 1970, Public Law 91-285, and during

the period said law is in effect;

IT IS FURTHER ORDERED that the defendant, State of

Washington, and the defendant Eugene Naff in his official

capacity as the Yakima County Auditor, shall jointly pay the

costs taxed by the Supreme Court in the amount of $692.36, in

equal portions.

DONE this 27 day of September, 1971.

_____
JUDGE FREDERICK G. HAMLEY

_____
JUDGE CHARLES L. POWELL

_____
JUDGE WILLIAM N. GOODWIN

Entered in Civil Docket on 9/27/71

-4-

Exhibit 17

```
FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JUL 06 2004

JAMES R. LARSEN, CLERK
_____DEPUTY
SPOKANE, WASHINGTON
```

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
YAKIMA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CV-04-3072-LRS** |
| ) | |
| v. ) | CIVIL NO. |
| ) | |
| YAKIMA COUNTY; CORKY MATTINGLY ) | COMPLAINT |
| Yakima County Auditor; ) | |
| JIM LEWIS, RONALD GAMACHE, ) | |
| and JESSE PALACIOS, ) | |
| County Commissioners. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

The United States of America, Plaintiff herein, alleges:

1.      The Attorney General files this action pursuant to Section 203 of the

Voting Rights Act of 1965 ("Section 203"), as amended, 42 U.S.C. § 1973aa-1a, 42

U.S.C. § 1973aa-2, and 28 U.S.C. § 2201.

2.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1345

and  42 U.S.C. § 1973aa-2.  In accordance with the provisions of 28 U.S.C. § 2284,

the Section 203 claim must be heard and determined by a court of three judges.

(Complaint - 2)

1       3. Defendant YAKIMA COUNTY, is a political and geographical subdivision

2  of the State of Washington and exists as a charter county, organized pursuant to the

3  laws of Washington.

4       4. Defendant CORKY MATTINGLY serves as Yakima County Auditor. As

5  Yakima County Auditor, she is responsible for the administration of elections and

6  voting procedures in Yakima County. Defendant MATTINGLY resides in Yakima

7  County and is sued in her official capacity.

8       5. Defendants JIM LEWIS, RONALD GAMACHE, and JESSE PALACIOS

9  serve as County Commissioners of Yakima County. The Board of County

10  Commissioners is the county's legislative body and is responsible for establishing

11  county policies and the overall administration of the Yakima County government,

12  including but not limited to funding of the office of the Auditor, personnel, and

13  supplies. Defendants Lewis, Gamache, and Palacios reside in Yakima County and

14  are sued in their official capacities.

15       6. According to the 2000 Census:

16         a. Yakima County has a total population of 222,581, of whom 142,676

17         (64.1%) are non-Latino and 79,905 (35.9%) are Latino;

18         b. Yakima County's total voting-age population is 151,830 persons, of

19         whom 107,457 (70.8%) are non-Latino and 44,373 (29.2%) are Latino;

(Complaint - 3)

1          c. Yakima County's total citizen voting age population is 129,575 of

2          whom 23,325 (18.0%) are Latino. Of Latino voting age citizens, 6,950

3          (29.8%) have limited English proficiency; and

4          d. Spanish heritage citizens of voting age with limited English

5          proficiency constitute 5.4% of the county's total voting age citizen

6          population.

7      7. Defendant Yakima County is subject to the requirements of Section 203 for

8  the Spanish language, as designated by the Director of the Census. See 28 C.F.R. §

9  55, Appendix. The Director determined that more than five (5) percent of Yakima

10  County's voting age citizens are members of a single language minority group

11  (Spanish heritage) who do not speak or understand English well enough to

12  participate in the English-language election process and have an illiteracy rate that is

13  higher than the national illiteracy rate. 28 C.F.R. § 55.5. The Census Bureau's

14  determination that Yakima County is covered by Section 203 for Spanish is final and

15  non-reviewable. 42 U.S.C. § 1973aa-1a(b)(4).

16      8. Because Yakima County is subject to the requirements of Section 203,

17  "any registration or voting notices, forms, instructions, assistance, or other materials

18  or information relating to the electoral process, including ballots" that Defendants

19  provide in English must also be furnished in Spanish. 42 U.S.C. § 1973aa-1a.

(Complaint - 3)

9.  Defendants have not provided effective election-related materials, information, and/or assistance in Spanish to limited English proficient Latino citizens as required by Section 203.  Specifically, Defendants have:

a.  Failed to provide complete and accurate Spanish translations of all materials produced in English and provided to the public, including, but not limited to, information about voter registration, candidate qualification procedures, voting by mail or absentee, voting at the polls, and voting-related information on the Yakima County Auditor's Internet site;

b.  Failed to provide effective Spanish-language assistance at county offices and polling places regarding election-related issues;

c.  Failed to publish Spanish-language materials in a timely fashion; and

d.  Failed to publish Spanish language materials and information about Spanish-language assistance in a manner accessible to limited English proficient Spanish-speaking voters.

10.  Defendants' failure to provide Spanish-language election information and assistance constitutes a violation of Section 203.

11.  Unless enjoined by this Court, Defendants will continue to violate Section 203 by failing to provide Spanish-language minority citizens of Yakima

(Complaint - 6)

1   County with Spanish-language election information and assistance necessary for their

2   effective political participation.

3                          PRAYER FOR RELIEF

4        WHEREFORE, the United States of America prays that this Court enter an

5   order:

6        1.   Declaring that Defendants have failed to provide Spanish-language

7             election information and assistance necessary to those who require it in

8             violation of Section 203;

9        2.   Enjoining Defendants, their employees, agents and successors in office,

10            and all persons acting in concert with them, from failing to provide

11            Spanish-language election information and assistance to persons with

12            limited English proficiency as required by Section 203;

13       3.   Ordering Defendants to devise and implement a remedial plan to ensure

14            that Spanish-speaking citizens are able to participate in all phases of the

15            electoral process as required by Section 203 for all future elections;

16       4.   Authorizing the appointment of federal examiners for elections held in

17            Yakima County pursuant to Section 3(a) of the Voting Rights Act, 42

18            U.S.C. § 1973a(a), through December 31, 2006.

19       Plaintiff further prays that this Court order such additional relief as the

(Complaint - 8)

1    interests of justice may require, together with the costs and disbursements in

2    maintaining this action.

3    Dated: July 6, 2004

4                                              JOHN D. ASHCROFT
5                                              Attorney General
6
7
8
9    JAMES A. McDEVITT                         R. ALEXANDER ACOSTA
10   United States Attorney                    Assistant Attorney General
11   WILLIAM A. BEATTY
12   Assistant United States Attorney
13   Chief, Civil Division
14   Eastern District of Washington
15   920 West Riverside Avenue # 300
16   Spokane, WA 99201-1494
17
18                                             JOSEPH D. RICH
19                                             Chief, Voting Section
20
21
22                                             JOHN TANNER
23                                             Special Litigation Counsel
24                                             BRUCE I. GEAR
25                                             ANA HENDERSON
26                                             Attorneys, Voting Section
27                                             Civil Rights Division -NWB
28                                             U.S. Department of Justice
29                                             950 Pennsylvania Ave.,N.W.
30                                             Washington, D.C. 20530
31                                             (202) 353-0419

(Complaint - 8)

```
 1
 2
 3
 4
 5   R. ALEXANDER ACOSTA
 6   Assistant Attorney General
 7   Civil Rights Division
 8   JOSEPH D. RICH
 9   Chief
10   JOHN TANNER
11   BRUCE I. GEAR
12   ANA HENDERSON
13   Attorneys
14   Voting Section
15   Civil Rights Division
16   United States Department of Justice
17   950 Pennsylvania Ave, N.W. - NWB Ste. 7201
18   Washington, D.C.  20530
19   202-353-0419
20
21   JAMES A. McDEVITT
22   United States Attorney
23   WILLIAM A. BEATTY
24   Assistant United States Attorney
25   Chief, Civil Division
26   Eastern District of Washington
27   920 West Riverside Avenue # 340
28   Spokane, WA 99201-1494
29   (509) 353-2767
30
31
32
33
34
35
36
37
38
```

(Complaint - 1)

Exhibit 18

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 03 2004

JAMES R. LARSEN, CLERK
_____ DEPUTY
YAKIMA, WASHINGTON

1
2
3
4
5          UNITED STATES DISTRICT COURT
6    FOR THE EASTERN DISTRICT OF WASHINGTON
7             YAKIMA DIVISION
8

| | | |
|---|---|---|
| 9 UNITED STATES OF AMERICA, | ) | |
| 10 | ) | |
| 11 Plaintiff, | ) | **CV-04-3072-LRS** |
| 12 | ) | |
| 13 v. | ) | CIVIL NO. |
| 14 | ) | |
| 15 YAKIMA COUNTY; CORKY MATTINGLY, | ) | CONSENT DECREE |
| 16 Yakima County Auditor; | ) | |
| 17 JIM LEWIS, RONALD GAMACHE, | ) | |
| 18 and JESSE PALACIOS, | ) | |
| 19 County Commissioners. | ) | |
| 20 | ) | |
| 21 Defendants. | ) | |
| 22 | ) | |

**I. Background**

23

24     A. The United States of America initiated this action pursuant to Section

25   203 of the Voting Rights Act of 1965 ("Section 203"), as amended, 42 U.S.C. §

26   1973aa-1a, 1973aa-2, and 28 U.S.C. § 2201, alleging that election practices and

27   procedures used by Yakima County, Washington, for Spanish-speaking citizens

28   violate Section 203. The claim under Section 203 must be heard and determined

29   by a court of three judges pursuant to 42 U.S.C. § 1973aa-2 and 28 U.S.C. § 2284.

- 2 -

1        B. Yakima County's coverage under Section 203 is based on a

2    determination by the Director of the Census that more than five (5) percent of the

3    citizens of voting age in the County are members of a single language minority

4    group (Spanish heritage) who do not speak or understand English well enough to

5    participate effectively in the English-language election process (hereinafter

6    referred to as Spanish-speaking citizens or voters), and that these persons have an

7    illiteracy rate higher than the national illiteracy rate, 42 U.S.C. 1973aa-1(a) .

8        C. In 1976 Yakima County was designated by the Director of the Census as

9    a jurisdiction subject to the requirements of Section 203 for persons of Spanish

10   heritage. 41 Fed. Reg. 29,998 (July 20, 1976). In 2002, Yakima County was again

11   so designated by the Director of the Census. 67 Fed. Red. 48,871 (July 26, 2002).

12       D. The United States alleges in its complaint that Yakima County is not

13   fully compliant with the requirements of Section 203 for Spanish-speaking

14   citizens residing in Yakima County with respect to the need to:

15          1. Provide complete and accurate Spanish translations of all materials

16            and information produced in English and provided to the public,

17            including but not limited to, ballots, information about voter

18            registration, candidate qualification procedures, voting by mail or

19            absentee, voting at the polls, and voting-related information on the

- 3 -

1    Yakima County website;

2         2.  Provide effective Spanish language assistance at County offices

3         and polling places regarding election-related issues;

4         3.  Publish Spanish language materials in a timely fashion;

5         4.  Make Spanish language materials, information, and assistance

6         available to Spanish-speaking voters; and

7         5.  Provide Spanish materials to those voters who need them or take

8         steps to notify such Spanish-speaking voters that Spanish materials

9         are available.

10   E.   The named defendant parties (hereinafter "Yakima County") do not

11   admit to the allegations of the complaint.  Yakima County, however, does share

12   with the United States a mutual interest to implement procedures that will protect

13   the rights of Spanish-speaking voters to participate fully in the electoral process in

14   compliance with the Voting Rights Act and the United States Constitution, and

15   therefore, Yakima County agrees to implement fully the terms of this consent

16   decree for enforcement of all applicable laws.  Accordingly, the United States and

17   Yakima County consent to the entry of this Order, as indicated by the signatures of

18   counsel at the end of this document.  The parties waive a hearing and entry of

19   findings of fact and conclusions of law on all issues involved in this matter.

- 4 -

1    Accordingly, it is hereby **ORDERED, ADJUDGED, AND DECREED**

2    that:

3    Yakima County, its agents, employees, contractors, successors and all other

4    persons representing the interests of Yakima County are hereby **ENJOINED** from

5    violating Section 203 by failing to provide in Spanish any "registration or voting

6    notices, forms, instructions, assistance or other materials or information" that they

7    provide in English. 42 U.S.C. § 1973aa-1a(c). More specifically, Yakima County

8    shall be required to do the following:

9    II.    Translation of election-related materials

10    A. All "registration or voting notices, forms, instructions, assistance, or

11    other materials or information relating to the electoral process, including ballots,"

12    42 U.S.C. 1973aa-1a(c), provided by Yakima County shall also be provided by

13    Yakima County in the Spanish language.  Yakima County shall ensure that both

14    English and Spanish language election information, materials, and announcements

15    provided by Yakima County are made equally available.

16    B. Yakima County shall translate into Spanish all election-related

17    documents and information it provides in English.  Such translation shall begin as

18    soon as the English text is known and shall be completed so as to allow

19    distribution along with the English text.  To ensure the quality of translations, the

- 5 -

1    County shall employ trained translators who are familiar with Spanish language

2    election terminology to produce clear and accurate written translations. The

3    County shall develop and maintain a glossary of Spanish election terminology

4    using Spanish terms understandable to local Latino citizens in concert with

5    bilingual members of local Latino communities.

6        C. All official ballots, including absentee ballots, shall be printed

7    bilingually in both English and Spanish. Any new voting system adopted by the

8    County shall offer bilingual ballots or a readily apparent option of a Spanish

9    ballot, and any audible version of the ballot on such machines shall be available in

10    English and Spanish.

11    III.    Dissemination of Spanish language information

12        A. All voter registration and election notices, forms, instructions, and other

13    materials available to voters in English shall also be printed in Spanish and shall

14    be displayed or available in the County Auditor's Office, each polling place, and

15    any other location where the County posts election-related materials on the same

16    basis as English language materials and information.

17        B. Yakima County shall ensure that all Spanish- and English-language

18    election-related information, materials, and announcements are made equally

19    available. Spanish-language information shall be distributed through newspapers,

- 6 -

1   radio and other media that exclusively or regularly publish or broadcast

2   information in Spanish. Dissemination of these announcements need not be

3   identical in all respects to dissemination of English-language announcements, but

4   shall be in the form, frequency, and media best calculated to achieve notice and

5   understanding equal to that provided to the English-speaking population.

6       C. Yakima County shall adopt a checklist identifying each Spanish-

7   language and bilingual material that the County makes available to the public at

8   each polling place. The checklist shall include, for each item, an attestation that

9   the poll workers at the polling place posted or made available to voters such

10  Spanish-language or bilingual document, or solicit a detailed written explanation

11  of why individual items were not posted or available. The election inspector for

12  each polling place must complete and sign this document before receiving

13  payment for work in the election, subject to applicable state and federal law.

14  Yakima County shall maintain a record of each failure to complete and sign the

15  checklist.

16  IV.    Spanish Language Assistance

17      A. Trained bilingual (English/Spanish) election personnel shall be available

18  to answer voting related questions by telephone without cost during normal

19  business hours and while the polls are open on election days.

- 7 -

1        B. Yakima County shall recruit, hire, and assign sufficient bilingual

2   (Spanish/English) poll workers, who are able to understand, speak, read, and write

3   Spanish fluently, to provide assistance to Spanish-speaking voters at the polls on

4   election days.  To assist in the recruitment of bilingual poll workers, the County

5   shall survey its employees to identify personnel who speak Spanish and, to the

6   extent such employees can be made available to provide assistance, allow and

7   encourage such employees to serve at the polls on election day or be available "on

8   call" to address questions or problems that may arise.

9        C. As part of its obligation to ensure that entities on whose behalf the

10  County conducts elections are fully compliant with Section 203 in their elections,

11  the County shall request that each entity for which it conducts elections perform

12  similar surveys of its employees and shall request from such entities, and maintain

13  copies of, all election-related materials and information created or disseminated by

14  such entities for each election.  In addition, the County shall request that each

15  school district or other educational entity for which the County conducts elections

16  implement a program that allows and encourages selected bilingual students (as

17  allowed  by state law and as part of an educational program devised by such

18  district) to serve as  poll workers on election day for all County elections,

19  including election days that fall on  school days, with such students receiving

- 8 -

1    academic credit appropriate to their service as well as all pay and benefits of poll

2    officials

3         D. The County shall invite eligible members of the Advisory Group,

4    discussed below, to serve as paid poll workers and to encourage other bilingual

5    voters to do so. The County shall publicize to the Spanish speaking community

6    the option of absentee voting to the same extent it does so for English-speaking

7    voters.

8         E. Bilingual assistance shall be provided in polling places in accordance

9    with the following:

10             (1) In polling places where the number of Spanish surnamed

11             registered voters is 150 to 299, there shall be at least one poll worker

12             bilingual in Spanish and English.

13             (2) In polling places where the number of Spanish surnamed

14             registered voters is 300 to 599, there shall be at least two poll workers

15             bilingual in Spanish and English.

16             (3) In polling places where the number of Spanish surnamed

17             registered voters is 600 to 999, there shall be at least three poll

18             workers bilingual in Spanish and English.

19             (4) In polling places where the number of Spanish surnamed

- 9 -

1          registered voters is over 1,000, there shall be at least four poll

2          workers  bilingual in Spanish and English.

3          (5)  When assigning poll workers bilingual in Spanish and English to

4          election boards at various polling places, assignment should be done

5          in a manner that there will be at least one bilingual poll worker on

6          each election board, whenever feasible.

7          (6)  The parties may agree to adjust the standards in this section in

8          light of information that the actual language need in a particular

9          polling place is lesser or greater than that set forth above.

10     F.  Yakima County shall make available and train in Spanish language

11  election terminology sufficient bilingual personnel who shall be on call throughout

12  election day to provide language assistance to Spanish-speaking voters in person

13  at any polling place in which additional language assistance is needed or where no

14  bilingual poll worker is available.  Such on-call staff shall be stationed in

15  appropriate areas of the County, including in the City of Yakima and locations in

16  the lower Yakima Valley, so as to minimize any delay for voters while the staff

17  member travels to the polling place.

18     G.  At each training session prior to an election, in addition to any required

19  state or County training, the County shall train all poll workers and other election

- 10 -

1     personnel present at the polls on the requirements of Section 203, including

2     making Spanish language assistance and materials available to voters and being

3     respectful and courteous to all voters regardless of race, color, language abilities,

4     or national origin. In addition to the general training for poll workers and

5     interpreters, the County shall train all bilingual poll workers on Spanish language

6     election terminology and how to interpret into Spanish the ballot(s), voting

7     instructions, and other election-related issues. The County shall maintain a record

8     of which poll workers attend training sessions, including the time, location, and

9     training personnel involved.

10         H. Yakima County shall post signs prominently in both English and

11     Spanish at sites where voting occurs stating that Spanish language assistance is

12     available. Bilingual poll workers shall be identified as such by badges. At sites

13     without bilingual poll workers, signs in both English and Spanish shall be posted

14     that explain how voters can obtain Spanish language assistance.

15         I. Upon receipt of complaints by voters, whether oral or written, Yakima

16     County shall investigate expeditiously any allegations of poll worker hostility

17     toward Spanish-speaking and/or Latino voters in any election. Yakima County

18     shall report the results of each investigation to the United States. Where there is

19     credible evidence that a poll worker(s) have engaged in inappropriate treatment of

- 11 -

1   Spanish-speaking and/or Latino voters, Yakima County shall remove the poll

2   worker(s).

3   V.   Program Coordinator

4   A.  The County shall employ, on a full time basis, an individual to

5   coordinate the County's Bilingual Election Program ("Program Coordinator") for

6   all elections within the County.  The County shall provide that individual with

7   transportation and other support sufficient to meet the goals of the Program.  The

8   Program Coordinator shall be able to understand, speak, write, and read fluently

9   both Spanish and English.

10   B.  The Program Coordinator shall work under the supervision of the

11   Yakima County Auditor to implement a bilingual election program.  The Program

12   Coordinator's responsibilities shall include coordination of translation of ballots

13   and other election information; development of an election glossary to ensure

14   uniform use of election terminology in Spanish; development and oversight of

15   publicity, including selection of appropriate Spanish-language media for notices

16   and announcements in Spanish and English-language print media that specifically

17   serves Latino communities for announcements in English; recruitment of bilingual

18   poll workers and interpreters, including assessment of their Spanish language

19   proficiency; devising specific steps to provide election information to the Spanish-

- 12 -

1  speaking community; sending staff to make presentations and answer questions at

2  events and meetings sponsored by Latino community organizations; and managing

3  other aspects of the Program.

4  VI.  <u>Advisory Group</u>:

5      A.  The Program Coordinator shall establish and chair an Advisory Group to

6  assist and inform the Bilingual Election Program and shall invite participation

7  from all organizations listed in Attachment A, as well as other individuals and

8  organizations that work with or serve the Spanish-speaking and Latino

9  communities in Yakima County.  Such Advisory Group shall be open to all

10  interested persons.

11      B.  The Advisory Group shall meet at least once a month in 2004, at least

12  every two months during 2005, and as the group determines is necessary in 2006.

13  In these meetings, Yakima County shall solicit information on how most

14  effectively to provide election materials, information, and assistance to Spanish-

15  speaking voters and how to publicize the County's Spanish language election

16  program.  The Program Coordinator shall provide notice of all planned meetings

17  to each member, including the date, time, location, and meeting agenda at least 14

18  days in advance, although members of the Advisory Group may agree to waive or

19  shorten this time period as necessary.

- 13 -

1        C. Within five days after each meeting, the Program Coordinator shall

2 provide a written summary of the discussion and any decisions reached at the

3 meeting to all members and to the County Auditor. If the County Auditor decides

4 not to implement an Advisory Group suggestion or a consensus cannot be reached

5 respecting such suggestion, the Auditor shall provide to the group through the

6 Program Coordinator and maintain on file a written statement of the reasons for

7 rejecting such suggestion.

8        D. The County shall transmit to all interested members of the advisory

9 group copies, in English and Spanish, of all election information, announcements,

10 and notices that are provided or made available to the electorate and general public

11 and request that they share such information with their members.

12 VII.   Evaluation of the plan

13        The parties recognize that regular and ongoing reassessment may be

14 necessary in order to provide the most effective and efficient Spanish language

15 program. Yakima County shall evaluate the Bilingual Election Program after each

16 election cycle (e.g., following 2004 elections) to determine which aspects of the

17 Bilingual Election Program are functioning well; whether any aspects need

18 improvement; and how to make needed improvements. The program may be

19 adjusted at any time upon written agreement of the parties.

- 14 -

1    VIII.  Federal Examiners and Observers:

2         A.  To monitor compliance with this Decree, the appointment of federal

3    examiners is authorized for Yakima County pursuant to Section 3(a) of the Voting

4    Rights Act, 42 U.S.C. 1973a (a), through December 31, 2006.

5         B.  Yakima County acknowledges the authority of federal observers to

6    observe all aspects of voting conducted in the polls on election day, including the

7    observers' authority to view County personnel providing assistance to voters

8    during voting, except where the voter objects.

9    IX.   Retention of Documents and Reporting Requirements

10        A.  During the duration of this decree, the County shall make and maintain

11   written records of all actions taken pursuant to this Consent Decree.  Such

12   documents, lists, and records shall be made available, upon reasonable notice, to

13   the United States for inspection and copying.

14        B.  During the duration of this decree, at least ten (10) days before each

15   County-administered election held in the County, Yakima County shall provide to

16   counsel for the United States, the name, address, and precinct designation of each

17   polling place; the name and title of each poll worker appointed and assigned to

18   serve at each polling place; a designation of whether each poll worker is bilingual

19   in English and Spanish; and an electronic copy of the final, official voter

- 15 -

1    registration list to be used in each such election.  Within thirty (30) days after each

2    election, Yakima County shall provide to counsel for the United States any

3    updated report regarding changes in these items as well as information about all

4    complaints the County received at the election regarding language or assistance

5    issues and the voters' registration list used in the election.

6    X.    Duty to Defend Consent Decree

7         The parties to this Consent Decree shall employ their best efforts to defend

8    this Consent Decree against any legal challenge.

9    XI.    Jurisdiction

10        The Court shall retain jurisdiction of this case to enter further relief or such

11   other orders as may be necessary for the effectuation of the terms of this

12   agreement and to ensure compliance with Section 203.

13   XII.    Termination of Consent Decree

14        This agreement is final and binding between the parties and their successors

15   in office regarding the claims raised in this action.  This agreement shall remain in

16   effect through December 31, 2006, and the United States may, within 90 days of

17

18

19

- 16 -

1    that date, move to extend the decree for good cause shown, in the event of a

2    violation of any provision contained herein by the County.

3    AGREED AND CONSENTED TO:

4    For Plaintiff:                              For Defendants:

5    UNITED STATES OF AMERICA

6

7

8    James A. McDevitt, United States Attorney   Terry Austin, Esq.

9    William A. Beatty, Asst. United States      County Counsel, Yakima County

10   Attorney and Chief, Civil Division          County Court House, Room 329

11   Eastern District of Washington              128 North Second Street

12   920 West Riverside Avenue # 300             Yakima, Washington  98901

13   Spokane, WA 99201-1494

14

15

16

17

18   R. Alexander Acosta

19   Assistant Attorney General

20   Civil Rights Division

21

22

23   Joseph D. Rich, Chief

24   John Tanner, Special Litigation Counsel

25   Bruce I. Gear

26   Ana Henderson, Attorneys

27   Voting Section, NWB

28   U.S. Department of Justice

29   Civil Rights Division

30   950 Pennsylvania Ave., N.W.

31   Washington, D.C.  20530

- 17 -

JUDGMENT AND ORDER

This three-judge Court, having been properly empaneled under 28 U.S.C. §
2284 to consider the United States' claim under Section 203 of the Voting Rights
Act of 1965 (as amended), 42 U.S.C. § 1973aa-1a (1992), and having determined
that it has jurisdiction over this claim, has considered the terms of the Consent
Decree, hereby enters the relief set forth above and incorporates those terms
herein.

ENTERED and ORDERED this 3ʳᵈ day of _September_, 2004.

UNITED STATES CIRCUIT JUDGE

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT JUDGE

1
2
3
4
5    R. ALEXANDER ACOSTA
6    Assistant Attorney General
7    Civil Rights Division
8    JOSEPH D. RICH
9    Chief
10   JOHN TANNER
11   BRUCE I. GEAR
12   ANA HENDERSON
13   Attorneys
14   Voting Section
15   Civil Rights Division
16   United States Department of Justice
17   950 Pennsylvania Ave, N.W. - NWB Ste. 7201
18   Washington, D.C.  20530
19   202-353-0419
20
21   JAMES A. McDEVITT
22   United States Attorney
23   WILLIAM A. BEATTY
24   Assistant United States Attorney
25   Chief, Civil Division
26   Eastern District of Washington
27   920 West Riverside Avenue # 300
28   Spokane, WA 99201-1494
29
30
31
32
33
34
35
36
37
38
39

## ATTACHMENT A: Community Contacts/Advisory Committee Members

| Name | Address | Phone | E-mail | Fax | Notes |
|---|---|---|---|---|---|
| Aguilar, Bengie | 529 Dayton Dr., Sunnyside 98944 | 837-7769 | baguilard@earthlink.net | 836-5591 | Sunnyside City Council |
| Aguilar, Juan | | | | | |
| Aguilera, Polo | | 574-1500 | | | Owner, Petunia Markets |
| Aguilera-Flemming, Terri | 4703 W Prasch Av, Yakima 98908 | | | | |
| Aliec, Frank | 152101 W County Rte 12, Prosser 99350 | 786-4532 | kzkr@bentonrea.com | 786-1181 | LaMaquina Musical Radio Station |
| Almeida, Raul | | | | | Mabton Police Chief |
| American Assc. for Ret. Peo. | | 966-6558 | | | |
| American Civil Liberties Union | | 206-624-2184 | | | |
| Americorps | | 800-880-4183 | | | |
| Arevalo, Paul | 128 Hawthorn Dr, Sunnyside 98944 | | | | Bilingual poll worker |
| Armendariz, Ernesto | P O Bxo 416, Mabton 98935 | 840-0357 | | | Mabton City Council |
| Arteaga, Mateo | 803 S 30th Av, Yakima 98908 | | | | |
| Baca, Mr. | | | | | |
| Bazan, Irene | 24 S 3rd Av, Yakima 98902 | 574-4967 | bazanirene@hotmail.com | | |
| Berry, Bob | P O Box 2888, Yakima 98907 | 307-3213 | bob@radiozorro.com | RCDR, | |
| City University | | 457-1000 | | 452-0541 | Zorro Radio |
| Community Services Offices | | 453-0303 | | | |
| Contreras, M.Laura | 6 S 2nd St #510, Yakima 98901 | 225-6100 | laura.contreras@columbialegal.com | | Employment Opportunities |
| Contreras, Myrna | 312 N 5th Av, Yakima 98902 | 575-5593 | | 575-4404 | Columbia Legal Services |
| Cordova, Rebecca | 3171 Lateral A Rd, Wapato 98951 | 453-8888 | | 576-8854 | Attorney |
| de la Cruz, Alex | 1203 W Grandview Av, Sunnyside 98944 | 969-2828 | | | Wapato School District Director |
| Diaz, Fred | 33 N D St, Toppenish 98948 | 840-5065 | | | Sunnyside City Council |
| Diaz, Kevin | 402 S 17th Av, Yakima 98902 | 865-5063 | | | Toppenish City Council |
| Escobar, Ted | P O Box 511, Toppenish 98948 | 865-4055 | | | |
| Farias, Jesse | 316 Southpark Dr #A, Wapato 98951 | 877-6169 | | | VIVA |
| Farm Workers Clin. Yak. Val. | | 865-5600 | | | City of Wapato Mayor |
| Farm Workers Opp. Prog | | 837-8600 | | | Servc. for seasonal & migratory farm workers |
| Flores, Santiago | 1012 W Mead Av, Yakima 98902 | | | | |
| Flores, Sylvia | 1002 N 16th Av, Yakima 98902 | 249-6015 | | | Bilingual poll worker |
| Franco, Hector | 815 N 28th Av, Yakima 98902 | 307-1183 | hfranco@mwinfo.net | | DSHS - Dist. Mgr. - Division of Child Support |
| Gamboa, Lupe | 107 E Riverside Av, Sunnyside 98944 | | | | Hispanic Chamber of Commerce |
| Garcia, Avelina A. | P O Box 99, Harrah 98933 | 848-2370 | | | |
| Garcia, Larry J. | P O Box 99, Harrah 98933 | 848-2370 | | | Harrah Town Council |
| Garcia, Ricardo | P O Box 800, Granger 98932 | 877-6847 | | | Mt. Adams School District Director |
| Garza, Lorenzo Jr. | 314 Peach Av, Sunnyside 98944 | 837-0906 | | | KDNA Radio, Manager |
| | | | | | Sunnyside School District Director |

| Name | Address | Phone | Email | Organization/Title |
|---|---|---|---|---|
| Gonzalez, Alfredo Jr. | P O Box 1225, Granger 98932 | 854-6276 | | Granger Town Council |
| Gonzalez, Tony | 600 Hedrick Pl, Grandview 98930 | 882-3877 | | Grandview School District Director |
| Guerra, Ernie | P O Box 463, Granger 98932 | 854-2727 | | Granger Town Council |
| Gutierrez, Luz Bazan | 1424 S 31st Av, Yakima 98902 | 952-7860 | | Rural Community Development Resources |
| Gutierrez, Ninfa R. | | 307-1247 | 453-5165 | VIVA |
| Guzman, Manuel | 1550 Bus Rd, Mabton 98935 | 894-5204 | | Mabton School District Director |
| Guzman, Tony | 102 N Central Av, Wapato 98951 | 877-2986 | | Wapato City Council |
| Heritage College | | 865-2244 | | |
| Hernandez, Mary | | | | |
| Herrera, Velva L. | P O Box 771, Mabton 98935 | 894-3435 | | Project Change/Planned Parenthood |
| Jiminez, Clara | 1122 Satus Av, Toppenish 98948 | 865-4222 | | Mabton City Council |
| Lara, Victor | 216 S 32nd Av, Yakima 98902 | | | Toppenish City Council |
| Larez, Thomas A. | 131 Washington St, Harrah 98933 | 848-2047 | | Attorney |
| Lopez, Anita | | 839-4903 | | Harrah Town Council |
| Macias, Gonzalo | 25 N I St, Toppenish 98948 | 865-6033 | | United Farm Workers of America |
| Mendoza, Gloria | 109 W 2nd St, Grandview 98930 | 882-2523 | | Toppenish School District Director |
| Migrant Alternative School | | 575-3492 | | GMC Training Institute |
| Molina, Virginia | P O Box 265, Mabton 98935 | 894-4104 | anital@bentonrea.com | |
| Morales, Jose | 1231 Donald Rd, Wapato 98951 | 307-0203 | | Mabton City Council |
| Morales, Mariano | 3907 Summitview Av, Ste, Yakima 98902 | | | |
| Morales, Medardo | 7420 Fort Rd, Wapato 98951 | | | Attorney |
| Morales, Michael | Yakima City Hall | | | |
| Morales, Robert | 2105 Hill Dr, Grandview 98930 | 882-2961 | | City of Yakima |
| Moreno, Lydia B. | 310 Elm St, Grandview 98930 | 882-1516 | | Grandview City Council |
| Nicacio, Bill | 705 S Teton Ave, Wapato 98951 | 877-4698 | | Grandview School District Director |
| Olivares, Carlos | 116 Park Av, Yakima 98902 | | | WA State Farmworkers Union |
| Oppo. Indust. Center | | | | |
| Orbea, Eduardo | P O Box 9668, Yakima 98909 | 248-6751 | eorbea@elsoldeyakima.com | Migrant Education Program |
| Orosco, Juan | | 577-7730 | 577-7768 | El Sol de Yakima |
| Ortega, Bertha | | | | City of Wapato Councilmember |
| Ozuna, Robert | 3240 Fort Rd, Toppenish 98948 | 867-7081 | | Heritage College |
| Palacios, David | 3240 Fort Rd, Toppenish 98948 | | | Heritage College |
| Palacios, Jesse | 1260 Appleway Rd, Grandview 98930 | 574-1500 | jesse.palacios@co.yakima.wa.us | Grandview Police Dept. |
| People for People | 128 N 2nd St #232, Yakima 98901 | 248-6726 | | County Commissioner |
| Perez, Patrick | 1118 Queen Av, Yakima 98902 | 453-6697 | | Adult employment services |
| Perez, Velma | 1407 S 20th Av, Yakima 98902 | 457-4662 | | |
| Perry Technical Institute | | 453-0374 | | |
| Planned Parenthood | | 248-3628 | | Hispanic Chamber of Commerce |

Updated 6/29/2004

| Name | Address | Phone | Email/Contact | Description |
|---|---|---|---|---|
| Rodriguez, Sonja | | | | |
| Ramon, Amelia | | | | |
| Retired Senio Volunt. Prog. | P O Box 800, Granger 98932 | 453-8888 | | KDNA |
| Romero, Julio | 1115 W Lincoln Av, #119, Yakima 98902 | 575-4224 | Volunteer placement | SW Voter Project/Consumer Credit Counseling |
| Sagrero, Rafael | P O Box 193, Mabton 98935 | 248-5270 | info@ccsyakima.org | Mabton School District Director |
| Sanchez, Larry | | 894-5245 | 248-5276 | Central WA Workforce Training |
| Sandoval, Tony | P O Box 10301, Yakima 98909 (personal) | 452-3561 | tonysand@bentonrea.com | Hispanavision - 452-8817 FAX: 248-7499 |
| Santillanes, Alex | 1407 W Chestnut Av, Yakima 98902 | 952-4760 | | Barrios Unidos |
| Soria, Ben | 104 N 4th Av, Yakima 98902 | 573-7001 | | Yakima School Dist. Superintendent |
| Trejo, Viviana | 708 Pine St, Mabton 98935 | 894-4671 | bsoria@aol.com 573-7181 | Mabton School District Director |
| Vega, Griselda | 6 S 2nd St, #510, Yakima 98901 | 575-5593 | griselda.vega@columbialegal.c 575-4404 | Columbia Legal Services |
| Velasco, Efrain | 503 S 3rd St, Yakima 98901 | 453-3064 | evelasco@seiu775.org 248-0516 | Local 775 - SEIU, Organizer |
| Villanueva, Janie | Catholic Diocese, 5301 Tieton Dr, 98908 | | | Catholic Diocese - Holy Family |
| Villanueva, Jose | | | | Community Member |
| Villanueva, Tomas | 140 Youngstown Rd, Toppenish 98948 | 854-2511 | | DSHS |
| Villarreal, Lilia O. | | 457-6850 | | Granger Town Council |
| Volunt. & Car. Ctr of Yak. Cty | 720 Second Av, Granger 98932 | 574-0105 | | Career Center seeks to promote volunteerism |
| WorkSource | | 575-2130 | | Employment and training services |
| Yakima ICNE Outreach Prog. | | 457-5058 | | |
| Yakima Interfaith Coalition | | 865-5121 | | Outreach Services |
| Yakima Tribal Council | | 575-2427 | | Employment training, education |
| Yakima Valley Comm. College | | 865-3054 | | International Students Program |
| Yakima Valley Farm Wor. Cl. | | 854-1801 | | Education and supportive services |
| Ybarra, Natalie | 221 E St, Granger 98932 | 249-1268 | | Granger Town Council |
| Ybarra, Vickie | 708 S 17th Av, Yakima 98902 | 894-4273 | vickiey@yvfwc.org | Yakima Valley Farmworkers Clinic/Yak. Sch. Bd. |
| Zavala, Vera C. | P O Box 614, Mabton 98935 | | | Mabton City Council |