UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ROGELIO MONTES, et al.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>CITY OF YAKIMA, et al.,<br><br>                    Defendants. | NO:  12-CV-3108-TOR<br><br>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

BEFORE THE COURT are cross-motions for summary judgment (ECF Nos. 64 & 67), and motions by the Plaintiffs to exclude the expert testimony of Dr. Stephan Thernstrom (ECF No. 62) and to strike the Second Supplemental Expert Report of Peter Morrison (ECF Nos. 88 & 89).  These matters were heard with telephonic oral argument on August 18, 2014.  The Plaintiffs were represented by Abha Khanna and Kevin J. Hamilton of Perkins Coie, LLC.  Defendants were represented by Francis S. Floyd and John A. Safarli of Floyd Pflueger & Ringer, P.S.  The United States of America, specially appearing through T. Christian

Herren, Jr., Bryan L. Sells and Victor J. Williamson of the Voting Rights Section of the Civil Rights Division of the U.S. Department of Justice, filed a Statement of Interest pursuant to 28 U.S.C. § 517.  ECF No. 99.  Subsequent to the hearing, the parties filed responses to the United States' Statement of Interest (ECF Nos. 100 & 106).  The Court has reviewed the briefing and the record and files herein and is fully informed.

BACKGROUND

This is an action to remedy an alleged violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.  Plaintiffs contend that the City of Yakima's at-large voting system deprives Latinos of the right to elect representatives of their choosing to the Yakima City Council.  In support of this contention, Plaintiffs note, *inter alia*, that no Latino has ever been elected to the City Council in the 37-year history of the current system—despite the fact that Latinos account for approximately one-third of the City's voting-age population and approximately one-quarter of its citizen voting-age population.  Plaintiffs ask the Court to enjoin the City from utilizing its current voting system in future elections and to order that the City implement a system that complies with Section 2.

The parties have filed cross-motions for summary judgment.  For the reasons discussed below, the Court concludes that there are no genuine issues of material fact concerning the dilutive effect of the City's election system on Latino votes.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 2

Because City Council elections are not "equally open to participation" by members of the Latino minority, Plaintiffs are entitled to summary judgment.

FACTS

The City of Yakima ("City") utilizes an at-large election system to fill the seven seats on the Yakima City Council.  Four of these seats, designated Positions 1, 2, 3 and 4, have residency restrictions attached.  Candidates running for one of these seats must reside in a geographic district corresponding to their seat number. The remaining three seats, designated Positions 5, 6 and 7, have no residency restriction.  Candidates running for one of these seats may reside anywhere within the City.  Each seat is allotted a four-year term.  Terms are staggered, with elections to fill seats with expiring terms held every two years.

Elections follow a "numbered post" format, meaning that candidates file for a particular seat and compete only against other candidates who are running for the same seat.  In the event that more than two candidates file for a particular seat, the City conducts a primary election to narrow the field to the top two candidates.  If the seat is one of the four residency-restricted seats, only voters who reside in the district corresponding to that seat may vote in the primary.  If the seat is unrestricted, all voters residing within the City may cast a vote.  The two candidates with the highest vote totals in the primary will then advance to a general election.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 3

The general election is essentially a collection of individual at-large races (three or four, depending upon which terms are expiring in a given election year). The two candidates running for each seat compete head-to-head, with the candidate amassing the most votes winning the seat. All registered voters may cast one vote in each head-to-head race, regardless of whether the seat at issue is residency-restricted. In order to win election under this system, a candidate must garner a simple majority of the votes cast in his or her head-to-head race.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted to a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific genuine issues of material fact which must be decided by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any

such fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* In ruling upon a summary judgment motion, a court must construe the facts, as well as all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Only evidence which would be admissible at trial may be considered. *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

DISCUSSION

## I. Overview of Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act of 1965 ("VRA"), prohibits states and their political subdivisions from utilizing voting practices or procedures which result in "a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). This legislation is designed to "help effectuate the Fifteenth Amendment's guarantee that no citizen's vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude." *Voinovich v. Quilter*, 507 U.S. 146, 152 (1993) (quoting U.S. Const. amend. XV, § 1). A violation of § 2 occurs when, based upon the totality of the circumstances, the challenged electoral process is "not equally open to participation by members of a [racial minority group] in that its members have less opportunity than other members of the electorate *to participate in the political process and to elect representatives of their choice*." 42 U.S.C. § 1973(b)

1    (emphasis added).  "The essence of a § 2 claim is that a certain electoral law,

2    practice, or structure interacts with social and historical conditions to cause an

3    inequality in the opportunities enjoyed by [minority] and [majority] voters to elect

4    their preferred representatives."  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

5         Section 2 does not confer a right to proportional representation, but rather a

6    right to participate equally in the political process.  *See* 42 U.S.C. § 1973(b)

7    ("[N]othing in this section establishes a right to have members of a protected class

8    elected in numbers equal to their proportion in the population."); *Gingles*, 478 U.S.

9    at 79 (core inquiry in § 2 case is "whether the political process is equally open to

10   minority voters"); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998)

11   ("Section 2 guarantees a fair *process*, not an equal *result*.") (emphasis in original).

12   For this reason, claims brought under § 2 are commonly referred to as "vote

13   dilution" claims.

14        *Gingles* is the seminal case applying § 2.  In *Gingles*, the Supreme Court

15   identified three "necessary preconditions" which a plaintiff must satisfy in order to

16   proceed with a vote dilution claim.  First, the plaintiff must demonstrate that his or

17   her minority group is "sufficiently large and geographically compact to constitute a

18   majority in a single-member [voting] district."  *Gingles*, 478 U.S. at 50.  Second,

19   he or she must establish that the minority group is "politically cohesive."  *Id.* at 51.

20   Third, the plaintiff must "demonstrate that the white majority votes sufficiently as

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 6

a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* In other words, a § 2 plaintiff must make a prima facie showing that "a bloc voting majority [will] *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* at 49 (emphasis in original). The plaintiff is not required to demonstrate that the challenged system is *designed* to discriminate against minority voters, or that the majority *intentionally* engages in racial bloc voting; he or she need only show that the system has "the *effect* of denying [the minority] the equal opportunity to elect its candidate of choice." *Voinovich*, 507 U.S. at 155 (emphasis in original); *see also Smith v. Salt River Project Agr. Imp. & Power Dist.*, 109 F.3d 586, 594 (9th Cir. 1997) ("Section 2 requires proof only of a discriminatory result, not of discriminatory intent.").

If the plaintiff satisfies each of the *Gingles* preconditions, he or she must then prove that, under "the totality of [the] circumstances," minority voters have less opportunity than members of the majority group to participate in the political process and to elect representatives of their choice. 42 U.S.C. § 1973(b). *Gingles* identifies seven factors relevant to this consideration, each of which is drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA. These so-called "Senate Factors" are as follows:

(1) The history of voting-related discrimination in the jurisdiction;

(2) The extent to which voting in the elections of the jurisdiction is racially polarized;

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 7

(3) The extent to which the jurisdiction has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

(4) The exclusion of members of the minority group from candidate slating processes;

(5) The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) The use of overt or subtle racial appeals in political campaigns; and

(7) The extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 44-45.  When relevant to the particular claim being asserted, a court may also consider the extent to which elected officials have been responsive to the particularized needs of the minority group, and the policy underlying the challenged voting practice or procedures.  *Id.* at 45.

The Senate Factors "are neither comprehensive nor exclusive," and other relevant factors may always be considered.  *Id.*  Further, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Id.* (citation omitted).  The ultimate inquiry is whether, under the totality of the circumstances, the challenged electoral process "is equally

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 8

open to minority voters." *Id.* at 79 (citation omitted).   This inquiry requires both a "searching practical evaluation of the past and present reality," and an "intensely local appraisal of the design and impact of the contested electoral mechanisms." *Id.* (citation omitted).   Once again, a discriminatory *result* is all that is required; intent to discriminate is not a relevant consideration. *Voinovich*, 507 U.S. at 155; *Smith*, 109 F.3d at 594.

## II.   Expert Witness Challenges

### A. Motion to Exclude Dr. Thernstrom

Plaintiffs move to exclude the testimony of Dr. Stephan Thernstrom, Defendants' Senate Factors expert, on the grounds that (1) Dr. Thernstrom is not qualified to opine about racial dynamics and socio-economic disparities between Latinos and non-Latinos in Yakima; (2) his opinions are not adequately supported by objective facts and data; and (3) his conclusions are not the product of reliable principles and methods.  Admissibility of expert witness testimony is governed by Federal Rule of Evidence 702.  The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 9

1   Fed. R. Evid. 702.

2       In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court directed

3   trial courts to perform a "gatekeeping" function to ensure that expert testimony

4   conforms to Rule 702's admissibility requirements.   509 U.S. 579, 597 (1993).

5   *Daubert* identifies four non-exclusive factors a court may consider in assessing the

6   relevance and reliability of expert testimony: (1) whether a theory or technique has

7   been tested; (2) whether the theory or technique has been subjected to peer review

8   and publication; (3) the known or potential error rate and the existence and

9   maintenance of standards controlling the theory or technique's operation; and (4)

10  the extent to which a known technique or theory has gained general acceptance

11  within a relevant scientific community.  *Id.* at 593-94.  These factors are not to be

12  applied as a "definitive checklist or test," but rather as guideposts which "may or

13  may not be pertinent in assessing reliability, depending on the nature of the issue,

14  the expert's particular expertise, and the subject of his testimony."  *Kumho Tire*

15  *Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  The ultimate objective is to

16  "make certain that an expert, whether basing testimony upon professional studies

17  or personal experience, employs in the courtroom the same level of intellectual

18  rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.

19      Having reviewed the record, the Court concludes that Dr. Thernstrom's

20  opinions are admissible for the limited purpose for which they are offered.  The

primary focus of Dr. Thernstrom's testimony is to point out flaws in the opinions of Plaintiffs' Senate Factors experts, Dr. Luis Fraga and Dr. Frances Contreras, about how racial dynamics and socio-economic disparities have the effect of denying Latinos equal access to the electoral process. *See* ECF No. 63-1, Exhibit B, at 2. In other words, Dr. Thernstrom's only objective is to "poke holes" in Dr. Fraga's and Dr. Contreras's theories; with a handful of inconsequential exceptions, he does not offer his own substantive opinions about the extent to which Latinos in Yakima are disadvantaged in accessing the electoral process. *See, e.g.*, Thernstrom Report, ECF No. 63-1, Exhibit B, at 43 ("What caused this [drop in median household income among Latinos] in the opening decade of this century? Latinos were catching up in the 1990s and then falling back in the 2000-2010 decade. Why? I don't have enough evidence to be sure of the answer, but Dr. Fraga's generalized discrimination theory is too vague to be of any use."). The Court finds that Dr. Thernstrom is qualified by his training and experience as a tenured professor, academic researcher, and frequently published author to offer these opinions. The Court further finds that his opinions are grounded in sufficient data and are derived from reasonably reliable methodology. Accordingly, Plaintiffs' motion to exclude Dr. Thernstrom's testimony is denied.

//

//

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 11

B. <u>Motion to Strike Second Supplemental Report of Dr. Morrison</u>

Plaintiffs move to strike the Second Supplemental Declaration of Dr. Peter Morrison on the ground that the opinions offered therein were disclosed after the discovery cutoff and in support of a reply memorandum to which Plaintiffs had no opportunity to respond. ECF No. 89. Although the subject declaration was indeed untimely and submitted under circumstances that did not permit a response, the Court finds that Plaintiffs have not been prejudiced. The sole purpose of the declaration is to demonstrate that Plaintiffs did not balance "electoral equality" among districts when creating their proposed districting plans. ECF No. 86-1. There is no factual dispute on this score, as Plaintiffs' expert, Mr. William Cooper, concedes that he attempted to equalize districts on the basis of total population rather than eligible voting population. The only disputed issue involves a purely legal question: whether districts which are approximately equal in total population, but which differ in eligible voting population, violate the "one person, one vote" principle embodied in the Equal Protection Clause. For the reasons discussed in Section III.A, *infra*, the Court concludes that any disparities among districts in eligible voting population are not fatal to Plaintiffs' claim. To the extent a better balancing of electoral equality among districts is required, it can be accomplished at the remedial stage of these proceedings. The motion to strike Dr. Morrison's Second Supplemental Report is therefore denied.

### III.  Plaintiffs Have Satisfied the *Gingles* Preconditions

A. <u>Latinos are a "sufficiently large and geographically compact" minority group to form a majority in a hypothetical single-member voting district.</u>

The first *Gingles* precondition requires that a minority group be "sufficiently large and geographically compact" to form a majority of voters in a single-member district.  *Gingles*, 478 U.S. at 50.  Stated more plainly, the question is: Are there enough minority voters, and are they sufficiently concentrated geographically, to form a majority of all eligible voters within a single-member voting district?  If the answer is yes, the first *Gingles* precondition is satisfied; if the answer is no, the entire claim fails as a matter of law.  The plaintiff must draw a hypothetical district which satisfies these requirements using real demographic data.

The exercise of requiring a § 2 plaintiff to draw a hypothetical "minority" district serves two related purposes.  First, it serves to link the alleged injury (the minority group's inability to elect representatives of its choosing) to the alleged cause (the challenged voting system).  As the Supreme Court explained in *Gingles*:

> Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. . . .  Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the [challenged] electoral structure.

478 U.S. at 50 n.17 (emphasis in original).

Second, drawing a minority district in which minority voters represent more than 50% of all eligible voters confirms that an effective remedy can be fashioned. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) ("Because the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice."); *Holder v. Hall*, 512 U.S. 874, 881 (1994) (plurality opinion) ("[W]here there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2."); *Barnett v. City of Chicago*, 141 F.3d 699, 702 (7th Cir. 1998), *cert. denied*, 524 U.S. 954 (1998) ("[T]he plaintiff must show that there is a feasible alternative to the defendant's map, an alternative that does a better job of balancing the relevant factors, although the fine-tuning of the alternative can be left to the remedial stage of the litigation.").  In short, if no workable minority district can be drawn, "there has neither been a wrong nor can there be a remedy."  *Growe v. Emison*, 507 U.S. 25, 41 (1993).

Courts analyzing vote dilution claims under § 2 typically divide the first *Gingles* precondition into two sub-criteria: numerosity and compactness. The numerosity criterion is satisfied when minority voters form "a numerical, working majority of the voting-age population" in the proposed district. *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009); *see also id.* at 19-20 ("[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."). In the Ninth Circuit, the appropriate measure of "voting-age population" is the *citizen voting age population* ("CVAP")—*i.e.*, the number of persons who are actually eligible to cast a vote. *Romero v. City of Pomona*, 883 F.2d 1418, 1425-26 (9th Cir. 1989) (holding that "eligible minority voter population," rather than total minority population, is the better measure of numerosity under *Gingles* 1 because it more accurately predicts whether minority voters could *actually* elect representatives of their choosing if the challenged voting system were abolished), *abrogated on other grounds by Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1363 (9th Cir. 1990) (en banc); *Cano v. Davis*, 211 F. Supp. 2d 1208, 1233 (C.D. Cal. 2002) *aff'd*, 537 U.S. 1100 (2003) ("The Ninth Circuit, along with every other circuit to consider the issue, has held that CVAP is the appropriate measure to use in determining whether an additional effective majority-minority district can be created.") (citing *Romero*, 883 F.2d at 1426).

Compactness, the second criterion, refers to the geographical dispersion of minority voters within the jurisdiction.  *League of United Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 433 (2006).  In essence, this criterion measures whether minority voters are sufficiently concentrated geographically to facilitate the creation of a single voting district in which minority voters outnumber majority voters.  *Gingles*, 478 U.S. at 50 & n.17.  Compactness in the § 2 context is not to be confused with compactness in the context of a challenge under the Equal Protection Clause to the manner in which voting districts have been apportioned. *LULAC*, 548 U.S. at 433.  In the equal protection context, "compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines"—*i.e.*, to determine whether voting districts were deliberately "gerrymandered" along racial lines.  *Id.*  The compactness inquiry under § 2, by contrast, focuses more generally on whether the proposed minority district reasonably comports with "traditional districting principles" such as contiguousness, population equality, maintaining communities of interest, respecting traditional boundaries, and providing protection to incumbents.  *See id.*; *Shaw v. Reno*, 509 U.S. 630, 647 (1993); *Easley v. Cromartie*, 532 U.S. 234 (2001).

//

//

1    1. *Numerosity*

2    Having thoroughly reviewed the record, the Court concludes that Plaintiffs

3    have carried their burden of establishing that a district can be drawn in which the

4    Latino citizen voting age population ("LCVAP") comprises more than 50% of the

5    district's total eligible voters.  Using the most recent data available from the U.S.

6    Census Bureau's *American Community Survey* ("ACS"),[1] Plaintiffs' expert, Mr.

7    William Cooper, generated five separate "plans" which break the City of Yakima

8    into seven individual voting districts.  The parties agree that this is the appropriate

9    number of districts because it corresponds to the number of seats on the City

10   Council.  Two of these plans, designated "Illustrative Plan 1" and "Illustrative Plan

11   2," were prepared using Mr. Cooper's preferred statistical methodology (referred

12   to by Mr. Cooper as "Method 1").  The other three plans, labeled "Hypothetical

13   Plan A," "Hypothetical Plan B" and "Hypothetical Plan C," were prepared using

14   statistical methodology favored by Defendants' *Gingles* 1 expert, Dr. Peter

15   Morrison ("Method 2").  The following represents the LCVAP in one of the seven

16

17

18   [1] Mr. Cooper's Second Supplemental Declaration analyzes data published in the

19   *2008-2012 American Community Survey 5-Year Estimates*.  ECF No. 66-2 at ¶ 2 &

20   n.1.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 17

hypothetical voting districts—"District 1"—across all five plans using both experts' preferred statistical methodology:

| Percentage of Eligible Latino Voters ("LCVAP") in "District 1" | | |
|---|---|---|
| | Method 1 | Method 2 |
| Illustrative Plan 1 | 54.51 | 52.52 |
| Illustrative Plan 2 | 54.70 | 52.67 |
| Hypothetical Plan A | 55.53 | 53.27 |
| Hypothetical Plan B | 59.30 | 56.31 |
| Hypothetical Plan C | 60.91 | 57.48 |

Cooper Second Supplemental Decl., ECF No. 66-2, Exhibit 5, at ¶ 11, Fig. 2.

As the table above clearly illustrates, there are at least five possible single-member voting districts which satisfy the numerosity requirement. Given that three of these options utilize the statistical methodology favored by Defendants' own expert, there are no genuine issues of material fact for trial as to numerosity.[2]

[2] The Court need not resolve the dispute concerning statistical methodology at this juncture. To establish liability for a § 2 violation, Plaintiffs need only demonstrate that it is *possible* to draw a minority district which satisfies the *Gingles* 1 criteria. That has been established using both Mr. Cooper's and Dr. Morrison's preferred statistical methods. To the extent that there remains a live dispute about which method is "better," the Court will resolve it during the remedy phase of the case.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 18

Moreover, to the extent that Dr. Morrison disputes the accuracy of the underlying ACS data, *see* Morrison Decl., ECF No. 79-2, Exhibit J, at ¶ 36-37, his objection is not well-taken.  Although U.S. Census data may not be perfectly accurate, it is routinely relied upon in § 2 cases.  *See*, *e.g.*, *Bartlett*, *supra*; *Growe*, *supra*; *Romero*, *supra*.  In any event, Defendants cannot be heard to complain about the accuracy of the ACS data because they have neither identified nor analyzed a more reliable data set.  *See Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 729-30 (N.D. Tex. 2009) ("[I]n Section 2 cases, Census figures are presumptively accurate until proven otherwise.") (citing *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999)).  Accordingly, the Court concludes that numerosity has been conclusively established on a materially undisputed factual record.

//

//

---

*See Barnett*, 141 F.3d at 702 ("The plaintiff is not required to propose an alternative map that is 'final' in the 'final offer' arbitration sense, where the parties cannot modify their offers once they have denominated them final and the tribunal is confined to choosing which of the final offers is better and cannot formulate its own, best remedy.").

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 19

2. *Compactness*

Plaintiffs have also demonstrated that the LCVAP is sufficiently "compact" to facilitate the creation of a reasonably compact minority district. At the outset, it bears noting that a substantial majority of the City of Yakima's Latino population lives in an area east of 16th Avenue. This area encompasses roughly one-third of the City's entire geographic area (9.78 square miles out of 28 square miles total). Cooper Decl., ECF No. 66-1, Exhibit 4, at ¶ 27 & Fig. 5. Census data from 2010 reveals that nearly three-fourths (72.54%) of the City's Latino population resides in this area. *Id.* at ¶ 27 & Fig. 5. Not surprisingly, this area is also home to a substantial portion of the Latino voting age citizen population, as evidenced by the fact that all 2010 Census block groups with a LCVAP of 40% or higher are located east of 16th Avenue. *Id.* at ¶ 27 & Fig. 6.

It is not difficult to create a sufficiently compact minority district from an area with such a high percentage of eligible Latino voters. Indeed, Mr. Cooper has generated several compelling examples. *See*, *e.g.*, Cooper Decl., ECF No. 66-1, Exhibit 4, at ¶¶ 50-56 & Figs. 10, 11; Cooper Supplemental Decl., ECF No. 66-2, Exhibit 6, at ¶¶ 27-32 & Fig. 8. As Plaintiffs correctly note, the compactness of the minority districts in these proposals is easily confirmed by simply looking at the maps of the proposed districts (District 1 in orange is the minority district):





ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 21

Even Hypothetical Plan A, which Mr. Cooper created using Dr. Morrison's preferred statistical methodology, contains a minority voting district that is reasonably compact on its face:



Moreover, Mr. Cooper's statistical analysis confirms that the proposed districts are sufficiently compact. Using a statistical measure known as the Reock test,[3] Mr. Cooper determined that the districts in each of his five proposed plans

_____

[3] Mr. Cooper describes the Reock test as follows:

> The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 22

were (1) more compact on average than the districts in the existing City of Yakima 2011 Plan; (2) more compact than one-quarter of the districts in the Washington State Legislature Plan; and (3) comparably compact to the plans utilized in Pasco, Spokane and Tacoma.  Cooper Second Supplemental Decl., ECF No. 66-2, Exhibit 5, at ¶¶ 15-19.  With this compelling and undisputed evidence, Plaintiffs have satisfied the compactness component of the first *Gingles* precondition.

Defendants disagree with the above conclusion on four separate grounds. First, they argue that Plaintiffs have ignored the principle of "electoral equality," which Defendants describe as the principle that "a citizen's vote should carry about the same weight as any other citizen's vote regardless of where a citizen resides." ECF No. 77 at 10 (citing *Reynolds v. Sims*, 377 U.S. 533, 579 (1964)).  In support of this argument, Defendants note that Plaintiffs' seven proposed voting districts, while roughly equivalent in total population size, are disproportionate in terms of *citizen voting-age* population.  According to Defendants, this imbalance "would invariably cause the votes of eligible voters in [the minority district] to carry far more weight than a vote in another district."  Morrison Decl., ECF No. 79-2, Exhibit J, at ¶ 39.  Dr. Morrison explains the situation as follows:

> [A]ny Latino majority-CVAP district encompassing 1/7th (14.3%) of the City's *total* population can encompass at most 8.4% of the City's

Cooper Second Supplemental Decl., ECF No. 66-2, Exhibit 5, at 7 n.7.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 23

> *voting-age citizen population*.   That 8.4% of eligible voters would necessarily exercise 14.3% of the power in electing City Council members—in effect, "one person, 1.7 votes."   Conversely, the remaining 91.6% of the eligible voters across the City would exercise only 85.7% of the power in electing City Council members—*i.e.*, "1 person, 0.94 votes."

Morrison Decl., ECF No. 79-2, Exhibit J, at ¶ 39 (emphasis in original).   Based upon this ostensible imbalance in "voting power," Defendants urge the Court to deny Plaintiffs' motion and grant summary judgment in their favor.   ECF No. 77 at 11; ECF No. 67 at 5-15.

The Court is not persuaded that this alleged violation of the "one person, one vote" principle requires dismissal of Plaintiffs' claim.   As Plaintiffs correctly note, Defendants are short on authority for the proposition that an imbalance in citizen voting-age population, as opposed to an imbalance in total population, is relevant to the "one person, one vote" calculus.   Indeed, *Reynolds v. Sims*, the primary case on which Defendants rely, appears to foreclose such an argument:

> By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned  on a *population basis*, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of *equal population* as is practicable.
>
> *   *   *
>
> Whatever the means of accomplishment, the overriding objective must be *substantial equality of population among the various districts*, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 24

*Reynolds*, 377 U.S. at 577, 579 (emphasis added); *accord Mahan v. Howell*, 410 U.S. 315, 321 (1973) (identifying "equality of population among the districts" as the basic constitutional principle embodied by the Equal Protection Clause); *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (explaining that "equal representation for equal numbers of people" is the objective of the Equal Protection Clause).

In fact, the only authority offered by Defendants that lends much credence to their electoral equality argument is a dissenting opinion filed by Judge Kozinski in *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991). Judge Kozinski's dissent attempts to answer the following question: "Does a districting plan that gives different voting power to voters in different parts of the county impair the one person one vote principle even though raw population figures are roughly equal?" *Id.* at 780 (Kozinski, J., dissenting). After reviewing a host of decisions applying the one person, one vote principle in the context of an equal protection challenge, Judge Kozinski posits that "a careful reading of the [Supreme] Court's opinions suggests that equalizing the total population is viewed not as an end in itself, but as a means of achieving electoral equality"—that is to say, a balance of "voting power" among *eligible* voters. *Id.* at 783. In the end, however, Judge Kozinski acknowledges that there is equal support for the contrary view: that population equality across voting districts is the

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 25

hallmark of the Equal Protection Clause's one person, one vote guarantee.  *Id.* at 785.

Defendants' reliance upon the Kozinski dissent is unavailing for several reasons.  First, the dissent is a minority opinion which does not carry the force of law.  Whatever the merits of Judge Kozinski's analysis, this Court is bound by the majority opinion, which flatly rejects the argument that voting districts must be equalized on the basis of eligible voters rather than total population.  *Garza*, 918 F.2d at 774 (emphasis added); *accord Chen v. City of Houston*, 206 F.3d 502, 522-23 (5th Cir. 2000), *cert. denied*, 532 U.S. 1046 (2001) (rejecting argument that voting districts must be apportioned on the basis of citizen voting age population (CVAP) rather than total population in order to comply with the Equal Protection Clause).

Second, the Kozinski dissent is of limited relevance because it arises in the context of an equal protection challenge.  To prevail on an equal protection challenge, a plaintiff must prove intentional dilution of a minority group's voting strength through racial gerrymandering.  *See*, *e.g.*, *Garza*, 918 F.2d at 766.  Because "[t]he *Gingles* requirements were articulated in a much different context than [*Garza*] presents," *id.* at 770, it would be inappropriate to import an equal "voting power" requirement into the *Gingles* framework.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 26

Third, the concerns identified by Judge Kozinski are not especially germane at this stage of the proceedings. Whereas the Kozinski dissent speaks primarily to the appropriate *remedy* for a violation of the Voting Rights Act and/or the Equal Protection Clause, the singular focus of the instant cross-motions for summary judgment is whether Plaintiffs can establish a § 2 violation in the first instance. Although they are unwilling to admit it (*see* ECF No. 77 at 12), Defendants are essentially arguing that *Gingles* requires Plaintiffs to come forward with a districting plan that perfectly harmonizes every "traditional districting principle," including electoral equality, in order to establish liability. That is simply not the law. *Gingles* requires a § 2 plaintiff to prove, by a preponderance of the evidence, that it would be possible to draw a district in which eligible minority voters make up more than 50% of the total voting population. In making that showing, the plaintiff must submit a districting plan which *reasonably* incorporates traditional districting principles such as contiguousness, maintaining population equality, respect for traditional district boundaries, and protection of incumbents. The thrust of the cases discussing the relevance of these traditional districting principles is that the plaintiff may not ignore them altogether when drawing a minority district that meets the compactness requirement. *See LULAC*, 548 U.S. at 433 (explaining that the compactness inquiry "should *take into account* traditional districting principles") (emphasis added) (quotation and citation omitted); *Shaw*, 509 U.S. at

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 27

647 (explaining that total "disregard" of traditional districting principles would be evidence of intentional discrimination in a racial gerrymandering challenge under the Equal Protection Clause); *Bush v. Vera*, 517 U.S. 952, 979 (1996) (explaining that "the district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race *substantially more than is 'reasonably necessary'* to avoid § 2 liability") (emphasis added).

What the first *Gingles* precondition does not require is proof that a perfectly harmonized districting plan can be created. Indeed, conditioning a § 2 plaintiff's right to relief upon his or her ability to create a letter-perfect districting plan would put the cart before the horse. *See Clark v. Roemer*, 777 F. Supp. 445, 463 (M.D. La. 1990) ("The determination of vote dilution begins with examining the existing election district and the existing number of positions. Whether a court ought to consider changes in either, as a part of the remedy *should a violation be found*, is no part of determining whether there is vote dilution, for if there is vote dilution it is the existing district which must be its cause[.]") (emphasis in original). In short, if the plaintiff proves by a preponderance of the evidence that a workable remedy can be fashioned, the first *Gingles* precondition is satisfied.

Having carefully reviewed the record, the Court concludes that there are no genuine issues of material fact for trial concerning Plaintiff's ability to make this showing. While Plaintiffs' proposed districting plan might not perfectly harmonize

each and every traditional districting principle, it is simply not required to.  In that regard, "[i]t bears recalling . . . that for all the virtues of majority-minority districts as remedial devices [for § 2 violations], they rely on a quintessentially race-conscious calculus aptly described as the 'politics of second best.'"  *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994) (citation omitted).  To whatever extent the proposal requires fine-tuning—including potential adjustments to achieve a higher degree of electoral equality between districts—these minor adjustments can be "left to the remedial stage of the litigation."  *Barnett*, 141 F.3d at 702.

Next, Defendants argue that Plaintiffs' proposed districting plan "violates Section 2's prohibition on minority vote dilution."  ECF No. 67 at 1.  Specifically, Defendants contend that "the voting power of eligible voters from ethnic and racial minorities (including Latinos) would be systematically devalued if they lived outside of Districts 1 and 2."  ECF No. 67 at 13.  In support of this argument, they assert that "a State may not trade off the rights of some members of a racial group against the rights of other members of that group."  ECF No. 67 at 14 (quoting *LULAC*, 548 U.S. at 437).  Because the proposed districting plan "confer[s] additional voting power on certain members of a minority group while diluting the voting power of other members," Defendants argue, ECF No. 67 at 14, Plaintiffs have "merely replace[d] one alleged violation of Section 2 with another sure violation," ECF No. 77 at 13.

This argument misapprehends the very essence of the § 2 remedy.  If a minority group successfully proves that a jurisdiction's voting system gives its members less opportunity than majority voters to participate in the political process and to elect representatives of their choosing, *see* 42 U.S.C. § 1973(b), it is entitled to the creation of a single-member voting district in which eligible minority voters account for more than 50% of the total voting population, *see*, *e.g. Bartlett*, 556 U.S. at 13.  The purpose of creating such a district is to afford minority voters an equal opportunity to meaningfully participate in the electoral process—in essence, to remove any unfair structural barriers to minority voters being able to elect representatives of their choosing.  *Voinovich*, 507 U.S. at 154 ("Placing [minority] voters in a district in which they constitute a sizeable and therefore 'safe' majority ensures that they are able to elect their candidate of choice.").  Once that remedy is implemented, there is no longer a violation of § 2.  Hence, the argument that Plaintiffs have merely "replaced one Section 2 violation with another" does not hold water.

Moreover, creating a minority district to remedy a § 2 violation will *always* result in a dilution of minority voting strength in the remaining districts.  *See Voinovich*, 507 U.S. at 154 ("[C]reating majority-black districts necessarily leaves fewer black voters and therefore diminishes black voter influence in predominantly white districts.").  The dilution of minority votes in other districts is an inevitable

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 30

byproduct of the § 2 remedy, and there is nothing improper about it.  *See Gomez v. City of Watsonville*, 863 F.2d 1407, 1414 (9th Cir. 1988) ("The fact that the proposed remedy does not benefit all of the Hispanics in the City does not justify denying any remedy at all."); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988) ("The fact that there are members of the minority group outside the minority district is immaterial.  All that is required is that the minority group be '*sufficiently* large and geographically compact to constitute a majority in a single member district.'") (emphasis in original) (quoting *Gingles*, 478 U.S. at 50).  After all, if a finding of vote dilution among minorities residing in the non-remedial district were sufficient to defeat a § 2 claim, it would be mathematically impossible for a plaintiff to ever establish liability under the *Gingles* framework.

Finally, Defendants argue that Plaintiffs "unconstitutionally gerrymandered" their proposed voting districts.  ECF No. 67 at 15.  This argument is essentially a derivative of the "electoral equality" argument addressed above.  *See* ECF No. 67 at 16 (arguing that the redistricting plans "establish that [Plaintiffs] made no attempt whatsoever to balance electoral equality with other race-neutral traditional districting principles," and that "electoral equality was subordinated to [Plaintiffs'] predominant goal of using ethnicity" to define the borders of their proposed districts).  As such, this argument is rejected for the reasons previously stated.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 31

Moreover, assuming for the sake of argument that the proposed districting plan must survive strict scrutiny under an equal protection analysis because it favors race over all other traditional districting criteria, *see* ECF No. 67 at 15-17, that does not preclude a finding of liability for a § 2 violation. As a district court presented with an identical argument deftly explained:

> The first problem with [this] argument is that [it] assume[s] that if race was [the] primary consideration in crafting the Illustrative Plan, the plan automatically fails as a racial gerrymander under the Equal Protection Clause. This argument ignores the applicable framework of an equal-protection claim. Upon a finding that a plan "subordinate[s] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), the district is not simply rejected as a racial gerrymander. Instead, the court applies strict scrutiny to determine if the plan pursues a compelling state interest and is narrowly tailored to achieve that interest. *Shaw v. Hunt*, 517 U.S. 899, 905 (1996).
>
> In *Shaw* . . . the Court assumed that compliance with § 2 can constitute a compelling state interest. The Court [has also] warned, however, that "the district drawn in order to satisfy § 2 must not subordinate traditional redistricting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." [*Bush v. Vera*, 517 U.S. 952, 979 (1996)]. . . . Thus, contrary to [defendants'] contention, it is possible that a district created to comply with § 2 that uses race as the predominant factor in drawing district lines may survive strict scrutiny.
>
> *    *    *
>
> The second problem with [this] argument is that it would have the Court collapse an equal-protection inquiry into the first *Gingles* prong and hold that if the Illustrative Plan fails under the Equal Protection Clause, it is not a permissible remedy. However, even if the

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 32

Illustrative Plan was drawn predominantly on racial lines . . . to determine whether it passes strict scrutiny, the court must know whether the district is necessary to avoid § 2 liability. Otherwise, the court cannot evaluate whether a plan drawn primarily along racial lines is nonetheless permissible because it does not "subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." *Vera*, 517 U.S. at 979. In other words, the court must first determine whether *Gingles* is met before ensuring that the proposed remedy complies with the Equal Protection Clause.

*Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1304-06 (N.D. Ga. 2013).

For the reasons so cogently explained in *Fayette County*, the Court "will not determine as part of the first *Gingles* inquiry whether [the proposed districting plan] subordinates traditional redistricting principles to race." 950 F. Supp. 2d at 1306. If Defendants believe that the present proposal cannot pass muster under the Equal Protection Clause, they may raise that issue during the remedial phase of the proceedings. As noted above, however, the Court questions whether a districting plan that fails to balance voting strength among districts of approximately equal population size would violate the one person, one vote mandate.

Plaintiffs' motion for summary judgment on the first *Gingles* precondition is granted. Defendants' motion for summary judgment on the same is denied.

//

//

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 33

B. Latinos are a "politically cohesive" minority group.

The second *Gingles* precondition focuses on whether the minority group is "politically cohesive." *Gingles*, 478 U.S. at 51. The relevant inquiry is "whether the minority group has expressed clear political preferences that are distinct from those of the majority." *Gomez*, 863 F.2d at 1415. To satisfy this requirement, the plaintiff must demonstrate that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56. Political cohesiveness must be proven with statistical evidence of historical voting patterns. *See Gomez*, 863 F.2d at 1415 ("[W]hether a racial group is politically cohesive depends on its *demonstrated propensity* to vote as a bloc for candidates or issues popularly recognized as being affiliated with the group's particularized interests") (emphasis in original) (quotation and citation omitted). Election results from within the challenged voting system are most probative, although results from "exogenous" elections may also be considered. *United States v. Blaine Cnty.*, 363 F.3d 897, 912 (9th Cir. 2004).

Plaintiffs have proffered statistical analyses performed by their voting expert, Dr. Richard Engstrom, of the voting patterns of both Latinos and non-Latinos in ten recent contests (nine elections and one ballot measure). These

contests were apparently selected because they featured a Latino candidate,[4] or, in the case of the ballot measure, an issue of presumed importance to Latinos.  The contests analyzed were as follows: (1) the 2009 City Council primary for Position 5; (2) the 2009 City Council general election for Position 5; (3) the 2009 City Council primary for Position 7; (4) the 2009 City Council general election for Position 7; (5) the 2011 City Council primary for Position 2; (6) the 2013 City Council primary for Position 5; (7) the 2013 City Council primary for Position 7; (8) the 2012 Supreme Court election for Position 8; (9) the 2013 Yakima School Board general election; and (10) the 2011 vote on Proposition 1 (which involved a proposal to change the voting system for City Council elections to a district-based system with seven voting districts).

Using a statistical analysis known as ecological inference ("EI"), Dr. Engstrom analyzed which candidates (both Latino and non-Latino) were favored by which voting groups (both Latinos and non-Latinos) in each of the ten contests. His analysis paints a clear picture of Latino voter cohesion.  Five of the contests

---

[4] A candidate need not be a member of the minority group in order to qualify as a "minority preferred" candidate for purposes of the political cohesiveness inquiry. *Ruiz*, 160 F.3d at 551.  "The minority community may prefer a white candidate just as the white community may prefer a minority candidate." *Id.*

analyzed—the 2009 City Council primary and general elections for Positions 5 and 7, the 2011 vote on Proposition 1, the 2013 School Board election and the 2012 Supreme Court election—are particularly illustrative.

      1. *2009 City Council Election (Position 5)*

Three candidates ran for Position 5 in the 2009 City Council election. The candidates were Sonia Rodriguez, a Latina who had been appointed to serve as the Position 5 representative prior to the election, and Sharon Madson and Dave Ettl, both of whom are non-Latino. A primary election was held to narrow the field to the top two candidates. Mr. Ettl and Ms. Rodriguez were the top two finishers, having received 47.5% and 38.2% of the votes, respectively. Based upon his EI analysis, Dr. Engstrom concluded that Ms. Rodriguez received an estimated **52.9%** of votes cast by Latino voters. Ms. Rodriguez received only an estimated 37.3% of votes cast by non-Latinos. Mr. Ettl, by contrast, received an estimated 49.4% of votes cast by non-Latino voters.

Ms. Rodriguez and Mr. Ettl subsequently squared off in the general election for Position 5. Ms. Rodriguez was again the candidate of choice among Latino voters, having received an estimated **92.8%** of their votes. Among non-Latino voters, Ms. Rodriguez received only an estimated 42.6% of the votes. Despite her strong support among Latino voters, Ms. Rodriguez lost the election with only 47.8% of the total votes. Engstrom Report, ECF No. 66-1, Exhibit 2, at ¶¶ 17-19.

2. *2009 City Council Election (Position 7)*

There were four candidates for Position 7 in the 2009 City Council election. Benjamin Soria, who is Latino, ran against Mitchell Smith, Bill Lover, and T.J. Davis, all of whom are non-Latino. Mr. Lover and Mr. Soria finished first and second in the top-two primary. Of the votes cast by Latino voters during this primary, Mr. Soria received an estimated **59.5%**. Among the votes cast by non-Latino voters, Mr. Soria received only an estimated 31.0%.

Mr. Soria was the strong favorite among Latino voters in the ensuing general election, with an estimated **92.7%** of that group's votes. Despite this strong support, Mr. Soria was defeated by a wide margin, having received only 35.0% of the total votes cast. Mr. Soria received only an estimated 30.5% of votes cast by non-Latino voters. Engstrom Report, ECF No. 66-1, Exhibit 2, at ¶¶ 20-22.

3. *2011 Vote on Proposition 1*

Proposition 1 involved a proposal to change the voting system for City Council elections to a district-based system with one voting district for each of the seven City Council seats. Dr. Engstrom's EI analysis revealed that Latino voters overwhelmingly favored this proposal: an estimated **98.2%** voted for it. Non-Latino voters, by contrast, did not favor the proposal; only an estimated 38.4% voted in favor. Proposition 1 was ultimately defeated by a margin of 58.5% in favor and 41.5% opposed. Engstrom Report, ECF No. 66-1, Exhibit 2, at ¶ 26.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 37

1          4.  *2013 School Board General Election*

2          Two candidates competed in the 2013 School Board general election:

3    Graciela Villanueva, a Latina, and Jeni Rice, a non-Latino.  Ms. Villanueva had

4    been appointed to the School Board prior to the election.  Although Ms. Rice

5    announced in September that she had withdrawn from the election, she ended up

6    winning the race with 61.2% of the total votes cast.  Ms. Villanueva received an

7    estimated **70%** of the votes cast by Latinos and only an estimated 35% of votes

8    cast by non-Latinos.  Engstrom Supplemental Report, ECF No. 66-2, Exhibit 10, at

9    ¶ 9; Alford Supplemental Report, ECF No. 66-2, Exhibit 11, at 1-2.

10          5.  *2012 Supreme Court Election*

11          Two candidates ran for Position 8 on the Washington Supreme Court in

12    2012: Steven González, a Latino, and Bruce Danielson, a non-Latino.  This was a

13    state-wide, non-partisan election.  Neither candidate had any strong ties to the City

14    of Yakima.   Based upon his EI analysis, Dr. Engstrom concluded that Mr.

15    González received **63.2%** of the votes cast by Latino voters residing within the

16    City of Yakima.  Among non-Latino voters, by contrast, Mr. González received

17    only an estimated 36.9% of votes.  Mr. González was beaten by Mr. Danielson in

18    Yakima, but fared much better statewide and won the election.  Engstrom Report,

19    ECF No. 66-1, Exhibit 2, at ¶¶ 27-28.

20

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 38

The results above are plainly indicative of "a significant number of [Latino voters] usually vot[ing] for the same candidates." *Gingles*, 478 U.S. at 56. In each of these contests, the Latino candidate or issue won more than 50% of the votes cast by Latino voters. In the case of the 2009 City Council general elections for Positions 5 and 7 and the 2011 vote on Proposition 1, Latino support of the Latino candidate (issue) exceeded 90%. Tellingly, in only *one* of the ten contests analyzed (the 2013 City Council primary for Position 7), did the Latino candidate not garner a majority of votes cast by Latino voters. *See* Engstrom Supplemental Report, ECF No. 66-2, Exhibit 10, at ¶ 6.

Defendants do not contest Dr. Engstrom's mode of analysis. In fact, their voting expert, Dr. John Alford, agrees that the EI method produces the most accurate measure of voter preferences. Alford Dep., ECF No. 66-1, Exhibit 3, at Tr. 101-04. Dr. Alford further acknowledges that Dr. Engstrom analyzed the best available data and that his analysis is statistically sound. *Id.* at Tr. 104, 135, 179. Nevertheless, Dr. Alford takes exception to Dr. Engstrom's ultimate conclusion: that the data reflect strong Latino voter cohesion. *Id.* at Tr. 134-35. In a nutshell, Dr. Alford's position is that the confidence intervals[5] surrounding Dr. Engstrom's

_____

[5] A confidence interval is a statistical measure of reliability which provides a range of values within which the actual value will fall 95% of the time. For example, if Candidate A is estimated to have received 75% of the votes cast by Latinos with a

estimates of Latino candidate preferences are too broad to support a reliable conclusion about whether Latino voters are politically cohesive. *See id.* at Tr. 117-19, 134. In other words, Dr. Alford agrees with the *result* reached by Dr. Engstrom—that Latino candidates (or issues) received more than 50% of votes cast by Latinos in nine out of the ten contests analyzed—but disputes whether that result is supported by enough raw data to warrant a conclusion that a significant number of Latino voters usually vote for the same candidates (or issues).

Dr. Alford's concerns, while legitimate from a statistics standpoint, do not defeat a finding of Latino voter cohesion. As an initial matter, all of the contests which Dr. Alford identifies as having insufficiently reliable confidence intervals are City Council *primary elections*. Alford Dep., ECF No. 66-1, Exhibit 3, at Tr. 117-18. This is significant because each of these primaries featured three or four candidates, as opposed to only two candidates in the general elections. Because the primary votes were spread across three or four candidates, there were fewer data points per candidate to analyze than in the general elections. This resulted in

---

confidence interval of 60% to 90%, we can be confident, to a 95% degree of certainty, that Candidate A did in fact receive between 60% and 90% of the Latino votes. Thus, the narrower the confidence interval, the more reliable the estimate; the broader the confidence interval, the less reliable the estimate.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 40

broader confidence intervals.  When votes were divided among the two surviving candidates in the general elections (in the two races in which Latino candidates advanced), the confidence intervals became much narrower:

| **<u>Results by Latino Candidate in 2009 City Council Elections</u>**<br><br>Estimated Percentage of Latino Votes **(Confidence Interval)** | | |
|---|---|---|
| | Position 5 – Rodriguez | Position 7 - Soria |
| Primary | 52.9 **(15.1 – 82.5)** | 59.5 **(16.5 – 83.8)** |
| General | 92.8 **(77.2 – 99.2)** | 92.7 **(74.1 – 98.4)** |

Engstrom Report, ECF No. 66-1, Exhibit 2, at 15.  The significance of this data is that we can be confident, to a 95% degree of certainty, that the Latino candidate received *at least* three-quarters of the votes cast by Latino voters when the City Council seat was on the line in the general election.

Furthermore, the broad confidence intervals assailed by Dr. Alford can most likely be attributed to low Latino voter turnout.  As Dr. Engstrom explains:

> The confidence intervals reported . . . are narrower for the estimates of the non-Latino voter behavior than that of Latinos.  This is to be expected given the differences in the relative presence of Latinos and non-Latinos across the precincts in Yakima.  The percentage of all of the ballots returned that were returned by Latino voters in Yakima ranged from 2.9 [percent] to 10.4 [percent] in these elections, and the highest percentage of Latinos among those returning ballots in any of the precincts has ranged from 18.6 to 41.9 across the elections.

1    Engstrom Report, ECF No. 66-1, Exhibit 2, at ¶ 29.  As Plaintiffs correctly note,

2    the Ninth Circuit has prohibited district courts from discounting statistics about a

3    minority group's candidate preferences on the basis of low voter turnout.  *See*

4    *Gomez*, 863 F.2d at 1416 ("The district court erred by focusing on low minority

5    voter registration and turnout as evidence that the minority group was not

6    politically cohesive.").  This makes good sense; "if low voter turnout could defeat

7    a section 2 claim, excluded minority voters would find themselves in a vicious

8    cycle: their exclusion from the political process would increase apathy, which in

9    turn would undermine their ability to bring a legal challenge to the discriminatory

10   practices, which would perpetuate low voter turnout, and so on." *Blaine Cnty.*, 363

11   F.3d at 911.  In view of this authority, the Court respectfully declines Defendants'

12   invitation to reject Dr. Engstrom's analysis on the basis of the challenged

13   confidence intervals.

14        In sum, Plaintiffs have made a strong showing that Latino voters in Yakima

15   have "clear political preferences that are distinct from those of the majority,"

16   *Gomez*, 863 F.2d at 1415, and that a significant number of them "usually vote for

17   the same candidates," *Gingles*, 478 U.S. at 56.  Because no rational factfinder

18   could conclude otherwise on this record, Plaintiffs are entitled to summary

19   judgment on the second *Gingles* precondition.

20

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 42

1  C. **The non-Latino majority votes sufficiently as a bloc to enable it to usually**

2  **defeat the Latino minority's preferred candidate.**

3  The third *Gingles* precondition focuses on whether the majority "votes

4  sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred

5  candidate. *Gingles*, 478 U.S. at 51. This inquiry is an extension of the second

6  *Gingles* precondition that essentially asks whether the majority can usually

7  overcome the political cohesiveness of the minority group. *Id.* at 56; *Growe*, 507

8  U.S. at 40. The degree of majority bloc voting required to satisfy this precondition

9  "will vary from district to district according to a number of factors." *Gingles*, 478

10  U.S. at 56. In general, however, a majority bloc vote that "normally will defeat the

11  combined strength of minority support plus [majority] 'crossover' votes rises to the

12  level of legally significant [majority] bloc voting." *Id.* Like political cohesiveness

13  of a minority group, majority bloc voting must be proven with historical data. *Id.*

14  at 46.

15  At the outset, it bears noting that no Latino candidate has *ever* been elected

16  to the Yakima City Council in the history of the current at-large voting system.

17  This is powerful evidence that the non-Latino majority will "usually" defeat the

18  Latino minority's preferred candidate. Given that Latinos now represent roughly

19  one-third of the City's voting age population and roughly one-quarter of its citizen

20  voting age population, one would certainly expect this group to have had *some*

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 43

success in electing a candidate of its choosing over the past 37 years if the political

process was "equally open to minority voters." *Gingles*, 478 U.S. at 79.

The ability of the majority to "usually" defeat the minority's preferred

candidate is also borne out by the statistical evidence. Once again, the 2009 City

Council races involving Ms. Rodriguez and Mr. Soria are instructive. As noted

above, Ms. Rodriguez initially ran against two non-Latinos, Sharon Madson and

Dave Ettl, in a top-two primary election. Ms. Rodriguez and Mr. Ettl advanced to

the general election with 38.2% and 47.5% of the total votes, respectively. Of the

votes cast by Latino voters, Ms. Rodriguez received an estimated 52.9%. Among

the votes cast by non-Latino voters, however, Ms. Rodriguez received only an

estimated 37.3%. In the ensuing general election, Ms. Rodriguez won an estimated

92.8% of the votes cast by Latino voters. Despite this overwhelming level of

support, Ms. Rodriguez lost the election, having received only 47.8% of the total

votes. This loss can be attributed to the fact that Ms. Rodriguez received only an

estimated 42.6% of "crossover" votes from non-Latino voters. Engstrom Report,

ECF No. 66-1, Exhibit 2, at ¶¶ 17-19.

Mr. Soria's campaign played out in a similar fashion. In the primary, Mr.

Soria competed against three non-Latino candidates: Mitchell Smith, Bill Lover

and T.J. Davis. Mr. Lover finished first with 54.4% of the total votes, and Mr.

Soria finished second with 31.8%. Mr. Soria received an estimated 59.5% of votes

cast by Latino voters, but only an estimated 31.0% of the votes cast by non-Latinos.  In the general election, Mr. Soria garnered an estimated 92.7% of Latino votes.  Notwithstanding this strong support, Mr. Soria was defeated by the non-Latino candidate, who garnered 65% of the total votes.  Like Ms. Rodriguez, Mr. Soria lost as a result of low crossover voting among non-Latino voters—in this instance, an estimated 30.5%.  Engstrom Report, ECF No. 66-1, Exhibit 2, at ¶¶ 20-22.

Non-Latino bloc voting was also prevalent in many of the other contests.  Proposition 1 was almost universally supported by Latino voters in 2011 (98.2%), but was defeated as a result of low crossover voting by non-Latinos (38.4%).  Engstrom Report, ECF No. 66-1, Exhibit 2, at ¶ 26.  Justice Steven González was the clear favorite among Latino voters in the 2012 Supreme Court election (63.2%), but lost in Yakima due to low non-Latino crossover (36.9%).  *Id.* at ¶¶ 27-28.  Graciela Villanueva had strong support among Latino voters in the 2013 School Board election (70.1%), but was defeated by a non-Latino opponent, *who had dropped out of the race prior to the election*, because of low crossover by non-Latinos (35.2%).  Alford Supplemental Report, ECF No. 66-2, Exhibit 11, at 2.

Even the remaining three City Council elections appear to have been influenced by low crossover voting.  In a three-person primary in 2011, Rogelio Montes received 53.5% of Latino votes, but garnered only 13.4% of non-Latino

1   votes.   Engstrom Report, ECF No. 66-1, Exhibit 2, at ¶¶ 24-25.   Isidro "Sid"

2   Reynaga, who won 67.4% of Latino votes in a three-person primary in 2013,

3   received only 15.3% of the votes cast by non-Latinos.   Engstrom Supplemental

4   Report, ECF No. 66-2, Exhibit 10, at ¶ 5.   Neither candidate made it out of his

5   respective primary.   Enrique Jevons, the lone Latino candidate who did not receive

6   a majority of Latino votes in the contests analyzed (39.2%), received only 11.4%

7   of non-Latino votes in his 2013 primary.[6]   He too was defeated.

8         Finally, it is important to note that the reliability of the crossover data above

9   is not disputed.   Unlike some of the confidence intervals associated with the Latino

10  voting preference data, the confidence intervals pertaining to the non-Latino voting

11  patterns are consistently narrow (presumably because the estimates of crossover

12  voting percentage are based upon a much larger sample size).   As Dr. Alford

13  testified during his deposition, the only dispute relative to the crossover data is

14  how it should be interpreted—*i.e.*, whether the undisputed percentages of crossover

15  votes are indicative of majority bloc voting.   Alford Dep., ECF No. 66-1, Exhibit

16  3, at Tr. 145-47.   Contrary to Defendants' assertions, the fact that Dr. Alford and

17  _____

18  [6] The candidate favored by Latino voters in this race, Carol Folsom-Hill (49.7%),

19  also received poor crossover support from non-Latinos (34.2%).   Engstrom

20  Supplemental Report, ECF No. 66-2, Exhibit 10, at ¶ 6.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 46

Dr. Engstrom have reached differing conclusions on that issue of law does not preclude summary judgment.

Against this great weight of undisputed evidence, Defendants argue that Plaintiffs cannot satisfy the majority bloc voting precondition because "low voter turnout among Latinos," rather than low crossover voting among non-Latinos, was the true cause of the Latino candidates' defeats. ECF No. 77 at 20. Defendants concede that the Ninth Circuit's decisions in *Gomez* and *Blaine County* foreclose low voter turnout arguments in the context of the political cohesiveness inquiry (*Gingles* 2), but argue that low voter turnout can still be relevant when analyzing whether the majority votes as a bloc (*Gingles* 3). ECF No. 77 at 20, n.10.

This argument is unavailing because the second and third *Gingles* inquiries are two sides of the same coin; both must be examined in tandem to determine whether the minority group's votes have been unlawfully diluted. As the Supreme Court explained in *Growe*, "the 'minority political cohesion' and 'majority bloc voting' showings [work together] to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger [majority] voting population." 507 U.S. at 40 (citation omitted). Accordingly, the Ninth Circuit's prohibition on weighing the impact of low voter turnout applies equally to both inquiries, as allowing low voter turnout to be considered at the third step would

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 47

produce the same untenable result as allowing it to be considered at the second. *Gomez*, 863 F.2d at 1416 & n.4; *Blaine Cnty.*, 363 F.3d at 911.

In the final analysis, there is only one rational conclusion to be drawn from the undisputed evidence recounted above: that the non-Latino majority in Yakima routinely suffocates the voting preferences of the Latino minority. In reaching this conclusion, the Court does not mean to suggest that non-Latinos are deliberately conspiring to outvote their Latino colleagues, or that the City has engaged in any wrongdoing. To reiterate, intent is not a relevant consideration in a § 2 case; all that matters is that the challenged election system has "the *effect* of denying [the minority] [an] equal opportunity to elect its candidate of choice." *Voinovich*, 507 U.S. at 155 (emphasis in original). Nonetheless, Plaintiffs have made a compelling showing that the non-Latino majority "votes sufficiently as a bloc to enable it . . . usually to defeat the [Latino] minority's preferred candidate," *Gingles*, 478 U.S. at 51, and no rational finder of fact could conclude otherwise. Plaintiffs are therefore entitled to summary judgment on the third *Gingles* precondition.

**IV. The Totality of the Circumstances (as Framed by the Senate Factors) Demonstrates that the City's Electoral Process is not Equally Open to Participation by Latino Voters**

The *Gingles* framework is merely a screening tool designed "to help courts determine which claims could meet the totality-of-the-circumstances standard for a

§ 2 violation." *Bartlett*, 556 U.S. at 21.  Consequently, satisfying the three *Gingles* preconditions does not result in a finding of liability.  *Id.*  To establish liability, the plaintiff must ultimately show that, under the "totality of [the] circumstances," members of a minority group have less opportunity than the majority to participate in the political process and to elect representatives of their choosing.  42 U.S.C. § 1973(b).  Nonetheless, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993).

In analyzing whether the totality of the circumstances test has been satisfied, courts look to the non-exhaustive "Senate Factors" identified in *Gingles*.  These factors include (1)  prior history of voting-related discrimination; (2) the degree of racially polarized voting; (3) the presence of voting practices or procedures that tend to subjugate the minority group's voting preferences, such as unusually large voting districts, majority vote requirements, and preclusion of so-called "single-shot" or "bullet" voting strategies; (4) the exclusion of minority group members from the candidate slating process; (5) the extent to which the minority group bears the effects of past discrimination in areas that tend to hinder its members' ability to participate effectively in the political process; (6) the use of subtle or overt racial appeals in political campaigns; and (7) the extent to which members of the

1  minority group have succeeded in being elected to public office.  *Gingles*, 478 U.S.

2  at 44-45.  In an appropriate case, a court may also consider (8) the extent to which

3  elected officials have been responsive to the particularized needs of the minority

4  group; and (9) the policy underlying the challenged voting practice or procedures.

5  *Id.* at 45.

6      The above factors "are neither comprehensive nor exclusive," and there is

7  "no requirement that any particular number of factors be proved, or that a majority

8  of them point one way or the other."  *Id.* (citation omitted).  The touchstone of the

9  inquiry is simply whether, under the totality of the circumstances, the challenged

10 electoral process "is equally open to minority voters."  *Id.* at 79 (citation omitted).

11 This necessarily requires a "searching practical evaluation of the past and present

12 reality" within the jurisdiction.  *Id.*  Further, a reviewing court must always make

13 an "intensely local appraisal of the *design and impact* of the contested electoral

14 mechanisms."  *Id.* (emphasis added) (citation omitted).

15     Before analyzing the Senate Factors, it will be helpful to revisit the process

16 by which City Council members are elected.  As noted above, the City of Yakima

17 Charter provides for elections specific to each of the seven City Council seats.

18 This is known as a "numbered post" system because candidates run for a specific

19 seat (post), and voting is conducted on a seat-by-seat basis.  Eligibility to vote in

20 primary elections depends upon whether the vacant seat is residency restricted.  If

the seat is residency restricted, only voters residing in the district assigned to that seat may cast a vote. If the seat is not residency restricted, by contrast, voting is open to all registered voters. The candidates with the top two vote totals advance to the general election.

General elections are a contest between two candidates for each open seat. Unlike in primary elections, eligibility to vote does not depend upon whether the open seat is residency restricted; at the general election stage, all registered voters cast a ballot for each seat. By way of example, if Positions 1, 3 and 7 are up for election, registered voters (regardless of where they live) cast one vote for one of the two candidates running for each of the three positions. Under this system, the candidate who earns a majority of the votes cast in his or her head-to-head race will win the seat. Against this backdrop, the Court will proceed to the totality of the circumstances analysis under the non-exclusive Senate Factors.

At the outset, the Court rejects Defendants' protestations that the record is not sufficiently developed to resolve the issue of liability on summary judgment. *See*, *e.g.*, ECF No. 77 at 22 (asserting that would be "premature" for the Court to weigh the Senate Factors on summary judgment and that granting the motion would "prevent[] Defendants from presenting the full body of evidence in support of their case"). While it is true that the Court must make a "searching practical evaluation" of the political realities and perform an "intensely local appraisal" of

the challenged voting system, *Gingles*, 478 U.S. at 79, the fact-specific nature of those inquiries does not relieve Defendants of their obligation to come forward with "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted). Defendants cannot avoid summary judgment by vaguely asserting that they have additional unspecified evidence to present at trial. The Court expressly finds that the record is sufficiently developed and not materially disputed to warrant a ruling on summary judgment.

A. History of Voting-Related Discrimination

The first Senate Factor focuses on "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36-37. Plaintiffs have proffered two instances of past discrimination against Latinos which they believe are relevant to the totality of the circumstances analysis. First, they note that the Yakima County Auditor persisted in administering literacy tests to Latino voters for several years after the passage of the Voting Rights Act of 1965, despite having been directed by the Washington Attorney General to discontinue the practice. ECF No. 64 at 33-34. Second, Plaintiffs note that Yakima County was sued by the U.S. Department of Justice in 2004 for failing to provide Spanish-language voting materials and

voter assistance as required by Section 203 of the Voting Rights Act.  ECF No. 64 at 34-35.

The Court finds the first example only marginally relevant because it arose many years ago in the context of newly-enacted legislation limiting (and later prohibiting) the use of literacy tests by federal and state election authorities.  *See* ECF No. 66-2, Exhibit 16; *Oregon v. Mitchell*, 400 U.S. 112 (1970).  The second example is more probative.  As recently as ten years ago, Yakima County was sued by the federal government for failing to provide Spanish-language voting materials and voter assistance to Spanish-speaking voters.  These proceedings terminated in the entry of a consent decree.  ECF No. 66-2, Exhibit 18.  Although Yakima County did not admit liability, it did agree to take several steps to ensure its future compliance with Section 203, including the implementation of a "Bilingual Election Program" managed by a full-time "Program Coordinator."  ECF No. 66-2, Exhibit 18, at 12-14.  The Court finds that this factor weighs slightly in Plaintiffs' favor.

B. Extent of Racially Polarized Voting

The second Senate Factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized."  *Gingles*, 478 U.S. at 37.  The concept of "racially polarized voting" encompasses the second and third *Gingles* preconditions—whether the minority group votes cohesively and whether

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 53

the majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate. *Gingles*, 478 U.S. at 56; *Ruiz*, 160 F.3d at 543. This factor, along with the seventh factor (extent of minority electoral success) are "the most important Senate factors" when the challenged electoral process allows all voters within the jurisdiction to cast a vote for any candidate running for any open position. *Blaine Cnty.*, 363 F.3d at 903 (citing *Gingles*, 478 U.S. at 51 n.15); *see also McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1043 (5th Cir. 1984) ("Although no factor is indispensable, the legislative history of the amendment to section 2 indicates that racially polarized voting will ordinarily be the keystone of a dilution case.").

For the reasons discussed above in conjunction with the second and third *Gingles* preconditions, there can be no serious dispute that voting in Yakima is racially polarized. In nine out of the ten contests analyzed, the Latino candidate received more than 50% of the votes cast by Latino voters. In the dispositive (*i.e.*, non-primary) elections, support ranged from **63.2%** (Supreme Court Position 8) to **98.2%** (Proposition 1). The two Latino City Council candidates who made it out of their primary elections received a remarkable **92.7%** and **92.8%** of the votes cast by Latinos in the general election.

Despite having received such strong support from Latino voters, the Latino candidate was defeated in every single race as a result of bloc voting by the non-Latino majority. In the dispositive elections, support for the Latino candidate (or

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 54

Latino-preferred issue) among non-Latino voters ranged from **30.5%** (2009 City Council Position 7) to **42.6%** (2009 City Council Position 5).[7]  These low levels of "crossover" support are highly indicative of majority bloc voting in this particular context; they demonstrate that, when presented with a choice between a Latino candidate and a non-Latino candidate, approximately 60% to 70% of non-Latino voters will vote for the non-Latino candidate.  As the evidence reflects, this degree of majority bloc voting routinely results in the Latino candidate being defeated— even when he or she has the overwhelming support of Latino voters.  This factor weighs strongly in favor of a finding of vote dilution.

C. <u>Presence of Suspect Voting Practices or Procedures</u>

The third Senate Factor looks to "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."  *Gingles*, 478 U.S. at 37.  Plaintiffs contend that four features of the City's electoral system render the Latino minority's votes particularly susceptible to dilution: (1) the use

---

[7] Support of the Latino-preferred candidate in the City Council primaries was even lower, ranging from **13.4%** (2011 City Council Position 2) to **37.3%** (2009 City Council Position 5).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 55

of numbered posts; (2) an effective majority vote requirement; (3) the staggering of terms; and (4) the residency restrictions attached to four of the seven positions. ECF No. 64 at 35-38.

The Court agrees that two of these features—the numbered post system and the effective majority vote requirement—cause substantial dilution of the Latino minority's votes.[8]   As many courts have recognized, a numbered post system "enhances [the minority group's] lack of access because it prevents a cohesive political group from concentrating on a single candidate."  *Rogers v. Lodge*, 458 U.S. 613, 627 (1982).  The dilutive effect of a numbered post system is best illustrated by way of a comparison to a "pure" at-large system.  In a pure at-large system, all candidates compete against each other in a single contest for a set number of open seats.  Voters are allowed a number of votes corresponding to the number of open seats ($n$), but may only cast one vote for any given candidate.  At the end of the race, the candidates with the $n$ highest vote totals fill the open seats.

---

[8] The Court finds that staggering of terms does not further enhance minority vote dilution in a numbered post system with an effective majority vote requirement. Further, the Court concludes that the incremental dilutive effect of the residency restrictions attached to Positions 1, 2, 3 and 4 is minimal.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 56

Minority voters can increase their voting strength in a pure at-large system by voting cohesively for one specific candidate. If the majority distributes its votes sufficiently across the entire field of candidates, the minority's preferred candidate will have a good chance of finishing among the top vote-getters. In essence, the objective of this strategy is to help the minority candidate beat out enough of his or her competitors to finish "in the money." Minority voters can further maximize their voting strength in a pure at-large system by withholding their remaining votes (the so-called "single-shot" strategy). This reduces the total number of votes cast in the election, thereby increasing the relative weight of the votes amassed by the minority's chosen candidate.

In a numbered post system, by contrast, seats are elected separately. Candidates run in separate races and compete only against other candidates who are running for the same seat. Voters may cast only one vote in each seat-specific race. In order to win a seat, a candidate must win his or her race outright (either by a plurality or majority of votes, depending upon the jurisdiction).

This system blunts the effectiveness of voting cohesively for one candidate. First, it forces the minority's chosen candidate to compete against fewer candidates than if the election were purely at-large. This results in the majority's votes being distributed among fewer total candidates, which has the effect of making it more difficult for the minority candidate to separate himself or herself from the pack.

Second, this system neutralizes the single-shot voting strategy.  Because seats are elected separately, declining to cast a vote in the races for the other seats does not increase the relative strength of the vote cast for the minority candidate in his or her seat-specific race.  Finally, the minority candidate must win his or her race outright.  When the degree of majority bloc voting is high and the number of candidates competing is low, winning the race outright can prove very difficult.

The dilutive effect of the City's numbered post system is further intensified by the fact that only two candidates are allowed to compete for each seat in the general election.  As noted above, the number of candidates competing in a seat-specific race directly impacts the effectiveness of a cohesive voting strategy; the fewer the number of candidates, the more difficult it becomes for the minority's chosen candidate to win the race outright.  The odds are particularly long when the race is between only two candidates, since the minority candidate must effectively win a majority of the total votes.

Here, it is undisputed that Latinos account for approximately one-quarter of the City of Yakima's total citizen voting-age population.  Under a best-case scenario—which assumes that all eligible Latinos are registered to vote, that they all turn out to vote in the election, and that they all vote for the same candidate—a Latino-preferred candidate would need **at least one-third (33.3%)** of the non-

1    Latino majority's votes to win a City Council seat.[9]   The reality, of course, is that

2    not all eligible Latinos are registered to vote, that not all Latinos who are registered

3    actually turn out to vote, and that not all participating Latinos vote the same

4    candidate.  As previously discussed, in the two general elections which featured a

5    Latino candidate running against a non-Latino candidate, 92% of Latinos voted for

6    the Latino candidate.  Using this level of cohesion as a benchmark, the Latino-

7    preferred candidate would need **at least 36%** of the non-Latino majority's votes to

8    win.[10]   If one were to further accept Defendants' assertion that registered Latino

9    voters turn out for elections at a rate of less than 40%, *see* ECF No. 77 at 20, the

10   minimum percentage of non-Latino majority votes required to win an election seat

11

12

13   _____

      [9] Assume a total of 10,000 voters, 2,500 of whom are Latino and 7,500 of whom

14   are non-Latino.  The Latino candidate would receive all 2,500 Latino votes and

15   would need another 2,501 non-Latino votes to reach a simple majority of 5,001

16   votes.  This represents 33.3% of the non-Latino votes (2,501 ÷ 7,500 = 0.333).

17

18   [10] The Latino candidate would receive 2,300 Latino votes (2,500 × 0.92 = 2,300),

19   and would need another 2,701 non-Latino votes to reach a simple majority of 5,001

20   votes.  This represents 36% of the non-Latino votes (2,701 ÷ 7,500 = 0.360).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 59

jumps to **42%** (based upon a conservative estimate of 70% non-Latino voter turnout).[11]

In performing these calculations, the Court does not mean to suggest that City Council elections can be reduced to a mere numbers game. After all, statistics cannot possibly account for the many human variables that influence a political election—least of all the qualifications and experience of the individual candidates. Instead, the purpose of this exercise is simply to illustrate how Latino voters are inherently disadvantaged by the framework of the current system. The bottom line is that, under the current system, it is *mathematically impossible* for Latino voters to elect a candidate of their choosing to the City Council unless (1) *all* Latino voters vote for the same candidate; and (2) a *minimum* of one-third of the non-Latino majority also votes for that candidate. When considered in conjunction with the degree of racial bloc voting noted above, this is a prime example of an

---

[11] Accounting for turnout rates, there are 6,250 voters, 1,000 of whom are Latino (40% turnout) and 5,250 of whom are non-Latino (estimated 70% turnout). The Latino candidate would receive 920 Latino votes $(1,000 \times 0.92 = 920)$, and would need another 2,206 non-Latino votes to reach a simple majority of 3,126 votes. This represents 42% of the non-Latino votes $(2,206 \div 5,250 = 0.420)$.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 60

1   electoral system that is not "equally open to minority voters."  *Gingles*, 478 U.S. at

2   79.  This factor weighs very strongly in Plaintiffs' favor.

3       D. Exclusion of Minorities from Candidate Slating Process

4       The fourth Senate Factor asks "whether the members of the minority group

5   have been denied access" to a candidate slating process.  *Gingles*, 478 U.S. at 37.

6   This factor is not applicable because the City of Yakima does not utilize a

7   candidate slating process.

8       E. Lingering Effects of Past Discrimination

9       The fifth Senate Factor is "the extent to which members of the minority

10  group in the state or political subdivision bear the effects of discrimination in such

11  areas as education, employment and health, which hinder their ability to participate

12  effectively in the political process."  *Gingles*, 478 U.S. at 37.  Plaintiffs offer the

13  following statistics from the *2010-2012 ACS 3-Year Estimates* as evidence that

14  Latinos continue to bear the effects of discrimination in Yakima: (1) that Latinos

15  are three times more likely to live below the poverty line than white residents; (2)

16  that median family income for Latinos is less than half the median family income

17  for white families; (3) that the rate of home ownership among Latinos is less than

18  half than that among their white counterparts; (4) that 55% of Latinos lack a high

19  school diploma, in comparison to only 12% of the white population; (5) that 57%

20  of Latino adults do not have health insurance, in comparison to only 18% of their

1    white counterparts; (6) that Latinos account for only 15% of City of Yakima

2    employees, despite the fact that Latinos represent 33% of the City's working-age

3    population. ECF No. 64 at 39-40.

4          Defendants do not dispute these statistics. They do, however, disagree with

5    Plaintiffs about (1) the extent to which the socio-economic disparities between

6    Latinos and whites can be attributed to discrimination; and (2) the extent to which

7    these disparities adversely impact Latinos' ability to participate in the political

8    process. ECF No. 77 at 28-30. The Court agrees with Plaintiffs that these data are

9    probative of whether the electoral process is "equally open to participation" by

10    Latinos. 42 U.S.C. § 1973(b). While not conclusive proof, marked disparities in

11    socio-economic status are circumstantial evidence of discrimination. Moreover, it

12    can hardly be disputed that depressed socio-economic conditions have at least

13    *some* detrimental effect on participation in the political process. For purposes of

14    the § 2 totality of the circumstances inquiry, a correlation between the two is

15    sufficient. *See Benavidez*, 638 F. Supp. 2d at 727 ("Where disproportionate

16    educational, employment, income level, and living conditions can be shown[,] and

17    where the level of minority participation in politics is depressed, 'plaintiffs need

18    not prove any further causal nexus between their disparate socio-economic status

19    and the depressed level of political participation.'") (quoting *Teague v. Attala*

20

*Cnty*, 92 F.3d 283, 294 (5th Cir. 1996)).  This factor weighs slightly in Plaintiffs' favor.

F.  Use of Subtle or Overt Racial Appeals in Campaigns

The sixth Senate Factor examines "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37.  Having reviewed the record, the Court is not persuaded that political campaigns in Yakima have been characterized by racial "appeals" to the voting base.  While race was admittedly discussed in the media in connection with the 2009 City Council race between Ms. Rodriguez and Mr. Ettl, there is insufficient evidence that either candidate attempted to sway voters with race-based appeals.  This factor is neutral.

G.  Extent of Minority Electoral Success

The seventh Senate Factor looks to "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.  Here, it is undisputed that no Latino candidate has ever been elected to the City Council in the 37 years that the current voting system has been in place.  Furthermore, the only Latina to have ever been appointed to the City Council, Ms. Rodriguez, was defeated by a non-Latino challenger when she subsequently ran for election.  These circumstances weigh "heavily in favor of vote dilution." *Fayette Cnty.*, 950 F. Supp. 2d at 1320 (collecting cases).

Defendants contend that the significance of this factor is diminished by the "electoral success of Latinos in neighboring or encompassing local jurisdictions," as evidenced by (1) the election of Jesse Palacios to the Board of Yakima County Commissioners in 1998 and 2002; and (2) the election of Vickie Ybarra to the Board of Directors of the Yakima School District in 2003.  ECF No. 77 at 24.  The Court does not find these "exogenous" election results particularly relevant.  As Plaintiffs correctly note, this Senate Factor focuses on the extent to which minority candidates have been elected to public office "in the jurisdiction." *Gingles*, 478 U.S. at 37.  The jurisdiction at issue here is the City of Yakima.  Elections that presumably draw voters from all of Yakima County or the entire Yakima School District (the borders of which Defendants have not identified) do not provide much insight into the ability of Latino voters to elect candidates of their choosing to the City Council.  *See Sanchez v. State of Colo.*, 97 F.3d 1303, 1324-25 (10th Cir. 1996) (explaining that with regard to the seventh Senate Factor, "exogenous elections—those not involving the particular office at issue—are less probative than elections involving the specific office that is the subject of the litigation") (quotation and citation omitted).

Moreover, even if one were to assume a substantial overlap in voting bases, there is no evidence that these other elections follow the same format as City Council elections.  As noted above, *Gingles* directs courts to closely scrutinize the

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 64

"design and impact of the *contested* electoral mechanisms."  478 U.S. at 79 (emphasis added).  The results of elections which do not follow the same format are not particularly relevant to establishing vote dilution within the challenged electoral mechanism.

On balance, the above factors weigh firmly in Plaintiffs' favor.  The existing record, undisputed in all material respects, supports only one rational conclusion: that under the totality of the circumstances, City Council elections are not "equally open to participation" by Latino voters.  42 U.S.C. § 1973(b).  The numbered post system, with its effective majority vote requirement, places Latino voters at a steep mathematical disadvantage, even when their voting strength is perfectly optimized. This built-in disadvantage "interacts with social and historical conditions to cause an inequality."  *Gingles*, 478 U.S. at 47.  Because non-Latino voters consistently vote for non-Latino candidates (at a rate of 60% to 70%), the chances of a Latino-preferred candidate earning enough "crossover" votes to win a City Council seat are very slim.  Indeed, no Latino candidate has ever been elected under this system. Having established that the Latino minority's votes are being unlawfully diluted, Plaintiffs are entitled to summary judgment.

## V.   Remedy

In their Complaint, Plaintiffs pray for an injunction "[e]njoining Defendants . . . from administering, implementing, or conducting any future elections for the

City of Yakima under the current method of electing City Council members," as well as an order directing "the implementation of an election system for the Yakima City Council that complies with Section 2 of the Voting Rights Act." ECF No. 1 at 9-10, ¶¶ 2-3. Having successfully established liability, Plaintiffs are entitled to these remedies. The Court respectfully directs the parties to meet and confer and submit the following on or before **October 3, 2014**:

(1) A joint proposed injunction; and

(2) A joint proposed remedial districting plan.

In the event that the parties are unable to agree on the terms of either item above, they may submit separate proposals. If necessary, the Court will contact the parties to schedule a hearing to resolve any remaining disputed issues.

**IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion to Exclude Expert Testimony of Stephan Thernstrom (ECF No. 62) is **DENIED**.

2. The parties' stipulated motion to expedite (ECF No. 88) is **GRANTED**. Plaintiffs' Motion to Strike Second Supplemental Expert Report of Peter Morrison (ECF No. 89) is **DENIED**.

3. Plaintiffs' Motion for Summary Judgment (ECF No. 64) is **GRANTED**.

4. Defendants' Motion for Summary Judgment (ECF No. 67) is **DENIED**.

5.  The telephonic pretrial conference scheduled for September 11, 2014 at 9:00 a.m., as well as the bench trial scheduled to begin on September 22, 2014, are hereby **VACATED**.  The deadlines for filing pretrial pleadings and the pretrial order are also **VACATED**.

6.  The parties shall meet and confer and submit a joint proposed injunction and a joint proposed remedial districting plan on or before **October 3, 2014**.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** August 22, 2014.



THOMAS O. RICE
United States District Judge